**CASE NO. 12-5951**

In The
# United States Court of Appeals
## For The Sixth Circuit

◆

**SHEM MALMQUIST; MEREDITH MALMQUIST**
*Plaintiffs - Appellants*,

vs

**METROPOLITAN GOVERNMENT OF NASHVILLE-DAVIDSON COUNTY,
TENNESSEE; GERMANTOWN, TENNESSEE**
*Defendants - Appellees*.

◆

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
CASE NO. 3:10-01014**

◆

# APPELLANTS' BRIEF

◆

**Jerry Gonzalez
Jerry Gonzalez PLC
2441-Q Old Fort Parkway, No. 381
Murfreesboro TN 37128
615-360-6060**
*Attorney for Plaintiffs - Appellants*

◆

# ORAL ARGUMENT WAIVED

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Sixth Circuit
Case Number: _12-5951_          Case Name: Malmquist v Metro Nashville et al.

Pursuant to 6th Cir. R. 26.1, ___Shem and Meredeth Malmquist___
<i>Name of Party</i>

make the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

| |
|---|
| NO. |

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

| |
|---|
| NO. |

## CERTIFICATE OF SERVICE

I certify that on March 5, 2013 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ Jerry Gonzalez_____<br><i>Signature of Counsel</i>

6CA-1
8/08

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. ................................................................ iv

STATEMENT OF JURISDICTION. ..................................................... 1

STATEMENT OF THE ISSUES. .......................................................... 2

STATEMENT OF THE CASE .............................................................. 4

STATEMENT OF FACTS. .................................................................... 6

SUMMARY OF ARGUMENT. ........................................................... 12

ARGUMENT. ...................................................................................... 15

    I.    STANDARD OF REVIEW. .............................................. 15

    II.    BACKGROUND. ............................................................. 15

    III.    HISTORY OF CHALLENGING THE ARBITRARY NATURE OF SETTING BAIL IN TENNESSEE. .................................................. 21

    IV.    BAIL UNDER THE U.S. AND TENNESSEE CONSTITUTIONS.. 37

        A.    Summary of History of Bail. ......................................... 37
        B.    Bail under the Eighth Amendment. ............................... 38
        C.    Bail under the Substantive and Procedural Due Process Prongs of the 14th Amendment.. .................................... 39
        D.    The Right to Bail Provided by Tennessee Law. ............ 44
        E.    Process of Determining Release on Recognizance and Setting Bail.. .................................................................. 47

    V.    DEFENDANT GERMANTOWN, BY DENYING BAIL BECAUSE THE WARRANT WAS FROM ANOTHER COUNTY, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.................. 49

VI.    DEFENDANT METRO NASHVILLE, BY ARBITRARILY
       INCREASING BAIL IF PLAINTIFFS USED A COMMERCIAL
       BAIL BONDSMAN AND BY SETTING BAIL ON AN
       ARBITRARILY CALCULATED PRESET FORMULA, VIOLATED
       THE EIGHTH AND FOURTEENTH AMENDMENTS.................. 54

CONCLUSION.................................................... 55

CERTIFICATE OF COMPLIANCE.................................... 57

CERTIFICATE OF SERVICE. ..................................... 58

ADDENDUM. ................................................... 59

# TABLE OF AUTHORITIES

<u>Cases</u>

*Atkins v Michigan*, 644 F.2d 543 (6th Cir. 1981). ............................................. 41, 54

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)................................... 45

*Carter by Carter v. Cornwell*, 983 F.2d 52 (6th Cir. 1993)................................... 15

*Doe v. Sullivan County*, 956 F.2d 545 (6th Cir. 1992). ......................................... 42

*Fields v Henry County, Tennessee*, 701 F.3d 180 (6th Cir. 2012). .......... 5, 33, 36, 51

*Gibson v. McMurray*, 159 F.3d 230 (6th Cir.1998)................................................ 51

*Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 99 S.Ct.

  2100, 60 L.Ed.2d 668 (1979)......................................................................... 50

*Jackson v. Richards Medical Co.*, 961 F.2d 575 (6th Cir. 1992)....................... 6, 15

*Mastrian v. Hedman*, 326 F.2d 708 (8th Cir. 1964). ............................................. 39

*Meachum v. Fano*, 427 U.S. 215 (1976)................................................................ 42

*Morgan v. Church's Fried Chicken*, 829 F.2d 10 (6th Cir. 1987). ........................ 15

*Persian Galleries v. Transcontinental Ins.*, 38 F.3d 253 (6th Cir. 1994). .............. 15

*Puertas v. Michigan Dep't of Corrections*, 88 F. Supp. 2d 775 (D. Mich. 2000) .. 41

*Stack v Boyle*, 342 U.S. 1 (1951). ................................................................... 35, 38

*State v Berrios*, 235 S.W.3d 99 (Tenn. 2007)........................................................ 41

*State v Wallace*, 193 Tenn. 182, 245 S.W.2d 192 (1952)....................................... 46

*U.S. v Hare*, 873 F.2d 796 (5th Cir. 1989).............................................................. 39

*U.S. v Scott*, 450 F.3d 863 (9th Cir. 2006)......................................................... 39, 40

*U.S. v. Salerno*, 481 U.S. 739 (1987)...................................................................... 54

*U.S. ex rel. Rubinstein v Mulcahy*, 155 F.2d 1002 (2nd Cir. 1946). ........................ 18

*U.S. v. Miller*, 604 F. Supp. 2d 1162 (W.D. TN 2009).............................................. 35

*U.S. v Briggs*, 476 F.2d 947 (5th Cir. 1973). ............................................................ 41

*Vitek v. Jones*, 445 U.S. 480 (1980)......................................................................... 42

*Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384 (2005).................................... 42

*Wolff v. McDonnell*, 418 U.S. 539 (1974). ....................................................... 42, 50

*Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595 (6th Cir.2006)........................ 51

<u>Statutes</u>

28 U.S.C. §1291.......................................................................................................... 1

T.C.A. 40-1-111........................................................................................................ 45

T.C.A. 40-11-102....................................................................................................... 44

T.C.A. 40-11-105....................................................................................................... 44

T.C.A. 40-11-106....................................................................................................... 46

T.C.A. 40-11-114....................................................................................................... 45

T.C.A. 40-11-115....................................................................................................... 47

T.C.A. 40-11-116. ................................................................. 47

T.C.A. 40-11-117. ................................................................. 47

T.C.A. 40-11-118. ................................................................. 48

T.C.A. 40-11-122. ................................................................. 45

T.C.A. 40-11-147. .......................................................... 46, 50, 51

T.C.A. 40-5-103. .................................................................. 44

T.C.A. 40-5-105. .................................................................. 45

Other Authority

1 Stephen, "A History of the Criminal Law of England" 234 (1883).............. 17, 38

Antibau & Rich, Modern Constitutional Law, 2d Ed. (West) 1997. ..................... 39

Beeley, Arthur. "The Bail System in Chicago". University of Chicago Press, 1927

................................................................................. 16

Foote, Caleb. "Compelling Appearance in Court: Administration of Bail in

    Philadelphia," University of Pennsylvania Law Review, June 1954...... 17, 18

Goldkamp, John, "Criminology: Questioning the Practice of Pretrial Detention:

    Some Empirical Evidence from Philadelphia", Journal of Criminal Law and

    Criminology, Winter 1983, p. 74................................................ 19

Goldkamp, John, "Philadelphia Revisited: An Examination of Bail and Detention Two Decades after Foote", Crime and Delinquency 1980, 26, p. 179. .. 16, 19

Harris, Donald. "The Vested Interests of the Judge: Commentary on Flemming's Theory of Bail". ............................................................................................ 16

Lowenkamp and Whetzel, "The Development of an Actuarial Risk Assessment Instrument for U.S. Pretrial Services." Federal Probation, 34:1. 2009.. ...... 16

Morse, Wayne and Ronald Beattie, "Survey of the Administration of Criminal Justice in Oregon," Oregon Law Review, 1932 (rep. ed., New York Arno Press, 1974). ............................................................................................. 16

Note, "Bail: An Ancient Practice Reexamined", 70 Yale L.J. 966 (1961). ............ 16

Pound, Roscoe and Felix Frankfurter. "Criminal Justice in Cleveland", 1922, rep. ed., Montclair, N.J.: Patterson Smith, 1968. .................................................. 16

Raybin, David Louis, 9 Raybin, Criminal Practice and Procedure, §4:6, p. 123 (West 8th Edition, 1985). ............................................................................. 21

Tennessee Attorney General Opinion 05-018. ........................................................ 46

Tennessee Constitution, Article I, §15. .................................................................. 44

Wiseman, "Discrimination, Coercion, and the Bail Reform Act of 1984: The Loss of the Core Constitutional Protections of the Excessive Bail Clause", 36 Fordham U. L. J. 121 (2009). ....................................................................... 37

Wisotsky, Steven. "Use of a Master Bond Schedule: Equal Justice Under Law?".

24 U. Miami L. Rev. 808, 810, fn 18 (1970)................................... 16, 20, 21

**STATEMENT OF JURISDICTION**

This was a civil action filed in the United States District Court for the

Middle District of Tennessee and the district court's jurisdiction was originally

based upon a federal question through the Plaintiffs' 42 U.S.C. §1983 claims.  This

Court's jurisdiction is based upon 28 U.S.C. §1291 because this is an appeal from a

final order dismissing all claims.

## STATEMENT OF THE ISSUES

1.    Whether the Excessive Bail Clause of the Eighth Amendment to the U.S. Constitution applies to prohibit government conduct where bail is denied outright awaiting transport to another jurisdiction when that denial is not "reasonably calculated" to assure "that defendant's" appearance in court.

2.    Whether the Excessive Bail Clause of the Eighth Amendment to the U.S. Constitution applies to prohibit government conduct where bail is set based on a preset bail schedule that is not "reasonably calculated" to assure "that defendant's" appearance in court.

3.    Whether the Excessive Bail Clause of the Eighth Amendment to the U.S. Constitution applies to prohibit government conduct where bail is increased for the sole purpose of enticing a commercial bail bonding company to post a bond for the bail and is not otherwise "reasonably calculated" to assure "that defendant's" appearance in court.

4.    Whether the procedural Due Process Clause of the 14th Amendment to the U.S. Constitution protects a state-law created right to be admitted to bail in the county of arrest when the warrant is issued by another county the same as those arrested on an in-county warrant.

5.     Whether the procedural Due Process Clause of the 14th Amendment to the U.S. Constitution protects a state-law created right to have bail determined on an individualized basis rather than on a preset bail schedule.

6.     Whether the substantive Due Process Clause of the 14th Amendment to the U.S. Constitution protects a right against an arbitrary setting of bail based on a preset bail schedule.

## STATEMENT OF THE CASE

The two count complaint (one against each defendant) was filed on October 27, 2010 as a class action citing violations of the Eighth and Fourteenth Amendments to the U.S. Constitution under 42 U.S.C. 1983 as it related to the practice of setting bail (or denying bail) by the party defendants. (R. 1: Complaint, PID 1-14).   On April 8, 2011, the parties consented to have the case heard by the Magistrate Judge. (Consent Form, R. 25, PID 82, Order granting consent, R. 26, PID 84).

Prior to any discovery and on the same date the parties filed a proposed initial case management order, Defendant Metro Nashville filed an answer to the complaint (Metro Nashville Answer, R. 22, PID 51-58) and a motion to dismiss under F.R.C.P. 12(b)(6) (Metro Nashville Motion to Dismiss, R. 24, PID 61). On November 29, 2011, the Magistrate Judge granted the motion and dismissed the claims against Metro Nashville. (Court Order, R. 40, PID 186; Court Memorandum, R. 39, PID 167-185).

On November 1, 2011, Defendant Germantown likewise filed a motion to dismiss and referenced Metro-Nashville's memorandum for support. (Germantown Motion to Dismiss, R. 38, PID 164). On July 18, 2012, the court also dismissed the

claim against Germantown. (Court order, R. 46, PID 220-221; Court

Memorandum, R. 45, PID 202-219; Final Judgment, R. 47, PID 222).

Plaintiffs timely filed a Notice of Appeal on August, 13, 2012. (Notice of

Appeal, R. 48, PID 223). On appeal, the case was held in abeyance pending the

outcome of a similar case, *Fields v Henry County, Tennessee*, Case No. 11-6352.

That case was decided in the defendant's favor on December 10, 2012. See *Fields*

*v Henry County, Tennessee*, 701 F.3d 180 (6th Cir. 2012) (time for filing Petition

for Writ of Certiorari not yet expired).

Because Plaintiffs herein do not feel that the decision in *Fields* was fully

dispositive of the facts and issues in their case and to preserve their rights to further

appeal when and if *Fields* is petitioned for review to the U.S. Supreme Court,

Plaintiffs requested and received a revised briefing schedule.

5

## STATEMENT OF FACTS

Because this case was dismissed under F.R.C.P. 12(b)(6) with no discovery, the facts are presented in a light most favorable to the plaintiffs as set out in the complaint. (Complaint, R. 1, ¶6-28, PID 2-5). [1]

On or about October 13, 2009, the ex-wife of Plaintiff Shem Malmquist, Danielle Nicolosi, a Davidson County resident, swore out a warrant against the plaintiffs in Nashville/Davidson County. The charge was based on the allegation that Ms. Nicolosi had received an anonymous letter in the mail in October 2008 that contained song lyrics similar to the "ole' McDonald had a farm..." song and contained her name in the lyrics and made reference to her Asian descent. The song purportedly threatened to have her killed if she did not leave Memphis never to return. Ms. Nicolosi swore that Plaintiffs had previously admitted in open court to having posted "the blog".

Based on these bare allegations, warrants were issued on October 13, 2009 at 20:56:26 for the arrest of Plaintiff Shem Malmquist by Nashville/Davidson County Judicial Commissioner Carolyn Piphus. The charge was domestic assault in violation of T.C.A. 39-13-111, a Class A misdemeanor.  One minute later, at 20:57:58, an arrest warrant was issued against Plaintiff Meredith Malmquist by

---

[1]     *Jackson v. Richards Medical Co.*, 961 F.2d 575, 577 (6th Cir. 1992).

Nashville/Davidson County Judicial Commissioner Steve Holzapfel. The charge was assault in violation of T.C.A. 39-13-101,  a Class A misdemeanor.

On October 28, 2009, based on the warrants issued out of Davidson County, Plaintiffs were arrested in their home by Germantown Police officers. They were held in the Germantown Police Department without bail awaiting transport to Davidson County. Normally, Germantown Police, upon arresting someone, contact one of the two part-time municipal judges for the setting of bail. The arresting police officer calls the judge and informs him or her of the charged offense and the judge will set the bail based on a list. The judge does not consider any of the statutory factors that are legislatively determined to be fair predictors of the likelihood to flee, does not actually question or examine the arrestee about any predicative factors, nor does the police officer. Rather, bail is set strictly based on a preset list or some arbitrary formula set by the municipal judge and a mittimus is signed and issued to incarcerate the person.

On warrants issued by other counties, the arresting police officer does not even call the municipal judge for the setting of bail as a matter of police department practice. It has been done this way by the Germantown Police Department for over 28 years, despite state law requiring that out of county arrestees have a right to be admitted to bail the same as in county arrestees.

7

Similarly, warrants on some charges, such as failure to appear, have the bail or bond preset and in those situations the arresting officer likewise will not contact a judge for the setting of bail or otherwise present the arrestee for examination by a magistrate prior to admitting the person to the jail. The Germantown Police Department has its own holding facility but is not set up to hold individuals for more than three days. If another county is contacted on a person arrested pursuant to the other county's arrest warrant and the other county indicates that it cannot pick the person up for more than three days, the person will be transported to the Shelby County jail in Memphis to be held until the other county can arrange transport.

Sometimes, the bail on an out of county warrant is preset by the other county but even in those circumstances, the Germantown municipal court clerk's office will not accept the bail. The clerk's office, headed by a court clerk appointed by the Germantown Mayor, has a policy or practice of not accepting bail payments set by other counties. Thus, pursuant to these Germantown policies, Plaintiffs were effectively denied bail and held until Davidson County sheriffs deputies were able to pick them up for transport back to Davidson County.

Sometime in the early morning hours of October 29, 2009, Davidson County deputies arrived to pick up the plaintiffs for transport back to Davidson County.

Once they arrived in Davidson County, Plaintiffs were separately presented to a

Nashville/Davidson County Judicial Commissioner for the setting of bail by video.

First, Plaintiff Shem Malmquist was presented and offered a choice of bail based

on how he planned to post it. If he wanted to use a bailbondsman, bail would be

$1000. If he wanted to pay the bail in cash, it would be $500. This is a very normal

and usual option given to arrestees. This option and the dollar amount set is

customarily decided upon by the judicial commissioner without ever questioning

or examining the arrestee about his or her likelihood to flee.

Plaintiff Shem Malmquist chose to post his bail in cash, intending to use his

credit card. At no time was Plaintiff Shem Malmquist questioned by the judicial

commissioner about his likelihood to flee or be a danger if released nor any of the

statutorily predictive factors of likelihood to flee. Instead, bail was set completely

arbitrarily based on some mysterious rule of thumb by the judicial commissioner.

Meredith Malmquist was next presented to a judicial commissioner also by video.

Similarly, she was never questioned or examined as to any factors related to

likelihood to flee. Instead, the judicial commissioner asked her if she wanted to do

the same as her husband. In other words, either post $500 in cash or use a

bailbondsman in which case bail would be $1000. Plaintiff Meredith Malmquist

chose to post hers in cash after the judicial commissioner told her that is what Shem Malmquist chose to do.

Plaintiffs were never told the process of how to post their bail. Despite repeated requests, they were not given the opportunity to make a phone call until four hours after their bail had been set by the judicial commissioner and even then they were not allowed to place a long distance phone call.

Judicial Commissioners of Nashville/Davidson County do not reduce the reasons for the bail they decide upon to written form. There is no record whatsoever, written or otherwise, of the reasons behind any bail decision made by a judicial commissioner of Nashville/Davidson County.

Plaintiffs used their one phone call to call their credit card company so that they could post their bail, knowing that the credit card company would reject a second charge in the same amount to the same recipient. Plaintiff Shem Malmquist posted the $500 bail for Meredith Malmquist through the credit card and then had to use a bailbondsman for himself due to the credit card restriction. Plaintiffs then had to find their own way back home to Germantown. Ultimately, their charges were dismissed as the allegations made by Shem Malmquist's ex-wife had been completely fabricated and untrue.

A review of bail set for those arrested and charged for domestic assault-fear of bodily injury for the period October 2009 through April 2010 in Nashville/Davidson County shows that out of 324 arrests, approximately 50% of all bail was set at $1500 or less, only 24, or 7%, were released ROR. Over the same period, assault-non domestic-fear of bodily injury, shows that 37% were released on bail of $1500 or less with only 13, or 9% released ROR. Out of over 3200 arrests for driving under the influence first offense over that same time period, the average bail was approximately $1500 with approximately 60% at exactly $1500 or less. For second offense DUI, the average was approximately $2500 with 66% at or below $2500. For third offense DUI, the average was approximately $4000, with approximately 60% at or below $4000. For fourth offense DUI, the average was approximately $8000 with 66% at or below $8000.

These statistics show that the bail set is predominately based on a monetary value, that the bail set is predominately based on a rule of thumb or other arbitrary formula based only on the charged offense, and that as an arrestee is presented with a history of similar offenses, the bail is incrementally increased as a form of punishment, again, without any regard to that particular individual's likelihood to flee or not appear for court.

## SUMMARY OF ARGUMENT

The Eighth Amendment, as interpreted by the U.S. Supreme Court, holds that bail is excessive unless it is the least amount necessary based on an *individual's* likelihood to not appear for court. Later interpretations have allowed the consideration in determining bail of whether an arrestee would be a danger to society or to victims if released pretrial. The idea that *every* individual, in broad, general terms, is a) a flight risk and b) can only be deterred from fleeing through the yoke of a monetary bail, without regard to a particular individual's characteristics predictive of that risk of flight, is anathema to the very concept of individualized examination and assessment. Without a particularized examination of an arrestee with regard to factors predictive of flight risk and danger, any bail set based on broad, generalized preset rules or schedules cannot, by any measure of logic, be the least amount necessary to deter *that* individual's flight. A particularized assessment of an *individual's* likelihood to flee or be a danger if released is a mutually exclusive situation to that of a preset bail schedule based on the charged offense alone applied across the board to everyone and anyone charged with that same offense. The two situations cannot logically exist in the same time and space. Since a system of setting bail that is preset without regard to individual characteristics cannot, at the same time, be based on an individualized assessment

of *that* particular individual's likelihood to flee, such a system of bail is excessive *per se* and therefore a violation of the Eight Amendment. Since it would be a violation of a right secured by the Constitution of the United States (the 8th Amendment), it is actionable under 42 U.S.C. §1983 in a federal court.

Under the 14th Amendment's due process clause, a right, once conferred by operation of state law, cannot be arbitrarily denied. The Tennessee Constitution and state law confers on every individual the *right* to be 1) examined by a judicial commissioner before being committed to the jail, 2) the *right* to be examined as to particular statutory factors predictive of the likelihood to flee, 3) and the *right* to be admitted to bail in the county of arrest on a warrant issued in another county the same as a person arrested in that county on a warrant issued in that county. These rights, and others, conferred by operation of state law, cannot be denied arbitrarily without violating the substantive due process clause which prohibits arbitrary action by the government.

Finally, the 14th Amendment due process clause - the procedural due process prong - provides the right to every individual to notice and an opportunity to be heard. When a county sets bail without notice to the arrestee as to the process or the conditions and fails to provide the arrestee an opportunity to be heard on the issue of bail, it violates the 14th Amendment's procedural due process. Likewise,

with regard to liberty interests created by operation of state law, the 14th

Amendment protects those liberty interests from denial by the government.

# ARGUMENT

## I.    STANDARD OF REVIEW

Whether the district court properly dismissed the action pursuant to Fed. R. Civ. P. 12(b)(6) is a question of law which an appeals court reviews *de novo*. *Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253, 258 (6th Cir. 1994). A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of the plaintiff's complaint. The court must accept as true all factual allegations in the complaint, and any ambiguities must be resolved in plaintiff's favor. *Jackson v. Richards Medical Co.*, 961 F.2d 575, 577 (6th Cir. 1992). A court, however, need not accept as true legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). A district court may properly grant a motion to dismiss when no set of facts exists which would allow the plaintiff to recover. *Carter by Carter v. Cornwell*, 983 F.2d 52, 54 (6th Cir. 1993).

## II.    BACKGROUND

The "bail system had its origin in England when the Statute of Westminster (1275) first defined bailable offenses. The practice of pledging security for one's liberty developed later and was administered on an individualized basis. The schedule of bail bonds is an American engraftment which facilitates the

administration of a mass criminal justice system. See generally Note, "Bail: An

Ancient Practice Reexamined", 70 Yale L.J. 966 (1961). Wisotsky, Steven. "Use of

a Master Bond Schedule: Equal Justice Under Law?". 24 U. Miami L. Rev. 808,

810, fn 18 (1970) (Addendum A063).

This American system of using a schedule of bail bonds has been criticized

as far back as 1922 with a critical review of the practice of setting bail in the city of

Cleveland. (Pound, Roscoe and Felix Frankfurter. "Criminal Justice in Cleveland",

1922, rep. ed., Montclair, N.J.: Patterson Smith, 1968). See also, Beeley, Arthur.

"The Bail System in Chicago". University of Chicago Press, 1927; Morse, Wayne

and Ronald Beattie, "Survey of the Administration of Criminal Justice in Oregon,"

Oregon Law Review, 1932 (rep. ed., New York Arno Press, 1974); and Harris,

Donald. "The Vested Interests of the Judge: Commentary on Flemming's Theory of

Bail". American Bar Foundation Research Journal, Spring, 1983, pp. 490-506

(Addendum A087). [2] But it was Professor Caleb Foote who was "the first to

undertake a comprehensive examination of bail practices, pretrial detention, and

their implications for criminally charged defendants" (Goldkamp, John,

---

[2]      It was these studies, along with that of Professor Foote, that inspired the
"enactment of the Pretrial Services Act of 1982 (18 U.S.C. §3152)" and
"represented the high-water mark of a major reform movement in the United
States." 2009, Lowenkamp and Whetzel, "The Development of an Actuarial Risk
Assessment Instrument for U.S. Pretrial Services." Federal Probation, 34:1
(Addendum A104)

"Philadelphia Revisited: An Examination of Bail and Detention Two Decades after Foote", Crime and Delinquency 1980, 26, p. 179, Addendum A108). Professor Foote conducted a comprehensive study of the system of bail in Philadelphia and found that the large number of bail determinations necessitated the development of a system of setting bail that was applied easily and rapidly (Foote, Caleb. "Compelling Appearance in Court: Administration of Bail in Philadelphia," University of Pennsylvania Law Review, June 1954, Addendum A122). Courts at the time had allowed consideration of such factors as the nature and circumstances of the offense charged, the weight of the evidence against the arrestee, the financial ability of the accused to post bail, his general character, the character of the surety posting bail on behalf of the accused, whether the defendant had been a fugitive from justice before or was a fugitive at the time of arrest. (Foote 1954, p. 1034, Addendum A125. [3] But Foote noted that all these factors, except for the nature of the offense charged, "vary so greatly in each case that they cannot be reduced to a rule of general applicability" (Foote 1954, pp. 1034-35, Addendum A125-126). Because "the administrative problems created by the large volume of cases in which bail must be set necessitates the creation of a standard which can be easily

---

[3]      These standards have come down from the time of Bracton, see 1 Stephen, "A History of the Criminal Law of England" 234 (1883), and were codified in the Habeas Corpus Act of 1679, 31 Car. II, c. 2.

and rapidly applied", the result was a system that used the "nature of the offense" as the "basic standard which guide[d] the decision as to the amount to be set" (Foote 1954, pp. 1034-35, Addendum A125-126). "[T]his determination on the basis of the nature of the offense 'seems to apply an abstract generality as the norm of decision, without consideration of the particular facts and circumstances disclosed' in the individual case". *United States ex rel. Rubinstein v Mulcahy*, 155 F.2d 1002, 1005 (2nd Cir. 1946); cited by Foote 1954, p. 1035, Addendum A125). Foote found, further, that at the "appellate level, cases dealing with excessive bail have involved amounts 'greater than usually fixed' for similar offenses." (Foote 1954, p. 1035, Addendum A126) The prevalence of relying principally on the charged offense for determining an amount to set as bail and using a "usual" amount fixed for that offense, begged the question of where this amount came from.

The rationale of this reliance on the nature of the offense charged as the standard to guide bail determination is that as the severity of the crime and possible punishment increases, the defendant, having more to fear, becomes more likely to jump bail. Even if this was well founded, there was no indication of how the range of bail "usually fixed" for a given offense had been established, and within Philadelphia there was a striking difference between the bail usually set in state

courts and that usually set in federal courts for comparable offenses. (Foote 1954, p. 1035, A126) Indeed, the "usual amount set" for a particular offense has to start somewhere and absent any empirical study of what amount is no more than necessary to address and deter a risk of nonappearance as to a particular individual, this "usual amount" likely comes from thin air as rote repetition.

Foote's study was followed up by Goldkamp in 1980. (Goldkamp, John, "Philadelphia Revisited: An Examination of Bail and Detention Two Decades after Foote", Crime and Delinquency. 1980, Addendum A108) The study was "based on interviews with Philadelphia bail judges, observations of first appearances, and empirical analysis of bail decisions for an estimated 8300 Philadelphia defendants" (Goldkamp 1980, p. 188, fn. 27, Addendum A117). Despite substantial reform and improvements to the bail system after Foote's 1954 critique, Goldkamp revealed that "the nature of the criminal charge still played the dominant role in bail determinations." (Goldkamp 1980, p. 188, Addendum A117).

Goldkamp, in 1983, again sought to examine predictive factors related to a person's likelihood to flee. (Goldkamp, John, "Criminology: Questioning the Practice of Pretrial Detention: Some Empirical Evidence from Philadelphia", Journal of Criminal Law and Criminology, Winter 1983, p. 74, Addendum A171). This study also concluded that the charged offense was the predominate factor and

that "current predictive skills are poor" on the part of judges who considered the issue of bail.

The predilection to rely on the charged offense as the predominate, if not the sole, factor to consider in setting bail has led to what can be called "bond schedules" where magistrates simply look at a list of charges with preset bond amounts. (Wisotsky, Steven. "Use of a Master Bond Schedule: Equal Justice Under Law?". 24 U. Miami L. Rev. 808 (1970), Addendum A063) Wisotsky studied the prevailing custom in Dade County, Florida and found a "shocking facet of this 'procedure' is that it constitutes a flagrant violation of the law." (Wisotsky 1970, p. 813, Addendum A068) Under Florida law, a magistrate was under a "statutory duty" to "conduct a preliminary examination unless the defendant exercise[d] his right to waive it." (*Id.*, citing Fla. Stat. §902.01; Fla. R. Crim. P. 1.22(a)) In Dade County at the time, bail was set by a booking officer by reference to a master bond list that established bond amounts for the most common offenses. (Wisotsky 1970, p. 813, Addendum A068) All this due to an "informal directive" issued by the judges of Dade County. (Wisotsky 1970, p. 812, Addendum A067) The Dade County system in 1970 was not an "atypical ...[or] deviant practice. On the contrary, 'in many localities ... [there is] a fixed schedule geared to the nature of the offense. As a rule, little or no inquiry or allowance is made for individual

20

differences between defendants based on the likelihood to appear at trial."
(Wisotsky 1970, p. 816, Addendum A071, quoting Freed & Wald, "Bail in the
United States: 1964", pp. 18-21 (1964))

Tennessee jurisdictions seem to follow the same prevailing custom of setting
bail based on a preset formula or rule of thumb. As expressed by David Raybin, the
Tennessee scholar on criminal law, "[t]he nature of the crime appears to be the
major consideration in present bond hearings." (Raybin, David Louis, 9 Raybin,
Criminal Practice and Procedure, §4:6, p. 123 (West 8th Edition, 1985)) The
evidence obtained from several Tennessee counties, including Defendant Metro
Nashville, bears this out.

## III.    HISTORY OF CHALLENGING THE ARBITRARY NATURE OF SETTING BAIL IN TENNESSEE

The instant case is one of several cases brought across the state challenging
the arbitrary practice of how bail is set across the State of Tennessee. A summary
of the other cases follows:

### A.    *Staley v Wilson County, Tennessee*, U.S. District Court for the Middle District of Tennessee, Case No. 3:04-1127 (J. Trauger)

The first of the cases was brought by Stephanie Staley, a young female who
had been arrested for public intoxication while riding as a passenger in a car, on
December 20, 2004 and, pursuant to 42 U.S.C. §1983, alleging a violation of her

21

Eighth Amendment right against excessive bail. [4] While at the Wilson County jail, the plaintiff's bond was originally set at $500 by the judicial commissioner on duty at the time, Charles Churchwell. (Staley R. 29-5: Deposition of Charles Churchwell, p. 65) She was not asked any questions related to her likelihood of future appearance as required by T.C.A. 40-11-115. (Staley R. 39: Court Memorandum Granting Class Certification, p. 4) But based on the "way she was acting towards authority figures", Mr. Churchwell raised the bond to $2500. (Staley R. 29-5: Churchwell Dep., p. 67). Mr. Churchwell testified that he usually set the bond before he ever questioned an arrestee and the bond amount was based on a "gut feeling". (Staley R. 29-5: Churchwell Dep., p. 41) If a police officer asked him to raise the bond, he would comply. (Staley R. 29-5: Churchwell Dep., pp. 41-42) Otherwise, Mr. Churchwell would set the bond amounts on a formula that he got "out of [his] head." (Staley R. 29-5: Churchwell Dep., p. 30) There was also evidence of other judicial commissioners who would raise a bond amount merely to enhance the attractiveness of the profit for bailbondsman, minimum amounts of bail regardless of the circumstances, denying bail so police officers could question a subject in the jail (called an "investigative hold"), and a general

---

[4]      Any references to the district court record under these case summaries is to the Record Entry in that particular case. All referenced documents are available on Pacer in electronic format except for the First Amended Complaint in *Staley v Wilson County* that was filed prior to implementation of ECF.

and complete lack of knowledge about the law regarding bail on the part of judicial

commissioners. Evidence was also presented that the General Sessions Judges in

the county followed an "unwritten rule on a DUI case ... the commissioners will

typically set a bond of a thousand dollars for each DUI offense. For example, the

first offense DUI would be a thousand dollars. A fifth offense would be a $5,000

bond." (Staley R. 38-1: Deposition of Judge Barry Tatum, p. 7)

In granting class certification, the District Judge found that,  as "a matter of

policy, bond amounts are not set pursuant to the statutory guidelines." (Staley R.

39: Court Memorandum Granting Class Certification, p. 5) Judge Trauger also

wrote that the "Eighth Amendment prohibits bail that is excessive. It does not

differentiate between excessive bail that is punitive in nature and excessive bail

that is arbitrary." (*Id.*, p. 15)

The case went to mediation where the parties settled and Wilson County

entered into a Consent Decree (Staley R. 65-1: Class Wide Settlement) which, in

part, required the county to comply with the state statutory provisions regarding the

setting of bail. (*Id.*, pp. 8-9)

    **B.**    *Jones v Rutherford County, Tennessee*, **U.S. District Court for the Middle District of Tennessee, Case No. 3:08-00782 (J. Echols)**

In *Jones v Rutherford County*, the plaintiff alleged that her bail was set at

$5000 without ever having been questioned by a magistrate about anything related

23

to her employment, family relations or any other issues that were designed to determine her likelihood to flee or be a danger to the community if released. (Jones R. 1: Complaint, p. 3) She demanded to see a magistrate (who were on duty 24 hours a day) but the request was denied and she was told she would have to wait for her first court appearance some two weeks away.  The complaint also alleged that Rutherford County judicial commissioners on some occasions increased bail as punishment when individuals misbehaved during booking and that they did not ask questions before setting bail. (*Id.*, p. 4) A preset bail listing, called an "Adult Charge Code Listing" was attached to the complaint and showed that Rutherford County set bail based on this list and maintained bail amounts for offenses that no longer existed, such as "vagrancy" ($250) and "homosexual acts" ($250). (Jones RE 1-1: Exhibit to Complaint, Adult Charge Code Listing)

The parties engaged in early mediation and settled the case with an agreement to start setting bail based on an individualized basis and no longer use the preset bail schedule.

**C.**    ***Painter v McNairy County, Tennessee*, U.S. District Court for the Western District of Tennessee, Case No. 1:09-01099 (J. Breen)**

In *Painter v McNairy County*, filed on April 24, 2009, the plaintiff alleged that he was arrested and had his bail set by the wife of the sheriff at $1000. (Painter R. 1: Complaint, ¶12) At no time was the plaintiff ever questioned by a judicial

commissioner about his employment, length of residence in the community or other factors predictive of his likelihood to flee. (*Id.*, ¶19) Unfortunately, about a year later, contact was lost with the plaintiff despite several attempts to get his participation in discovery. Plaintiff's counsel moved to withdraw and the motion was granted. (Painter R. 14: Order Granting Motion to Withdraw) The case was ultimately dismissed for failure to prosecute.

**D.    *Tate v Hartsville/Trousdale County, Tennessee*, U.S. District Court for the Middle District of Tennessee, Case No. 3:09-0201 (J. Campbell)**

*Tate v Trousdale County* was filed on March 2, 2009. In *Tate,* the plaintiff alleged that Trousdale County set bail as matter of policy on something other than an individualized assessment of that individual's likelihood to flee. After some discovery, the plaintiff filed for class certification and showed that bail seemed to be set by some rule of thumb with preordained amounts. (Tate R. 24: Brief in Support of Motion for Class Certification, p. 7) The district judge granted class certification and found that the plaintiff "has sufficiently pled a colorable or viable claim under the Eighth and Fourteenth Amendments.... Plaintiff has satisfied the numerosity requirement by stating a colorable claim that Trousdale County, as a matter of policy, sets bail arbitrarily, in violation of the Eighth and Fourteenth

Amendments." (Tate R. 40, Court Memorandum Granting Class Certification, p. 3 (citing *Staley v Wilson County, supra*)).

At summary judgment, Judge Campbell reversed his preliminary conclusion and cited a 9th Circuit case, *Galen v County of Los Angeles*, 477 F.3d 652 (9th Cir. 2007), for his holding that a "court cannot 'assume that plaintiff's bail was excessive simply because the state failed to comply with a self-imposed procedural requirement'" and held that a plaintiff must demonstrate a violation of federal law, not state law. (Tate R. 85: Court Memorandum Granting Summary Judgment, p. 85)

However, reliance on the 9th Circuit case was, respectfully, misplaced. First, in *Galen*, the plaintiff alleged that his $1,000,000 bail was excessive in violation of the Eighth Amendment. The 9th Circuit affirmed the dismissal of his claim because "he failed to adduce evidence of the reason for or motive behind the Commissioner's enhancement of bail." *Galen*, at 659. Thus, the dismissal was supported on the basis of a lack of evidence not any substantive constitutional analysis.

*Galen* also stands for the rule that in analyzing the Excessive Bail Clause, a court must "look to the valid state interests bail is intended to serve for a *particular individual* and judge whether bail conditions are excessive for the purpose of

achieving those interests." *Id.*, at 660 (emphasis added). Notice that the court does not focus only on the dollar amount of bail but also on the "bail conditions" and whether the "bail conditions are excessive" as to that "particular individual".

Clearly, our jurisprudence regarding bail has not always been couched in the terms of dollar amount but also in terms of "conditions" of bail. "The only arguable substantive limitation of the Excessive Bail Clause is that the Government's *proposed conditions of release* or detention not be 'excessive' in light of the perceived evil." *United States v Salerno*, 481 U.S. 739, 753, 107 S.Ct. 2095, 2105 (1987) (emphasis added). See also, Tennessee Code Annotated §40-11-114(a) (requiring the "condition of release" be in writing). Indeed, the "ancient practice [was] securing the oaths of responsible persons to stand as sureties to the accused", a practice that had nothing to do with monetary dollar amounts. Lester, "Presumed Innocent, Feared Dangerous: The Eighth Amendment's Right to Bail", 32 N. Ky. L. Rev. 1 (2005). Moreover, "[a] system of bail based totally on some form of monetary bail .... would be unconstitutional." American Jurisprudence, Bail and Recognizance §16, p. 316 (citing *State v Blake*, 642 So. 2d 959, 968 (Ala. 1994) ("A system of bail based totally on some form of monetary bail, and not providing for release on a defendant's own recognizance in appropriate circumstances, would be unconstitutional."); *Lee v Lawson*, 375 So. 2d 1019, 1023 (Miss. 1979) ("A

consideration of the equal protection and due process rights of indigent pretrial detainees leads us to the inescapable conclusion that a bail system based on monetary bail alone would be unconstitutional."); *Bandy v U.S.*, 82 S.Ct. 11 (1961)). Surely, the drafters of the 8th Amendment were not intending to protect a bail system based solely on money in light of the historical context of bail at the time.

The court in *Galen* simply affirmed the dismissal, even in light of California's "comprehensive statutory scheme", *id.*, at 660, because the plaintiff failed to show at the summary judgment stage that the judicial commissioner of Los Angeles enhanced his bail for an improper purpose under California law. Thus *Galen* also correctly recognized that California law set the contours of what would be excessive under the Eighth Amendment.

So from *Galen* two rules of law are clarified. First, that state law can set the contours of what is excessive under the Eighth Amendment. Second, that excessiveness is not measured by whether the dollar amount  was too high or too low but also involves an analysis of how that dollar amount was reached under state law and whether that dollar or any "condition of bail" is more than necessary for that *particular individual* in light of the state's interests. Indeed, the 9th Circuit clearly stated that, "[t]here [was] no evidentiary basis in the record to conclude one

way or the other whether Galen's bail was 'excessive' under California law or the Constitution." *Galen*, at 661.

While the Constitution does not define "excessive" explicitly, the test applied by the courts is that bail is "excessive" if it is at an amount  higher than which is reasonably calculated to give adequate assurance that the defendant will appear for trial and serve his sentence if he is convicted and his conviction is affirmed. *Stack v Boyle*, 72 S.Ct. 1, 4, 342 US 1, 5 (1951). By this definition, if the "amount" is not "*reasonably* calculated" it must, therefore, be excessive. To be sure, a magistrate who *reasonably* calculates the bail on an *individualized* basis may very well arrive at the same amount that another magistrate arrives at without engaging in a  reasonable calculation. This is the very reason why the dollar amount should not be the primary focus in this type of analysis. Two methods of setting bail, one reasonably calculated and one not, may very well arrive at the same figure. But under Supreme Court precedent, one method would be constitutional and the other would be excessive and, therefore, unconstitutional.

The district court in *Tate,* thus, erroneously focused, as most courts appear prone to do, on the word "excessive" as it relates to a dollar amount as opposed to whether it was "excessive"  because it was not *individually* based.

The *Tate* court also relied on a district court opinion out of Texas, *Terrell v. City of El Paso*, 481 F. Supp. 2d 757, 766 (W.D. Tex. 2007). But nowhere in *Terrell* does the court analyze the Eighth Amendment or the 14th Amendment under the same claims made by the plaintiffs in the present case or the plaintiff in *Tate*. Indeed, the *Terrell* court rejected a Florida district court case that held the exact opposite – that preset bonds *were* unconstitutional, by calling it "anomalous and outdated". *Terrell*, at 767 (rejecting *Ackies v. Purdy*, 322 F. Supp. 38 (D.C. Fla. 1970)). [5] If that is the standard, then this Court should reject the holding of *Tate v Trousdale County* because it is anomalous with the clear precedent of appellate courts holding that bail is excessive under the Eighth Amendment if it is not individually assessed. This cherry-picking of cases that seem to hold opposite conclusions on the same issue cries for resolution.

### E.    *Holman v Macon County, Tennessee*, U.S. District Court for the Middle District of Tennessee, Case No. 2:10-0036 (J. Campbell)

James Holman filed his Complaint on April 12, 2010 claiming that he was arrested for sixth offense DUI and that his bail was set by a judicial commissioner at $12,500 without examining him as to community ties or other predictors of likelihood to flee. (Holman R. 2: Complaint, ¶5-9)

---

[5]    *Ackies v Purdy* was the result of a lawsuit brought against Dade County, Florida, as discussed in Wisotsky 1970, *supra* and Addendum, *infra*.

A little over three months after the *Tate v Trousdale County* decision, Judge Campbell granted class certification in *Holman*, again finding that Mr. Holman made out a colorable claim. In opposing class certification, Macon County cited to *Tate v Trousdale County* for the argument that the plaintiff could not make out a colorable claim as required by Rule 23. Not only did Judge Campbell reassert that the right to be free pending trial is "inherent in the concept of a liberty interest protected by the due process clause of the Fourteenth Amendment", but he also held that a state further creates a liberty interest when it places substantive limitations on official discretion. (Holman R. 42, Court Memorandum Granting Class Certification, p. 6) Despite his decision in *Tate*, class certification was again granted which surely casts doubt on the rationale in dismissing Mr. Tate's claims and on the precedential value of *Tate v Trousdale County*. It is apparent that Judge Campbell, after his *Tate* decision, came to see that a state law *can* create a fundamental liberty interest that cannot be denied without due process and came to recognize a substantive due process right to bail.

Unfortunately, due to the plaintiff's medical condition, the plaintiff was unable to continue to participate as a class representative, a new representative could not be located, and the case was dismissed without adjudication on the merits.

**F.**     ***Robertson v Bedford County, Tennessee*, U.S. District Court for the Eastern District of Tennessee, Case No. 1:10-00320 (J. Mattice)**

Plaintiff Ricky Robertson filed suit on November 29, 2010 alleging that his bail on disorderly conduct and public intoxication was set based on a rule of thumb or a preset list. (Robertson R. 1: Complaint, ¶18) Defendants promptly filed a partial motion to dismiss on October 3, 2011 (Robertson R. 12: Partial Motion to Dismiss) relying on arguments made in the preceding cases. The motion was granted and Plaintiff's claims related to bail were dismissed. (Robertson R. 32, Court Memorandum.)

**G.**     ***Fields v Henry County, Tennessee,* U.S. District Court for the Middle District of Tennessee, Case No. 1:09-01267 (Mag. J. Bryant)**

Plaintiff Gary Fields filed suit on December 10, 2009 alleging that he was denied bail pursuant to a county policy of denying bail for a minimum of twelve hours for any arrestee charged with domestic assault in violation of state law. (R. 1, Complaint) On February 9, 2010, the defendant moved for summary judgment (R. 4, Motion for Summary Judgment) which was deferred pending limited discovery. Summary judgment for the defendant was granted on September 30, 2011 (Judgment, R. 43, PID 388) and a Notice of Appeal was filed. (Notice of Appeal, R. 44, PID 389).

This Court then affirmed summary judgment on December 10, 2012. *Fields v Henry County, Tennessee*, 701 F.3d 180 (6th Cir. 2012). Mr. Fields, represented by the undersigned, intends to file for Writ of Certiorari but has not yet filed his petition, due on March 10, 2013.

Although somewhat similar to the instant case, the opinion of the Sixth Circuit Court panel in *Fields* is distinguishable on several grounds. First, *Fields* complained of a practice and policy by Henry County of denying bail and holding those arrested on domestic assault charges for a 12-hour period, in violation of **T.C.A. 40-11-150**. *Fields*, at 183. [6] In *Malmquist*, the plaintiffs complain that they were denied bail pursuant to a practice and policy of denying bail by the city of Germantown to those arrested on out of county warrants, in violation of **T.C.A. 40-11-147**. (Court Memorandum, R. 45, PID 203-204). While both *Fields* and *Malmquist* complained about the practice and policy by the respective defendants of violating the Bail Reform Act of 1978 (codified, in part, under Title 40, Chapter 11) as a whole and both sought class certification, their claims were dismissed by

---

[6]     While the plaintiff in *Fields* also alleged a practice of denying bail to those arrested out-of-county, the panel deciding that case rejected that argument on other than the merits. "Finally, Fields asserts a liberty interest rooted in his right to post bail in the county where he was arrested, even if the warrant issued in another county. But Fields's arrest, detention, and bail hearing all took place in Henry County. Thus, assuming such a right exists, it was not implicated here." *Fields*, at 187.

different district courts based only on the particular provisions that applied to them. Both were thus dismissed on narrow grounds that cannot be expanded to apply to each other when both sought expansion but were turned away on their broader arguments.

Second, *Malmquist* is also based on the practice and policy of Defendant Metro Nashville to deliberately increase bail to ostensibly encourage commercial bail bondsman to post an arrestee's bail. This is done without regard to an individual's risk of flight or danger to the community if released as is shown by the allegation in the complaint that Metro Nashville's Judicial Commissioner decided to offer Mr. Malmquist the choice of two bail amounts, $500 or $1000, based on whether he intended to post his bail in cash or by a commercial bail bondsman. This issue was not raised in *Fields* and was not addressed by the panel in *Fields*.

Similarly, while *Fields* alleged that the defendant, Henry County, had a "practice and policy of setting bail by a preset schedule that is on a list maintained at the jail" (Fields Complaint, R. 1, ¶12), the plaintiff never presented any facts that he himself was subjected to any "preset schedule" or any "list maintained" by the jail. Nonetheless, the panel decision in *Fields* held that there was "nothing inherently wrong with bond schedules.... The bond schedule represents an assessment of what bail amount would ensure the appearance of the average

34

defendant facing such a charge. The schedules are therefore aimed at assuring the presence of a defendant. [Citing *Stack v Boyle*, 342 U.S. 1 (1951)] ("[T]he fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant." ... Thus, the mere use of a schedule does not itself pose a constitutional problem under the Eighth Amendment." This was pure dicta because it was not necessary to resolve all of the claims that applied to Mr. Fields. [7]

Also of importance is that the *Fields* decision, indeed the very quote cited above, contradicts itself. While on the one hand the opinion correctly quotes *Stack* for the rule that bail for any individual must be based upon standards relevant to the purpose of assuring the presence of ***that*** defendant, it uses that quote to conclude that bail schedules, which cannot logically be based on any one particular defendant since it is purportedly based on the "average" defendant, is constitutional. This simply makes no sense. The *Fields* court notably took literary license in changing the *Stack v Boyle* language of "that defendant" to "a

---

[7]    "Dicta" is where opinions of a judge do not embody the resolution or determination of the specific case before the court and are "[e]xpressions in [a] court's opinion which go beyond the facts before [the] court and therefore are [the] individual views of [the] author of [the] opinion and not binding in subsequent cases as legal precedent." *United States v. Miller*, 604 F. Supp. 2d 1162, 1167 (W.D. TN 2009) (quoting Black's Law Dictionary 454 (6th ed. 1990)).

defendant", an important difference. One is specific to an individual while the other is generalized.

While it is clear and in need of no citation that a published opinion of one panel cannot be overturned by a subsequent panel, this does not apply to a remark of *obiter dictum* that did not address the actual *facts* of the case (as opposed to mere allegations designed to support a claim for class certification) nor an *obiter dictum* that is contradicted by the very citation given in support. Thus, the holding in *Fields* concerning preset bail schedules is not binding on this panel in deciding this case.

Finally, the court in *Fields* concluded, by attempting to encompass the entire Bail Reform Act and reinterpreting the claims of Mr. Fields - incorrectly, that nothing in the "Tennessee Code, individually or in concert with another section, granted him a right to be released earlier than he was." *Fields*, at 187-188. Yet Mr. Fields ***never*** asserted that he was entitled to be released "earlier than he was." He merely asserted that he was entitled to be treated in accordance with the rights given him under Tennessee law and which were protected under the 14th Amendment.

In short, *Fields* recognized that the defendant, Henry County, had indeed violated Tennessee law, as the defendant admitted in oral argument, in holding

domestic assault arrestees for twelve hours but that this violation was not protected as a liberty interest under the 14th Amendment and was not excessive under the 8th Amendment.

The plaintiffs herein, however, present a different set of facts under a different provision of Tennessee law. Therefore, *Fields* is not dispositive of their case.

## IV.    BAIL UNDER THE U.S. AND TENNESSEE CONSTITUTIONS.

### A.    Summary of History of Bail

The origins of the Eighth Amendment's Excessive Bail Clause are narrowly traced to the seventeenth century. The struggle between the Stuart monarchs and Parliament led to three landmark pieces of legislation curtailing the exercise of royal prerogative and safeguarding individual rights: the Petition of Right in 1628, followed by the Habeas Corpus Act of 1679 and, finally, the English Bill of Rights in 1689, which contains the "excessive bail ought not to be required" phrasing that, in modified form, and after appearing in the Virginia Declaration of Rights, appears in the U.S. Bill of Rights. Together, these three bills sought to curb the abuse of the King, and later judges, who arrested subjects without charge and held them indefinitely or with bail so high that it was impossible for them to obtain pretrial release. See, generally, Wiseman, "Discrimination, Coercion, and the Bail

37

Reform Act of 1984: The Loss of the Core Constitutional Protections of the
Excessive Bail Clause", 36 Fordham U. L. J. 121 (2009). See also, 1 J. Stephen, "A
History of the Criminal Law of England", (1883).

### B.     Bail under the Eighth Amendment

The Eight Amendment, as written into the U.S. Constitution, provides that
excessive bail shall not be required.  Bail is excessive when it is set higher than an
amount reasonably calculated to fulfill the purpose of assuring that *particular
defendant's* presence at trial. *Stack v. Boyle*, 342 U.S. 1, 5 (1951) (regarding the
"modern practice of requiring a bail bond or the deposit of a sum of money subject
to forfeiture" as one that "serves as additional assurance of the presence of an
accused".) "Since the function of bail is limited, the fixing of bail for any
*individual defendant* must be based upon *standards* relevant to the purpose of
assuring the presence of *that defendant*." *Id.* (emphasis added)  In *Stack*, the Court
concluded that bail had not been fixed in the proper manner, stating that to "infer
from the fact of indictment alone a need for bail in an unusually high amount is an
*arbitrary act*. Such conduct would inject into our own system of government the
very principles of totalitarianism which Congress was seeking to guard against in
passing the statute under which petitioners have been indicted." *Stack*, at 6
(emphasis added).

### C.    Bail under the Substantive and Procedural Due Process Prongs of the 14th Amendment.

Although pretrial detention is not a *per se* violation of due process, the due process limit on the duration of preventive detention requires assessment on a case by case basis. *U.S. v Hare*, 873 F.2d 796 (5th Cir. 1989). Thus, "[a] schedule of fees based only upon the offense charged, applied equally to both rich and poor, would be unconstitutional."  Antibau & Rich, Modern Constitutional Law, 2d Ed. (West) 1997.

Once a state provides for the right to be admitted to bail it cannot deny the right to an individual arbitrarily. In *Mastrian v. Hedman*, 326 F.2d 708, 711 (8th Cir. 1964), *cert. denied*, 376 U.S. 965, the court wrote that "as to . . . offenses . . . for which a state has provided a right of bail it may not, any more than as to other substantive or procedural benefits under its criminal law system, engage in such administration as arbitrarily or discriminatorily to effect denial or deprivation of the right to a particular accused." There is no authority for detaining someone in jail while awaiting trial, or the imposition of special bail conditions, based merely on the fact of arrest for a particular crime. *U.S. v Scott*, 450 F.3d 863, 874 (9th Cir. 2006). The detention must be on an individualized basis. *Id.* Where the risk of flight "is so slight", "any amount of bail is excessive; release on one's own

39

recognizance would then be constitutionally required, which could further limit the government's discretion to fashion conditions of release." *Id.*, at 867, n5.

The right to keep someone in jail does not in any way imply the right to release that person subject to unconstitutional conditions--such as chopping off a finger or giving up one's firstborn. Once a state decides to release a criminal defendant pending trial, the state may impose only such conditions as are constitutional, including compliance with the prohibition against excessive bail. In some instances--when flight would be irrational, such as when the crime involves a minor traffic infraction--any amount of bail may be excessive because the bail amount would not serve the purpose of ensuring appearance in court to answer the charges. For example, a person arrested for speeding on a California highway cannot be detained pending trial, but must be released after signing a "notice to appear." See Cal. Veh. Code §§ 40500(a), 40504(a). This appears to be a legislative determination that a person arrested for violating the Vehicle Code who satisfies the conditions of section 40504(a) is not a sufficient flight risk or danger to the community to require incarceration pending trial. This legislative determination that bail would serve no relevant purpose implies that, for such a violation, any amount of bail would be constitutionally excessive. *Id.* (emphasis added). *Cf.* T.C.A. 55-10-207(a)(1), T.C.A. 40-7-118 (use of citations in lieu of

continued custody of an arrested person) and *State v Berrios*, 235 S.W.3d 99, 105 (Tenn. 2007) ("Tennessee's 'cite and release' statute ... created a 'a presumptive right to be cited and released for the commission of a misdemeanor.'"

Due process also requires that a magistrate denying bail or setting bail must also clearly state the reason for the denial or the conditions or amount of bail."The Sixth Circuit has ruled that pre-trial denial of bail without a statement of reasons is a violation of the Fourteenth Amendment." *Puertas v. Michigan Dep't of Corrections*, 88 F. Supp. 2d 775, 780 (D. Mich. 2000) (citing *Atkins v Michigan*, 644 F.2d 543, 550 (6th Cir. 1981)). See also, *US v Briggs*, 476 F.2d 947 (5th Cir. 1973) (where district court's order stating reasons for denying defendants' motion to reduce bail did not consider factors with respect to each defendant that would justify the conditions of release imposed in the case and concluded that a uniform bail was appropriate, each defendant was entitled to know the reasons why particular conditions of release were imposed in his case.)

"According to the Sixth Circuit, the right to bail pending trial is a 'fundamental' and 'important' liberty interest protected by the Due Process clause of the Fourteenth Amendment that may not be taken away arbitrarily." *Puertas*, at 781 (citing *Atkins*, at 550) (emphasis added). A protected liberty entitlement can be created by state law and when a liberty interest has been thus created, the due

41

process clause acts to insure that the state-created right is not arbitrarily abrogated. *Meachum v. Fano*, 427 U.S. 215, 226 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state-created right to "good time" credit by statute which specified that it would only be forfeited based on serious misbehavior); *Vitek v. Jones*, 445 U.S. 480, 488 (1980) (finding a protected liberty interest in Nebraska state law stating that a prisoner could not be transferred to a mental hospital without a finding that he was suffering from a mental illness for which he could not secure adequate treatment in the correctional facility.)

Liberty interests can be created by state rules or mutually explicit understandings as well as by statute. "Liberty interests protected by the Fourteenth Amendment may arise from two sources - the Due Process Clause and the laws and regulations of the State." *Doe v. Sullivan County*, 956 F.2d 545, 556 (6th Cir. 1992); see also *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies.") (citations omitted). Thus, a liberty interest may arise from substantive due process, embodied in the 14th Amendment, and from procedural due process, created by operation of state law.

The various federal courts, including the U.S. Supreme Court and the Sixth Circuit, have held, then, that:

1.    Bail must be related to the *individual's* likelihood to flee and limited to assure *that* person's appearance. In other words, it cannot be applied across the board based on something that is not individualized;

2.    Bail cannot be more than necessary to assure *that* person's appearance;

3.    Bail must be "reasonably calculated";

4.    Bail cannot be set or denied arbitrarily or discriminatorily;

5.    Bail must be supported by a "statement of reasons" or it is arbitrary *per se*;

6.    Must be set by some adjudicatory procedure or standards that does not violate due process.

7.    When a legislature has determined that bail would serve no relevant purpose, that implies that, for such a violation, any amount of bail would be constitutionally excessive.

8.    Right to bail is a liberty interest if created by state law and thus protected under the due process clause of the 14th amendment.

9.    Right to bail is a liberty interest implied in the word "liberty" which cannot be arbitrarily denied.

**D.    The Right to Bail Provided by Tennessee Law**

In Tennessee, the *right* to bail is set by the state Constitution. "That all prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or the presumption great." Article I, §15. See also, T.C.A. 40-11-102. When a defendant is arrested, he or she is "entitled to be admitted to bail by the committing magistrate, by any judge of the circuit or criminal court, or by the clerk of any circuit or criminal court; provided, that if admitted to bail by the clerk of any circuit or criminal court, the defendant has a right to petition the judge of the circuit or criminal court if the defendant feels that the bail set is excessive, and shall be given notice of this fact by the clerk." T.C.A. 40-11-105. However, the "clerk of any circuit or criminal court may only admit the defendant to bail when the judge is not present in the court and the clerk reasonably believes that the judge will not be present within three (3) hours after the defendant has been committed to the county or city jail, following arrest." *Id.* No person can be committed to jail "for any criminal matter until examination thereof is first had before some magistrate." T.C.A. 40-5-103. The examination must also be reduced

to writing. [8] The magistrate is required to reduce the examination of the accused to writing, if the accused submits to an examination, and also all the evidence adduced on **both** sides, and is authorized to discharge, bail, or commit the accused and to take all necessary recognizances to enforce the appearance of the defendant, the prosecutor or witnesses at the proper court. T.C.A. 40-5-105.

Bail, when not given in open court, is given by a written undertaking, containing the *conditions of release*, the agreement of the defendant to appear in the court having jurisdiction of the offense as directed by the court and/*or an amount to be paid* for nonappearance, signed by the defendant, and if made under §40-11-122(2), signed also by court-approved and sufficient surety or sureties. The written undertaking must be approved by the officer taking it. T.C.A. 40-11-114(a). A judicial commissioner has a "dut[y]" to set "bonds and recognizance in accordance with the procedures outlined in chapters 5 and 6 of ... title [40]." T.C.A. 40-1-111(d)(2)(B) .  A constitutional duty generally may not be abdicated. See, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961); *Holman v Macon County*, Case No. 2:10-0036 (M.D. Tenn.), R. 42, p. 5. Once bail

---

[8]    An "examination" is an "investigation by a magistrate of a person who has been charged with crime and arrested, or of the facts and circumstances which are alleged to have attended the crime, in order to ascertain whether there is sufficient ground to hold him to bail for his trial by the proper court." Black's Law Dictionary (6th Ed.)

has been set, the court having jurisdiction over the criminal offense may only review the bail on an "abuse of discretion" standard (T.C.A. 40-11-106(b)(1)) or whether the judicial commissioner acted arbitrarily or capriciously. (T.C.A. 40-11-106(b)(2)). Without a written finding of the reasons for bail, this review is impossible.

An out-of-county warrant should be treated the same as an in-county warrant for purposes of admitting to bail. "A defendant arrested in one county on a warrant issued in another county for the commission of an offense for which the maximum punishment is imprisonment for ten (10) years or less is entitled to be admitted to bail in the county of arrest by the same officials and in the same manner as if arrested in the county issuing the warrant." T.C.A. 40-11-147.

Thus, a person is "entitled to bail as a matter of ***right***..." *State v Wallace*, 193 Tenn. 182, 186, 245 S.W.2d 192, 193 (1952) (emphasis added). See also Tennessee Attorney General Opinion 05-018, holding that one is "entitled to an *individual* determination of bond" whether the arrest is a warrantless arrest, arrest pursuant to a warrant, or an arrest pursuant to a capias or attachment and holding that a "pre-set bond schedule" published by the judges of the jurisdiction is specifically prohibited. (R. 29-5: AG Opinion 05-018, found at http://www.tn.gov/attorneygeneral/op/2005/t5content.html).

**E.    Process of Determining Release on Recognizance and Setting Bail.**

Bail should be determined by taking into consideration those conditions

which may reasonably answer the question of whether an individual will appear

"as required..." T.C.A. 40-11-115. The default is release on one's own recognizance

and bail may be required ***only*** "absent a showing that conditions on a release on

recognizance will reasonably assure the appearance of the defendant as required..."

T.C.A. 40-11-117.

These conditions include employment status and history, financial condition,

family ties and relationships, reputation, character and mental condition, prior

criminal record including prior releases on recognizance or bail, the identity of

responsible members of the community who will vouch for the defendant's

reliability, the nature of the offense, probability of conviction and likely sentence

(insofar as these factors are relevant to the risk of nonappearance) and, finally, any

other factors indicating the defendant's ties to the community or bearing on the risk

of willful failure to appear.  *Id.*

If an individual is not eligible for release upon recognizance after

consideration of these factors, the bail set must be the "least onerous .... reasonably

likely to assure the defendant's appearance in court" (T.C.A. 40-11-116(a)) and the

same considerations must be taken into account as those used to determine release on recognizance. T.C.A. 40-11-118(b).

In sum, then, under Tennessee law:

1.      All arrestees are entitled to bail and have a *right to bail* under the Tennessee Constitution and Tennessee Code except for those charged with a capital offense.

2.      Persons arrested on out-of-county warrants are entitled to bail in the county of arrest in the same manner as anyone else arrested in that county;

3.      No one can be committed to the jail until an examination for the purpose of determining the need for bail is done by a committing magistrate;

      a.      An examination is an interrogation of **both** sides.

4.      A judicial commissioner has a duty to set bail. A clerk may set bail *only if* a judge or magistrate cannot be located *within 3 hours of arrest*.

5.      The reasons for bail must be reduced to writing;

6.      The default release is release on recognizance (ROR). Only after a determination that ROR is insufficient to ensure the arrestee's appearance may a magistrate go to the next step of considering what conditions of release would address a likelihood to not appear;

7.      A pre-set bond schedule is specifically prohibited.

48

Since the State of Tennessee has created these rights by operation of law they are protected liberty interests under the 14th Amendment due process clause that may not be taken away arbitrarily or in a discriminatory fashion. To deny any of these rights afforded by state law in an arbitrary fashion, including the right to be interrogated with a presumption of ROR *before* being committed to jail or admitted to bail, and the right to post bail in whatever manner they see fit under the law (cash or sureties without penalty as to which), is to deny due process both procedurally and substantively.

## V.    DEFENDANT GERMANTOWN, BY DENYING BAIL BECAUSE THE WARRANT WAS FROM ANOTHER COUNTY, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.

Defendant Germantown violated and, as far as anyone can tell, continues to arbitrarily violate and deny the *right* to bail set out in state law to those arrested within its city borders. More specifically, Germantown does not grant bail to those arrested on warrants from other counties and holds then without bail for as long as it takes for the issuing county to arrange transport back to the county that originally issued the warrant.

In addition, because Defendant Germantown denies bail on out-of-county warrants based on a general policy without regard to the individual characteristics of any particular arrestee, it is not based on an *individualized* assessment.

For its part, Germantown denies that it does not call a magistrate to set bail on warrants issued by other counties and denies that it has followed this practice for the last 28 years. (Complaint, R. 1, ¶11, PID 3; Germantown Answer, R. 22, ¶11, PID 52). However, for purposes of this analysis, the Court must assume that Plaintiffs' factual allegations are true.

An expectation of release may qualify as a constitutionally protected liberty interest. See *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex*, 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ("[T]he expectancy of release provided in this statute is entitled to some measure of constitutional protection."); *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests. ... [citations omitted] We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government").

T.C.A. 40-11-147 is explicit. "A defendant arrested in one county on a warrant issued in another county for the commission of an offense for which the maximum punishment is imprisonment for ten (10) years or less is **entitled** to be

admitted to bail in the county of arrest by the same officials and in the same manner as if arrested in the county issuing the warrant." (Emphasis added).

The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir.2006). State law creates protected liberty interests when (1) the state places "substantive limitations on official conduct" by using "explicitly mandatory language in connection with requiring specific substantive predicates," and (2) the state law requires a specific outcome if those "substantive predicates are met." *Gibson v. McMurray*, 159 F.3d 230, 233 (6th Cir.1998).

T.C.A. 40-11-147 uses the language of rights ("entitled") to dictate to the particular authority that an arrestee on an out-of-county warrant has a *right* to be admitted to bail. While the *Fields* court seemed to describe the particular provision of the Bail Reform Act at issue there as a "[p]rocedural right[]" that does not "require a particular substantive outcome" (*Fields*, at 186), this is like saying that a right to trial without the requirement of how the trial should end (guilty or not guilty) is not really a liberty interest worthy of protection. Similarly, the right to be heard, enshrined in the basic concepts of liberty our country was founded on, is not

really a right at all but only a procedural guide that has no dictated outcome and is therefore not worthy of protection. On the contrary, the right to be "admitted to bail" is far more than a mere right to be heard without guarantee of an outcome. It is the right to plead one's case, to present evidence against the presumption that everyone is a flight risk unless proven otherwise and to argue against such arbitrary presumptions that are not based on empirical evidence at all. Indeed, without the right to be heard before an impartial magistrate, one *is* guaranteed the outcome - to stay in custody until some Sheriff's deputy from the other county gets around to putting down his coffee and going to pick up the arrestee in the other county which may be clear on the other side of the state. With a process where an arrestee can be heard, as state law requires, there is an absolute probability that bail <u>will be</u> granted except for capital offenses as the Tennessee Constitution mandates. The amount or release conditions may be immeasurable as far as the outcome of this procedure is concerned, but bail **will be granted**. Thus, it is certain that under Tennessee law, for those offenses other than capital murder, bail ***must*** be set at an amount or under such conditions as to ensure ***that*** individual's likelihood to flee. What amount under what conditions and whether bail can be posted by the accused, directly or through other means such as a commercial bail bondsman, is the only unknown in the equation. But set it must be and this is all that Plaintiffs ask for. To be sure,

Plaintiffs do not claim they have any right to be *released* earlier than they were, as the *Fields* court misconstrued the claim of Mr. Fields. They merely argue that they had a *right* to have bail set and to be given an opportunity to post that bail after it was set based on their individual likelihood to flee.

And, again, because it is not based on that particular individual's likelihood to flee or be a danger if released, the policy of Germantown in denying bail to those arrested on out of county warrants is not "reasonably calculated", is not the "least amount necessary", and is tantamount to outright denial of bail which is a violation of Tennessee law and the Tennessee Constitution and as prohibited by the 8th Amendment.

Thus, Germantown violated the substantive prong of the due process clause by denying bail arbitrarily. It violated the procedural prong of the due process clause by refusing to present Plaintiffs to a magistrate, as state law required for those arrested on out of county warrants where the outcome, had they been thus presented, would have been certain - they would have been admitted to bail. And Germantown violated the Excessive Bail provision of the 8th Amendment because the denial of bail to the plaintiffs was not "reasonably calculated" on an individualized basis of their likelihood to flee.

**VI.    DEFENDANT METRO NASHVILLE, BY ARBITRARILY INCREASING BAIL IF PLAINTIFFS USED A COMMERCIAL BAIL BONDSMAN AND BY SETTING BAIL ON AN ARBITRARILY CALCULATED PRESET FORMULA, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.**

It cannot be disputed that increasing bail purely for the purpose of enticing or encouraging a commercial bail bondsman to post a bond is not the "least amount necessary" to ensure *that defendant's appearance in court* and is completely arbitrary. Under the Supreme Court's framework, although the state can define criminal conduct for which bail is not available, "[b]ail set at a figure higher than an amount reasonably calculated [to ensure the defendant's presence at trial] is 'excessive' under the Eighth Amendment." *U.S. v. Salerno*, 481 U.S. 739, 752 (1987) (quoting *Stack v. Boyle*, 342 U.S. at 5). Similarly, setting bail based on a preset formula violates the Eighth Amendment because it is not "reasonably calculated" to ensure "that defendant's" appearance in court.

Additionally, the denial of bail pending trial, via "cursory orders supplying no reasons . . . violate[s] the standards for due process established by the fourteenth amendment." *Atkins v. People of State of Mich.*, 644 F.2d 543, 550 (6th Cir. 1981). Thus, this practice violates the substantive due process provision of the 14th Amendment.

## CONCLUSION

What we have before us is a systematic abuse and admitted violation of the Tennessee Constitution and Tennessee state law as set forth in the Bail Reform Act of 1978 that has infected the entire State of Tennessee. Defendants, such as Henry County in *Fields* even go so far as to admit they continue to violate state law at oral argument. There is no shame in local jurisdictions in this state that continue to set bail arbitrarily and in violation of law. Their main defense is that there is no *federal* remedy. And because there is no *state* private right of action akin to 42 U.S.C. 1983, local governments violate the law with impunity and those sitting in jail, even on minor, non-violent offenses, are left to wonder what good a "right to bail" is if they cannot assert that right in a court of law. Truly, how can this be allowed to happen? The only ones who truly benefit and enjoy such arbitrary actions are the commercial bail bondsman that troll the local jails in search of easy money, assisted by judicial commissioners who serve their interests in making sure that their profit margin is worth the efforts in completing the necessary paperwork.

This case is limited by the facts presented in the complaint as other cases raising similar issues have been decided narrowly based on the facts presented there. It appears that the courts have demanded that plaintiffs assert claims based only on the particular provisions of the law at issue and not on generalized claims.

55

For the reasons argued above, the judgment below should be reversed and the case

reinstated for further proceedings.

Respectfully submitted,

*/s/ Jerry Gonzalez*
Jerry Gonzalez (018379)
Jerry Gonzalez PLC
2441-Q Old Fort Parkway
No. 381
Murfreesboro, TN 37129
615-360-6060
jgonzalez@jglaw.net
*Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 12,256 words (using WordPerfect

Word Count), excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using Word

Perfect X5 using 14 point Times New Roman font.

                                                    /s/ Jerry Gonzalez

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following:

Allison L. Bussell (23538)
Christopher Lackey
Asst. Metropolitan Attorneys
P.O. Box 196300
108 Metro Courthouse
Nashville TN 37219-6300
615-862-6341
allison.bussell@nashville.gov

Attorneys for Metro Nashville

Robert M. Burns, #15383
C. Mark Harrod, #28416
HOWELL & FISHER, PLLC
Court Square Building
300 James Robertson Parkway
Nashville, TN 37201-1107
rburns@howell-fisher.com
mharrod@howell-fisher.com
(615) 244-3370

Attorneys for Germantown

This the 5th day of March, 2013.

/s/ Jerry Gonzalez

# ADDENDUM CONTENTS

1.  Designation of Relevant District Court Documents.

2.  Journal Articles cited in main brief.

    a.  Wisotsky, Steven. "Use of a Master Bond Schedule: Equal Justice Under Law?". 24 U. Miami L. Rev. 808 (1970).

    b.  Harris, Donald, "The Vested Interests of the Judge: Commentary on Flemming's Theory of Bail". American Bar Foundation Research Journal, Spring, 1983. 8:490-506.

    c.  Lowenkamp, Christopher and Jay Whetzel, "The Development of an Actuarial Risk Assessment Instrument for U.S. Pretrial Services. Federal Probation, 2009. 73:2.

    d.  Goldkamp, John, "Philadelphia Revisited: An Examination of Bail and Detention Two Decades after Foote", Crime and Delinquency 1980, 26:179.

    e.  Foote, Caleb. "Compelling Appearance in Court: Administration of Bail in Philadelphia," University of Pennsylvania Law Review, June 1954.

f.      Goldkamp, John, "Criminology: Questioning the Practice of Pretrial Detention: Some Empirical Evidence from Philadelphia", Journal of Criminal Law and Criminology, Winter 1983, 74:1556.

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry No. | Description | PageID No.'s |
|---|---|---|
| 1 | Complaint | 1-14 |
| 22 | Metro Nashville Answer | 51-58 |
| 24 | Metro Nashville Motion to Dismiss | 61 |
| 25 | Order | 82 |
| 26 | Order | 84 |
| 38 | Germantown Motion to Dismiss | 164 |
| 39 | Memorandum Op. | 167-185 |
| 40 | Order | 186 |
| 45 | Memorandum Op. | 202-219 |
| 46 | Order | 220-221 |
| 47 | Final Judgment | 222 |
| 48 | Notice of Appeal | 223 |

# JOURNAL ARTICLES

# USE OF A MASTER BOND SCHEDULE: EQUAL JUSTICE UNDER LAW?

Steven Wisotsky*

I. Introduction ............................................................ 808
II. Operation of the System—The Invisible Man ............................ 812
III. Constitutional Dimensions ........................................... 816
   A. *The Due Process Question* ........................................ 816
   B. *The Equal Protection Question* ................................... 822
IV. Conclusion ............................................................ 829

*Millions of men and women are, through the American bail system, held each year in "ransom" in American jails, committed to prison cells often for prolonged periods before trial.*

R. Goldfarb, Ransom 1 (1968).

*The methods we employ in the enforcement of our criminal law have aptly been called the measure by which the quality of our civilization may be judged.*

Chief Justice Warren in *Coppedge* v. *United States*, 369 U.S. 438, 449 (1962).

## I. Introduction

The last decade or so may justifiably be considered a revolutionary period in American criminal jurisprudence.[1] During that time, the federal judiciary, with the United States Supreme Court in the vanguard, continually rolled back the frontiers of procedural due process in criminal law, thus limiting the methods by which the awesome powers of government may be brought to bear upon the individual accused of crime. Generally speaking, this revolution has been aimed at restricting the states from infringing upon most of the specific guarantees of the Bill of Rights. Federal courts have imposed these constitutional limitations on the states through the medium of the due process clause of the fourteenth amendment. As a result, the once vigorously argued "incorporation debate"[2] has for all practical purposes been laid to rest.

Thus, under the present status of federal constitutional law, the operation of the criminal processes of the several states is subject to most of the restrictions of the Bill of Rights. Specifically, the following constitutional limitations now apply to state judicial process through

---

* J.D.; LL.M. candidate and Ford Urban Law Scholar at Yale University; former associate editor, *University of Miami Law Review*; former Student Instructor, Freshman Research and Writing.

1. *See* Bureau of Nat'l Affairs, Inc., The Criminal Law Revolution 1960-1968 (1968); Belli, The Law Revolution (1968).

2. *See, e.g.,* Adamson v. California, 332 U.S. 46 (1947); Palko v. Connecticut, 302 U.S. 319 (1937); Twining v. New Jersey, 211 U.S. 78 (1908).

A063

the operation of the due process clause of the fourteenth amendment: the prohibition of the fourth amendment against unreasonable search and seizure (and the concomitant exclusionary rule);[3] the prohibitions of the fifth amendment against double jeopardy[4] and compulsory self-incrimination[5]; the guarantees of the sixth amendment to a speedy trial,[6] to a trial by jury for serious offenses,[7] to the confrontation of opposing witnesses,[8] to compulsory process for obtaining defense witnesses,[9] and to the assistance of counsel;[10] and the prohibition of the eighth amendment against cruel and unusual punishment.[11]

In addition to this package of constitutional rules governing the conduct of the trial itself, stringent restrictions are operative at the time of arrest and interrogation[12] and at other pretrial stages of criminal prosecution as well.[13] Furthermore, the courts have expanded the purview of the equal protection clause of the fourteenth amendment to impose upon the states the affirmative duty of minimizing the effects of indigency upon a defendant in a criminal case.[14]

Notwithstanding this judicial activism in certain areas of the criminal law, the courts have remained aloof from other problems which might be characterized by low visibility but which are nonetheless urgently in need of solution. Perhaps, foremost among these is the dismal failure of the American bail system to secure for the poor the full measure of benefits attributable to the legal presumption of innocence. The impact on the indigent defendant of the practice of requiring a money bond as a condition of pretrial release is obvious: he stays in jail, sometimes for periods longer than the sentence typically imposed for commission of the crime for which he is charged.

But, despite this condition, which is widely deplored[15] and thor-

---

3. Mapp v. Ohio, 367 U.S. 643 (1961).

4. Benton v. Maryland, 395 U.S. 785 (1969).

5. Malloy v. Hogan, 378 U.S. 1 (1964). *See also* Griffin v. California, 380 U.S. 609 (1965) (the "no-comment" rule applies to the states).

6. Klopfer v. North Carolina, 386 U.S. 213 (1967).

7. Duncan v. Louisiana, 391 U.S. 145 (1968).

8. Pointer v. Texas, 380 U.S. 400 (1965).

9. Washington v. Texas, 388 U.S. 14 (1967).

10. Gideon v. Wainwright, 372 U.S. 335 (1963).

11. Robinson v. California, 370 U.S. 660 (1962).

12. Miranda v. Arizona, 384 U.S. 436 (1966); Escobedo v. Illinois, 378 U.S. 478 (1964).

13. *United States v. Wade*, 388 U.S. 218 (1967) (a lineup is a critical stage of criminal prosecution at which a defendant has the right to counsel).

14. *See* the discussion in regard to the equal protection attack on stationhouse bail at section III, p. 822 *infra*.

15. *See, e.g.,* R. GOLDFARB, RANSOM 4, 5 (1968) [hereinafter cited as RANSOM]. The American bail system is a scandal. It typifies what is worst and most cynical about our system of justice. It discriminates against the poor, against those who advocate or represent unpopular courses of action. It compromises and prostitutes the administration of justice by the courts. It is not only unfair; it is illogical; it does not even work well. The bail system is to a great degree a socially countenanced ransom of people and of justice for no good reason.

oughly documented by legal commentary,[16] the courts have not been responsive to this fundamental problem. Notwithstanding the valiant service which has been extracted from the fourteenth amendment in the aforementioned areas of the criminal law, a state of dormancy has prevailed with respect to its application to the problem of pretrial detention of indigent defendants in state jails.[17] Neither due process nor equal protection have, in the hands of the courts, yielded an amelioration of the injustices wrought by the adoption in America of the fixed-bond bail system.[18] Whether the evolution of a more humanitarian national ethos in regard to the problems of poverty, and the development, *pari passu*, of a coresponding body of case law, have rendered the fixed-money-bond per-offense system constitutionally vulnerable is the subject of this comment.

Before undertaking to explore the constitutional ramifications of certain aspects of the bail system, a note on scope and methodology is in order. First, it is necessary to establish the relevant factual context in which the legality of the bail system will be tested. For this purpose, this paper will have recourse to the bail practices of Dade County, Florida, although this is not a case study in the strictest sense. That is

---

16. Perhaps, the most definitive scholarly exposition on the subject is Foote, *The Coming Constitutional Crisis in Bail*, 113 U. PA. L. REV. 959 (Part I), 1125 (Part II.) (1965) [hereinafter cited as Foote]. A very widely cited work written for comprehension by both the lawyer and lay reader is RANSOM, *supra* note 15. Excellent brief treatments of the problem are Ryan, *The Last Days of Bail*, 58 J. CRIM. L.C. & P.E. 542 (1967); Comment, *Equal Protection and the Indigent Defendant: Griffin and its Progency*, 16 STAN. L. REV. 394 (1964). *See generally, Symposium, The Bail System: Is it Acceptable?*, 29 OHIO ST. L.J. 1005 (1968); Note, *Bail or Jail: Toward An Alternative*, 21 U. FLA. L. REV. 59 (1968). Legal literature abounds with other articles and studies on the American bail system, and no attempt at exhaustive citation is made here.

17. Discussion in this paper will be directed primarily to the bail practices of the states and therefore will raise the applicable constitutional issues under the fourteenth amendment. The practice of the Federal system, while far from Elysian, is rendered much more civilized by Fed. R. Civ. P. 5(a) which requires the arresting officer to "take the arrested person without unnecessary delay before the nearest available commissioner . . ." for a preliminary examination, the conduct of which is governed by Fed. R. Civ. P. 5(c). Rule 5(c) further requires that "[t]he Commissioner shall admit the defendant to bail as provided in these rules."

Adherance to this requirement of a prompt arraignment is encouraged by the McNabb-Mallory exclusionary rule. Unfortunately, however, the exclusionary rule does not obligate the State of Florida to adhere to its own counterpart to FED. R. CRIM. P. 5, which is simply not enforced. Furthermore, this executive nonfeasance has received judicial approbation. This point will be further developed below. *See* note 40, *infra* and accompanying text. In any event, the constitutional principles that will be raised under the fourteenth amendment will be fully applicable to the federal government through the operation of the fifth amendment. This follows despite the fact that the fifth amendment contains no equal protection clause since the due process clause of the fifth encompasses invidious and gross discrimination. *See* Bolling v. Sharpe, 347 U.S. 497 (1954); Steward Machine Co. v. Davis, 301 U.S. 548 (1937).

18. The bail system had its origin in England when the Statute of Westminster (1275) first defined bailable offenses. The practice of pledging security for one's liberty developed later and was administered on an individualized basis. The schedule of bail bonds is an American engraftment which facilitates the administration of a mass criminal justice system. *See generally* Note, *Bail: An Ancient Practice Reeaxamined*, 70 YALE A065 866 (1961).

to say, Dade County offers a typical example of the operation of the bail system in large metropolitan communities throughout the United States, but the facts of Dade's practices are chosen primarily for illustrative purposes. Additionally, reference will be made to a civil rights action filed in the United States District Court for The Southern District of Florida to permanently enjoin the operation of Dade's master bond system because of its alleged constitutional infirmities.[19]

Finally, it should be noted that the scope of what is undertaken here is relatively narrow. There will be no discussion with respect to the question of whether there is a "right" to bail under the Federal Constitution.[20] Although several inferior courts have assumed that the excessive bail clause of the eighth amendment is carried over into the due process clause of the fourteenth,[21] the United States Supreme Court has never ruled directly on the issue. In any event, speculation in the legal literature[22] is rendered academic by the fact that the right to bail is granted by statute in the federal system,[23] and by nearly all state

---

19. Ackies v. Purdy, Civil No. 69-1062 (S.D. Fla. 1969). The suit is a class action brought under the Civil Rights Act, 42 U.S.C. § 1983 (1964) for declaratory and injunctive relief against the application of a master bond schedule to indigent defendants on the grounds that it violates the due process and equal protection clauses of the fourteenth amendment, and the "right" to bail under the eighth and fourteenth amendments. (In its decision, unreported at the time of publication, the southern district did find the use of the master bond lists to be violative of due process and equal protection, and the court permanently enjoined the use of such lists unless the accused has first been informed of his right to have conditions of release set by a magistrate and thereafter knowingly and voluntarily waives his right to a hearing).

One of the attorneys for the plaintiffs in this action is Bruce S. Rogow of E.O.P.I. Legal Services. The author wishes to gratefully acknowledge the generous assistance of Mr. Rogow, who provided resource materials and much of the original inspiration for this commentary.

20. A literal reading of the eighth amendment yields no "right" to bail, as the Supreme Court has observed:

The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause has never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept . . . . Indeed, the very language of the Amendment fails to say all arrests must be bailable.

Carlson v. Landon, 342 U.S. 524, 545-46 (1951).

21. See, e.g., Mastrian v. Hedman, 326 F.2d 708, 711 (8th Cir. 1964), cert. denied, 376 U.S. 965 (1964); Pilkinton v. Circuit Court, 324 F.2d 45, 46 (8th Cir. 1963).

22. See, e.g., Foote, supra note 16, at 986-87, 1125. Professor Foote concludes, based on an analysis of the historical evidence, that the only sensible interpretation of the eighth amendment is that it creates a right to bail, not merely a limitation on amount in those cases where it is set at all.

23. 18 U.S.C. § 3146(a) (1964) provides:

[a]ny person charged with an offense, other than an offense punishable by death, shall, at his appearance before a judicial officer, be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond. . . . .

The statute is unusually progressive in favoring the pretrial releases of accused persons without the necessity of posting a bail bond or deposit of cash. Such conditions, among others specified, can be imposed, singly or in combination, according to the determination made by the judicial officer in the exercise of his discretion, which he deems necessary to "reasonably assure the appearance of the person for trial. . . ."

constitutions.[24] Neither will there be presented any assertion that the money-bail system is an unmitigated evil which ought to be abolished in toto.[25] In short, the scope of the discussion herein will be limited to the questions whether the widespread practice among the states of *setting bail on the sole basis of a bond schedule without regard to the particular circumstances of the individual case* violates, when applied to indigents, either the due process or the equal protection clause of the fourteenth amendment.

## II. Operation of the System—The Invisible Man

In 1958, an informal directive was issued by the Judges of the Criminal Court of Record of Dade County, Florida, directing the Sheriff of Dade County to set bail for defendants charged with crimes triable in the criminal courts and in the justice of the peace courts of Dade County according to a master bond schedule provided by the judges of these courts.[26] A similar directive was also issued to the Sheriff by the Metropolitan Court of Dade County, for cases returnable to that court.[27] Changes in the master bond list are made from time to time upon orders of the various courts.[28]

Thus, upon arrest for a crime, the defendant is brought to the Dade County jail where he is "booked," *i.e.*, custody of the defendant is transferred from the arresting officer or the transporting officer to the booking officer at the jail, and the charges against the defendant are recorded. As part of this booking procedure, bail is set by the booking officer by reference to the master bond list which establishes bond amounts for the most common offenses.[29] No discretion is exercised; the process is strictly mechanical. No inquiry is made by the booking

---

24. *See, e.g.*, Fla. Const. art. I, § 14 (1968):
Every person charged with a crime . . . shall be entitled to release on reasonable bail with sufficient surety unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great.
This new constitution supercedes Fla. Stat. § 903.01 (1967) and the identical Fla. R. Crim. P. 1.1130(a) which provide that "[a]ll persons in custody for the commission of an offense, not capital, shall before conviction be entitled as of right to be admitted to bail. . . ." In any event, in all cases where the offense charged is not punishable by death or life imprisonment, the right to pretrial bail is absolute.
Bail pending appeal is quite another matter, being severely restricted by statutory provisions. *See* Fla. Laws 1969, ch. 69-1, 2, 307.

25. The use of a master bond schedule is a great convenience for all defendants with sufficient resources to meet the required amount because it permits them to secure instant release. It is only the indigent who suffers for lack of a prompt preliminary examination. *See* note 122 and corresponding text *infra*.

26. Complaint at § 7, Ackies v. Purdy, Civil No. 69-1062 (S.D. Fla. 1969).

27. *Id.*

28. Plaintiff's deposition of Jack Sandstrom, Supervisor of Correctional Div. of the Pub. Safety Dept. of Dade County, Florida, at 14, Ackies v. Purdy, Civil No. 69-1062 (S.D. Fla. 1969) [hereinafter cited as Deposition]. The master bond list is itself a compilation of both oral directives and formal written orders of the Chief Judge of the Criminal Court of Record, the Chief Judge of the Metropolitan Court, and the four individual Justices of the Peace. *Id.* at 35.

29. *Id.* at 6 *et seq.*

officer into the background of the defendant before bail is set. Thus, no consideration is given as to whether the defendant has appeared or failed to appear in prior cases in which he may have been released on bond.[30] Neither is any inquiry made with respect to the length of time the defendant has resided in the county, his employment status, family ties, income or assets.[31] The booking officer merely refers to the list for the established bond figure for the offense charged, and the defendant either makes bail (whether by posting the cash bond or by paying the premium on a bond posted by professional bondsmen), or goes directly to jail.[32] He will reman there unless he can get the court to reduce bond. Failing that, the defendant stays in jail until his court date. No judicial determination as to the proper amount of a bond for the individual defendant is made in a normal case.[33] Furthermore, nonjudicial assessment of the defendant's situation is not made with regard, for example, to such factors as the apparent weight of the evidence against the defendant. Actually, such investigation by the booking officer is rendered impossible by the fact that the transporting officer is frequently not the arresting officer and thus has no personal knowledge of the case.[34]

To anyone who respects the law as a just and viable institution, the most shocking facet of this "procedure" is that it constitutes a flagrant violation of the law. Two Florida statutes relating to arrests with and without a warrant unequivocally require that the arrested person be brought before a committing magistrate "without unnecessary delay."[35] Furthermore, "[w]hen the defendant is brought before the magistrate upon an arrest, either with or without a warrant . . . ," it is the statutory duty of the magistrate to conduct a preliminary examination unless the defendant exercises his right to waive it.[36] The purpose of a preliminary examination is, of course, to determine whether there is probable cause to believe that the defendant has committed the offense of which he is accused. If cause is lacking, the defendant is to be discharged from custody;[37] however, if probable cause is found, "the magistrate shall hold him to answer" and "[i]f the defendant is bailable as of right by the magistrate, he shall be admitted to bail."[38] Obviously, if no preliminary hearing is held, all defendants who lack the

---

30. *Id.* at 10.

31. *Id.* at 10, 11.

32. *Id.* at 12.

33. For capital offenses and those carrying a penalty of life imprisonment, there is no listing on the Master Bond Schedule and thus no bond is set at all at the booking. Bond can, however, be set by a judge having jurisdiction over the case. *Id.* at 28, 29.

34. *Id.* at 41.

35. FLA. STAT. § 901.06 (1969) provides that in the case of an arrest pursuant to a warrant, "the officer making the arrest shall without unnecessary delay take the person arrested before the magistrate who issued the warrant. . . ." FLA. STAT. § 901.23 (1969) requires that "[a]n officer who has arrested a person without a warrant, shall without unnecessary delay take the person arrested before the nearest or most accessible magistrate. . . ."

36. FLA. STAT. § 902.01 (1969); FLA. R. CRIM. P. 1.22(a).

37. FLA. STAT. § 902.13 (1969); FLA. R. CRIM. P. 1.22(b)(2).

38. FLA. STAT. § 902.14 (1969).

means to make the bond amount required by the master list must continue to languish in jail until their cases come to trial. On the other hand, those who have made bond suffer no prejudice from the lack of a hearing because they have secured their pretrial freedom.

Notwithstanding the mandatory language of the statutes, however, they are routinely not enforced,[39] with the express condonation of the Florida courts which adhere to the position that a preliminary examination is not essential to due process of law.[40] Moreover, attempts to require their enforcement, such as the contention that the McNabb-Mallory exclusionary rule be adopted, have been rebuffed.[41] Thus, as a general rule no preliminary examination is conducted and bail is not set, as required by law, by a judicial officer at a judicial proceeding.

Occasionally, however, bail is set or modified by a judge in an informal manner. One possibility is that a defendant who is represented by counsel may have his attorney contact the judge by phone to request a reduction in bond from the amount set by the master bond schedule, to set bond where there is no provision for it in the master bond list, or to permit release on recognizance.[42] Occasionally, the reverse of this occurs; that is, the arresting officer may call the judge and request an increase of bond over the master bond amount for a defendant he regards as too dangerous to be at liberty or otherwise a poor risk for bail.[43]

For indigents, however, the street is strictly one-way. The Public Defender's office does not maintain a staff at the jail to consult with persons booked into the jail, and it never interviews a prisoner until assigned to do so by court order.[44] Thus, the Public Defender does not become involved in a case at the booking stage and cannot act in behalf of the defendant for the purpose of securing a reduction in bond or a release on recognizance.

A precise statistical portrait of the human effects of this procedure is difficult to compose. According to the estimates of the Supervisor of the Dade County jail, approximately 36,000 separate bookings into the jail occur in a typical year, of which about 50 percent are for traffic or other county ordinance violations. Of the remaining 18,000 cases triable before the criminal court of record or justice of the peace courts, the supervisor estimates that approximately 75 percent bond out, the vast majority doing so through the services of a professional bondsman.[45] The 75 percent figure seems a bit high in comparison with the findings of a national field study[46] done in various communities across

39. Deposition, *supra* note 28, at 31.
40. Johnson v. State, 181 So.2d 667 (Fla. 1st Dist. 1966).
41. Young v. State, 140 So.2d 97 (Fla. 1962).
42. Deposition, *supra* note 28, at 38, 39.
43. *Id.* at 37.
44. *Id.* at 39, 40.
45. *Id.* at 44.
46. Silverstein, *Bail in the State Courts—A Field Survey and Report*, 50 Minn. L. Rev. 621, 634 (1966).

A069

the nation. The study found that in Dade County, out of a sample of 197 felony defendants, only 29 percent were released on bail.[47] This figure was significantly lower than the 47 percent average for a representative sample of large counties in the country, a large county being defined as having 400,000 or more persons.[48]

In any event, the precise percentage of defendants released on bail is not crucial, for it is beyond dispute that a substantial percentage of defendants are unable to make bail.[49] The consequence of such inability is that the defendant remains incarcerated in the Dade County jail an average of nearly 33 days between the time of arrest and his eventual presentation to a court, and delays of 60 days or more are not uncommon.[50] The inescapable conclusion is that the effects of the bail system upon defendants financially unable to bail out of jail is to confine them for a significant period of time, prior to the commencement of any judicial processes. And, of course, the bail system entraps the innocent as well as the guilty, thereby destroying the value of the constitutional presumption of innocence.[51] This destruction occurs not only because of the pretrial incarceration itself, but because defendants who

---

47. *Id.*, Table 5 at 634.

48. *Id.*

49. *Studies of the operation of the bail system have demonstrated that even at the very lowest levels of bail—say five hundred dollars—where the bail bond premium may be only twenty-five or fifty dollars, there is a very substantial percentage of persons who do not succeed in making bail and are therefore held in custody pending trial.* Packer, *Two Models of the Criminal Process*, 113 U. PA. L. REV. 1, 43, *citing* Attorney General's Committee, *Report on Poverty and the Administration of Federal Criminal Justice* 67, 135 Table IV (1967) [hereinafter cited as Allen Report].

50. Affidavit of Richard N. Tilton, Ackies v. Purdy, Civil No. 69-1062 (S.D. Fla. 1969). The data was gleaned from the files of the clerk of the Dade County Criminal Court of Record for the period between November 17, 1969, to February 18, 1970. Of the sample of 126 defendants who were unable to make bond for one reason or another, the average number of days of incarceration between arrest and initial presentation to a justice of the peace or a criminal court judge was 32.92 days. The minimum period of incarceration was 4 days, and the maximum 92.

51. The presumption of innocence has constitutional status, *i.e.*, it is a requirement of due process of law. *In re* Winship, 90 S. Ct. 1068, 1072 (1970). Nevertheless, those who style themselves realists may object to the rhetoric in the text, as inconsistent with the statistical reality that most persons arrested for serious crimes are in fact guilty. For example, of the 300,000 persons charged with felonies each year, an average of 69% plead guilty. Of the 12% whose cases go to trial, 80% are convicted. Combining these two bits of data yields a "guilt factor" of approximately 79%. (Most of the remaining 19% of cases are dismissed before trial.) L. SILVERSTEIN, DEFENSE OF THE POOR 9 (1965).

On the other hand, a substantial percentage of those accused are never adjudicated guilty. *See* Rankin, *The Effect of Pretrial Detention.* 39 N.Y.U.L. REV. 641, 642 (1964) [hereinafter cited as Rankin] (27% of a sample of 358 jailed defendants were not convicted); Note, *A Study of the Administration of Bail in New York City*, 106 U. PA. L. REV. 693, 727 (1958) [hereinafter cited as *New York Bail Study*] (20% of sample not convicted). In addition, reversals on appeal often lower the proportion of defendants who are legally not guilty.

Ultimately, the controversy is reducible to a conflict between two antipodal conceptions of the criminal process and the value accorded the abstraction of human dignity. *See* Packer, *Two Models of the Criminal Process*, 113 U. PA. L. REV. 1, 38-44 (1964), in which the author posits two antithetical value systems—the Due Process Model and the Crime Control Model.

A070

Case 2:12-5951    Document 008114610844    Filed 03/05/2013    Page

remain in jail pending trial are statistically significantly more likely to be convicted than those who are released on bond.[52] Furthermore, it is obvious that pretrial loss of liberty has other adverse consequences on the personal life of the indigent defendant, among which are loss of employment, disruption of family life, and social ostracism merely from being in jail, regardless of the ultimate disposition of the case.[53]

Before proceeding to the constitutional implications of this system, it is advisable to emphasize that the procedures employed in Dade County are not atypical and do not represent a deviant practice. On the contrary, "in many localities . . . [there is] a fixed schedule geared to the nature of the offense. As a rule, little or no inquiry or allowance is made for individual differences between defendants based on the likelihood to appear at trial."[54] Stationhouse bail is "[o]ne of the most prevalent forms of mechanical bail setting," and while it has the virtue of insuring the prompt release of a defendant with money, it also raises serious questions of fairness: "Set automatically on the basis of the offense, it bypasses any effort to determine the accused's likelihood to return and discriminates most forcefully against defendants without money."[55]

All available studies confirm two dominant characteristics in the national bail pattern: In a system which grants pre-trial liberty for money, those who can afford a bondsman, go free; those who cannot stay in jail.[56]

## III. CONSTITUTIONAL DIMENSIONS

### A. *The Due Process Question*

*The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure, is to enable them to stay out of jail until a trial has found them guilty.*

*Stack* v. *Boyle,* 342 U.S. 1, 7 (1951)
(concurring opinion of Mr. Justice Jackson).

52. Rankin, *supra* note 51. This study disclosed "findings [that] provide strong support for the notion that a causal relationship exists between detention and unfavorable disposition." *Id.* at 655. The study was scrupulous in its attempts to isolate the effect of certain seemingly important variables such as prior record, amount of bail, type of counsel (privately retained or court-appointed), family integration, and employment stability, and concluded that "when considered separately [they] do not account for the statistical relationship between detention before adjudication and unfavorable disposition." *Id.* at 655. The point is developed further at p. 822 *infra. See also* the foreword to this study, Wald, *Pretrial Detention and Ultimate Freedom: A Statistical Study,* 39 N.Y.U.L. REV. 631 (1964) [hereinafter cited as Wald].

53. RANSOM *supra,* note 15, at 32.

54: FREED & WALD, BAIL IN THE UNITED STATES: *1964,* 18-21 (1964) [hereinafter cited as FREED].

55. *Id.*

56. *Id.*

Query: Does the use of a master bond schedule to set bail in uniform amounts for a given category of offense without regard to the particular circumstances of the case deprive an accused of his liberty without due process of law? It has already been demonstrated that the effect upon indigent defendants of this system is to keep them incarcerated for substantial periods of time,[57] before the commencing of any judicial processes. Certainly, this runs counter to elementary notions of fair play, but is it also repugnant to the Federal Constitution?

The starting point of analysis is the proposition that, although it is frequently utilized for a variety of other purposes,[58] the setting of bail has only one legitimate, *i.e.*, officially sanctioned function,[59] to wit: to ensure the presence of the accused at his trial and his amenability to orders of the court resulting therefrom.

---

57. *See* note 50 *supra*.

58. "The system of bail is used also by society as a social and political weapon to punish in advance of trial and sentence those it does not like." RANSOM, *supra* note 15, at 2. Goldfarb is not alone in perceiving a credibility gap. "Although bail is recognized in the law solely as a method of insuring the defendant's appearance at trial, judges often use it as a way of keeping in jail persons they fear will commit crimes if released before trial." PRESIDENT'S COMM'N ON LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE, THE CHALLENGE OF CRIME IN A FREE SOCIETY 131 (1967) [hereinafter cited as CHALLENGE OF CRIME]. "The Theory that bail serves solely to insure appearance for trial may be universally expounded by appellate courts, but the practice of trial courts tells quite another story." FREED, *supra* note 54, at 11.

59. Despite the hypocrisy documented in note 58 *supra* and the corresponding text, a legitimate case can be made for using bail to maintain incarceration of the accused where he poses a threat to society, whether because of this propensity to commit another crime, flee the jurisdiction, intimidate witnesses, etc. The practice has in fact received judicial approbation. *See* Sellers v. United States, 89 S. Ct. 36 (1968) (Black, Cir. J.) (dictum); Rehman v. California, 85 S. Ct. 8 (1964) (Douglas, Cir. J.); Carbo v. United States, 82 S. Ct. 662 (1962) (Douglas, Cir. J.). It should be noted, however, that the foregoing cases involve the question of a denial of bail pending appeal, which is distinguishable from pretrial detention because the presumption of innocence is destroyed upon conviction.

In any event, it is quite clear that the case for pretrial detention *has nothing whatsoever to do* with the determination of the proper bail amount in a given case; on the contrary, it is relevant only to the initial determination of whether to set any bail at all. Furthermore, even a total denial of admission to bail affords the defendant minimal due process guarantees because a hearing is held to consider the circumstance of the individual's case; bail is not *granted or denied*, as in the manner of bail setting under a master bond schedule, simply by reference to the name or category of offense charged.

Considered in this regard, the preventive detention bill now pending in Congress, S. 2600, 91st Cong., 1st Sess. (1969), would amend the Federal Bail Reform Act of 1966, 18 U.S.C. § 3146(b) (Supp IV 1964) to permit the denial of bail if pretrial release would jeopardize the safety of any other person or the community. But even in that event, a hearing would be required at which the full array of due process guarantees would be afforded, *e.g.*, the right to counsel and to cross-examination, the government would bear the burden of proof of the defendant's alleged dangerousness, and a judicial officer would have to make written findings of fact in addition to concluding that "there is substantial probability that the defendant committed the offense with which he is charged." Finally, the pretrial detention would be limited to a maximum of 60 days. For a discussion and summary of the bill, see Mitchell, *Bail Reform and the Constitutionality of Pretrial Detention*, 55 VA. L. REV. 1223 (1969).

Ironically, the safeguards included in a proposal to deny totally admission to bail in limited circumstances far surpass in fairness the procedures, or lack thereof, employed under a master bond schedule system, which purports to grant pretrial freedom.

> A recognizance of bail, in a criminal case, is taken to secure the due attendance of the party accused, to answer the indictment, and to submit to a trial, and the judgment of the court thereon.[60]

The foregoing conception of the role of bail was articulated by the United States Supreme Court in 1834, and more than a century later that formulation was still adhered to in the leading case of *Stack v. Boyle*.[61]

> The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty. Like the ancient practice of securing oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused.[62]

Given this limited function, "the fixing of bail for any individual defendant must be based upon *standards relevant to the purpose of assuring the presence of that defendant*."[63] These standards have been recognized by the law for many years. For example, four traditional criteria are adopted in Federal Rules of Criminal Procedure. They are the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail, and the character of the defendant.[64] Under the 1966 Federal Bail Reform Act,[65] several additional criteria[66] were adopted in order "to assure that all persons, regardless of financial status, shall not needlessly be detained pending their appearance . . . , when detention serves neither the ends of justice nor the public interest."[67]

---

60. *Ex parte* Milburn, 34 U.S. 704, 710 (1835). *Accord*, Cheney v. Trammell, 65 Fla. 451, 62 So. 916 (Fla. 1913), State *ex rel*. Crabb v. Carson, 189 So.2d 376 (Fla. 1st Dist. 1966); FLA. STAT. § 903.12 (1967); FLA. R. CRIM. P. 1.130(d).

61. 342 U.S. 1 (1951).

62. *Id.* at 4, 5.

63. *Id.* at 5 (emphasis added).

64. FED. R. CRIM. P. 46(c).

65. 18 U.S.C. § 3146(b) (Supp. IV 1964).

66. In determining which conditions of release will reasonably assure appearance, the judicial officer shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the accused, the accused's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions, and his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings.

*Id.* Ironically, nearly identical criteria are adopted by FLA. STAT. § 903.03(2)(a) (1969), which only comes into operation *after* an accused is held to answer by a magistrate. Thus, for indigents, the lack of a preliminary examination renders the statutory criteria for pretrial release a nullity.

*See* note 59 *supra*, in regard to the proposed preventive detention amendment to the Bail Reform Act of 1966, S. 2600, 91st Cong., 1st Sess. (1969).

67. 80 Stat. 214 § 2 (1966).

Obviously, the use of a master bond schedule necessarily means that there are no "standards relevant to the purpose of assuring the presence of the defendant." Under a master bond system, there is only one relevant question: What is the name of the offense with which the defendant is charged? To answer this question, of course, no inquiry into the particular circumstances of the individual case is necessary. But then, what of the principle that "[e]ach defendant stands before the bar of justice as an individual"?[68] If this is indeed a principle of American jurisprudence, and not merely a rhetorically ringing but meaningless dictum, then one thing becomes absolutely clear: a hearing is required by the Constitution before any substantial confinement may occur. Although "[m]any controversies have raged about the cryptic and abstract words of the due process clause . . . ,"[69] there can be no doubt that "[t]he fundamental requisite of due process of law is the opportunity to be heard."[70] This proposition is so well ensconced in the constitutional pantheon that no further citation is necessary.

> It is sufficient to say that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice and an opportunity of being heard . . . .[71]

Not only is a hearing the *sine qua non* of due process for ideological reasons,[72] but it also serves a vital pragmatic function as well. The United States Supreme Court has characterized the hiatus between the institution of formal charges and the commencement of trial as "perhaps the most critical period of the proceedings . . . when consultation, thoroughgoing investigation and preparation [are] vitally important . . . ."[73]

> Without this conditional privilege [of bail], those wrongly accused are punished by a period of imprisonment, while awaiting trial and are *handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense.*[74]

These are only a few of the impediments to the conduct of the trial itself, and they are relatively obvious. In fact, the handicap placed

---

68. Stack v. Boyle, 342 U.S. 1, 9 (1951) (Jackson, J., concurring).
69. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313 (1950).
70. Grannis v. Ordean, 234 U.S. 385, 394 (1914).
71. Holden v. Hardy, 169 U.S. 366, 389-90 (1898).
72. The second objective . . . [in addition to assuring the reliability of the guilt-determining process] traditionally deemed a part of the due process of law is more elusive and subtle. But its vitality is manifest in a number of requirements not fully explicable in terms of the first objective. . . . Central to these requirements is the notion of man's dignity, which is denigrated . . . by procedures that fail to respect his intrinsic privacy . . . .
Kadish, *Methodology and Criteria in Due Process Adjudication—A Survey and Criticism,* 66 Yale L.J. 319, 347 (1957).
73. Powell v. Alabama, 287 U.S. 45, 57 (1932).
74. Stack v. Boyle, 342 U.S. 1, 7 (1951) (Jackson, J. concurring).

**A074**

upon a jailed accused in the preparation of his defense are overwhelming. But like a stone cast into a pond, pretrial detention has ever-widening ramifications.

> The economic facts of the bail system go even further. When the defendant who cannot afford bail goes to jail before trial, he loses his present earning capacity, and often his job. His family suffers. Some people have been forced onto relief rolls as a result of lost earning capacity caused by pre-trial detention. All of this happens *before trial, without regard to their guilt or innocence.* It is, in effect, punishment for the crime of poverty.[75]

Thus, the gravamen of the due process argument with respect to a bail process that incarcerates the poor for substantial periods of time before trial has two components: first, the confinement is tantamount to punishment before trial, a flagrant violation of procedural due process requirements; and second, its consequences are so prejudicial as to deny fundamental fairness at trial. The latter proposition is a demonstrable reality, as the following table illustrates:

TABLE 1

RELATIONSHIP BETWEEN DETENTION AND UNFAVORABLE DISPOSITION[76]

| Disposition | Bail | Jail |
|---|---|---|
| | % | % |
| Sentenced to prison | 17 | 64 |
| Convicted without prison | 36 | 9 |
| Not convicted | 47 | 27 |
| Number of defendants | (374) | (358) |

The statistics speak volumes, but perhaps in order to realize their full impact it is necessary to verbalize them:

> What is surprising, even shocking, is the fact disclosed by this study that jailed first offenders not only are twice as likely to be convicted and six times as likely to receive prison sentences as bailed first offenders, but that bailed first offenders are half again as likely to receive prison sentences as bailed repeat offenders. According to this study, a defendant with a prior record who manages to obtain bail stands a far better chance of probation or suspended sentence than a first offender who is held in detention.[77]

---

75. RANSOM, *supra* note 15, at 32 (emphasis added).

76. Rankin, *supra* note 51, at 642. The sample is composed of felony defendants charged in New York City during the years 1961 and 1962.

77. Wald, *supra* note 52, at 635. Further, prejudice may result from the ever-present pressure on jailed defendants to plead guilty. One study showed only 74.6% of the bailed defendants, as opposed to 89.6% of the jailed defendants, pleaded guilty. *New York Bail*

A075

With respect to the former contention, *i.e.*, that loss of pretrial liberty is punishment in advance of judgment, the conclusion is not quite as compelling. The concept of due process requires a fair proceeding before a forum with jurisdiction prior to the rendition of *final* judgment. This is obviously distinguishable from incarceration resulting from inability to make bail pending the commencement of the trial. Nevertheless, pretrial detention, apart from the prejudicial consequences flowing therefrom, is not rendered less "final" in a nonlegal sense by the absence of a final judgment; the time spent in jail is irretrievably lost to the defendant.

At this juncture, comparison with judicial decisions which require a hearing in administrative proceedings as the minimum requisite of due process is illuminating. Thus, the courts have held that a hearing is required prior to discharging an employee from public employment,[78] prior to a revocation of a security clearance of a civilian employee,[79] prior to a denial of admission to a state bar,[80] prior to the expulsion of a student from a publicly operated school,[81] and prior to the termination of welfare benefits.[82]

Keeping in mind that these are all nonjudicial proceedings, that the consequences of administrative arbitrariness generally result in the detriment of property rights rather than the loss of individual liberty, and that the standards of procedural due process are, and should unquestionably be, more stringent in criminal proceedings, the compelling conclusion is that the failure of the state to accord a hearing prior to imposing pretrial detention is a deprivation of liberty without due process of law. In fact, if it is true that "[p]resentence liberty may be one of the most significant rights that a free society can grant an accused,"[83] there can be only one conclusion: In a society which ostensibly respects the integrity of human personality, a person accused of crime has a right to expect and to be accorded a prompt hearing for inquiry into the individual circumstances of his situation before being condemned by neglect to suffer pretrial imprisonment.[84]

---

*Study, supra* note 51, at 727. *See* Note, *Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas,* 112 U. Pa. L. Rev. 865 (1964).

78. Slochower v. Board of Higher Educ., 350 U.S. 551 (1956). For an extensive treatment of the due process requirement and its rationale in administrative proceedings, *see* Davis, *The Requirement of a Trial-Type Hearing,* 70 Harv. L. Rev. 193 (1956).

79. Greene v. McElroy, 360 U.S. 474 (1958).

80. Willner v. Committee on Character and Fitness, 373 U.S. 96 (1963).

81. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961).

82. Goldberg v. Kelly, 90 S. Ct. 1011 (1970).

83. Wald, *supra* note 52, at 631.

84. Consider in this regard the recommendation of the Presidential Comm'n on Civil Disorders contained in the report of the Nat'l Advisory Comm'n of Civil Disorders—1968. In chapter 13, "The Administration of Justice under Emergency Conditions," the Commission recommended a hearing for each defendant arrested under riot conditions:

When the riot defendant comes before the court, *he should receive an individual determination of bail amount.* He should be represented by counsel and the judge should ascertain from counsel, client and bail interviewer the relevant facts of his

## B. *The Equal Protection Question*

> *The American bail system discriminates against and punishes the poor. The rich can afford to buy their freedom, and do; the poor go to jail because they cannot afford the premium for a bail bond.*

R. GOLDFARB, RANSOM, 32 (1968).

Query: Does the equal protection clause of the fourteenth amendment forbid the fixed-schedule setting of bail without regard to the individual circumstances of an "indigent"[85] defendant on the theory that it is an unreasonable and arbitrary discrimination? While no case has directly considered this point, there is substantial case authority by analogy for the proposition that it is an unreasonable and arbitrary economic discrimination. Beginning in 1956, the Supreme Court of the United States has rendered decisions in an unbroken chain of cases which suggest the broad constitutional rule that any deprivation of fundamental rights incident to criminal prosecution which is based on the poverty of the accused is a violation of the equal protection clause.

---

background, age, living arrangements, employment and past record. Uniform bail amounts based on charges and riot conditions alone should be shunned as unfair. *Id.* at 192 (emphasis added).

If this is the recommended procedure under riot and mass arrests where fixed bail schedules would facilitate the awesome problem of processing the arrests, it should follow, *a fortiori*, that a hearing should be required in the case of an ordinary arrest.

85. A major definitional problem inheres in use of the word "indigency," which is employed throughout this article. The establishment of satisfactory criteria for the determination of indigency is, of course, a necessary precondition to the achievement of a fair bail system for the poor. Yet, a definitive answer to the question is rendered impossible by the infinite permutations of financial status. A man with $100,000 in assets and $101,000 in liabilities (and no current income), for example, is technically insolvent, while a man with four dependents, no debts, and an annual income of $3,500 is not indigent, although he falls below the Federal Government's guidelines on poverty.

The key seems to lie in liquidity, *i.e.*, the possession or availability of cash. Thus, for purposes of assigning court-appointed counsel, the prevailing test of indigency is whether the accused is able to make bond. This, of course, brings us full circle to the question initially posed. Suppose a defendant has a few hundred dollars with which he can either hire counsel or post bond. Is he indigent for the purpose for which he does *not* use the money? Further, should he be required to go into debt to raise the money for either purpose? Suppose he has nonliquid assets, such as a car, which he uses for transportation to and from his job. Should he be required to sell it? Questions of this kind can be multiplied *ad infinitum*, and no very satisfactory answer for any of them is apparent. *See generally* L. SILVERSTEIN, DEFENSE FOR THE POOR 106-09 (1965).

For purposes of this article, the author will fall back upon the compromised but liberal definition suggested by the *Allen Report*:

> An impoverished accused is not necessarily one totally devoid of means. A problem of poverty arises for the system of criminal justice when *at any stage of the proceedings* lack of means in the accused substantially inhibits or prevents the proper assertion of a right or a claim of right.

This definition is useful in a discussion of bail because it recognizes the concept of the near-indigent or the person of insufficient means, rather than dwelling on the less common status of total destitution. For both, the emphasis must be on noneconomic factors which demonstrate reliability for release without bond.

For judicial discussions of what constitutes indigency, *see* State v. Vallejos, 87 Ariz. 119, 348 P.2d 554 (1960); *In re* Patterson, 136 Colo. 401, 317 P.2d 1041 (1957); Pearlman v. State, 226 Md. 67, 172 A.2d 395 (1961).

A077

This "new fetish for indigency," as Mr. Justice Clark scornfully referred to it,[86] began with the seminal case of *Griffin v. Illinois*.[87] In *Griffin*, full and direct appellate review from an Illinois conviction required at least a partial stenographic transcript of the trial. By a vote of 5 to 4, the Court upheld the contention that the due process and equal protection clauses of the fourteenth amendment required that all indigent defendants be furnished without cost a transcript necessary for the prosecution of an appeal. Justice Black announced the four man plurality opinion.

> In criminal trials a State can no more discriminate on account of poverty that on account of religion, race, or color. Plainly the ability to pay costs in advance bears no rational relationship to a defendant's guilt or innocence . . . .[88]
> . . . .
>
> It is true that a State is not required by the Federal Constitution to provide . . . appellate review at all . . . . But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty.[89]
> . . . .
>
> There can be no equal justice where the kind of trial a man gets depends on the amount of money he has.[90]

The principles of the *Griffin* case were reaffirmed in the case of *Douglas v. California*.[91] In that case, petitioners were convicted of 13 felonies in a California court. Thereafter, they appealed as of right to the California District Court of Appeal and requested the appointment of counsel to assist them. The request was denied, and the Supreme Court of the United States held that such a denial was a violation of their constitutional rights.

> [W]here the merits of *the one and only appeal* an indigent has of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor.[92]

Again, the leitmotif appeared: "[T]here can be no equal justice where the kind of an appeal a man enjoys 'depends on the amount of money he has.' "[93]

---

86. Douglas v. California, 372 U.S. 353, 359 (1963) (dissenting opinion).
87. 351 U.S. 12 (1956).
88. Griffin v. Illinois, 351 U.S. 12, 17, 18 (1956).
89. *Id.* at 18.
90. *Id.* at 19.
91. 372 U.S. 353 (1963).
92. *Id.* at 357.
93. *Id.* at 355, *citing Griffin*. The view of the issues taken by the dissenters was

The principles first articulated in *Griffin* and *Douglas* have been expanded and further entrenched in a sequence of subsequent cases in which the Court has invalidated many state provisions in criminal law which impose intolerable burdens upon the poor man. In *Burns v. Ohio*,[94] for example, the Court invalidated the practice of requiring a $20.00 filing fee before the Ohio Supreme Court would consider motions to hear appeals of felony convictions. As applied to indigents, the fee was held violative of the equal protective clause, based on the authority of *Griffin*. "The imposition by the State of financial barriers restricting the availability of appellate review for indigent criminal defendants has no place in our heritage of Equal Justice Under Law."[95] Similarly, in *Smith v. Bennett*,[96] the Court held Iowa's statutory requirement that a $4.00 filing fee accompany petitions for writs of habeas corpus to be violative of the equal protection clause. The Court declared that "to interpose any financial consideration between an indigent prisoner of the State and his exercise of a state right to sue for his liberty is to deny that prisoner equal protection of the laws."[97]

Even procedures which impose lesser burdens of a nonmonetary nature upon indigents have similarly fallen to the proscription of the equal protection clause under the hand of the Supreme Court. For example, in *Lane v. Brown*,[98] Indiana's public defender act providing for assistance of counsel to represent indigent prisoners in postconviction proceedings was held unconstitutional. The defendant had unsuccessfully filed a petition for a writ of error *coram nobis* in the trial court. The statute required the public defender's approval before an indigent criminal defendant could obtain a free transcript of record which was necessary to perfect an appeal from a denial of a petition for such a writ. The case was decided on the authority of *Griffin*. In *Draper v.*

---

quite opposed to this line of thought. The opinion by Mr. Justice Harlan, in which Mr. Justice Stewart joined, put the whole controversy into sharp relief:

> The States, of course, are prohibited by the Equal Protection Clause from discriminating between 'rich' and 'poor' *as such* in the formulation and application of their laws. But it is a far different thing to suggest that this provision prevents the State from adopting a law of general applicability that may affect the poor more harshly than it does the rich . . . . Every financial exaction which the State imposed on a uniform basis is more easily satisfied by the well-to-do than by the indigent. Yet I take it that no one would dispute the constitutional power of the State . . . to impose a standard fine for criminal violations, or to establish minimum bail amounts for various categories of offenses.

*Id.* at 361.

> Laws such as these do not deny equal protection to the less fortunate for one essential reason: The Equal Protection Clause does not impose on the States 'an affirmative duty to lift the handicaps flowing from differences in economic circumstances.'

*Id.* at 362.

    94. 360 U.S. 252 (1959).
    95. *Id* at 258.
    96. 365 U.S. 708 (1961).
    97. *Id.* at 709.
    98. 372 U.S. 477 (1963).

*Washington*,[99] the affirmance by the state supreme court on the sole basis of a stenographic record of a hearing on a motion by an indigent defendant for a trial transcript which was necessary for an appeal of the trial was held to violate the equal protection clause because it did not constitute a record of sufficient completeness as required by the fourteenth amendment. This too was decided on the basis of *Griffin*.

Dispensing with the citation of numerous other cases, the proposition seems well-established that the denial or unavailability to an indigent defendant of important rights or procedures in the criminal process which are available to the man with means is violative of the equal protection clause of the fourteenth amendment. But there is an ambiguity in the broad meaning of this body of case law. It cannot fairly be read for the strict proposition that in all situations the state must afford precise economic equality in its criminal procedures. "Absolute equality is not required; lines can be and are drawn and we often sustain them."[100] It may be that the more reasonable interpretation of these cases is that, rather than being required to put all defendants upon a footing of equality regardless of their financial status, the state need only guarantee equal access to its established criminal procedures.

> In all cases the duty of the State is to provide the indigent as adequate and effective an appellate review as that given appellants with funds—the State must provide the indigent defendant with means of presenting his contentions to the appellate court which are as good as those available to a non-indigent defendant with similar contentions.[101]

What, then, is the lesson of these cases with respect to the question of setting bail for an indigent? In the absence of decisional authority directly on point,[102] analogy to traditional judicial criteria for determining whether a classification violates the equal protection clause must be relied upon. The traditional test states that equal protection is denied only if the classification is "without any reasonable basis and therefore is purely arbitrary."[103] However, where a classification relates to "funda-

---

99. *372 U.S. 487 (1963).*

100. Douglas v. California, 372 U.S. 353, 357 (1963).

101. Draper v. Washington, 372 U.S. 487, 496 (1963).

102. The financial inability of a defendant to make bail does not *per se* render that amount excessive. Stack v. Boyle, 342 U.S. 1 (1951); White v. United States, 330 F.2d 811 (8th Cir. 1964). These cases do not, however, deal with the issue of whether the setting of any bail for indigents is excessive or violative of equal protection. In the latter regard, *see* Pelletier v. United States, 343 F.2d 322 (D.C. Cir. 1965). "It is an individous discrimination to deny appellant release because of his poverty . . . ." *Id.* at 323 (Bazelon, C.J., dissenting). Justice Bazelon takes the same position in Pannell v. United States, 320 F.2d 698, 701 (D.C. Cir. 1963). Research has not disclosed a case where a majority opinion has held that bail may not be required of an indigent defendant. *See* notes 114-19 and accompanying text *infra* in regard to the opinion of Justice Douglas in Bandy v. United States, 81 S. Ct. 197 (1960) (Douglas Circ. J.).

103. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911); *see* Rinaldi v. Yeager, 384 U.S. 305 (1966), wherein the Supreme Court invalidated for want of a

mental" rights, "its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest."[104] Under either test, the constitutionality of the master-bond-schedule method of setting bail is suspect. The use of the master lists creates two categories of persons; those who can afford the master bond bail and secure their release from jail, and those who cannot. The question then arises, whether this system of classification bears a rational relationship to a legitimate power of the state, which is to secure the appearance of the defendant at trial. It is difficult to find such a rational relationship in the system, given the fact that the majority of bail bonds are procured through the services of a professional bail bondsman.[105] In that event, the premium once paid is lost forever, and the defendant who posts a bail bond instead of the cash itself has no monetary stake in returning to stand trial.[106] Furthermore, "the ability to pay costs in advance *bears no rational relationship* to a defendant's guilt or innocence and could not be used as an excuse to deprive a defendant of a fair trial."[107] Analogously, the ability to make bond bears no rational relationship to the likelihood that the defendant will appear for trial. If, then, the poverty of the accused is not a constitutionally permissible basis upon which to deny him the guarantees of procedural due process at trial, can it be sustained as the sole criterion upon which to deprive him of pretrial liberty?

Even if the classification established by the master bond list could pass constitutional muster under the traditional standard of a rational basis, there is a much greater obstacle to be surmounted under the compelling interest test of equal protection.[108] Since the classification which

---

rational basis a New Jersey statute requiring reimbursement of costs from unsuccessful appellants who were sentenced to prison, but not from those who were merely fined, put on probation, or otherwise disposed of. "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes . . . . It also imposes a requirement of some rationality in the nature of the class singled out." *Id.* at 308-09.

104. Shapiro v. Thompson, 394 U.S. 618, 638 (1969); *see also* Williams v. Rhodes, 393 U.S. 23, 31 (1969).

105. In New York City, for example, nearly all bail is posted through commercial sources. *New York Bail Study, supra* note 51, at 703-04.

106. *See* Ryan, *The Last Days of Bail*, 58 J. CRIM. L.C. & P.S. 542, 544 (1967). Technically, the defendant who defaults by not appearing for trial would be liable as the principal on the surety bond. In reality, however, the only significant deterrent against such default is criminal prosecution, whether by contempt citation or for flight to avoid prosecution. The latter applies equally to those who pay a bail bondsman, post a cash bond, or are released without bond. Thus, the rational basis for requiring a bond as a condition of pretrial release is extremely attenuated.

107. Griffin v. Illinois, 351 U.S. 12, 17, 18 (1956) (emphasis added).

108. [W]e reject appellants' argument that a mere showing of a rational relationship between the [statute] . . . and these four admittedly permissible state objectives will suffice to justify the classification . . . . [A]ppellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.
Shapiro v. Thompson, 394 U.S. 618, 634 (1969).

results from a master bond list relates to the asserted fundamental right not to be deprived of liberty without due process of law, the use of the list must be scrutinized under the stricter test. In other words, the state must show that a compelling interest is promoted by the use of the master list without a hearing and its resultant classification. Given the tenuous rationality of the classifications, it follows, *a fortiori*, that the master bond schedule fulfills no such vital function. On the contrary, the plausible conclusion is that the setting of bond for indigents solely by reference to a master bond schedule, and without an individual hearing, creates an arbitrary, unreasonable, or invidious discrimination[109] in violation of the equal protection clause. In short, the use of a master bond schedule is inconsistent with the judicial command that "all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.' "[110]

To reach this conclusion, however, is not to solve the problem but merely to raise a further question. If the fourteenth amendment prohibits pretrial incarceration of defendants who cannot make the bond required by the master schedule, then what is to be done with them? Unless the entire bail system itself is to be abolished, the states cannot be prohibited from setting any bail for indigents, for that would produce the absurd result of automatic release for indigents,[111] but not for those who merely lack enough money to make bond. It must be remembered that the law grants a right to be released on bail[112] and only requires that it not be excessive.[113] But this is an empty guarantee for that percentage of the population for whom any bail is excessive.

Perhaps, the best approach to this conundrum is to adopt the position advanced by Mr. Justice Douglas sitting as a Circuit Justice

---

109. "[O]ur own constitutional guarantees of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons." Griffin v. Illinois, 351 U.S. 12, 17 (1956).

110. *Id., citing* Chambers v. Florida, 309 U.S. 227, 241 (1939).

111. *See* Walls v. Genung, 198 So.2d 30 (Fla. 1967), wherein the court rejected the petitioner's claim that the requirement of a money bond (low in his case—$850) from an indigent defendant was inconsistent with due process and equal protection because it "would make of indigency a pass-key to all places of restraint to which he might be committed prior to trial." *Id.* at 31. *See also Ex parte* Smith, 141 Fla. 434, 193 So. 431 (1940), where it was stated that it would be a futile gesture for the judge to grant a motion for reduction of bond where it did not appear that petitioner could make bail in any amount.

112. The right in Florida is granted by constitution, statute, and rule of procedure. *See* note 24 *supra.*

113. Jones v. Cunningham, 126 Fla. 333, 170 So. 633 (1936). Reasonable bail is determined by the circumstances of the case. Mendenhall v. Sweat, 117 Fla. 659, 158 So. 280 (1934). Ironically the latter case also holds that the fixing of excessive bail is tantamount to a denial of bail, and that a reasonable amount is one that does not "preclude the probability of the ordinary citizen in like circumstances and conditions of those of the accused being able to furnish [it] . . . ." *Id.* at 663, 158 So. at 282. This formula is readily adaptable to facilitate the pretrial release of the poor by setting no bail or low bail (*e.g.*, $1). There is no Florida case authority for this proposition, however.

in *Bandy v. United States*.[114] Mr. Douglas first stated the problem in a manner which provides authority, albeit by way of *obiter dictum*, for the proposition that *Griffin* and its progeny may be specifically applicable to the problem posed by the application of the money bail system to an indigent defendant:[115]

> [The] theory [of bail] is based on the assumption that a defendant has property. . . . We have held that an indigent defendant is denied equal protection of the law if he is denied an appeal on equal terms with other defendants, solely because of his indigence [citation omitted]. Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?[116]

Evading a direct answer to his own question, Justice Douglas went on to say that "I approach this application with the conviction that the right to release is heavily favored and that the requirement of security for the bond may, in a proper case, be dispensed with."[117] Douglas did not, however, order Bandy's release without bond, which had already been set at $5,000.00 upon a prior petition.[118] Bandy soon renewed his application for release without bond, whereupon Justice Douglas delivered another important statement in the form of dictum:

> Further reflection has led me to conclude that *no man should be denied release because of indigence*. Instead, under our constitutional system, a man is entitled to be released on 'personal recognizance' where other relevant factors make it reasonable to believe that he will comply with the orders of the Court.[119]

This, it is submitted, provides a reasonable alternative to the problem of how indigent defendants should be treated for purposes of admission to bail. Stated simply, a judicial examination into the individual

---

114. 81 S. Ct. 197 (1960) (Douglas, Cir. J.). There are actually three *Bandy* cases concerned with bail. The complicated history of the litigation is set forth in detail by *Foote, supra* note 16, at 1154 n.274.

115. The application of the *Griffin* rule to the bail problem runs, in skeletal form, as follows. The State of Florida grants an absolute right to bail in all cases except those where the offense is punishable by death or life imprisonment. In all other cases, there is a right to bail, limited however, by the requirement of "sufficient sureties." Upon arrest in the typical case, the only way to secure prompt pretrial release is to post a cash bond or pay a bondsman to post it. This monetary requirement is a blatant economic discrimination against the poor which is lacking in any rational justification, or, in the alternative, which fails to promote a compelling state interest for its infringement of a fundamental right, *i.e.*, the right to pretrial liberty.

116. Bandy v. United States, 81 S. Ct. 197, 198 (1960) (Douglas, Cir. J.).

117. *Id.*

118. Bandy v. United States, 81 S. Ct. 25 (1960) (Douglas, Cir. J.).

119. Bandy v. United States, 82 S. Ct. 11, 13 (1961) (Douglas, Cir. J.) (emphasis added). Compare this proposition with the statement in CHALLENGE OF CRIME, *supra* note 58, at 131, which goes even further in recommending that "money" bail should be imposed only when reasonable alternatives are not available.

circumstances of the case should be held to determine whether the accused should be released, the determination to be made according to the sole criterion whether the defendant will return to stand trial.[120] If his appearance seems reasonably assured, then bail can be totally dispensed with or set in a nominal amount. This approach has the further virtue of eluding the definitional problem of indigency. If, for example, a poor, but not destitute, defendant can raise five dollars, and he is otherwise a good risk for pretrial release, bail can be set in the nominal sum.

Ultimately, the crux of the matter is the necessity of a pretrial hearing at which such inquiry can be made. Thus, the solution to the equal protection problem lies in the minimal guarantee of procedural due process. Nevertheless, regardless of the constitutional label applied to the approach, the important thing is that a conditional right of pretrial release should be established for all accused persons regardless of income or wealth. This would make a reality of the Supreme Court's pronunciamento that "the Fourteenth Amendment weighs the interests of rich and poor criminals in equal scale, and its hand extends as far to each."[121]

## IV. CONCLUSION

Having arrived at the conclusion that both due process of law and equal protection of law are violated by the master-bond-schedule bail system employed in Dade County and in many other metropolitan areas, the next phase of inquiry shifts to focus upon reform of the repugnant aspects of that system.

The author's suggestion is not that the master bond system should be swiftly and totally excised; on the contrary, it is a device of great social utility for those accused persons who have sufficient money to meet the scheduled amount since it enables them to obtain instant release from custody.[122] What is necessary is a dual system of admission to bail whereby those who cannot make the scheduled amount at the book-

---

120. If the state wishes to adopt a preventive detention measure for recidivists or others about whom it is reasonable to perceive a threat to the peace and safety of the community, it might pass constitutional muster if properly restricted. The real point, however, is that in either case a prompt hearing would be held to determine whether the accused should be released, and if so, upon what conditions.

121. Smith v. Bennett, 365 U.S. 708, 714 (1961).

122. The same rapid release could also be accomplished without station house bond if magistrates are located at the jail or wherever the booking is performed. This, of course, would require the presence of committing magistrates on a 24-hour basis; however, this represents the most progressive reform. But, since it entails considerable additional expense for a jurisdiction that has no committing magistrate system, it is not likely to be adopted. The best that can realistically be hoped for is a compromise version which insures a prompt preliminary examination, preferably within twenty-four hours. Other proposals have been even more tolerant of delay; the PRESIDENT's COMM'N ON LAW EN-FORCEMENT AND ADMINISTRATION OF JUSTICE: TASK FORCE 85 (1967) recommended a maximum delay of 72 hours. For this reason, station house bond should be retained.

Case: 12-5951    Document: 00611141841    Filed: 03/06/2013    Page:

ing are given a prompt hearing at which a reduction of bond and/or other conditions of release are considered by the judicial officer. In addition, those persons who were able to meet the stationhouse bail amount could be examined to determine whether that amount is proper or is in need of revision up or down in light of the individual circumstances of the case.

To accomplish this end, existing machinery is adequate; all that is required is the strict judicial enforcement of Florida Statutes sections 901.06 and 901.23 so that persons arrested will be taken before a committing magistrate "without unnecessary delay."[123] This, in turn, almost certainly requires the adoption of the McNabb-Mallory rule[124] or some modified version, although statutory compliance might be achieved through new legislation assessing penalties against police officers who violate their statutory duty. Recently, proposed legislation was introduced into the Florida Legislature which was a hybrid of the two approaches.[125] Whichever road is traveled, the destination must be the same: an absolute requirement of a preliminary examination promptly after arrest, at least for those unable to make stationhouse bond.

At this hearing, which need not be an adversary proceeding (although the assignment of counsel to indigent defendants is desirable), the judicial officer must inquire into all relevant factors of the defendant's background according to prescribed criteria. The standards set forth in the Federal Bail Reform Act of 1966[126] provide adequate guidelines which Florida has already adopted in the from of Florida Statutes section 903.03.[127] Whatever the standards applied, the focus of the in-

---

123. *See* note 35 *supra.*

124. *See* note 17 *supra.*

125. H.B. 647 (April 11, 1969). The bill would require the presentation of the arrestee within the first six daylight hours after arrest; failing that, he is to be released from custody immediately. The McNabb-Mallory exclusionary rule is also included in that "[a]ny evidence obtained from the arrestee prior to his being taken before a committing magistrate shall be inadmissible in court." Finally, the failure of a law enforcement officer to adhere to the requirements of the act may be considered an indirect civil contempt of court for which the arrestee may recover money damages against the officer at the rate of $50.00 per hour.

126. *See* note 66 *supra.*

127. FLA. STAT. § 903.03(1) (1969):
(1) After a person is held to answer by a magistrate, the court having jurisdiction to try the defendant shall . . . have jurisdiction to hear and decide all preliminary motions as to bail . . . .
(2) (a) The Florida parole and probation commission shall have the authority and upon the request of the judicial officer . . . in whose court a person charged with . . . bailable offense is held . . . to make an investigation and report to said judicial officer, which may include the following:
    1. The circumstances of the accused's family ties, employment, financial resources, character and mental condition, the length of residence in the community;
    2. His record of convictions and record of appearance at court proceedings or record of flight to avoid prosecution or failure to appear at court proceedings; and
    3. Such other facts as may be needed to assist the court in its determination of the indigency of the accused and whether he should be released on his own recognizance.
(b) The judicial officers shall not be bound by such recommendations.

A085

quiry should be the determination of conditions of release adequate to assure the appearance of the defendant at trial.[128] The right to release should be favored strongly, and those arrested of limited means ought to be released on nominal bail: the completely destitute should be released on personal recognizance or in the recognizance of another if they are otherwise good risks.[129]

The adoption of these procedures will certainly not usher in the millenium, but they can do a great deal to increase respect for the law[130] and to elevate the threshold of injustice that American society now tolerates with such insouciance. Most of all, what is needed is an act of reform which demonstrates convincingly that justice in the criminal law is not the special province of the well-to-do.

> We should say now, and in no uncertain terms, that a man's mere property status, without more, cannot be used by a state to test, qualify, or limit his rights as a citizen of the United States. "Indigence" in itself is neither a source of rights nor a basis for denying them. The mere state of being without funds is a neutral fact—constitutionally an irrelevance, like race, creed, or color.[131]

---

128. Preventive detention for "dangerous" defendants or hard-core repeaters is also a legitimate social objective, and may be incorporated into the standards adopted for the conduct of the preliminary examination. However, as stated previously, preventive detention bears on the completely different question of whether to set any bail at all, not the amount that should be set. *See* note 59 *supra.* It thus works no discrimination among accused persons according to their economic status.

129. *See* Comment, *Bail or Jail*, 21 U. FLA. L. REV. 59, 65-67 (1968).

130. No general respect for, nor adherence to, the law as a whole can well be expected without judicial recognition of the paramount need for prompt, eminently fair and sober criminal law procedures.

Coppedge v. United States, 369 U.S. 438, 449 (1962). Consider specifically the disrespect for law likely to be engendered by the nonenforcement of the Florida statutes which require a preliminary hearing:

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

131. Edwards v. California, 314 U.S. 160, 184-85 (1941) (Jackson, J., concurring).

Review Essay

# The Vested Interests of the Judge: Commentary on Flemming's Theory of Bail

**Donald J. Harris**

## Introduction

Historians of Anglican justice tell us that the emergence of bail coincided with the early efforts of the state to suppress private vengeance. By a series of encroachments, individual law and the "blood feud" were displaced more and more by social law, and the blind acts of passion that compensated perceived wrongs gradually gave way to a more deliberative justice, eventually resulting in an interval between accusation and trial. But this created a conflict of values. The idea that the culpable might abscond, leaving the community deprived of its due, ran counter to the notion, at that point rude and tentative, that an accused person should not be deprived of his liberty until a formal adjudication of guilt. Bail was an attempt to reconcile this conflict.[1]

Roughly 13 centuries later the problem of what to do with the alleged criminal remains fundamentally the same. The issues are defined more clearly today, but careful reasoning has failed to produce a stable public consensus. Indeed, the debate over bail has escalated in recent decades. While critics and reformers try to reduce the incidence of pretrial detention and the hardships of the money bail system, especially as it affects the poor, a pervasive and intensifying fear of crime has renewed concern for the state's interest in limiting the release of defendnts. At the heart of the debate are questions pertaining to the legitimate (ethical and legal) purposes of bail and the best means for achieving them. Answers to many of these questions turn on empirical research.

This essay will sketch the main currents of this debate, first taking up the issue of the legal aims of bail. A brief discussion of the bail reform movement follows, leading to an examination of the core problem of bail administration—prediction. Finding that magistrates cannot reliably distinguish between defendants posing differing degrees of risk prompts the question of what functions (or whose interests) the bail decision actually serves. The text

**Donald Harris** is Assistant Director for Research and Planning for the Administrative Office of Pennsylvania Courts, Supreme Court of Pennsylvania. Ph.D. 1978, Temple University. Opinions expressed herein are solely those of the author.

1. Bail may be defined broadly as security for the release of an individual from legal custody. Concern here will be limited to the release of criminal defendants prior to verdict.

© 1983 American Bar Foundation

under review here, Roy Flemming's *Punishment Before Trial*,[2] proposes an answer. According to Flemming, the proper study of the bail decision is not the substantive laws of bail nor the predictive accuracy of bail determinations, but it is rather the organizational environment of the magistrates who set bail. It is here that political pressure is applied to the judicial process. And it is here that magistrates devise strategies to ease that pressure. The view that bail practices can be explained in terms of the material forces affecting the lower criminal courts opens the bail debate to considerations of social theory.

### Purposes of Bail Pending Trial

In most jurisdictions of the United States the accused must be brought before a magistrate for an initial appearance shortly after arrest. At that point the accused is informed of the charges against him and of his right to counsel, has a date set for a probable cause hearing, and has the conditions of bail set. Each year tens of thousands of individuals are remanded to jail for failure to post bail or because of an outright denial of bail.[3] This imprisonment deprives the accused of his highly valued liberty; it disrupts his social and family life and quite possibly his employment; it hampers his ability to aid in his own defense; it subjects him to the stigma, the emotional trauma, and the physical privations of prison; and, finally, it may have a prejudicial effect on the final outcome of the case. Given the enormity of the consequences, analysis of the "rightful" purpose of the bail decision is warranted.

At present, two theories of bail predominate. The first theory contends that the excessive bail clause of the Eighth Amendment implies an affirmative right to bail in noncapital cases.[4] As no explicit language to that effect is found in the federal Constitution, the inference relies on a reading of the historical evolution of the American Bill of Rights. According to this argument, the framers of the Constitution, while incorporating two of the principal features of the English law of bail—the writ of habeas corpus and the prohibition against excessive bail—inadvertently omitted the third: an express reference to bail as a matter of right in a broad category of cases.[5] The oversight is hypothesized to have stemmed from a failure to recognize "the tripartite nature of the English protection against abusive pretrial detention, involving procedure and the right to bail as well as control of the judicial abuse of excessive bail."[6] That the law of bail in England and its American colonies of the eighteenth century was nondiscretionary is further evidenced by the in-

2. Roy B. Flemming, Punishment Before Trial: An Organizational Perspective of Felony Bail Processes (New York: Longman, 1982).

3. U.S. Justice Statistics Bureau. Profile of Jail Inmates: Sociodemographic Findings from the 1978 Survey of Local Jails (Washington, D.C.: Government Printing Office, 1981).

4. Caleb Foote, The Coming Constitutional Crisis in Bail: I, 113 U. Pa. L. Rev. 959 (1965); Laurence H. Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va. L. Rev. 371 (1970); Paul D. Borman, The Selling of Preventive Detention 1970, 65 Nw. U.L. Rev. 879 (1971).

5. The principle of habeas corpus appears in Article I, Section 9 of our Constitution. The excessive bail language was adopted, almost verbatim, from the 1689 English Bill of Rights.

6. Foote, *supra* note 4, at 986.

clusion of a right to bail as a basic human right in various colonial charters and early state constitutions. Hence a more literal interpretation of the Constitution, one which would lend either to Congress or to the judiciary the discretion to determine when bail is appropriate, leads to the extraordinary and incorrect conclusion that a constitutional protection could be rendered moot by legislative or judicial action. Embodied in this fixed right to bail, moreover, is an even older principle: the presumption of innocence. In the context of pretrial proceedings, this means that a person accused of a crime is just as entitled as his accuser to the respect and freedom accorded to all members of society. Bail has as its sole purpose, then, the limited state objective of insuring the appearance of the defendant at future court proceedings. The risk to society of releasing a number of potentially violent offenders is the price we pay for our system of justice.

The second theory, drawing on much the same historical data, rejects the contention of a right to bail implicitly guaranteed by the Eighth Amendment and claims a broader governmental interest in the regulation of bail.[7] Four premises support the argument. First, since the excessive bail clause was developed in England as a specific remedy for judicial abuse of the bail procedure (judges were setting prohibitively high bail to circumvent the Habeas Corpus Act of 1679) it had neither the intent nor the effect of establishing a right to bail. Second, the right to bail was neither universal among the colonies nor among the early states. Consequently, in the jurisprudence of the seventeenth and eighteenth centuries, admission to bail was not acknowledged as a fundamental human right. Third, the Judiciary Act of 1789—establishing a statutory right to bail in noncapital cases—was drafted and passed in the same session in which Congress considered and finally approved the Bill of Rights. It is highly unlikely that the Framers were blind to the distinction between statutory and constitutional rights. And fourth, the presumption of innocence was never meant to apply to proceedings before trial. "It is simply a rule of evidence which allows a defendant to stand mute at trial and places the burden upon the government to prove the charges against him beyond a reasonable doubt."[8] On the basis of the foregoing, a constitutional right to bail cannot be asserted. It is for Congress to define the classes of cases in which bail shall be permitted. This paves the way for a legislative denial of bail in those cases where the arrestee is likely to commit crimes while on release.[9] Bail under this theory may properly serve two purposes: compelling appearance in court and the preventive custody of dangerous defendants.

The United States Supreme Court, for whatever reason, has never ruled on

---

7. John N. Mitchell, Bail Reform and the Constitutionality of Pretrial Detention, 55 Va. L. Rev. 1223 (1969); Hermine Herta Meyer, Constitutionality of Pre-Trial Detention (Pts. 1 & 2), 60 Geo. L.J. 1139, 1381 (1972); William F. Duker, The Right to Bail: A Historical Inquiry, 42 Alb. L. Rev. 33 (1977).

8. Mitchell, *supra* note 7, at 1231.

9. In those cases where the arrestee poses a substantial threat to the judicial process (e.g., interfering with witnesses or jurors), the denial of bail derives from the inherent powers of the court to protect the integrity of its own proceedings.

whether the Eighth Amendment confers a right to bail. Lower courts have relied, alternatively, on the dicta of two landmark cases, both decided the same term—*Stack v. Boyle*[10] and *Carlson v. Landon*[11]—to find or deny a constitutional entitlement to bail, but without authoritative resolution. Federal statutory law is also divided on the breadth of the government's interest in bail. The two pertinent measures, both proposed as model legislation for the states, are the Bail Reform Act of 1966[12] and the Preventive Detention Code of the District of Columbia (1970).[13] In keeping with the presumption favoring pretrial release voiced in *Stack,* the Bail Reform Act limits the interests of government to insuring appearance at trial. The act also establishes a priority for the least restrictive terms of release necessary to reasonably guarantee the defendant's presence at court. Conversely, the D.C. Code, more in line with the reasoning in *Carlson,* provides for the temporary pretrial confinement of criminal defendants whose release pending adjudication poses a clear threat to the public safety.

Lack of agreement about the purposes of bail is less demonstrable at the state level. Forty-nine states have a constitutional provision against excessive bail, and more than 30 states explicitly recognize a constitutional right to pretrial bail except in capital cases.[14]

### The Means of Bail

The traditional money bail system[15] has been the target of extensive criticism since the early 1920s. With reams of documentation attesting to its various deficiencies, detractors point out, *inter alia,* that indigent defendants, many of whom are reliable citizens presenting little or no risk of pretrial crime or flight, are often detained in disproportionately high numbers simply

10. 342 U.S. 1, 4 (1951). In *Stack* appellants were charged with conspiring to violate the Smith Act, and bail was set at $50,000 for each petitioner. Although primarily concerned with appellant's claim that bail as fixed was excessive, the Court recognized the "*traditional right to freedom before conviction* [which] permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction" (emphasis added). Release before trial is, however, "conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." If the court finds that no amount of bail will deter the accused from absconding, then it follows that the accused may be held without bail.

11. 342 U.S. 524, 542 (1952). In *Carlson,* a 5–4 majority held that alien Communists awaiting deportation proceedings—a civil matter—are not entitled to bail under the Eighth Amendment. The Court went on to say that the prohibition against excessive bail was only intended to mean that where money bail was authorized by statute, it should not be excessive. Thus the rationale underlying the bail decision need not be limited to defendant's likelihood of appearance, but may also take cognizance of a "reasonable apprehension of hurt" as in the present case "from aliens charged with a philosophy of violence against this Government" (p. 542).

12. 18 U.S.C.A. §§3146–3152.

13. 5 D.C. Code §§23-1321–1331, (Cum. Supp. 1983).

14. See John S. Goldkamp, Two Classes of Accused: A Study of Bail and Detention in American Justice (Cambridge, Mass.: Ballinger Publishing Co., 1979), for a detailed (though slightly dated) description of state bail laws.

15. Money bail suggests a contractual relationship between the government and the defendant (and his surety, if he has one). In return for the defendant's release from custody, a monetary payment is made (or asset pledged) to the court, along with a promise to comply with the conditions of release set by the court. Should the defendant fail to comply, the security posted may be forfeited and the defendant subjected to rearrest, reincarceration, or other sanctions.

because they lack the wherewithal to raise bail.[16] Additionally, magistrates tend to adopt informal schedules under which bond amounts are correlated closely with the gravity of the charge, ignoring factors more relevant to the arrestee's ability to conform to the conditions of release as well as his financial ability to post bail;[17] critics also state that detainees, because of the coercive effect of a jail cell, are more likely to enter into plea negotiations merely to gain quick resolution of their cases;[18] and in a similar vein, detainees, solely because of their bail status, tend to suffer higher conviction rates and more severe sentences.[19] But clearly the most virulent criticism of the money bail system is reserved for the professional bondsman and the corporate surety:

> [T]he professional bondsman system . . . is odious at best. The effect of such a system is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, *and the ones who are unable to pay the bondsmen's fees* remain in jail. The court . . . [is] relegated to the relatively unimportant chore of fixing the amount of bail.[20]

In addition to giving a major role in the judicial process to extralegal actors whose interests are not coterminous with the court's, other commentators have noted that the money bail system may provide a temptation to nefarious practice:

> The bail bond business is subject to a variety of allegations of corruption. The charges range from alleged tie-ins with the police and court officials, involving kickbacks for steering defendants to particular bondsmen, to collusion and corruption aimed at setting aside forfeitures of bonds where the defendants have failed to appear.[21]

In recognition of these failings, a reform movement began to appear in the early 1960s to improve custody and release practices. The pivotal experiment —The Manhattan Bail Project (1961)—tested the hypothesis that a higher

16. Arthur L. Beeley, The Bail System in Chicago (Chicago: University of Chicago Press, 1927).

17. Steven Wisotsky, Use of a Master Bond Schedule: Equal Justice Under Law? 24 U. Miami L. Rev. 808 (1970).

18. Hans Zeisel, Bail Revisited, 1979 A.B.F. Res. J. 769.

19. Recent studies claiming evidence of a conviction bias, sentencing bias, or both include James Eisenstein & Herbert Jacob, Felony Justice: An Organizational Analysis of Criminal Courts (Boston: Little, Brown & Co., 1977); Peter W. Greenwood et al., Prosecution of Adult Felony Defendants: A Policy Perspective (Lexington, Mass.: D. C. Heath & Co., Lexington Books, 1976); Robert Hermann, Eric Single, & John Boston, Counsel for the Poor: Criminal Defense in Urban America (Lexington, Mass.: D. C. Heath & Co., Lexington Books, 1977); William M. Rhodes, Plea Bargaining: Who Gains? Who Loses? PROMIS Research Project Pub. 14 (Washington, D.C.: Institute for Law and Social Research, 1978); Goldkamp, *supra* note 14; Gerald R. Wheeler & Carol L. Wheeler, Two Faces of Bail Reform: Analysis of the Impact of Pretrial Status on Disposition, Pretrial Flight and Crime in Houston, 1 Pol'y Stud. Rev. 168 (1981). Cf. William M. Landes, Legality and Reality: Some Evidence on Criminal Procedure, 3 J. Legal Stud. 287 (1974); Sorrel Wildhorn et al., Indicators of Justice: Measuring the Performance of Prosecution, Defense, and Court Agencies Involved in Felony Proceedings (Lexington, Mass.: D. C. Heath & Co., Lexington Books, 1977).

20. Pannell v. United States, 320 F.2d 698, 699 (D.C. Cir. 1963) (Wright, J., concurring).

21. American Bar Association, Standards Relating to Pretrial Release 62 (Approved Draft, 1968).

proportion of defendants could be released on their own recognizance (ROR—that is, without posting security) if judges were given verified information about their backgrounds and ties to the community. With the verified information, judges were releasing on nonfinancial terms four times the number of persons as they were releasing without this information and with a considerably lower failure-to-appear (FTA) rate.[22] The project led to the development of a prediction instrument that rated defendants according to certain objective criteria—background information such as employment history, residential stability, family contacts, prior criminal record—to determine each defendant's propensity for flight. Those defendants obtaining the required scores were recommended to the court for ROR. The apparent success of the experiment stimulated similar ROR instruments and projects nationwide.[23]

Another innovation—"percentage bail"—required the defendant to deposit only part of the bail amount (typically 10%) directly with the court, to be refunded minus a small administrative fee, once court proceedings are concluded. Under this plan, conceived in Illinois in 1964, the defendant is usually spared the bondsman's fee, which was never refundable.[24]

Both alternatives were incorporated into the Federal Bail Reform Act of 1966 as well as the standards of the American Bar Association (1968),[25] the standards of the National Advisory Commission on Criminal Justice Standards and Goals (1973),[26] the Uniform Rules of Criminal Procedure (1974),[27] and the standards of the National Association of Pretrial Service Agencies (1978).[28] Each of these models established a strong presumption in favor of ROR. Each proposes a range of alternatives to be imposed if the court finds that ROR is unwarranted, starting from the least onerous conditions reasonably calculated to assure the defendant's appearance at court and/or to reduce the potential danger to the community.

Although these models differ in their positions on preventive detention and the specific criteria they recommend for distinguishing among defendants at the initial appearance, they consistently place emphasis on the "community ties" standard in assessing the probabilities of crime and flight prior to verdict.

### The Problem of Prediction

The utility of any system of pretrial release (whether money bail, percent-

22. Charles E. Ares, Anne Rankin, & Herbert Sturz, The Manhattan Bail Project: An Interim Report on the Use of Pre-Trial Parole, 38 N.Y.U. L. Rev. 67 (1963).

23. Donald E. Pryor, Pretrial Practices: A Preliminary Look at the Data, Pretrial Issues (Washington, D.C.: Pretrial Services Resource Center, 1980).

24. Charles H. Bowman, The Illinois Ten Per Cent Bail Deposit Provision, 1965 U. Ill. L.F. 35 (1965).

25. Supra note 21.

26. National Advisory Commission on Criminal Justice Standards and Goals, Corrections (Washington, D.C: Government Printing Office, 1973).

27. National Conference of Commissioners on Uniform State Laws, Uniform Rules of Criminal Procedure (St. Paul: West Publishing Co., 1974).

28. National Association of Pretrial Services Agencies, Performance Standards and Goals for Pretrial Release and Diversion (Washington, D.C.: National Association of Pretrial Services Agencies, 1978).

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: 102

age bail, ROR, or supervised or conditional release—or whether the decision to admit the defendant to one form of release or another is based on the seriousness of the charge, the defendant's prior criminal record, or the strength of his community ties) depends in large part on the predictive validity of that system. Unless defendants can be accurately sorted into high- and low-risk subgroups, the legitimacy of the system is plainly open to challenge. For this reason, the past few years witnessed the creation of a large number of prediction aids based on The Manhattan Bail Project, and a large number of studies were designed to measure their predictive capability. The lessons of this research, as will be evident, also apply to the magistrates' unassisted judgments.

Predictions of pretrial failure are susceptible of two types of error, as shown in figure 1. The two types of errors are (1) false positives—the defendant is predicted to fail to appear and/or recidivate and actually would not, and (2) false negatives—the defendant is predicted to succeed pretrial and actually does not. Among other features, an optimal pretrial release program would have negligible rates of false negatives and false positives.

The base rate refers to the proportion of the total population of defendants who would actually fail pretrial. The lower the base rate the more difficult it is to predict accurately,[29] and unless a predictive methodology can provide more information than is given by the base rate alone, it is of little practical utility.[30] The selection rate refers to the proportion of the total population of defendants who are predicted to fail pretrial.

ACTUAL BEHAVIOR

| | | Pretrial Failure | Pretrial Success | |
|---|---|---|---|---|
| PREDICTED BEHAVIOR | Pretrial Failure | true positive | false positive | SELECTION RATE |
| | Pretrial Success | false negative | true negative | |

BASE RATE

**Fig. 1    Behavior Predicted**

The development and comparison of models (prediction instruments) that would minimize the rates of false positives and false negatives through a process of research and testing is not a straightforward matter, and there are

29. Lower base rates pose greater problems of prediction because the variation in the dependent variable (FTAs, bail crime) is reduced, and it is this variation that must be analyzed in the search for predictors.

30. Prediction efficiency can be measured by the proportionate reduction in errors achieved by using the prediction instrument in lieu of the base rate. E.g., if the base rate is 15%, then drawing upon this datum alone, one could correctly classify 85% of the defendants by simply predicting that all the defendants would succeed. Should the correct classification of 90% of the defendants result from the use of the prediction device, the proportionate reduction in error would equal one-third. Of course this assumes the false positives and false negatives are not differentially weighted which, as a matter of public policy, they generally are.

A093

substantial methodological difficulties to overcome. To begin with, operational definitions of FTAs and crimes committed while on release involve a component of guesswork. Concern with nonappearance presumably is limited to willful failures to appear, the defendant seeking to permanently evade prosecution. Those failing to appear for lack of notification, by oversight, or because of losing their way, going to the wrong courthouse or courtroom, or being ill are of less practical importance. Hence measures of FTAs must tap the dimension of intent.[31]

Even more troublesome are measures of pretrial crime. Rates of rearrest are imperfect because not everyone who commits a crime is arrested, nor is everyone arrested guilty of committing a crime. Conviction rates for crimes committed on bail are more certain with respect to the defendant's guilt, but only a small proportion of offenses ever result in conviction. If the interest in bail crime stems from a concern with potentially dangerous defendants, then the measure should clearly be arrests or convictions for serious crimes—which tend to have a lower base rate and thus are more difficult to predict —as opposed to arrests or convictions per se.[32]

A second problem with predictive devices is that they are constructed with samples having a selection bias that may lead to invalid results.[33] Ideally, research designed to test or develop prediction models should be based on either the total population of defendants within a jurisdiction or a representative sample of the total population. That would require releasing *all* defendants, or a representative group of them, prior to trial in order to determine which factors are related, and in what ways, to pretrial flight and crime. For legal and political reasons, a sampling design of this sort has never been implemented fully.

A third set of problems with prediction scales revolves around the issue of instrument decay. Whether prediction scales retain their efficiency over time, or whether shifting economic and social realities negate the predictive value of items earlier found to have significance, cannot be resolved a priori. Periodic checks and renovations of prediction tables are essential if they are to retain their usefulness. However, prediction instruments derived from theoretical constructs, as opposed to those developed inductively from the search

---

31. Not surprisingly, consistency among working definitions is rare. One survey of 51 pretrial release projects found 37 different methods of calculating FTA rates. Hank Goldman, Derva Bloom, and Carolyn Worrell, The Pretrial Release Program (Washington, D.C.: Office of Planning, Research and Evaluation of the U.S. Office of Economic Opportunity, Government Printing Office, 1973).

32. Predictions of violent crime tend to be the most difficult of all:

What makes violence so particularly difficult to predict is not merely its rarity, but its situational quality. Deterministic models to the contrary notwithstanding, violence generally is not a quality which inheres in certain 'dangerous' individuals: it is an occurrence which may erupt—or may not—in certain crisis situations. Whether it does erupt, whether it is reported, whether the perpetrator is apprehended and punished, depend upon a wide variety of fortuitous circumstances, largely beyond the actor's control. Not only the actor's proclivities, but the decisions of other individuals—the victim, the bystanders, the police, the magistrate—may determine whether an act of violence occurs and whether it comes to be included in the criminal statistics. Trying to predict violence on the basis of information concerning only the supposedly violence-prone individual—without taking these numerous external contingencies into account—is trying to solve a multi-variate problem by keeping track of only one variable. It is hazardous undertaking, indeed.

Andrew von Hirsh, Prediction of Criminal Conduct and Preventive Confinement of Convicted Persons, 21 Buffalo L. Rev. 717, 735 (1972).

33. James J. Heckman, Sample Selection Bias as a Specification Error, 45 Econometrica 153 (1979).

for statistical correlates of pretrial success and failure, are likely to more closely fit the processes affecting defendant behavior over time. They may also benefit from logical analysis and refinement. Accuracy of prediction in either event assumes the availability of complete and reliable data. Unfortunately the record-keeping practices of the lower courts have rarely justified that assumption.

Granting, for the sake of argument, that these methodological troubles allow for satisfactory solutions—such as valid and reliable measures of pretrial performance, representative sampling, instrument stability over time, complete and accurate data—precise predictions still may not result. In the last analysis it is an empirical question whether an instrument's error rate falls within the boundaries of what is deemed acceptably low. And what is an acceptable error rate is invariably an elusive and value-laden issue. Our legal system places a greater (but finite) emphasis on avoiding unjustified imprisonment (the false positive problem) even if that should mean, because of a lower selection rate, the release of a larger number of defendants who would fail pretrial (the false negative problem). Yet it is the false negatives who are visible to the judiciary and the community; by that fact alone they may weigh heavier in society's thinking. Being invisible, the false positives tend to be an abstract concern. Further, predictive accuracy as well as the relative importance of the two types of error may differ considerably depending on whether FTAs or bail crime is the variable of interest.

In the case of pretrial crime (as compared with flight), it is reasonable to argue that the threshold of tolerance for false positives should be decidedly more favorable to the defendant. No witnesses or material facts link the defendant to the crime; indeed, no crime has yet been committed. The law thus has a weaker hold on the accused. For this reason, preventive detention must be based on something more than the absence of an affirmative right to bail. It must be predicated on the empirically validated assumption that future crime can be predicted accurately at the individual level.[34] Failure to demonstrate the validity of that assumption leaves the theory, and thus the practice, of preventive detention without a logical justification.

Despite, or perhaps because of, the methodological obstacles just enumerated, the empirical literature on predicting dangerousness is largely consistent in the view that prognostications of violent and serious crime are grossly inaccurate. In recent research efforts,[35] Monahan, for example, estimates a false positive rate of 54 to 99.7%. Goldkamp's review of the literature yields

34. Strictly speaking, individual prediction is a misnomer. In any prediction problem individuals similar with respect to a selected set of characteristics are assigned to classes, and then statements are made about the expected conduct of members of the classes. Don M. Gottfredson, Assessment Methods, *in* Crime and Justice, vol. 3, The Criminal Under Restraint, Leon Radzinowicz & Marvin E. Wolfgang, eds. (New York: Basic Books, 1977).

35. John Monahan, The Prediction and Control of Violent Behavior, *in* Research into Violent Behavior: Overview and Sexual Assaults 180, table 2, Hearings Before the Subcommittee on Domestic and International Scientific Planning, Analysis, and Cooperation, Committee on Science and Technology, U.S. House of Representatives, 95th Cong., 2d Sess. Jan. 10, 1978 [No. 64] (Washington, D.C.: Government Printing Office, 1978).

an equally gloomy assessment of the state of the art: "available research has demonstrated that predicting a defendant's propensity to commit (dangerous) crime while on pretrial release is at present nearly impossible."[36] In a similar vein, Feeley and McNaughton conclude that "reliable predictors of those likely to be rearrested while free on pretrial release are not likely to be forthcoming on the basis of any of the currently gathered types of information."[37] And even if it were possible to identify persons with a higher than average probability of dangerousness, their chances of committing a violent act may still be fairly small due to the low base rates of violent behavior, even among high-risk subgroups. Clearly, then, the assumption of accurate predictions of serious criminal behavior at the individual level is without convincing empirical support.[38]

Studies attempting to identify predictors of who will fail to appear, on the other hand, have tended to yield mixed results. Community and family tie variables (e.g., steady employment, marital status, stable residence) are found in varying degrees to be related to "jump" rates in the works of Wice,[39] Wilson,[40] Lazarsfeld,[41] Venezia,[42] and Ozanne et al.[43] Yet confirmation of these relationships is lacking in the research of Landes,[44] Kirby,[45] Eskridge,[46] Wheeler and Wheeler,[47] Feeley and McNaughton,[48] and Gottfred-

---

36. Goldkamp, *supra* note 14, at 100.

37. Malcolm Feeley & John McNaughton, The Pretrial Process in the Sixth Circuit: A Quantitative and Legal Analysis (New Haven, Conn.: New Haven Pretrial Services Council, 1974); see also Preventive Detention: An Empirical Analysis, 6 Harv. C. R.—C. L. L. Rev. 289 (1971); Alan M. Dershowitz, The Law of Dangerousness: Some Fictions About Predictions, 23 J. Legal Educ. 24 (1970); Henry J. Steadman, Some Evidence on the Inadequacy of the Concept and Determination of Dangerousness in Law and Psychiatry, 3 J. Psychiatry & L. 409 (1973); John Monahan & Lesley Cummings, Social Policy Implications of the Inability to Predict Violence, J. Soc. Issues [No.] 2, 1975, at 153. Cf. Landes, *supra* note 19.

38. This conclusion applies with even greater force to the intuitive or subjective predictions made by magistrates and bail judges. Drawing accurate and precise distinctions between defendants is a task of colossal complexity, and performance data are seldom available to a judge to execute the mental calculations. "Judges rarely know how other judges treat similarly situated defendants and, *for the most part, never know what happens to the particular defendants for whom they have set bail*" (emphasis added). Joseph R. Glancey, Municipal Court of Philadelphia, Foreword, *in* John Goldkamp, Michael Gottfredson, & Susan Mitchell-Herzfeld, Bail Decisionmaking: A Study of Policy Guidelines (Philadelphia: unpublished monograph, 1982). Absent systematic feedback, positive as well as negative, it is impossible for judges to learn from their experience.

39. Paul B. Wice, Freedom for Sale: A National Study of Pretrial Release (Lexington, Mass.: D. C. Heath & Co., Lexington Books, 1974).

40. Robert Wilson, A Practical Procedure for Developing and Updating Release on Recognizance Criteria (Wilmington: College of Urban Affairs, University of Delaware, 1975).

41. Paul F. Lazarsfeld, An Evaluation of the Pretrial Service Agency of the Vera Institute of Justice (New York: Vera Institute, 1974).

42. Peter Venezia, Pretrial Release with Supportive Services for "High Risk" Defendants (Davis, Cal.: National Council on Crime and Delinquency, 1973).

43. Marq R. Ozanne, Robert A. Wilson, & Dewaine L. Gedney, Jr., Toward a Theory of Bail Risk, 18 Criminology 147 (1980).

44. Landes, *supra* note 19.

45. Michael Kirby, Recent Research Findings in Pretrial Release (Washington, D.C.: Pretrial Resource Center, 1977).

46. Chris Eskridge, An Empirical Study of Failure to Appear Rates Among Accused Offenders (Columbus: Program for the Study of Crime and Delinquency, Ohio State University, 1978).

47. Gerald Wheeler & Carol Wheeler, Predicting Court Appearance of Felony Defendants (paper presented at the National Symposium of Pre-Trial Services, Louisville, Ky., 1979).

48. Feeley & McNaughton, *supra* note 37.

son.[49] Much the same situation exists with respect to the severity of the offense charged/FTA relationship. Landes[50] uncovers a direct effect; Eskridge[51] and Schaffer[52] find evidence of an inverse association; others find no correlation at all.[53] Inconsistent findings are also reported on the impact of the severity and extent of the accused's prior criminal record as well as to the type of current or prior offense. It remains a suggestive but open question to what extent the incompatible results are attributable to differences in research methods as well as to the jurisdictions studied.

There is, of course, an academic ring to some of these issues. In particular the traditional reliance of magistrates on the charge standard (including the defendant's prior criminal record) appears to be a phenomenon more durable than most bail reform projects. The older the reform project, it seems, the lower the regard for community ties indicators and prediction instruments. But why should charge indicators persistently explain the largest share of the variance in bail decisions, both in traditional and reform jurisdictions? It may be that judges believe, as one analyst contends:

> there is an eminently logical basis for consideration of the seriousness of a defendant's charges in bail determinations: The more seriously a defendant is charged, the more he or she has to fear from conviction and from sentencing by the judge. The longer the possible sentence, bail judges might argue, the greater the incentive to flee and the greater the need for restraint. A supplemental role for prior convictions in bail determinations can be similarly defended: Defendants with prior convictions may have violated probation or parole with the new charges, and may be facing considerable "back time" on old convictions in addition to incarceration that could result from a new conviction.[54]

Or it may be that this is little more than professional ideology, a cover story, carefully guarding a different set of motives. In view of the fairly strong evidence that neither offense-charged nor community-ties criteria can reliably distinguish between persons likely to fail pretrial, there are ample grounds for suspicion. It is to concerns of this sort that we next turn.

### Flemming's Model

Much of the debate on the means and ends of bail and virtually all of the research designed to appraise the value of alternative policies center on questions of how the bail system should operate and by what steps improvements will occur. Flemming, in *Punishment Before Trial,* prefers a different tack. The questions asked in his research are sociological in nature: Why do pretrial release practices, in terms of such factors as detention rates and bail amounts vary across jurisdictions? What conditions promote the change or stability of these practices over time? In taking this approach Flemming at-

---

49. Michael R. Gottfredson, An Empirical Analysis of Pretrial Release Decisions, 2 J. Crim. Just. 287 (1974).

50. Landes, *supra* note 19.

51. *Supra* note 46.

52. S. Andrew Schaffer, Bail and Parole Jumping in Manhattan in 1967 (New York: Vera Institute of Justice, 1970).

53. E.g., Goldkamp, *supra* note 14.

54. *Id.* at 222.

tempts to reveal the silent politics underlying bail decision making in the contemporary United States and the mechanisms through which it operates.

The point of departure for Flemming's analysis is the postulate that bail judges accommodate their policies to the pressures and constraints emanating from the local administrative and political environment. Using standard models of organizational choice and decision making as a guide,[55] Flemming sets forth a conceptual framework in which uncertainty, risk, and resources are the variables of primary interest. Uncertainty arises in a number of ways: in trying to discern true from false positives; in deciding the amount of bail where the final outcome, in terms of confinement or release, may depend on the willingness of a third party to post security; and in balancing the discordant aims of bail (de jure and de facto) including the equitable treatment of defendants, a low selection rate, compelling appearance, reducing jail congestion and incarceration costs, and safeguarding the community against predatory criminals.

Risk refers to the probability and intensity of adverse feedback associated with a bail decision or set of decisions. The judge (in his cloak of solemnity) is an easy and natural target for criticism. Any quarter of his political milieu—police officials, prosecutors, defenders, a higher court, the press, community groups—can develop into a source of acrid reproof and perhaps even of formal penalties. The effects of risk can be aggravated or mitigated according to the extent to which judicial officers are vulnerable to sanctioning. For example, those with shorter terms of office, or those merely appointed and serving at the pleasure of a higher official, are likely to be more vulnerable and therefore more sensitive to criticism than are magistrates with longer terms of office or those who must run for reelection on a nonpartisan, uncontested ballot. "Risk, then, varies according to the political milieu of the court and with its institutional characteristics as they pertain to the security or vulnerability of its officials" (p. 23).

These two fundamental ideas—that uncertainty permeates the bail decision and that the bail decision involves risks to the judge—help to explain the durability of the charge standard:

> Uncertainty and risk create contextual incentives and disincentives that mold what court officials feel are feasible or permissible choices. Bail options such as recognizance release routinely may be dismissed as impractical or unreasonable for various crimes or, perhaps, for most if not all felonies. In some cities otherwise sweeping bail reforms stop short of drastically reducing normal bail amounts for fear of arousing political opposition. (P. 24)

Thus alleged rapists and robbers may not pose a greater statistical threat of pretrial crime than prostitutes and pickpockets, but from the vantage point of the judge (where career security is kept firmly in sight) the stakes are obviously much higher, even in jurisdictions where defendant dangerousness is

---

55. James G. March & Herbert A. Simon, Organizations (New York: John Wiley & Sons, 1958); Richard M. Cyert & James G. March, A Behavioral Theory of the Firm (Englewood Cliffs, N.J.: Prentice-Hall, 1963).

A098

not a legal consideration. To hedge their bets judges tailor the amount of bail to the seriousness of the charge and the extensiveness of the prior record. And when the stakes are thought to be too expensive (as with particularly gruesome, notorious, or otherwise highly injurious crimes) bail may be set deliberately beyond the means of the accused. This tactic of sub rosa preventive detention reduces to zero the uncertainty problem of false negatives. Needless to say, it also presents problems of procedural fairness.

The third concept in Flemming's analytic scheme—resources—refers to the legal, bureaucratic, and institutional limitations on the judge's range of options in determining bail. Institutional resources, the most important theoretically, are the jail and its detention capacity. The jail's significance is palpable and straightforward. It proclaims the power of the law, its brute force. It confers credibility on the bail system by showing the threat to be real, and that it must be taken seriously. The notion of detention capacity, on the other hand, is a great deal more slippery. Defined in terms of admissions (the number of newly admitted detentioners a facility can accommodate), capacity involves an element of slack—that is, unexploited opportunities, undiscovered economies, and waste. Thus capacity can be altered easily by double- or treble-celling inmates, by shifting sentencing patterns for minor offenders to allow more jail space for detentioners, or by expediting the court proceedings of persons who are unable to post bail or whose bail has been denied or revoked. There are two points to be made here: First, jail congestion tends to have a liberalizing effect on bail policies. Second, the jail congestion/bail policies relationship only comes into play once the slack in jail space is taken up and the strategy of expanding capacity to accommodate further increases in the detention population is no longer feasible.

Why some courts change their bail policies over time while others do not can be explained, then, not only in terms of the stability of environmental forces but also in terms of slack resources. Respondent to external pressure to ease release standards (for instance from newspaper exposés about brutal jail conditions), judges will search for solutions to restore equilibrium by decreasing slack. If these attempts (e.g., quickening the tempo of dispositions) fail to bring peace, other solutions or temporizing measures may be sought. In this manner slack resources act to cushion bail practices from sudden environmental shocks and turbulence. Only when the court is under sharp attack, the pressure sustained, and the search for "safe" alternatives exhausted will large-scale reform appear as a viable solution. Conversely, pressures to tighten up release policies (which often follow in the wake of sensational crimes committed on bail) are more indulgently received by judges. In these circumstances exploiting the slack in jail space reduces the risk of further mishaps. Thus slack facilitates adaptation to a changing world. During favorable times slack accumulates, becoming a reservoir of search opportunities; during periods of political adversity, slack provides the means for resisting structural change and minimizing risk. Flemming describes the adjustment process in terms of a decision rule: "choose the alternative that involves the least

risk." Application of the rule in different situations produces different policy outcomes:

> The choice process selects and tests policy alternatives, then, according to the risk avoidance rule, and if a policy change restores equilibrium the process comes to a halt. If it does not, the cycle of search and adoption resumes, using the same rule, until a balance is struck. The nature of the environmental shock disrupting the status quo, and the court's perception of its strength and the consequences of ignoring it, affect the likelihood of change and its extent. Equally important are the kinds and amounts of slack existing in the pretrial process as a whole. The relationship between detention resources and the factors affecting the inflow and outflow of prisoners structure the array of choices open to a court when grappling with disequilibrium and therefore the kinds of changes it adopts when reacting to environmental disturbances. (P. 38)

Such a description of policy setting entails a number of assumptions that require theoretical or empirical justification. One is equilibration—that there is a steady state toward which the system aims. As Flemming's model is specified, this means that shifts in bail policy are discrete events; once they occur, policies are expected to be stable (and the system at rest) for a period of time. This view of equilibration, however, may be arbitrarily narrow. One can alternatively envision a system of continuously changing steady state solutions, with bail policies never stabilizing despite ongoing equilibration adjustments. In substantive terms, the assumption of a system in constant motion, where judges simultaneously modify and buffer their policies, invites a more dynamic and perhaps more plausible image of bail judges in their struggle to balance the countervailing pressures of risk and resources.

Another assumption in Flemming's formulation, related to system equilibrium, concerns the place of bail judges in the local criminal justice system. Flemming's discussion of resource slack gives the distinct impression that bail judges occupy a privileged position relative to the other parts of the system, that they can draw upon excess slack at will, whether in jail capacity, case processing, sentencing, or anywhere else in the system. The following passage may stand as representative:

> Pretrial release practices are likely to be most stable, therefore, when there is a relative abundance of both detention and disposition slack. Overcrowding provides a way of absorbing seasonal fluctuations in defendant volumes, periodic crackdowns on crime, or shifts in the severity of charges lodged against defendants without altering standard or habitual bail practices. The presence of dispositional slack, e.g., the availability of judges who can be reassigned from civil to criminal dockets, provides resources to process increases in caseloads. Accordingly, rises in the jail population can be moderated even if only normal disposition times are maintained, again without resorting to revision in bail policies. The scope and cost of pretrial punishment, it might be noted, are not necessarily greatest under this set of conditions. . . . But by the same token this "full slack" condition would not lead to its minimization. (P. 146)

There are at least two reasons to think this assumption naive. First, the crimi-

nal justice system is an open system, a network of interrelated parts that receives inputs from and produces outputs to the environment. Not infrequently the principal components of the system—police; prosecutor; defender; legislature; courts of limited, general, and appellate jurisdiction; and areas like probation, county and state corrections, and parole—have unique or even opposing interests to advance vis-à-vis funding sources, the press and public, or special interest groups such as the organized bar. Control over slack resources is helpful in pursuing those interests. In the absence of a single criminal justice system manager, the tensions underlying the setting and buffering of policy take on additional political overtones, resembling at times a species of internecine war, in which one agency's policy may be targeted as another agency's slack. That the entire system should defer to the will of bail judges, as Flemming seems to suggest, is to fancy a degree of generosity that simply strains credulity.

Second, most jurisdictions in the United States exhibit a formal hierarchy within the judicial branch where supervisory authority, like judicial power, flows from the top down. This arrangement is generally encoded in the judiciary articles of the various state constitutions. Consequently bail judges, when differentiated from the trial bench, are usually subordinate to the bench much as the trial judges, in turn, are subordinate to the appellate courts. It would be hard to understand the bail judge's domination of trial court resources, as they comprise a part of the "minor judiciary" in most instances. Indeed, the pace of litigation, the allocation of judicial manpower, and the sentencing of misdemeanants and felons are the key policy variables that the trial court seeks to control in its own efforts to juggle risk against resources. In sum the influence bail judges actually have is probably far less than Flemming supposes and is likely to differ across jurisdictions and over time. Accordingly the assumption of the bail judge's centrality in the criminal justice system is better conceptualized as a variable.

Several lessons for bail reform are suggested by Flemming's analysis. First, reform efforts are likely to succeed only when sufficient incentives are marshaled to overcome local political arrangements. Second, reforms are less likely to be neutralized or co-opted if they originate at a supralocal level (a federal appellate court or state legislature). And, third, reforms that leave local decision makers with very little room for discretion have the best chance of all.

One further point. The themes taken up by Flemming in *Punishment Before Trial,* the analytic frame he employs, and the minor amendments offered here form a cogent though coarse theoretic account. It is not a formal theory in the sense of a deductive explanation. No hierarchical sets of propositions are derived leading to falsifiable hypotheses. There is much work to be done before that stage is reached. There is also an urgent need for the development and criticism of theories from other perspectives: functionalist, microeconomic, Marxist, ethnomethodological, and others. At present a poverty of theory afflicts the field of bail research, owing not so much to a failure of imagination as to sheer neglect. Yet the problem of bail raises ques-

tions of public policy too important to resolve by default. It is by no means a belittlement of Flemming's work to say that his chief contribution may be to spur the expansion of the bail debate to include issues of social theory.

**Flemming's Study Design**

While the persuasive power of a theory depends, as does any intellectual enterprise, on the clarity, parsimony, and logical coherence of the argument set forth, a theory must also be refutable; otherwise it is true by definition—a tautology. Equally important, a convincing theory must fit the empirical evidence. This latter point, to the extent it implies the necessity of rigorous research methods, seems to have been lost on Flemming.

"The empirical basis for [Flemming's] book rests on [two] detailed case studies of pretrial release practices in Detroit and Baltimore" (p. 6). Quantitative data from the two sites along with information culled from sources such as newpaper articles, annual reports, and unpublished documents supplement the personal observation and interview data. Such an eclectic approach prompts specific questions of validity and reliability. To begin with it is often difficult to know whether the findings of a case study are representative of the target universe. Since the entire sample consists of only two jurisdictions, the studies reported may be tainted with the peculiarities associated with those jurisdictions. Consequently they can only be viewed as illustrative, at most a whetstone for honing the model, lest we invoke the fallacy of induction.

In each case study there is also the problem of evaluating the fit of theory to data. Recall that the prime explanatory variable in Flemming's analysis is the pressure exerted by "politically influential actors." They represent the proximate source of risk for bail judges and, within the limitations discussed earlier, they account for the shifts in pretrial release policies. However, we gain empirical knowledge of this variable exclusively through the pieces and bits of "facts" offered up in Flemming's narrative—in short, through hearsay. Conspicuously absent are more systematic and critically accessible forms of data, like those produced through a careful content analysis of newspaper reports and editorials. Having the appearance of selectivity, these data are actually of minimal scientific value, and any interpretations ascribed to the data tend to look highly convenient.

The quantitative component of Flemming's research primarily involves measurements of the dependent and control variables. Precisely how the data were collected at the two sites we are not informed. Therefore we know nothing of the source documents, the unit of count, the sampling design, the problems in measurement, in comparability, and so on. Our curiosity is directed instead to another text,[56] presumably the source of the data. However, only a hasty discussion is to be found there, and so examination of a third publication is recommended.[57] The task of pursuing these materials turns out

56. Eisenstein & Jacob, *supra* note 19.
57. James Eisenstein & Herbert Jacob, Measuring Performance and Outputs of Urban Criminal Courts, 54 Soc. Sci. Q. 713 (1974).

to be less than gratifying: much is still indecipherable; other parts are misleading. For example, it seems that the original purpose in gathering the data was to study the processing through the trial courts of defendants charged with serious criminal offenses.[58] As a result, only information on felony defendants was collected. But Flemming's inquiry has a different object, namely, to model bail-setting practices. With what justification is the range of study truncated by the exclusion of misdemeanor defendants? Not on theoretical grounds apparently. For one thing, misdemeanor defendants allow magistrates broad discretion and minimal risk. The larger the proportion of misdemeanor defendants on a court's docket, the easier it is for magistrates to avoid the hazards of environmental change. Thus within the boundaries of Flemming's analytic construct, those charged with lesser offenses play a crucial role. Exclusion of misdemeanor cases, we surmise, is for reasons of expediency: data were not available. Rather than obscuring this point (note the book's subtitle—*An Organizational Perspective of Felony Bail Processes*), Flemming should have rendered the problem explicit, and indicated how problems with the data must be taken into consideration when interpreting the statistical findings.

**Conclusion**

Not very long ago Caleb Foote argued that "prediction [of pretrial crime] is not only impossible but obviously impossible, and that the debate about the prediction of dangerousness is a put-on to conceal and perpetuate a discriminatory system of justice in the face of growing unwillingness from those difficult lower classes to continue to be treated more as objects than as humans."[59] Flemming's argument proceeds from much the same premise— that the administration of bail cannot be explained in terms of good faith efforts to immobilize dangerous or flight-prone defendants. There are other factors present, with career security of bail judges perhaps the most dominant. Both propositions warrant careful empirical analysis. And if the recent constitutional amendments approved in Nebraska, Illinois, Florida, Michigan, Arizona, Colorado, and California indicate a growing national attraction for preventive justice, then research into these questions ought to begin at once.

---

58. Eisenstein & Jacob, *supra* note 19, at 174.
59. Caleb Foote, Comments on Preventive Detention, 23 J. Legal Educ. 48, 53 (1970).

# The Development of an Actuarial Risk Assessment Instrument for U.S. Pretrial Services

*Christopher T. Lowenkamp*
*Jay Whetzel*
*Office of Probation and Pretrial Services*
*The Administrative Office of the U.S. Courts*

**THE ENACTMENT OF** the Pretrial Services Act of 1982 (18 U.S.C. §3152) represented the high-water mark of a major reform movement in the United States. Inspired by the research efforts of Arthur Beeley (1927) and Caleb Foote (1954) and affirmed by the work of the Vera Institute (1961), the legislation ensured that the federal courts would have their own personnel exclusively committed to assisting with pretrial release and detention decisions. The new personnel were to "collect, verify, and report to the judicial officer, prior to the pretrial release hearing, information pertaining to the pretrial release of each individual charged with an offense..." The mandate further directed officers to "where appropriate, include a recommendation as to whether such an individual should be released or detained and, if release is recommended, recommend appropriate conditions..." (§3154). As federal courts implemented the legislation, judicial officers began receiving objective, verified information—information that they soon began to rely upon. Officers performing the pretrial services function became deeply involved in a challenging calculus, i.e., determining if citizens, presumed innocent, would lose their liberty while the government sought to prove its allegations of criminal conduct.

Subsequent legislation broadened the scope of the court's concern to include not only a defendant's future court appearance but also the safety of the community (see the Bail Reform Act of 1984). Both are to be "reasonably assured" by conditions that mitigate any risks posed by the defendant. Among the factors to be considered by the court, pretrial services' area of expertise quickly became the

"history and characteristics of the person," including the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" (§3142 (g)(3)(A)). Officers learned to interview defendants, verify information, run record checks, explore release options and type a full report for submission to the court in a matter of hours, not days. There was no calculation for pretrial services officers akin to the sentencing guidelines that had debuted during the same period; officers began to identify the specific factors that, either by statute or by their own experience, indicated risk. Once risks were identified, officers recommended conditions to mitigate those risks to a degree that would "reasonably assure" future appearance and community safety. As prosecutors and defense counsel made their respective arguments, pretrial services officers emerged as true professionals and remained an impartial body assisting the court's decision-making.

During the last five to ten years, the rate of pretrial release detention has steadily increased (VanNostrand and Keebler, 2009). As of March, 2009, 53 percent of pretrial defendants were ordered held in pretrial detention, *excluding* those in the United States illegally (TABLE h-14a> Caseload Tables FY 2009—Second Quarter). A variety of factors contributed to this growth, although, according to the results of recent analyses, 60 percent can be attributed to a steadily increasing risk of the defendants being charged in federal

court (VanNostrand & Keebler, 2009). Today, pretrial detention is more the norm than the exception for citizens charged in federal court. This reality has not only deprived thousands of liberty, but has produced massive expenditures and logistical nightmares for those responsible for pretrial detention (see Van-Nostrand and Keebler 2009 and also OFDT summary statistics at http://www.usdoj.gov/ofdt/summary.htm). While this may not yet represent a crisis in the federal criminal justice system, it does stand on its head the presumption of innocence and, frankly, the vision of the founding fathers (see the Eighth Amendment of the U.S. Constitution, which protects against excessive bail).

This is the context in which we should consider the adoption of a risk prediction tool. With such an actuarial tool, we can now more effectively assess defendant risk and we can improve the recommendations we make to the court. There is a well-documented history of professionals rejecting actuarial tools as an affront to their clinical or otherwise experienced judgment. Time and time again, however, actuarial tools have shown greater predictive power than clinical judgment. "The predictive criterion validity of actuarial assessments of major risk and/or need factors greatly exceeds the validity of unstructured clinical judgment" (Andrews et al., 2006:21; see Grove and Meehl, 1996 and Grove, Zald, Lebow, Snitz, & Nelson, 2000 for a thorough review of this topic). While we do not minimize the commitment and value that officers add, the current pretrial assessment process is indeed "unstructured clinical judgment." For those steeped in the research, practitioners'

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: 114

frequent resistance to actuarial tools is unconscionable; some have lamented that "Failure to conduct actuarial risk assessments or consider its results is irrational, unscientific, and unprofessional" (Zinger 2004: 607).

The term "actuarial" can sound quite foreign to the field of criminal justice. According to the *Encyclopedia Britannica*, actuaries "compute the probability of the occurrence of various contingencies of human life such as birth, marriage, sickness, unemployment, accidents, retirement and death. *They also evaluate the hazards of property damage or loss and the legal liability for the safety and well-being of others*" (emphasis added). Is that not, in effect, what we as officers do as we assess risk and make release or detention recommendations? Actuarial tools are increasingly being adopted to improve other professions where individual practitioners are asked to make difficult decisions about potentially risky situations and/or individuals. (See for instance Doueck, English, DePanfilis, and Moote 1993 for an example of risk assessment in the area of child welfare. See also Hilton, Harris, and Rice 2009 for an application of risk assessment to police decision-making in domestic violence situations.) It is now apparent that the use of an actuarial assessment aid can improve our ability to make release and detention recommendations. Below we present the findings on the development of such an instrument for federal pretrial services.

## Method

In this section we review some brief information regarding the sample used in this study and the method employed to develop and validate the risk assessment instrument. Detailed descriptions of the sample and some of the multivariate analyses are presented in VanNostrand and Keebler (2009).

### Participants

The current study began with all defendants (n = 565,178) entering the federal system between FY2001 and FY2007. Given that the current study focused on predicting pretrial success or failure while on bond, those cases that were detained during pretrial were deleted from the sample. This process reduced the sample by 335,248 (59 percent of the cases). Due to missing data, the final sample size for analyses relating to the development of the pretrial risk instrument varies between 185,827 and 215,338. The sample size used in any particular analysis is dependent on the variables used in the analyses and the rate of

missing data associated with those variables (see VanNostrand and Keebler, 2009 for specific details on missing data).

### Measures

There were numerous measures (over 70) in the larger dataset; however, variables of interest for the construction and validation of the pretrial risk instrument included several predictor or independent variables and two dependent variables. Independent measures included defendant demographics, offense details, criminal history, substance use information, mental health information, and residential, educational, and employment status. The specific measures used in the development and validation of the risk assessment instrument were: number of prior felony convictions, number of prior failure-to-appears, pending charges, current offense type, current offense level, age at interview, highest educational level, employment status, home ownership, and substance use. These variables were identified as policy-relevant and empirically related to pretrial outcomes through multivariate analyses conducted by VanNostrand and Keebler (2009) and additional multivariate models run for this study.

Two dependent measures (outcomes) were included in this study. The first measure, FTA/NCA, was considered to be present and an indicator of failure if the defendant either failed-to-appear in court or was charged with a new criminal arrest while on pretrial release. The second dependent measure, FTA/NCA/TV, was considered to be present and also an indicator of failure if the defendant either failed-to-appear, was arrested for a new criminal charge while on pretrial release, or had his/her bond revoked due to technical violations.

### Analysis

Our analysis was fairly straightforward and consistent with prior research on the development of risk instruments (Gottfredson and Snyder, 2005). More specifically, we used a split sample process for construction and validation. We identified potential risk factors based on the results of VanNostrand and Keebler (2009) as well as on the results of supplementary logistic regression analyses using a split sample process and bootstrapping. Once a set of risk factors was identified, we assigned points to those risk factors and calculated a risk score. The relationship between this score and the outcomes of interest was evaluated. We then applied the risk calculation to the remaining 50 percent of the sample to deter-

mine if the risk instrument held across the two halves of the larger sample. The results of these analyses are presented in the next section.

## Results

After running a series of bivariate analyses and multivariate logistic regression models, we identified a number of factors relevant to predicting pretrial outcomes and scoring schemes for each of those factors. As indicated in Table 1, most factors relate to criminal history and the specifics of the current offense. However, four measures are dynamic and measure substance abuse, home ownership (community ties), educational attainment, and employment status. The factors identified are very similar to those identified in previous research on the prediction of pretrial risk. Note that there are varying point values for some items; however, most items are scored in a 0 and 1 format. Even those items with multiple point values still use a simple weighting process (0, 1, or 2 points).

Table 1 reports the failure rates based on the two outcome measures for all defendants (column labeled A), the construction sample (column labeled C) and the validation sample (column labeled V). The total number of cases in the entire sample ranges from 185,827 to 215,338, depending on the variables used in the bivariate analysis. The total number of cases in the construction and validation samples ranges between 90,655 and 107,893, depending on the variable used in the bivariate analysis. As noted in Table 1, there is very little variation in the relationships across the construction and validation samples. All relationships are statistically significant at the p < .001 level.

Table 2 presents the average risk scores, standard deviations, and values for the area under the curve (AUC) for the receiver-operating-characteristic (ROC). As indicated in Table 2, the average score for the two samples is 6.8 and the standard deviation is 2.5. The AUC values produced when predicting failure as measured by the FTA/NCA measure are .694 for the construction sample and .690 for the validation sample. As indicated by the upper and lower confidence intervals, these two values do not differ significantly. The AUC values when using the total risk score to predict the FTA/NCA/TV measure for the two samples are .726 and .725. Again, as indicated by the confidence intervals, these two values do not differ significantly from one another.

The next table, Table 3, displays the number of offenders in each risk category and the failure rates for each outcome measure. This information is presented for the overall sample as there were no significant differences in failure rates between the construction and validation samples. Five categories were identified and were labeled category I through V. Table 3 presents the number of defendants within each category, the failure rates for the outcome measures of interest, the odds of success, and PSO release recommendations for the entire sample.

As indicated in Table 3, a full 30 percent of the defendants fall into the lowest risk category (Category I). Almost similar percentages fall into categories II and III (29 and 26 percent respectively). Much smaller percentages of defendants were placed into categories IV and V. Note that with both measures of failure the rates increase from one category to the next. The failure rates for category V are 10 times the failure rates for category I defendants when considering FTA/NCA. A similar trend is also noted when considering the FTA/NCA/TV measure.

In addition to the failure rates for each category, there are odds-of-success for each outcome measure and the percentage of defendants where the PSO recommended release. The odds of success are interpreted as the odds of a success occurring to the odds of success not occurring. Note that the odds of success during pretrial release do drop quickly when moving from one category to the next; however, even with the highest-risk category, the odds of success occurring is either 4:1 or 2:1 depending on how success is defined. Similarly, the rate at which PSOs recommend release also drops quickly across categories (from 86 percent for category I to 13 percent for category V). It should be noted that the instrument was not developed nor in use when these release recommendations were made.

## Discussion

The purpose of this article was to provide an argument in favor of risk assessment in the federal pretrial system and a brief description of the process used to develop a proposed pretrial risk instrument. Given that the role of the pretrial services officer is similar to that of an actuary, it appears that an actuarial assessment would enhance a pretrial services officer's ability to fulfill this role. The instrument presented in this article provides a quick and accurate way for pretrial services officers

### TABLE 1.
Risk factors and failure rates by sample

| Variable | FTA/NCA | | | FTA/NCA/TV | | |
|---|---|---|---|---|---|---|
| | A | C | V | A | C | V |
| **Number of felony convictions** | | | | | | |
| 0-None | 6 | 6 | 6 | 10 | 10 | 10 |
| 1-One to four | 11 | 12 | 11 | 19 | 19 | 19 |
| 2-Five or more | 16 | 15 | 16 | 26 | 26 | 26 |
| **Prior FTAs** | | | | | | |
| 0-None | 6 | 6 | 6 | 11 | 11 | 11 |
| 1-One to four | 12 | 12 | 11 | 22 | 22 | 21 |
| 2-Five or more | 15 | 15 | 14 | 26 | 26 | 26 |
| **Pending cases** | | | | | | |
| 0-No | 6 | 6 | 6 | 11 | 11 | 11 |
| 1-Yes | 12 | 12 | 12 | 22 | 22 | 22 |
| **Current offense type** | | | | | | |
| 0-Theft/fraud, violent, other | 4 | 5 | 4 | 8 | 8 | 8 |
| 1-Drug, firearms, immigration | 10 | 10 | 10 | 18 | 18 | 18 |
| **Offense class** | | | | | | |
| 0-Misdemeanor | 4 | 4 | 5 | 6 | 6 | 6 |
| 1-Felony | 8 | 8 | 7 | 14 | 14 | 14 |
| **Age at interview** | | | | | | |
| 0-47 and older | 4 | 3 | 4 | 6 | 6 | 6 |
| 1-27 to 46 | 7 | 7 | 7 | 13 | 13 | 13 |
| 2-26 or younger | 9 | 9 | 9 | 17 | 17 | 16 |
| **Highest education** | | | | | | |
| 0-College degree | 3 | 3 | 3 | 5 | 5 | 5 |
| 1-High school degree, vocational, some college | 6 | 6 | 6 | 11 | 11 | 11 |
| 2-Less than high school or GED | 10 | 10 | 10 | 19 | 19 | 18 |
| **Employment status** | | | | | | |
| 0-Employed | 6 | 6 | 6 | 10 | 10 | 10 |
| 1-Unemployed | 9 | 9 | 9 | 17 | 17 | 17 |
| **Residence** | | | | | | |
| 0-Own/purchasing | 4 | 4 | 4 | 7 | 7 | 7 |
| 1-Rent, other, no place to live | 8 | 8 | 8 | 15 | 15 | 15 |
| **Current drug problems** | | | | | | |
| 0-No | 5 | 5 | 5 | 7 | 7 | 7 |
| 1-Yes | 10 | 10 | 10 | 19 | 19 | 19 |

### TABLE 2.
Average Scores, Standard Deviations, and AUC values by sample

| Sample | FTA/NCA | | | FTA/NCA/TV | | | | |
|---|---|---|---|---|---|---|---|---|
| | Lower | AUC | Upper | Lower | AUC | Upper | Average | Standard Dev |
| All | .687 | .692 | .696 | .722 | .726 | .729 | 6.83 | 2.49 |
| Construction | .687 | .644 | .700 | .722 | .726 | .729 | 6.83 | 2.49 |
| Validation | .683 | .690 | .696 | .720 | .725 | .730 | 6.82 | 2.49 |

Lower=Lower Bound 95% CI for AUC; Upper = Upper Bound 95% CI for AUC.

### TABLE 3.
Failure Rates, Odds of Failure, and PSO Release Recommendations.

| Risk Category | N | % | FTA/NCA* | Odds of Success | FTA/NCA/TV* | Odds of Success | PSO Release Recommendation |
|---|---|---|---|---|---|---|---|
| Category I (0-4) | 55,243 | 30 | 2% | 49:1 | 3% | 32:1 | 86% |
| Category II (5-6) | 53,193 | 29 | 6% | 16:1 | 10% | 9:1 | 60% |
| Category III (7-8) | 47,915 | 26 | 10% | 9:1 | 19% | 4:1 | 41% |
| Category IV (9-10) | 20,833 | 11 | 15% | 6:1 | 29% | 2:1 | 28% |
| Category V (11+) | 4,555 | 3 | 20% | 4:1 | 35% | 2:1 | 13% |

* P < .001

Case: 12-5951     Document: 006111610811     Filed: 03/05/2013     Page: 116

to begin to develop an empirical understanding of the risk posed by pretrial defendants. The next step in the process of implementing a pretrial risk assessment in the federal pretrial services system will be full use of the information provided by the instrument in structuring recommendations about release and conditions of release.

The legislative history of pretrial services is one of a reform movement that sought to protect the rights of citizens and to make sure that there are not two systems of justice, one for the affluent and another for the less fortunate. Examining the probabilities of failure and odds of success in Table 3 prompts the question: What did Congress intend in §3142(c) when it directed judicial officers to "reasonably assure" a defendant's future appearance or the safety of the community? Is "reasonably assure" a 49-to-1 wager? Or a 4-to-1 wager? When what hangs in the balance is the liberty of someone who has been charged, but not convicted, of a crime, braver bets are called for. The risk prediction instrument offers, we believe, an opportunity to use science to reinvigorate the pretrial services mission.

## References

Andrews, D. A., Bonta, J., & Wormith, S. J. (2006). The recent past and near future of risk and/or need assessment. Crime and Delinquency, 52, 7-27.

Beeley, A. L. (1927). The Bail System in Chicago. Chicago, IL: University of Chicago Press.

Doueck, H., English, D. DePanfilis, D. and Moote, G. (1993). Decision making in child protective services: a comparison of selected risk assessment systems. Child Welfare, 75(5), 441-452.

Foote, C. (1954). Compelling Appearance in Court: Administration of Bail in Philadelphia. University of Pennsylvania Law Review, 102, 1048-1049.

Gottfredson, D.M., & Snyder, H.N. (2005). The Mathematics of Risk Classification: Changing Data into Valid Instruments for Juvenile Courts Washington, D.C.: National Center for Juvenile Justice.

Grove, W. G., & Meehl, P. E. (1996). Comparative efficiency of informal (subjective, impressionistic) and formal (mechanical, algorithmic) prediction procedures: The clinical-statistical controversy. Psychology, Public Policy, and Law, 2, 293–323.

Grove, W. G., Zald, D. H., Lebow, B., Snitz, B., & Nelson, C. (2000). Clinical versus statistical prediction: A meta-analysis. Psychological Assessment, 12, 19-30.

Hilton, N.Z., Harris, G.T., & Rice, M. E. (2009). Risk assessment for domestically violent men: Tools for criminal justice, offender intervention, and victim services. Washington D.C.: American Psychological Association.

VanNostrand, M. & Keebler, G. (2009). Pretrial risk assessment in the Federal Court. Washington D.C.: U.S. Department of Justice.

Zinger, I. (2004). Actuarial risk assessment and human rights: A commentary. Canadian Journal of Criminology and Criminal Justice, 46(5), 607-620.

# Philadelphia Revisited:
# An Examination of Bail and Detention
# Two Decades after Foote

**John S. Goldkamp**

*After nearly two decades of reform efforts, bail and pretrial detention have remained controversial—in some instances because of a move toward embracing preventive detention more openly, while in others because of attempts to outlaw the role of the commercial bondsman in pretrial release. This article refocuses on a landmark study of bail in Philadelphia by Caleb Foote in 1954 and contrasts its findings with a 1977 study conducted in the same city. The second study, although not designed as a replication of Foote's study, offers an opportunity to gauge the progress of reform over two decades. The conclusion is that, in spite of noticeable improvement in bail and release procedures, a number of issues defined so sharply by Foote in 1954 remained unresolved today.*

As a result of the publication of Professor Caleb Foote's study of bail and detention in Philadelphia in 1954,[1] Philadelphia became a symbol of all that was "wrong" with the American bail system. Although Foote was certainly not the first to criticize the American way of bail,[2] he was the first to undertake a comprehensive examination of bail practices, pretrial detention, and their implications for criminally charged defendants. The Philadelphia Bail Study, as his study was called, was significant not only because it documented many inequities and raised questions concerning the constitutionality of bail and detention practices, but also because it served as a major catalyst for bail reform efforts that began in New York in the early 1960s. Many years after publication of the study—and partly as a result of it—Philadelphia came to be viewed as an entirely different kind of bellwether: as a model of bail reform and exemplary pretrial services that other cities sought eagerly to emulate. From the point of view of bail practices, Philadelphia had been transformed from a "traditional" to a "reform" jurisdiction.[3]

JOHN S. GOLDKAMP: Assistant Professor, Acting Chair, Department of Criminal Justice, Temple University, Philadelphia.

1. Caleb Foote, "Compelling Appearance in Court: Administration of Bail in Philadelphia," *University of Pennsylvania Law Review*, June 1954, pp. 1031–79.

2. See Roscoe Pound and Felix Frankfurter, *Criminal Justice in Cleveland* (1922; rep. ed., Montclair, N.J.: Patterson Smith, 1968); Arthur Beeley, *The Bail System in Chicago* (Chicago: University of Chicago Press, 1927); and Wayne Morse and Ronald Beattie, "Survey of the Administration of Criminal Justice in Oregon," *Oregon Law Review*, 1932 (rep. ed., New York: Arno Press, 1974).

3. Paul Wice, *Freedom for Sale* (Lexington, Mass.: D. C. Heath, 1974).

**A108**

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

The aim of this paper is to explore some of the changes that have occurred in bail practices in Philadelphia since the time of Foote's study and to consider their implications. This will be achieved by using Philadelphia as a unique case study of the recent concern about the administration of bail. More specifically, the major findings set forth in Foote's 1954 study of bail in Philadelphia will be contrasted with a more recent study of bail decision making in the same city[4] to assess the extent to which the major difficulties pointed out by Foote have or have not been addressed and resolved after more than twenty years.[5] The second study of bail in Philadelphia, it should be noted, was not designed as a replication of the first; thus, comparison of specific findings is not appropriate. However, comparison of the general findings of both studies using the issues set forth by Foote may provide a gauge for evaluating the present state of affairs in bail, bail reform, and pretrial detention.

## THE PHILADELPHIA BAIL STUDY

It is difficult to discover an issue that was addressed by the bail reform movement of the 1960s that was not first discussed by Foote in his 1954 study. Because of the comprehensive treatment of bail and detention in that study, it may be helpful to organize the issues raised by Foote according to the following perspectives for the purposes of this discussion: the unstructured exercise of discretion in bail matters, the procedural impediments to the fair administration of bail, the presumption of guilt and pretrial punishment, the inequitable treatment of defendants at bail, and questions about the effectiveness of bail practices.[6]

---

4. John S. Goldkamp, "Bail Decisionmaking and the Role of Pretrial Detention in American Justice" (Ph.D. diss., School of Criminal Justice, State University of New York at Albany, Albany, N.Y., 1977).

5. As part of a broader investigation of bail decision making and the role of pretrial detention in American justice, bail decision making in Philadelphia was examined as a case study in 1977. In this study the cases of a cohort of defendants (weighted $n = 8,300$) arriving for initial appearance between August 1 and November 2, 1975, were followed until completion—in many cases until 1977. The specifics of the 1977 study differed in many ways from the earlier Foote study, but many issues can be seen to overlap in both. The 1977 study is reported in different parts and formats in the following documents: Ibid.; John S. Goldkamp, "Bail Decisionmaking in Philadelphia," Working Paper 11 (Albany, N.Y.: Criminal Justice Research Center, 1978); and John S. Goldkamp, "Release or Detention before Trial in Philadelphia," Working Paper 12 (Albany, N.Y.: Criminal Justice Research Center, 1978). It also constitutes a portion of John Goldkamp, *Two Classes of Accused: A Study of Bail and Detention in American Justice* (Cambridge, Mass.: Ballinger, 1979).

6. This conceptualization of the issues raised by Foote in his 1954 study is the author's own; it is hoped that this interpretation fairly describes the substance of that study as it is relevant to the present analysis.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

*Problems with Discretion in Bail Determinations*

Foote argued persuasively in the Philadelphia Study and in subsequent discussions[7] that bail was administered for only one legitimate purpose: to assure the presence of defendants at required court proceedings.[8] In his examination of Philadelphia bail practices, Foote sought evidence to support a finding that bail decisions had that specific objective. After many observations of court bail proceedings and analysis of data collected from the courts and the prosecutor's office, he was unable to conclude that bail judges in Philadelphia were transacting their business on the basis of standards reflecting that concern. Instead, bail appeared to be decided according to only one criterion, the criminal charge:

> Custom has established a standard related to the nature of the crime charged, *a standard which is sufficiently flexible to permit in any crime an amount sufficient to have the practical effect of holding most defendants in prison.* The individual is subordinated to the class into which he is placed according to the type of crime with which he is charged, although what relationship to the risk of non-appearance this may have is unknown.[9] (emphasis added)

Foote explained that the bail judges' reliance on the charge criterion was a product of "the administrative problems created by a large volume of cases" that necessitated "the creation of a standard which can be easily and rapidly applied." He acknowledged also the logic behind use of such a standard: "As the severity of the crime and possible punishment increases, the defendant, having more to fear, becomes more likely to jump bail."[10] However, doubting the validity of such a rationale, Foote perceived the popularity of the charge criterion as reflecting the judges' preference for an all-purpose standard that could be easily manipulated to accomplish a variety of aims.

Foote encountered evidence of some highly discretionary and highly questionable uses of bail. Most notable among these—and most objectionable according to Foote's view—were the manipulation of cash bail by judges intent on detaining defendants they deemed particularly dangerous (preventive detention) and the use of cash bail (and detention) for punitive purposes. In

---

7. Caleb Foote, "The Coming Constitutional Crisis in Bail: I," *University of Pennsylvania Law Review*, vol. 113 (1965), p. 959; and Caleb Foote, "The Coming Constitutional Crisis in Bail: II," *University of Pennsylvania Law Review*, vol. 113 (1965), p. 1125.

8. There are clearly other views of the bail function, for instance to protect the community from dangerous defendants—just the view to which Foote has objected. A recent analysis of sources of legal policy in the area of bail has shown that both the appearance view and the dangerousness view may be supported, though such guidelines are quite vague in many respects. See Goldkamp, *Two Classes of Accused.*

9. Foote, "Compelling Appearance in Court: Administration of Bail in Philadelphia," p. 1043.

10. Ibid., p. 1035.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

short, bail determinations in Philadelphia were seen as easily prone to abuses of discretion and as based on a standard that was so broad that it could be used for any purpose.

Approximately twenty-five years earlier, the Wickersham Commission (influenced by the work of Arthur Beeley)[11] had called for radical changes in the administration of bail "in the direction of the individualization of bail determinations based on the history, character, standing, personality and record of the accused."[12] Although "individualization" in bail was perceived to be a means for structuring the discretion of bail judges and rendering fairer decisions that would take into account individual characteristics of defendants, "the gulf which separates this goal of individualization from the Philadelphia practices which have been noted in this study is so wide as to suggest that it cannot be bridged."[13] Because of the pressure of the large volume of cases and because bail was decided at the very lowest level of the judiciary, it seemed doubtful that "individualization" would become a reality in Philadelphia bail practices. Besides, "the employment of a pre-bail investigation to develop information about the defendant would involve prohibitive expense and the denial of bail to all defendants for the time necessary to make the investigation."[14]

The role of the bondsman in the bail system in Philadelphia at that time was criticized as another source of potential abuse of discretion. In 1954, when nearly all bail decisions were framed in terms of cash amounts, bondsmen brokered the prospects of pretrial release for a great share of defendants. Whether or not a defendant was able to gain release may have depended frequently on the bondsmen's discretionary selection of their clientele. That is, certain defendants may not have been viewed favorably as "good business" by bondsmen—and thereby been prevented from raising the cash needed for their release—because they did not meet the bondsmen's selection criteria based on business concerns. Often these criteria had little to do with risk of flight; conceivably, poor defendants with low bails may have been turned down merely because the fees to be earned by the bondsmen would have been considered too small. (Bondsmen may also have considered persons charged with petty offenses as much more likely to abscond and thus as not worth the trouble or the financial risk.)

11. Beeley, *The Bail System in Chicago.*

12. Foote, "Compelling Appearance in Court: Administration of Bail in Philadelphia," p. 1069. See The Wickersham Commission, *National Commission on Law Observance and Enforcement, Report on Prosecution* (Washington, D.C.: Govt. Printing Office, 1931).

13. Foote, "Compelling Appearance in Court: Administration of Bail in Philadelphia," p. 1070.

14. Ibid., p. 1071.

**A111**

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

*Procedural Impediments to
the Fair Administration of Bail*

Foote portrayed the bail decision-making machinery in Philadelphia as characterized by "divided responsibility," with the result that many defendants experienced considerable delays awaiting bail setting or had bail denied altogether because of procedural inefficiencies. Persons charged with minor offenses stood the best chance of having bail set relatively quickly, because this was done by magistrates in the lowest court. But defendants charged with more serious crimes (felonies and capital cases) had bail denied in the lowest court at their first appearances pending application to a higher court through the district attorney's office. According to Foote, it was often not clear to defendants who had bail refused in the original bail court that they had the right to have bail set upon application to the higher court. Even those represented by counsel (who submitted the request automatically) were detained a week or more while waiting for the second hearing. Thus, the defendants charged with more serious crimes were not only likely to have higher bails set (because of the unwritten law that fixed bail according to the seriousness of the charge), but, in addition, had to submit to procedural delays and denials simply because of the nature of their charges. Foote concluded that "the division of responsibility, which makes possible such infringements of the right to prompt bail, is an anachronism which has no practical utility."[15]

*Presumption of Guilt and Pretrial Punishment*

The due process notion of presumption of innocence requires that criminally charged defendants be treated as innocent until guilt has been established. Thus, a glaring affront to due process is offered by the very existence of the practice of pretrial detention. To the defendant, pretrial detention is essentially punitive; it institutionalizes the punishment of persons who theoretically are presumed innocent. More troublesome to due process principles than the mere existence of pretrial detention is the use of bail for the purpose of detaining persons deemed dangerous by bail judges. As Foote noted, preventive detention undermines due process because it operates on untested assumptions about defendants' past behavior (presumed guilt) and also on highly speculative predictions of defendants' future behavior. It was Foote's position not only that preventive detention by means of bail procedures was legally inappropriate and ineffective, but also that other mechanisms—such as accelerated trials—might be better suited to concerns about defendant dangerousness.

15. Ibid., p. 1046.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

**A112**

*Inequitable Bail Practices*

Bail practices in Philadelphia at the time of Foote's study may have acted to treat defendants inequitably in a number of ways. It was already noted above, for example, that certain defendants were made to suffer delays in confinement or had bail denied by confusing procedures while others did not—merely as a result of the nature of the charged offenses. But several other aspects of bail practices in Philadelphia were open to serious "equal justice" criticisms.

A first problem relates to disparity in bail decisions received by ostensibly similar defendants.[16] Foote found that, although judges were consistent in their unanimous reliance on the charge standard, the manner in which the charge criterion was interpreted varied considerably from judge to judge. Thus, defendants charged with a specified crime appearing before one judge might be viewed quite differently before another judge. Disparity in bail decisions may have resulted from the lack of agreed-upon standards or goals, or highly personal uses of bail by different judges; whichever may have been the case, unequal treatment of similar defendants was the undesirable result.

A second equity question is the obvious issue of economic bias inherent in any bail system that relies predominantly on cash bail. It was clear to Foote that even if similar amounts of cash bail were set for similarly charged defendants—a practice which on its face might appear fair—defendants without financial resources would be at a consistent disadvantage and the result would be an institution of pretrial detention reserved only for poor defendants.

A third equity issue raised by Foote derived from his findings that more detained than released defendants were ultimately convicted and, if convicted, handed down severe sentences. The major implication was that detained defendants were unfairly prejudiced at later judicial stages by the fact of their detention—and were therefore being denied the equal protection of the law.

*The Effectiveness of Bail Practices*

Finally, Foote's study raised serious questions concerning the effectiveness of bail practices in Philadelphia.[17] Foote viewed the bail decision as involving the prediction of the likelihood that defendants would flee before trial. He doubted seriously that such prediction based on the seriousness of the criminal charge would be accurate or effective. According to data collected, risk of flight was related to charge seriousness in a fashion exactly opposite to that

16. The definition of "similarly situated" in bail matters is highly problematic. If the function of the bail decision is to predict likely defendant flight or pretrial crime, then similar defendants would be defendants in similar "risk" categories. But, as will be discussed below, defendant risk cannot as yet be statistically determined. Here, this complication is put aside; similar means only defendants in similar charge categories.

17. From Foote's perspective, effectiveness in this sense pertains to the appearance-assuring function: Are bail practices effectively serving to guarantee the appearance of defendants at required court proceedings?

**A113**

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

assumed by traditional judicial wisdom: Defendants charged with the least serious criminal offenses failed to appear at court at a rate substantially higher than that of seriously charged defendants. Moreover, Foote expressed skepticism about the ability to predict defendant flight even if the ideal of "individualization" (consideration of alternative kinds of defendant data) could be realized: "An honest attempt to individualize bail determination must be plagued by the treacherous uncertainty inherent in predicting future human behavior."[18]

Any deterrent value associated with the use of cash bail to protect against possible defendant flight was seen to be destroyed when a bondsman was employed, because defendants lost the fee paid to the bondsman—whether or not they returned to court. In fact, Foote suggested, bondsmen offered defendants planning to abscond a chance to purchase their freedom. Bail paid by the individual (though susceptible to economic bias) or third-party bail (when the third party was a close friend or relative) was seen as providing a more effective incentive for defendants to return to court.[19]

*Foote's Recommendations
for Improving Bail Practices*

Based on this thorough evaluation, Foote offered several recommendations for improving the bail system. Failure to appear at court should be made, he suggested, into a criminal offense. The use of cash bail should be substantially reduced in favor of other nonfinancial conditions (such as personal recognizance). In what must certainly have been received as a "radical" statement at that time, he argued that "the ultimate abolition of the bail system is the only solution for the prejudice to jail defendants which results from their low economic status."[20] Furthermore, short of abolishing cash bail for poor defendants, bail amounts ought to be substantially reduced to render release affordable to more defendants. (Foote had noted that many poor defendants facing nonserious charges were being detained on relatively small amounts of bail.) The preventive detention use of bail decision making ought to be curbed, for bail was not the appropriate means for addressing the danger question: "If it is feared that defendants will commit further crimes if released, the remedy is not preventive detention but a prompt trial."[21] Finally,

18. Foote, "Compelling Appearance in Court: Administration of Bail in Philadelphia," p. 1036.

19. It should also be noted, by way of irony, that the tendency of judges to presume the guilt (rather than the innocence) of defendants when deciding bail was also a highly ineffective practice. Foote reported that approximately one-third of all defendants detained on unaffordable cash bail before trial (i.e., those most likely to have been presumed guilty) were ultimately acquitted or had all charges dropped.

20. Foote, "Compelling Appearance in Court: Administration of Bail in Philadelphia," p. 1073.

21. Ibid., p. 1077.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

Foote recommended that the damage to the presumption of innocence of detained defendants be tempered by minimizing the punitive features of pretrial confinement.

## CURRENT BAIL PRACTICES IN PHILADELPHIA

As part of a broader investigation of bail decision making and the role of pretrial detention in American criminal justice, bail practices in Philadelphia were again studied in 1977. Cases of a large number of defendants who had bail decided in the fall of 1975 were studied after their final resolutions by 1977.[22] Between 1954 and the more recent inquiry, the major occurrence of relevance was the bail reform movement—in which Foote's work played an important seminal role. Logically, the most noticeable changes in Philadelphia's bail practices can be explained principally as a result of bail reform. The most striking difference in Philadelphia "before" and "after," consequently, is the radical alteration of the structure of the early phases of its criminal justice system that deal with bail and pretrial release. These structural changes are capsuled here.

Perhaps the most striking departure from the Philadelphia of 1954 in present bail matters is the fact that the bail function is transacted in a centrally organized fashion. All defendants (except homicide defendants) have bail decided no more than twelve hours after their arrest, at a court held in one location and then only after they have been thoroughly interviewed for information on community ties, employment, income, health problems, and prior record. All of the municipal court judges whose responsibility it is to decide bail have available to them reports from the Pretrial Services Division providing the alternative kinds of data that Foote and his predecessors considered necessary for "individualized" bail decisions. Gone is the "divided responsibility"; an entire division of the Philadelphia court system is now responsible for pretrial services, which includes supervising defendants on release (notifying them of court dates, etc.) and providing thorough background information on defendants going to their first appearances before a judge. Notably, "individualization" has occurred in Philadelphia without the delays foreseen by Foote. Not only do lower court judges have additional defendant data to consider as alternatives to the charge standard criticized by Foote, but, in addition, all non-law-trained lower court judges have been replaced by lawyer judges.

The Foote of more than two decades ago would be further astonished to discover that, according to the more recent study, the use of cash bail as a decision option has considerably diminished. Nearly half of all defendants in

22. The study was conducted in 1977, but the sample consisted of cases entering the early stages of criminal processing at initial appearance in Philadelphia during the fall of 1975. Because the later outcomes of these cases were also important to the study, it was necessary to allow a sufficient period of time for their resolution. By early 1977 all cases had been completed.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

the 1977 study were granted release on personal recognizance. Compared with the 75 percent detention rate reported by Foote in 1954, only 25 percent of Philadelphia defendants experienced pretrial detention beyond a twenty-four-hour period in 1975; half of these—only 12 percent of all defendants—remained confined during the entire preadjudicatory interval. In addition, defendants in 1975 who were not released immediately after first appearance still had a further recourse: They were considered for conditional release, a form of release that is conditioned by participation in certain programs or supervision. There is evidence also that defendants who were detained in Philadelphia in 1975 were confined for considerably shorter periods than previously. Where possible, they were given an accelerated court calendar. (Philadelphia, like the rest of Pennsylvania, has been operating in accordance with a "speedy trial" provision.) Moreover, special sessions of court were held at the jail to expedite the processing of minor cases (usually misdemeanors) that might otherwise have been unnecessarily delayed.

In addition to centrally organized bail and pretrial release functions and the appearance of "individualized" bail decision making, a further major alteration in the Philadelphia way of bail can now be observed: the disappearance of the bondsman. In a major reform, Philadelphia's courts have replaced bondsmen with a Ten Percent program which allows defendants to deposit 10 percent of the amount of their cash bail with the court. The deposit is refundable (minus a service charge) as soon as it has been ascertained that the defendant has appeared in court. In the event that defendants cannot afford the 10 percent amount themselves, the use of third-party bail is strongly favored as a way of inducing relatives or friends to have a stake in assuring that a defendant will not face the necessity of resorting to a bondsman. Apparently, many of Foote's criticisms concerning the use of cash bail in Philadelphia were addressed by the time of the 1977 study.

## HAVE THE MAJOR ISSUES BEEN RESOLVED?

Clearly, major reforms have been implemented in Philadelphia since the time of Foote's study. Philadelphia has been transformed from a jurisdiction symbolizing the disorder and abuses characteristic of the American bail system in the 1950s to a model bail reform jurisdiction. But have the major issues raised by Foote in 1954 been fully resolved? Perhaps not. The five critical dimensions used to summarize Foote's study in the beginning of this discussion will again be briefly considered to permit an issue-by-issue assessment of this question.

### Discretion

On the surface, at least, it would appear that the discretion which under the former system was so vulnerable to abuse has now been solidly structured.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

**A116**

Judges are presently instructed in the *Pennsylvania Rules of Court*[23] to weigh as many as sixteen items of information about defendants in deciding bail. (Among these are not only the nature of the charge and the prior record, but also a variety of other kinds of data, such as defendants' community ties, employment, and financial resources.) The Pretrial Services Division was created to make possible this information-gathering and digesting function. Although implementation of this reform appears to be the very embodiment of the "individualization" ideal that evolved from Beeley[24] and the Wickersham Commission[25] through Foote, it is interesting to note that the 1977 study found that the nature of the criminal charge still played the dominant role in bail determinations.[26] The "standard," criminal charge, that was so criticized by Foote appears to survive undaunted—despite the existence of newer decision-making guidelines and an ROR (personal recognizance release) program to help operationalize them.

The fact that the alternative kinds of defendant data (e.g., community ties) diligently collected by the ROR program staff in Philadelphia did not play an influential role in either bail determinations or the determination of release or detention in the recent study suggests two hypotheses: (1) Either judges remain convinced that criminal charge is the most reliable predictor of risk of flight, or (2) they remain steadfast in adhering to a flexible, all-purpose standard that, as Foote explained, has the "practical effect of holding" any defendants who for various reasons may have impressed bail judges unfavorably. In short, not only is judicial consideration of standards governing bail decision making still highly discretionary, but so are the uses to which the bail function may presently be put. Because judges are not required to communicate the reasoning behind their bail decisions, there can be no guarantee that decision goals may not shift freely from appearance concerns to preventive detention based on defendant dangerousness, as well as punitive, political, or other discretionary purposes.[27]

*Procedural Impediments*

Virtually all of the procedural complications resulting in delay or denial of bail that Foote discussed have been overcome by a much more efficient, centrally organized pretrial services agency in Philadelphia. And this may be seen as a major accomplishment of reform. (Homicide defendants may still have bail denied until the preliminary hearing, however.)

---

23. *Pennsylvania Rules of Court* (1976).
24. Beeley, *The Bail System in Chicago.*
25. Wickersham Commission, *National Commission on Law Observance and Enforcement.*
26. Goldkamp, *Two Classes of Accused.*
27. This conclusion in the 1977 study is based on interviews with Philadelphia bail judges, observations of first appearances, and empirical analysis of bail decisions for an estimated 8,300 Philadelphia defendants.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

**A117**

*Presumptions of Guilt and Pretrial Punishment*

In the 1977 study, interviews with Philadelphia bail judges were conducted to learn the judges' views about bail decision making and pretrial detention.[28] It was clear in those interviews that presumption of guilt is an unavoidable concomitant of the reliance on the criminal charge criterion and that both are features of preventive detention related to dangerousness concerns in bail. That is, when defendants are charged with serious crimes, judges may conservatively assume their guilt and further assume that they would be dangerous (or at least more dangerous than nonseriously charged defendants) if freely released before trial. In spite of the inexactness and the controversial nature of this sort of predictive "science," it is clear that this branch of bail ideology is and will remain a powerful force in Philadelphia, as elsewhere. According to those interviewed, pretrial punishment may occasionally be the direct intention of certain judges (e.g., those wishing to educate defendants with a "taste of jail"), but more frequently pretrial detention of the presumed innocent is considered a necessary evil in an imperfect system. Considering the urgent interests of the state in guaranteeing attendance at court and protecting the community, it is unlikely that the pretrial punishment paradox inherent in the detention of defendants will ever be resolved more favorably for defendants, except through maintaining a high rate of pretrial release and devising accelerated court calendars. (The risks of a liberal release policy can be counterbalanced, as Foote suggested, by shortened preadjudicatory periods.)

*Inequitable Treatment of Defendants*
*in Bail Practices*

The inequities inherent in procedural delay and in the role of bondsmen in the former Philadelphia practices have been virtually eliminated, as noted above, but the problem of disparity in bail decisions has not. The 1977 study did not address the issue of judge-to-judge inconsistency, but there is no reason to assume that such variation has been noticeably affected by bail reform practices. (This statement is supported by the 1977 finding noted above that judges were not influenced by the availability of data on community ties provided as a result of bail reform.) More than that, however, a major finding of the 1977 study was that, after acknowledging the influential role of the criminal charge, and two or three other less influential items, a great amount of the variation in bail decisions could not be explained by any recorded defendant data.[29] (At least fifty items of information pertaining to legal, demographic, and other defendant characteristics were considered in the empirical analysis in that study.) The implication of this finding is that other factors that are difficult to measure—such as the personal judicial philosophies of those set-

---

28. Goldkamp, *Two Classes of Accused.*
29. Goldkamp, "Bail Decisionmaking in Philadelphia."

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

**A118**

John S. Goldkamp

ting bail and their perceptions of defendants—may have accounted for a large amount of variation in bail decisions. To the extent that bail decisions were not explainable empirically by observable patterns, irregularity or disparity remained one of their principal features. It is difficult to feel confident that, even today, similar defendants in Philadelphia are likely to receive similar outcomes at bail. Clearly, serious questions of the fairness of bail decisions remain.

In response to the issue of economic discrimination inherent in a system of cash bail raised by Foote in 1954, it must be said that reforms in Philadelphia have made substantial inroads. To begin with, ROR in 1975 was used in nearly half of all cases—compared with a negligible percentage of cases in 1954. For that half of defendants, then, economic discrimination is no longer a relevant concern.[30] For the other half, it is certain that the economic impact of cash bail has been lessened through the Ten Percent program. If it cannot be stated for certain that the "price" of cash bail has gone down under the program (and some have suggested that judges have simply adjusted the amount of bail upward to compensate), it can at least be stated that defendants now regain the amounts that previously would have been lost to the bondsman's fee. Nevertheless, because even low bail may be unaffordable to poor defendants, any bail system relying on cash bail will always be discriminatory to a certain extent, by definition.

The third equity issue raised by Foote concerning the possible disadvantage suffered by detained defendants in the subsequent processing of their cases was specifically examined in the 1977 study. The question here was whether pretrial custody in itself had an influence on later outcomes of defendants' cases. After detailed empirical analysis of the relationship as it pertained to dismissal, diversion, conviction, and sentencing, it was found that the relationship survived the exercise of controls only when sentencing outcomes were considered.[31] In short, it appeared that the relationship between pretrial custody and later outcomes was nonexistent (for the decisions regarding dismissal/continuation and acquittal/conviction) or spurious (for the decision about diversion/nondiversion) except at sentencing when sentences were dichotimized as nonincarcerative/incarcerative. Specifically, detained defendants whose cases later progressed through the criminal process all the way to sentencing were substantially more likely to receive sentences to incarceration than their counterparts who had been released before the adjudication of their

---

30. Study to date has not demonstrated, however, whether defendants granted ROR are those who most need relief from cash bail or individuals who would be able to pay for their release under a cash bail system.

31. The 1977 study had consideration of this relationship as a special focus. That analysis was carefully constructed to employ the appropriate sample for each judicial decision examined. See John S. Goldkamp, "The Effects of Detention on Judicial Decisions: A Closer Look," *Justice System Journal*, Winter/Spring 1980.

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

cases. Though the applicability of the "effects of detention" issue has been narrowed by the analysis conducted in the 1977 study from the more general statement made in 1954, it still presents a serious equal protection dilemma.

### Effectiveness

Foote had questioned the effectiveness of bail practices from a number of perspectives. First, he expressed serious doubt that bail decision making operating on the basis of the criminal charge could effectively predict likely absconders; second, he was not hopeful that other kinds of information would ameliorate the prospects for effective prediction. Although the 1977 study did not try to predict risk of flight or pretrial crime, research conducted in recent years[32] has sought to shed light on this problem. To date no research has been able to isolate reliable predictors of either flight or dangerousness using criminal charge, past record, community ties, or any other defendant data presently available. Research examining failure-to-appear and pretrial crime rates has shown that many defendants appearing before bail judges may be released on nonfinancial conditions (ROR) without increasing the rate of nonappearance experienced under traditional cash bail systems. Nevertheless, a major question remains: Without any evidence of a greater ability to predict defendant flight or propensity to commit crime before trial than was suspected by Foote in 1954, what criteria should be deemed acceptable in bail decision making and why? How should the issue of the appropriateness of decision criteria be resolved in view of their overall ineffectiveness?

Foote's other effectiveness issue—relating to cash bail when paid to the bondsman—has been made moot in Philadelphia. Not only has the bondsman's function been eliminated in Philadelphia bail practices, but, in addition, the Ten Percent program operating there stresses third-party bail to add to the defendant's incentive to appear in court the stake of interested relatives or friends in retrieving their investments.

### CONCLUSION

Apparently, the assessment of bail practices in Philadelphia published by Professor Foote in 1954 has served as a blueprint of issues and change for the years of reform that succeeded his study. Two decades after his landmark study, bail reform has wrought substantial changes in the administration of bail in Philadelphia, and many of the issues raised by Foote have been addressed with fairer and more efficient procedures. Many of his recommendations appear to have been either prophetic or to have contributed directly to

32. See John S. Goldkamp, "Bail Decisionmaking and the Role of Pretrial Detention: A Critical Review of Empirical Research," Working Paper 10 (Albany, N.Y.: Criminal Justice Center, 1978).

**A120**

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

John S. Goldkamp

changes that were later institutionalized as part of the routine of the contemporary Philadelphia court system. In the 1970s, Philadelphia has become as much a symbol of enlightened criminal justice reform in the pretrial area as it had in the 1950s gained notoriety as a symbol of all that was ignominious about American bail practices. The usefulness of comparing the two Philadelphias as a case study extends beyond that city's special experience, for many other cities have been involved in similar reform struggles during roughly the same interval.

On a more troublesome side, this exercise has served to point out areas where major bail and detention issues have not been resolved. Apparently, the bail decision still lends itself to highly discretionary uses and individualistic procedures for evaluating defendants at bail—this despite all the trappings of a modern court bail reform agency. Judges are still free to arrive at their decisions impressionistically, idiosyncratically, or conscientiously according to existing guidelines, or not—as fate might have it. Bail reform has offered bail judges new resources to aid their decision-making process (recall that Foote reported judges in 1954 had little more than a description of the offense on which to base their decisions), but the 1977 study has shown that these resources may be ignored or used to reinforce the very decision-making practices that were the targets of the reform measures.

Serious questions about disparity in bail decisions that had been raised by the Foote study were not resolved in the 1977 study; rather, they were increased. Because of the uncertainty over the purpose of the bail decision (is it oriented toward appearance or dangerousness?) and the confusion over the means to be used in arriving at the decision, it is quite probable that similar defendants would in contemporary Philadelphia be treated in very different fashions by different bail judges. Furthermore, criticisms concerning economic bias in bail practices will not be overcome as long as cash bail continues to be a major bail option and as long as many defendants continue to be economically disadvantaged. (Yet, it should be noticed that economic bias will be minimized in a system like Philadelphia's where ROR is used in half of all cases and the bondsman has been replaced by a Ten Percent program.) The final issue that has not disappeared in two decades is the question concerning the effect of detention on the final outcomes of defendants' cases. It now appears that this relationship may apply only to defendants reaching the sentencing stage, and there those who have been detained are considerably more likely than those released to receive severe incarcerative sentences. Clearly, this is an issue that needs to be investigated further.

**A121**

Downloaded from cad.sagepub.com at MIDDLE TENNESSEE STATE UNIV on April 20, 2011

1954]

# COMPELLING APPEARANCE IN COURT: ADMINISTRATION OF BAIL IN PHILADELPHIA

*Editor's Note—This study was financed by the Institute of Legal Research of the University of Pennsylvania Law School and was completed by editors of the Law Review under the direction of Caleb Foote.†*

The right to bail before trial in non-capital cases is guaranteed by constitutional and statutory law.[1] "This traditional right to freedom before conviction," the Supreme Court has said, "permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."[2] But the right to bail is not an unqualified right to freedom, for the accused may be required to post such security as will reasonably ensure his appearance in court for trial. Certainty of appearance could be guaranteed only by incarcerating all prisoners, whereas not inflicting punishment until guilt is determined would require the abolition of all pre-trial imprisonment. Reconciliation of this conflict is attempted by "properly striking a balance between the need for a tie to the jurisdiction and the right to freedom from unnecessary restraint."[3]

This study is an examination of how this adjustment is made in the administration of bail in Philadelphia in non-capital cases before conviction. It includes a survey of the methods employed to set bail, determination of the proportion of defendants who do not obtain bail, the comparative treatment of bail and jail defendants and the relative efficacy of different kinds of bail as deterrents against non-appearance at trial.

---

† Instructor at Law, University of Pennsylvania Law School. The cooperation of the many persons who assisted in this study is acknowledged with gratitude.

1. U.S. Const. Amend. VIII ("Excessive bail shall not be required") ; Fed. R. Crim. P. 46 (Before conviction "[a] person arrested for an offense not punishable by death shall be admitted to bail"). See opinion of Mr. Justice Butler as Circuit Justice for the Seventh Circuit in United States v. Motlow, 10 F.2d 657, 659 (7th Cir. 1926) : "The Eighth Amendment provides that 'excessive bail shall not be required.' This implies, and therefore safeguards, the right to give bail at least before trial. The purpose is to prevent the practical denial of bail by fixing the amount so unreasonably high that it cannot be given. The provision would be futile if magistrates were left free to deny bail." See Comment, 51 Mich. L. Rev. 389 (1953). While the Eighth Amendment is not a limitation upon the states, Collins v. Johnston, 237 U.S. 502 (1915), state constitutional and statutory guarantees to bail are parallel, *e.g.,* Pa. Const. Art. I, § 14 ("All prisoners shall be bailable by sufficient sureties, unless for capital offenses where the proof is evident or presumption great"), Pa. Stat. Ann. tit. 19, § 51 (Purdon Supp. 1953). This study does not include problems arising where granting bail is discretionary, as on appeal after conviction, Fed. R. Crim. P. 46(a), or pending trial for capital offenses.

2. Stack v. Boyle, 342 U.S. 1, 4 (1951).

3. United States *ex rel.* Rubinstein v. Mulcahy, 155 F.2d 1002, 1004 (2d Cir. 1946).

(1031)

**A122**



FIGURE 1.   PROPORTION OF STATE DEFENDANTS IN MAGISTRATES' COURTS
WHO DID NOT RAISE BAIL ACCORDING TO AMOUNT OF BAIL

## I. THE AVAILABILITY OF BAIL

Mr. Justice Jackson has said that: "The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial.  On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty." [4]  If a bail system is to have this effect, it must go as far in facilitating access to bail as is consistent with reasonable assurance that the defendant will present himself at his trial.   To make bail readily available, the following standards must be met:

(1) the amount of bail which is required must not be excessive, *i.e.,* it must be no higher than is necessary to compel appearance; [5] and

(2) the procedure must provide for bail to be set promptly after arrest, allow opportunity for the accused to contact potential bondsmen, protect the defendant against exorbitant charges and corrupt practices, and afford an expeditious method of posting the bond.

### (a) *Determination of Amount of Bail*

The most important of the above requirements is the proscription against excessive bail.  The inverse relationship between the amount set and the likelihood that a defendant can post the required security was apparent in both the state and federal cases which were observed (see figures 1 and 2).  In the samples which were studied, *73% of state offenders*

4. Stack v. Boyle, 342 U.S. 1, 7-8 (1951) (concurring opinion).
5. U.S. CONST. AMEND. VIII; PA. CONST. Art. 1, § 13; Stack v. Boyle, 342 U.S. 1 (1951); United States v. Motlow, 10 F.2d 657 (7th Cir. 1926).



FIGURE 2.  PROPORTION OF FEDERAL DEFENDANTS WHO DID NOT RAISE
BAIL ACCORDING TO AMOUNT OF BAIL

for whom magistrates set bail obtained pre-trial release, but in the federal cases, where the range of "normal" bail is higher by $500 or more, this figure was reduced to 53%.[6] Fifteen per cent of the state sample did not raise bail even when the amount was very low.  When the bail was set higher than $500, the proportion of offenders who could not put up bond began to rise, and above $1000 the proportion was so great that pre-trial release became the exception.  At the $1500 level the likelihood that the defendant would remain in prison until his trial occurred was four and one-half times as great as at the $400 level.  In most cases, therefore, the amount of bail will determine whether or not an offender will regain his freedom after arrest.  One purpose for imposing a higher amount which would be consistent with the theory of bail would be that the increase in the defendant's financial stake reduces the likelihood of non-appearance at his trial.  In practice, however, higher bail usually means that appearance in court is being obtained by holding the defendant behind bars.

In cases involving the constitutional prohibitions against excessive bail, both federal and state courts have clearly articulated that the purpose to be achieved in determining the amount of bail is limited to the objective of insuring appearance for trial.[7]  It follows that release may not be im-

6. See notes 27, 29, 68 *infra.*

7. Stack v. Boyle, 342 U.S. 1 (1951); *Ex parte* Milburn, 9 Pet. 704, 710 (U.S. 1835); McNair's Petition, 324 Pa. 48, 187 Atl. 498 (1936).

peded by setting high bail for other purposes, such as punishment or the prevention of possible future criminal activity.[8]  If the amount is higher than that reasonably required to fulfill its legitimate purpose, it is constitutionally excessive.[9]  This limitation recognizes that the defendant is as yet merely an accused.  The preliminary hearing at which bail is usually set determines only whether or not there is a prima facie case sufficient to hold the defendant for trial.  Since frequently the defendant is not represented and no evidence in his behalf is produced, there is no justification for the imposition of punishment or for a finding of probable future criminality.[10]

The guiding factors for determining the amount of bail are summarized in Federal Rule of Criminal Procedure 46(c) : [11]

> "If the defendant is admitted to bail, the amount thereof shall be such as in the judgment of the commissioner or court or judge or justice will insure the presence of the defendant, having regard to the nature and circumstances of the offense charged, the weight of the evidence against him, the financial ability of the defendant to give bail and the character of the defendant."

Courts have also considered the character of the surety,[12] whether the defendant was a fugitive from justice when apprehended,[13] a record of previous bail jumping [14] and, in one case, the difficulty of escape from the jurisdiction (Hawaii).[15]

Except for the nature of the offense charged, these factors vary so greatly in each case that they cannot be reduced to a rule of general applicability; but the administrative problems created by the large volume of

---

8. *See* United States v. Foster, 79 F. Supp. 422, 423 (S.D.N.Y. 1948).

9. Stack v. Boyle, 342 U.S. 1 (1951) ; Bennett v. United States, 36 F.2d 475 (5th Cir. 1929).  *See* Commonwealth v. Kardosh, 9 Pa. D. & C. 812 (Northampton County 1927).

10. In Williamson v. United States, 184 F.2d 280, 281-3 (2d Cir. 1950), Mr. Justice Jackson, as Circuit Justice for the Second Circuit, allowed bail to convicted Communists pending an appeal over the contention that the defendants would continue "a course of conduct and activity dangerous to the public welfare, safety and national security of the United States."  He said: "Imprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this country and so fraught with danger of excesses and injustice that I am loath to resort to it, even as a discretionary judicial technique to supplement conviction of such offenses as those of which defendants stand convicted."  This reasoning applies even more forcefully to the administration of bail before conviction.

11. These standards have come down from the time of Bracton, see 1 STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 234 (1883), and were codified in the Habeas Corpus Act of 1679, 31 CAR. II, c. 2.  The same standards have been applied in Pennsylvania in the only cases discussing the subject.  Commonwealth v. Kardosh, 9 Pa. D. & C. 812 (Northampton County 1927) ; Commonwealth v. Williams, 6 Pa. D. & C. 162 (Lackawanna County 1924).

12. Ewing v. United States, 240 Fed. 241 (6th Cir. 1917).

13. *In re* Grimes, 99 Cal. App. 10, 277 Pac. 1052 (1929)  (fact that defendant in flight when apprehended warrants high bail).

14. *In re* Lamar, 294 Fed. 688 (D.N.J. 1924) ; Lee's Case, 15 Fed. Cas. 136, No. 8, 180 (E.D. Pa. 1865).

15. International Longshoreman's Union v. Ackerman, 82 F. Supp. 65 (D. Hawaii 1948), *rev'd on other grounds,* 187 F.2d 860 (9th Cir.), *cert. denied,* 342 U.S. 859 (1951).

cases in which bail must be set necessitates the creation of a standard which can be easily and rapidly applied. It is not surprising, therefore, that the nature of the offense is in fact the basic standard which guides the decision as to the amount to be set. On the appellate level, cases dealing with excessive bail have involved amounts "greater than usually fixed" for similar offenses.[16] Only then do the courts examine the other variable factors to determine whether the higher amount is warranted by a proportionately higher risk.[17] The rationale of this reliance on the nature of the offense charged as the standard to guide bail determination is that as the severity of the crime and possible punishment increases, the defendant, having more to fear, becomes more likely to jump bail. Even if this is well founded,[18] there is no indication of how the range of bail "usually fixed" for a given offense has been established, and within Philadelphia there is a striking difference between the bail usually set in state courts and that usually set in federal courts for comparable offenses.[19] Judge Clark has noted that this determination on the basis of the nature of the offense "seems to apply an abstract generality as the norm of decision, without consideration of the particular facts and circumstances disclosed" in the individual case.[20]

The "financial ability of the defendant to give bail"[21] is an obviously relevant guiding standard if the bail system is to effect the release of as many defendants as possible pending trial. If an accused appears to be a good risk, the amount of his bail should be proportioned to his ability to pay; otherwise, high bail is being used to incarcerate dependable persons. While some courts have emphasized the importance of this factor,[22] inability to raise bail does not in itself render the amount of bail excessive.[23] The decision as to how much if any consideration should be given to the defendant's financial ability is purely discretionary with the court or magis-

16. See, *e.g.,* Stack v. Boyle, 342 U.S. 1 (1951) (up to $100,000 on charges of violating Smith Act); Spector v. United States, 193 F.2d 1002 (9th Cir. 1952) ($50,000 on Smith Act); People *ex rel.* Sammon v. Snow, 340 Ill. 464, 173 N.E. 8 (1930) ($50,000 on charge of vagrancy); United States *ex rel.* Rubinstein v. Mulcahy, 155 F.2d 1002 (2d Cir. 1946) ($500,000 for Selective Service).

17. See note 16 *supra*. "If bail in an amount greater than that usually fixed for serious charges of crimes is required in the case of any of the petitioners, that is a matter to which evidence should be directed in a hearing so that the constitutional rights of each petitioner may be preserved." Stack v. Boyle, 342 U.S. 1, 6 (1951).

18. See text at notes 25-6 *infra*.

19. See text at note 43 *infra*.

20. United States *ex rel.* Rubinstein v. Mulcahy, 155 F.2d 1002, 1005 (2d Cir. 1946).

21. FED. R. CRIM. P. 46(c).

22. Bennett v. United States, 36 F.2d 475, 477 (5th Cir. 1929): "The amount of the bail bond in a criminal case is largely determined by the ability of the defendant to give it, and what would be a reasonable bond in a given case can usually best be determined by the trial judge, because of his familiarity with the facts and the financial ability of the defendant to give security." *See* Commonwealth v. Kardosh, 9 Pa. D. & C. 812 (Northampton County 1927).

23. United States v. Rumrich, 180 F.2d 575, 576 (6th Cir. 1950) ("a person arrested upon a criminal charge, who cannot give bail has no recourse but to move for trial"); *Ex parte* Malley, 50 Nev. 248, 256 Pac. 512 (1927).

trate setting bail, provided the amount set is not disproportionate to the general average of bail set for that offense.

In federal cases arising in Philadelphia, a number of defendants who could not post bond were released on their own recognizance when the Commissioner believed that they would appear for trial. Except in cases of assault and battery by automobile, this almost never occurred in the state courts and no information was elicited during bail-setting as to the defendant's financial condition. The elimination of the financial factor resulted in bail being set in amounts which, as Reginald Heber Smith once remarked about legal costs, "are too low to deter the rich, but high enough to prohibit the poor." [24]

Other factors which are supposed to be considered, such as the particular circumstances of an offense and the weight of the evidence against the defendant, have the same kind of relevance to the risk of non-appearance as the seriousness of the offense. While this will influence the incentive to flee, its importance is questionable under modern conditions when the more serious the charge, the more likely it is that flight will be followed by a determined and usually successful attempt at apprehension. In Philadelphia it was found that most bail jumping was for minor crimes and that there was none for the most serious offenses.[25] This emphasizes the fact that the relationship of such standards to the actual risk of non-appearance is unknown. No psychological studies were found which cast any light on the problem of how a court or magistrate can distinguish the reliable from the unreliable defendant, and no tests have been made to determine whether the standards enunciated by judicial or legislative declaration are in fact reliable indicators. An honest attempt to individualize bail determination must be plagued by the treacherous uncertainty inherent in predicting future human behavior.[26]

Appellate decisions in bail cases are rare. If a defendant is financially unable to raise bail, he probably cannot afford an appeal which might not be decided within the normal period of pre-trial detention. Because the first determination of the amount of bail is in the great majority of cases also the final determination, it is important to observe how the courts' and magistrates' almost unreviewed discretion is actually exercised.

(b) *Setting Bail in Philadelphia*

The Philadelphia practices observed in this study involved bail determinations made in three different ways. For most state offenses bail

---

24. SMITH, JUSTICE AND THE POOR 23 (1919).

25. See text following note 124 *infra*.

26. Compare the problem of trying to predict recidivism as part of the effort to individualize treatment of criminals. For a review of studies made in this field see Monachesi, *American Studies in the Prediction of Recidivism*, 41 J. CRIM. L. & CRIMINOLOGY 268 (1951). There have been no comparable attempts to develop "prediction tables" related to the risk of non-appearance. See, however, a detailed study of 170 untried defendants made by BEELEY, THE BAIL SYSTEM IN CHICAGO 59-153 (1927). See note 155 *infra*.

was set during the preliminary hearing before a magistrate.[27]  For certain serious state crimes, of which burglary, robbery, rape, and narcotics offenses are the most important, bail was set by a judge of a common pleas court.[28]  In federal cases, the determination was made by a United States Commissioner.[29]

Measured by the number of defendants, the proceedings in the magistrates' courts are by far the most important.  The hearings are held each morning at 9 at divisional police courts in dingy station houses throughout the city.  Defendants, arrested during the preceding 24 hours, number between two and twenty depending upon the section of the city.  They are accompanied by lawyers in only 15% of the cases.[30]  The magistrate must also dispose of summary offenses, including the overnight drunks.  The presiding magistrate is an elected official who is usually not a lawyer [31] and the assistant district attorney is often the only lawyer present.  Police officers and prosecuting witnesses, who are waiting to testify, mingle with spectators in the frequently crowded room.  The location, conditions and lack of defense counsel produce an atmosphere which is ill-suited to careful judicial determination.

The primary purpose of the preliminary hearing is to determine whether or not there is a prima facie case sufficient to hold the defendant; and determination of the amount of bail receives, at the most, secondary consideration.  After the police evidence has been presented, the defendant is warned, in a sometimes hasty and almost unintelligible manner, of his right not to testify, and then he is given a chance to present a defense.  In

---

27. PA. STAT. ANN. tit. 19, § 51 (Purdon Supp. 1953) provides that with certain exceptions, see note 28 *infra*, power to set bail is given to "any judge, justice, mayor, recorder or alderman."  In all cases observed in this study where bail was set at the preliminary hearing, the proceedings were before a magistrate, and the material was obtained in two ways. (1) A sample of 48 hearings between June 25 and August 11, 1953, in which bail was set in 124 cases, were observed. (2) The transcripts of 861 cases in which bail was set were examined.  This sample consisted of cases in the pre-indictment file of the District Attorney's office between June 26 and August 11, 1953.

28. PA. STAT. ANN. tit. 19, § 51 (Purdon Supp. 1953) provides that bail in these cases can be set by the supreme or common pleas courts or judges thereof or a mayor or recorder of a city.  All cases studied involved bail set before a common pleas judge, the sample consisting of all 109 felony bail cases passing through the District Attorney's office from March 1 to June 30, 1953.  See Rule 51C, Rules of Courts of Oyer and Terminer and General Jail Delivery and Quarter Sessions of the Peace of Philadelphia County, 123 LEGAL INTELLIGENCER 671 (Philadelphia, Dec. 21, 1950), for the procedure followed, quoted at note 40 *infra*.

29. FED. R. CRIM. P. 46(c).  Bail in federal cases can also be set by judges or justices.  A sample of 208 federal bail-settings was studied by taking the first 25 cases out of each of the last eight docket books of the United States Commissioner, the cases covering the period from July 5, 1950 to July 2, 1953.  Each of these cases was then traced in the records of the clerk of the District Court for the Eastern District of Pennsylvania to determine the outcome of the case and to see if the defendant obtained release on bail.

30. Out of 857 hearings, defense lawyers appeared in 130.

31. PA. STAT. ANN. tit. 42, § 1048 (Purdon 1930).  The only qualifications for the position are that the magistrate must be at least 35 years old, be a natural born citizen or naturalized for at least ten years, and be a qualified voter of Philadelphia and have been a resident thereof for at least five years.  A few of the magistrates are lawyers.

**A128**

addition to this evidence, the magistrate has before him the information in the docket: name, address, age, occupation (sometimes omitted) and charge. In some cases he will also have the criminal record, and, in the 15% of the cases in which defense counsel are present, the magistrate may be given some further information about the defendant relevant to bail determination.

During the hearings, magistrates frequently interject questions and, in about one-third of the cases, various factors which are thought to be relevant to bail will be discussed, such as criminal record, employment, family status, cooperation with the police, value of property taken, or amount of damage done. After all the testimony has been concluded, the magistrate either dismisses the defendant, sets bail for court, or, in cases in which bail can be set only by a judge, holds the suspect "without bail for court." The decisions as to holding the defendant and the amount of bail are given together, and there was little indication that any independent thought had been given to the amount of bail.

Because custom or intuition appears to be the basis of bail determinations, it is difficult to ascertain what standards are being applied. However, the fact that evidence of the crime is the only information which the magistrate possesses in two-thirds of the cases [32] indicates that the nature of the crime and circumstances behind the particular charge are the primary factors in bail decisions.

Although theoretically the only purpose to be served in determining the amount of bail is to assure the defendant's presence at his trial, it was evident from observation of magistrates' court hearings that this was not the only objective. Chief Magistrate Clothier stated that bail is used to "break" crime waves,[33] and in many cases the setting of high bail by the magistrates was motivated by a desire to keep the defendant incarcerated until the time of trial. Sometimes, however, a magistrate would exercise restraint and adhere to the theory of bail. When an assistant district attorney asked for $1500 bail in one case, the magistrate responded: "Bail is set to insure appearance. We don't punish people by setting high bail." [34] But this example is the exception and normal magisterial practice indicated that bail was often used for punishment purposes. The following reports sustain this conclusion and also show that it is frequently assumed in the hearings, solely on the basis of prosecution testimony, that the defendant is guilty.

In setting bail for an employee accused of larceny by sneak, one magistrate said: "I'll make it $1500—that will hold anybody." One could interpret this as an attempt to create an obligation to appear for trial, but the disproportionate amount and the lack of concern for the individual indicate an intent to keep the defendant in jail.

---

32. In the 124 observed cases, questions relative to bail were not asked in 87.
33. Interview, June, 1953.
34. This and all succeeding quotations from magistrates were either obtained from the transcripts of the proceedings or were taken down at hearings by the observer for this study.

One case inspired the magistrate to exclaim: "Anybody that hits their mother with a blackjack, there is sure something wrong, lady." When the assistant district attorney objected to the bail of $1000 by saying that $500 would be sufficient, the magistrate replied: "I disagree with you, Mr. District Attorney. I feel that the man should be punished and I don't feel that $500 bail is sufficient." When the defendant's attorney protested the use of bail as punishment, the magistrate denied such an intention and reduced the bail to $800.

In setting $600 bail for a numbers offense, the magistrate said: "If you didn't bite the policeman I wouldn't be so hard. I would be lenient with you."

In a case involving an auto offense, the magistrate exclaimed: "All right, I don't like hit and run drivers"; and $800 bail was set.

An assault and battery case, in which the victim was hospitalized, prompted bail of $1,500 and the explanation: "He is a Puerto Rican. What a bum."

A defendant charged with injuring his father's eye was told: "Anyone who hits his father ought to be electrocuted." $1500 bail was set for further hearing.

Another case involved a Negro woman who intervened after a policeman had told a Negro boy to stop grabbing the packages of customers coming out of a supermarket. A heated argument developed into a fracas, and eight police cars responded to a riot call. The magistrate lectured the defendant on minding her own business and said: "I'm going to make an example of you." $1500 bail was set.

Another indication of the use of bail for punishment was the practice of ostensibly setting bail for each offense with which the defendant was charged. When a defendant's attorney in one case asked for reduction of bail from $10,000, the magistrate said: "Today we have two cases involving two things. I set $5000 on each case, or $10,000 for court."

For a charge of forgery and false pretenses, bail was set as follows: "On the M— A— case, $1000; on the M— G— case, $500; on the other G— case, $500; the C— case, $500; the S— case, $500; the J— G— case, $500; the H— M— case, $500." The total for this one defendant was $4000.

A defendant charged with gambling and assault and battery on an officer was held on $800 for each offense, or a total of $1600.

Another purpose in setting bail, especially for narcotics cases, was an endeavor to keep the defendant from continuing his practices by incarcerating him in jail. In setting bail for a narcotics and assault and battery offense, one magistrate said: "I'm tired of seeing you in front of me; I'll hold you in $2500 bail for court. Maybe that will keep you in for a while." In another case, involving assault and battery on a woman, a police captain recommended: "I would like to ask for a high bail on this fellow. He should be kept off the street and we should protect these women. I would

**A130**

ask for $10,000 bail." Although the magistrate set $5000, this figure is still many times above the standard for assault and battery and sufficiently high to make it very probable that the defendant could not raise bail.

On the other hand, there was a tendency to use low bail when the magistrate felt that the crime was not a serious one, or when he felt that there were mitigating circumstances, or when he was not convinced of the defendant's guilt. In one case, a police officer was charged with driving a police car while intoxicated and bail was first set at $300. When informed that the defendant had four children and would be severely handicapped if forced to raise $300, the magistrate reduced it to $100.[35]

Two men were charged with slugging an officer in a case which grew out of the arrest of sidewalk gamblers who had almost been snatched from the hands of the police by a disorderly mob of sympathizers. The defense was that the officer had hit the defendants' mother first. The magistrate, noting that it was Mother's Day, released the defendants in the custody of their mother for a further hearing.[36]

In a case of public indecency, the magistrate said: "This woman is positive. Therefore, I'll have to hold him for court, but I'll make bail very low," *i.e.,* $300 for court.

One magistrate reduced bail twice during a hearing (from $800 to $600 to $500) when the defendant kept protesting his innocence.

In a case of assault with threat to kill, when the assistant district attorney suggested $2000 or $1500, the magistrate replied: "I think there are extenuating circumstances," and he set $1000 bail.

In a numbers case, a magistrate said: "We'll be easy on Murphy," and he set $300 for court.

The failure to release defendants on their own recognizance in any cases except assault and battery by automobile indicates that magistrates may not be aware of their clear power to release a defendant without security.[37] In one gambling case, in which the defendant's attorney asked that the defendant be released in the attorney's custody, the magistrate said: "This District Attorney is gunning for me. They're arresting magistrates for things like that."

A few cases were observed in which a defendant should not have been held at all, but the magistrate nevertheless set bail, either to make the defendants "serve some time" for acts for which they could not be convicted or, by finding a prima facie case, to protect the arresting officers against possible false arrest suits. In one case two defendants were alleged to have done nothing more than ask the prosecuting witness for change for $500. The magistrate, apparently recognizing a potential confidence scheme, held each in $600 bail. The defendants could not raise the money and thus each spent a month in jail. In an assault and battery case, the

---

35. Philadelphia Inquirer, May 10, 1954, p. 1, col. 4.
36. *Id.,* p. 1, col. 1.
37. McNair's Petition, 342 Pa. 48, 187 Atl. 498 (1936).

magistrate held the defendant in $300 bail because "I want to protect the officer so they cannot do anything to you [the officer]."

On other occasions, gamblers were brought in by detectives with no evidence. The detectives had been ordered to arrest "known gamblers" whenever possible to get them to leave the district.[38] The magistrates dismissed the charges in these cases and issued stern lectures to the police on citizens' rights.

Except for narcotics offenses, the amount of bail set by the magistrates was usually under $1000. The usual figures were $300, $400, $500, $600 or $800, with gambling offenses averaging $500 and narcotics $1250. One of the greatest ranges occurred in assault and battery, in which the amount varied from $300 to $5000. Of 100 assault and battery cases in the District Attorney's pre-indictment file between June 26 and July 13, 1953, the distribution of bail was: $300—13; $400—7; $500—29; $600—16; $700—1; $800—11; $1000—13; $1500—3; $2000—2; $2500—2; $5000—3.

For 81 untaxed liquor cases in a sample taken from the same source the range was smaller, 21 being under $500, 39 at $500, 20 between $600 and $1000, and one at $1500.

The amount of bail for each crime depended, furthermore, on the particular magistrate before whom the defendant appeared, for each magistrate develops his own intuitive pattern. In a sample of 226 hearings for gambling offenses the average bail for all cases was $503, but the averages for some individual magistrates ranged from $382 to $610:

| Magistrate | $300 | $400 | $500 | $600 | $800 | $1000 | Average |
|---|---|---|---|---|---|---|---|
| A | 0 | 4 | 15 | 14 | 5 | 1 | $600 |
| B | 1 | 1 | 10 | 0 | 0 | 0 | $475 |
| C | 8 | 2 | 11 | 0 | 0 | 0 | $413 |
| D | 6 | 3 | 7 | 10 | 10 | 0 | $610 |
| E | 4 | 12 | 1 | 0 | 0 | 0 | $382 |
| All magistrates | 44 | 39 | 81 | 30 | 28 | 4 | $503 [39] |

Thus Magistrate D imposed an amount more than $500 in 59% of his cases, while Magistrate E never imposed more than $500 and was below that figure in 94% of his cases.

The more serious state offenses are not bailable by a magistrate and bail can be set only if the defendant through his attorney requests such action by the Quarter Sessions Court.[40] In such instances, a copy of the

38. See, *e.g.*, Philadelphia Evening Bulletin, October 19, 1953, p. 1, col. 4; Philadelphia Inquirer, October 20, 1953, p. 1, col. 2.

39. This total includes the individual magistrates shown in the table.

40. See note 28 *supra*. Rule 51C, Philadelphia Quarter Sessions Court, see note 28 *supra*, provides: "Informal oral applications for fixing bail without issuing a writ of habeas corpus or requiring the appearance of the Commonwealth's witnesses may be made in Quarter Sessions Courtroom No. 2, at 10 a.m. on any day following commitment, provided 24 hours' notice of intention to do so has been given to the district attorney and to the Bureau of Police. On such application only the police report need be considered in determining whether bail shall be allowed, and neither the defendant nor the prosecuting witnesses need personally appear. Only one such informal application may be made."

commitment sheet is brought to the District Attorney, who adds a resumé of the facts and a recommendation as to bail. The courts followed this recommendation in 95% of the cases, so that the District Attorney was actually the one who made the bail determination. An office list of recommended bail for each offense is utilized by the assistant district attorney in making the recommendation. Selections from this list follow:

> *"Consider always:* Has he a family; a job; a house he owns; a record? And is there publicity of the sort to make him run? Also, what is the value of property or money taken?

> *"Sodomy:* $750 normal where defendant's partner adult. Upward where (a) partner a minor; (b) violence.

> *"Burglary:* (a) Of building—$1500 normal. Upward where felony intended to be committed inside was other than larceny; upward where weapon carried. (b) Of auto—$500 normal.

> *"Robbery:* (a) Strong Arm—$1500 normal. (b) Knife or Gun —$2500 normal.

> *"Rape:* (a) Other than what would have been Common Law— $500 normal; upward where girl 13 or younger. (b) Common Law— $2500, upward where injury other than the rape itself is caused.

> *"Arson:* $1000 normal.

> *"Bad Checks:* $2000 normal; these fellows wander."

In 37% of the cases, the individual recommendation was lower in multiples of $500 than the listed figure for the crime, and in 19% of the cases it was higher.[41] The factors which caused such variations are not clear, but apparently they include lack of evidence or a large family on the one hand, and a bad criminal record or particularly heinous act on the other.[42]

In federal cases, the procedure for bail determination before the United States Commissioner was far more dignified than were the comparable state proceedings. The low volume of cases, the fact that the proceedings take place in the Federal Court House, the lack of trials for summary offenses, the absence of noise and confusion, and the high calibre of the personnel all contributed to this difference. The assistant United States attorney handling a particular case is expected to recommend bail; but there is no list comparable to the recommended bail list of the District Attorney's office, and apparently little thought is given to the problem of amount of bail in the United States Attorney's office. The Commissioner considered primarily the severity of the crime but in most cases it appeared that he also took other relevant factors into account.

---

41. Based on a sample of 122 felony bail cases passing through the District Attorney's office from March 1, 1953 to June 30, 1953.

42. Rape in particular rarely received as much as its listed $2500 bail. Fifteen out of seventeen cases were lower, one was $2500 and one $5000.

**A133**

Of 208 bail settings at the Commissioner's hearings, 121, or 58%, resulted in the release of the defendant before trial. Fifty of those released were allowed to sign their own recognizances. Nearly half of these 50 defendants were charged with failure to report for induction under Selective Service, and all but one of their cases were dismissed when they reported for induction. Excluding these special Selective Service cases, the number obtaining release was 52%.[43] The average amount set for those raising bail (excluding the recognizances) was $1200; for those remaining in jail the average bail was $2800. Highest bail was for narcotics offenses, averaging $3600 for 51 cases, or nearly three times the average state bail for the same offense. This discrepancy suggests the arbitrary determination of the standard against which individual bail is measured. The different and sometimes interstate nature of federal crimes hardly warrants establishing a standard which is several times higher than that set for state offenses.

Bail determinations made in federal cases, by magistrates, and in Quarter Sessions Court all display the great emphasis placed upon the nature of the offense in fixing the amount of bail. Particularly in state cases, there was seldom any explicit examination of the factors which are relevant to the likelihood that the individual defendant is a good or a poor risk. Frequently the imposition of high bail was unrelated to this risk. Rule 51C of the Quarter Sessions Court, governing bail fixing in that court, explicitly provides that "on such application only the police report need be considered in determining whether bail shall be allowed, and neither the defendant nor the prosecuting witnesses need personally appear." [44] This removes any possibility of making the kind of determination which appellate courts have held to be required.[45]

Custom has established a standard related to the nature of the crime charged, a standard which is sufficiently flexible to permit in any crime an amount sufficient to have the practical effect of holding most defendants in prison. The individual is subordinated to the class into which he is placed according to the type of crime with which he is charged, although what relationship to the risk of non-appearance this may have is unknown.

### (c) *Time Necessary to Obtain Bail*

The effectiveness of the right to bail is partly dependent upon the speed with which it can be exercised. Two questions are involved: (1) the extent of police detention before the preliminary hearing and (2) the delay in setting bail in cases in which the magistrate is not authorized to perform that function.

The first question does not raise a serious problem in Philadelphia at the present time. The District Attorney's office, with the cooperation of

---

43. Compare proportion of defendants released in state cases. See note 68 *infra*.
44. See notes 28, 40 *supra*.
45. See notes 2, 11 *supra*.

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: ?

1044        *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 102

the police, is currently enforcing a rule providing that persons arrested before 8 a. m. are brought before the next regular sitting of the magistrates' court at 9 a.m. so that no detention can exceed 25 hours.[46]    During the period of detention prior to the preliminary hearing, persons arrested for some lesser offenses may obtain release overnight on a copy of the charge.[47] The officer in charge of the police station in which a defendant is held must, upon request, issue a copy of the charge against the defendant.[48]    If the defendant's representative can find a magistrate and persuade him to sign the copy, the prisoner is released until the preliminary hearing.

In the sample which was studied, 348 defendants, or approximately one out of five, obtained release in this manner, and only four failed to appear at the hearing the next day.    It was impossible to observe what standards the magistrates applied in their administration of release on the copy of the charge, because their decisions are made at all hours wherever a magistrate can be found.

A much more serious procedural problem is created by the division of responsibility for setting bail, prohibiting the magistrate from setting bail for persons accused of arson, rape, mayhem, sodomy, buggery, robbery or burglary.[49]    Persons charged with these offenses, after being held at the preliminary hearing, must procure someone else (usually an attorney) to notify the District Attorney that bail is requested; he must then have the District Attorney's recommendation placed on the commitment sheet and have a common pleas judge sign the order for bail.[50]

The practical effects of this procedure were twofold.    First, for those who obtained bail it took an average of five days from the time of the preliminary hearing until bail could be posted.[51]    This period is almost five times as long as the average time required when bail was set in magistrates' court.[52]    Second, the procedure frequently operated to deny bail, notwithstanding the constitutional mandate that all offenders charged with

---

46. Annual Report 1952, District Attorney's Office of Philadelphia 10 (1953) (hereinafter cited as Dist. Att'y Rep.).    Note, however, the possibility of further detention in a case in which a magistrate continues a preliminary hearing for a defendant for whom the magistrate cannot set bail.    This increases the delay discussed in text at note 49 *et seq. infra.*

47. Pa. Stat. Ann. tit. 42, § 1113 (Purdon Supp. 1953).

48. *Ibid.*

49. Pa. Stat. Ann. tit. 19, § 51 (Purdon Supp. 1953).

50. This was the procedure normally followed when this study was made, rather than the more formalized method prescribed by Quarter Sessions Court Rule 51C, quoted at note 40 *supra.*

51. Based on 75 cases for which data could be obtained from the same sample described in note 28 *supra.*

52. Out of 368 persons who obtained bail after it had been set by a magistrate in preliminary hearing, based on a sample of all cases entering the District Attorney's pre-indictment file between July 15 and August 11, 1953, the time required for release on bail was:

297 defendants were released the same day as the preliminary hearing;

24 were released the day following the preliminary hearing;

47 defendants were released later than the day after the preliminary hearing, the average time for these 47 cases being 7 days after the preliminary hearing.

**A135**

non-capital offenses *"shall* be bailable." [53]   In common parlance among police and magistrates the crimes for which the latter cannot set bail are described as "non-bailable," and there is ironic truth in this label.   When a magistrate holds such an offender at preliminary hearing, he will state, "without bail for court," and a substantial number of defendants do not understand that they may still be able to obtain bail by going through the procedure outlined above.   Among the prisoners interviewed during this study who were being held in jail awaiting trial, 46 were defendants being "held without bail."   Thirty-two of these, or 70%, stated that they had not learned of the possibility that they could obtain bail until they had been in prison for some time.   A number did not learn of their rights until they talked with us or with a representative of the Philadelphia Voluntary Defender Association, or until they found out by prison rumor after a week or two in jail.

Sometimes the officials foster this fiction.   In one case in which a seaman was held "without bail for court" the following exchange took place:

Defendant: "What do you mean, hold me without bail"?

Magistrate: "That means that you will be kept in jail for two or three weeks until this case can be decided by a higher court."

Defendant: "You mean I got to stay here all that time"?

Magistrate: "Are you kicking?   Why, lots of guys jump ship just so they can stay here."

One of the prisoners stated that his mother asked a detective how much bail was required, and was told only that the defendant was being held without bail.

Even those who are aware of their right to apply to the court for bail must surmount the obstacles and delay inherent in the requirement of a second hearing.   It is virtually essential for a defendant to obtain an attorney before he can proceed to have bail set, and this involves both delay and expense.   The District Attorney's office has recently announced a policy which will increase the delay in robbery cases.   According to this report: [54]

> "It was understood that [Chief Inspector] DuBois, acting for Police Commissioner Thomas J. Gibbons, suggested that the district attorney's office make bail for armed holdup so high that the defendant would be forced to remain in jail until trial.

> "The bail in such cases, fixed by the court after a magistrate's hearing, now averages $2500.   It was reported that even at this figure not one in ten armed holdup suspects is able to raise bail.

> "While the district attorney's office rejected the suggestion of higher bail in such cases, it agreed to ask the court to follow stricter procedure in fixing the bail.

---

53. See note 1 *supra.*

54. Philadelphia Evening Bulletin, Jan. 21, 1954, p. 3, col. 1.   This procedure follows that outlined in Rule 51C rather than the more informal method normally employed.   See text at note 50 *supra.*

". . . in the future the defendant will have to give 24 hour formal notice in writing to the district attorney's office and the police of his intention to ask for bail. Then an assistant district attorney and detectives will appear before the court when bail is asked."

The division of responsibility, which makes possible such infringements of the right to prompt bail, is an anachronism which has no practical utility. When the court sets bail in the "non-bailable" offenses it almost invariably follows the recommendation of the District Attorney. The latter is also represented at preliminary hearings, and there is no reason why bail in all cases should not be set at that time, provided that the District Attorney has the right to petition a court immediately for higher bail if he feels that the amount set is too low.[55] In the absence of legislative change to this end, the spirit of the constitutional guarantee would demand that each defendant be fully informed at the preliminary hearing of his right to bail, and that in all cases bail be set promptly by the court without requiring that the defendant, handicapped by his incarceration in prison, first obtain a lawyer and make a formal request.

### (d) *Effecting Release on Bail*

A defendant, for whom bail has been set in an amount which he is financially able to afford, faces problems arising out of his relationship with bondsmen or the inadequacy of facilities for posting bail. A recent Pennsylvania statute regulating professional bondsmen limits the amount which they can charge to not more than 10% on the first $100 and 5% on each additional $100.[56] In the event of an overcharge, the Act provides for treble damages [57] and for a fine and imprisonment.[58] The Act also seeks to prevent gouging by making it a misdemeanor for any person to accept "any fee or compensation for obtaining a bondsman" [59] or for "any

---

55. Senate Bill No. 472, Session of 1953, Pennsylvania legislature, which failed to pass, would have provided that for offenses for which the magistrate is not now able to set bail, see PA. STAT. ANN. tit. 19, § 51 (Purdon Supp. 1953), the magistrate shall set bail. "If the district attorney at the hearing before the mayor magistrate alderman or justice of the peace objects to the amount of bail fixed or the surety or sureties required if any the accused shall not be discharged but shall be brought before a law judge of a common pleas court within forty-eight (48) hours for the purpose of the fixing of bail by that court."

56. PA. STAT. ANN. tit. 19, § 90.9 (Purdon Supp. 1953).

57. *Ibid.*

58. *Id.* § 90.10(b) (fine of $500 to $1000 and/or imprisonment not exceeding six months). For a similar provision, see ILL. ANN. STAT. c. 38, § 627(n) (Smith-Hurd Cum. Supp. 1953). See also MONTGOMERY, REPORT OF THE CLERK OF THE RECORDER'S COURT, CITY OF DETROIT 16, 35 (1952), reporting maximum rates in effect in Washington and Baltimore (5%) and Boston (5% on secured bail and 10% on unsecured). The average fees in Detroit are reported to be the same as in Boston, but there is no legal control over the fee. "We have approximately fourteen licensed bail bondsmen and the competition between them is keen. This competition serves as a control over the amount of fees charged." Letter dated November 17, 1953 from E. Burke Montgomery, Clerk of the Recorder's Court, Detroit, on file in Biddle Law Library, University of Pennsylvania Law School.

59. PA. STAT. ANN. tit. 19, § 90.10(c) (Purdon Supp. 1953).

**A137**

law enforcement officer, employe of a penal institution," or court official to have a pecuniary interest in or derive any profit from the bonding business.[60]

Such limitations have not proved to be very successful in preventing overcharging in other jurisdictions.[61]  In Philadelphia in 1952 an investigation by the District Attorney's office "revealed that defendants involved in morals charges and in charges of driving motor vehicles while intoxicated were particularly susceptible to being shaken down by bondsmen," and two arrests resulted.[62]

A related problem in other jurisdictions, about which we have no Philadelphia information, involves collusion between lawyers and bondsmen.  In Chicago, "aside from the question of ethics in having bondsmen solicit cases for lawyers and the 'pressuring' of the accused into accepting the attorney of the bondsmen's choice, there is unquestionably in such instances a splitting of fees between the attorney and the bondsmen so that in most instances the accused does not get the best representation for his money." [63]   In New York the Kings County Grand Jury found that bondsmen were recommending lawyers, splitting fees and, in some cases, refusing to furnish bail unless those lawyers were chosen.[64]

The final procedural provision, which is necessary to facilitate the release of defendants able to post bail, is the existence of convenient facilities for this purpose.  In Philadelphia, bail may be posted before any magistrate, and the office of the bail clerk of Quarter Sessions Court is open during normal business hours.  The Magistrate's Court Act requires that a magistrate be available 24 hours a day at the Central Police Station, but at the time of this study this provision was ignored.[65]  Compliance with the law in this respect would be of substantial benefit both in facilitating the posting of bail and in obtaining the necessary signature for release on a copy of the charge.  It also would do away with the necessity of searching for a magistrate and perhaps waking him up in the middle of the night to take bail.

---

60. *Id.* § 90.10(e).

61. "Probably the two most prevalent evils still existing [regarding bail] and for which there appear to be no satisfactory solution despite close supervision and the records which the bondsmen are required to keep by law or established rule are: (1) Fees charged in excess of the statutory limit and (2) solicitation of cases on behalf of attorneys by bondsmen." Letter dated March 2, 1953 from V. W. Peterson, Operating Director, Chicago Crime Commission, on file in Biddle Law Library. See also MONTGOMERY, REPORT, *op. cit. supra* note 58 at 16, 22, for a report that the maximum fee rule is probably not observed in Baltimore and Washington.

62. DIST. ATT'Y REP., *op. cit. supra* note 46, at 14.

63. Letter from V. W. Peterson, *supra* note 61.

64. New York Times, March 9, 1948, p. 26, col. 3. For other instances of collusion see MONTGOMERY, REPORT, *op. cit. supra* note 58 at 4, 16.

65. "There shall be established a magistrates' court in the city hall of the city of Philadelphia which shall be open during the entire twenty-four hours of each day, with a magistrate continually present thereat or immediately available. . . ." PA. STAT. ANN. tit. 19, § 1110 (Purdon Supp. 1953).

**A138**

## II. The Jailed Defendant

One evil of a system which employs the financial deterrent of a bond as its method of compelling appearance in court is its effect upon those who are unable to post the bond. The right to bail is founded upon the belief that it will not only help keep the innocent from being punished while awaiting vindication but that it will also enable the defendant to work with his counsel, search out evidence and witnesses in preparation of a defense, and maintain employment so that he can support his dependents and employ the counsel of his choice. To determine the extent to which the Philadelphia bail system effectuates this policy, investigations were made to determine (1) what proportion of defendants do not raise bail and are detained from arrest until trial; (2) what proportion of such jail defendants are found innocent and what proportion of those who are found guilty are not sentenced to imprisonment; (3) the duration of such pretrial detention; (4) the possible prejudices to the jail defendants compared with bail defendants in trial and sentencing; and (5) the extent of the handicap of having to prepare a defense from a prison cell.[66]

### (a) Proportion of Defendants Detained

Three out of four defendants charged with serious crimes for which bail must be set in court [67] were held in jail between arrest and trial. Of those charged with less serious crimes for whom bail was set by a magistrate, about one in four (27%) did not obtain release. These figures are based on samples totaling 752 defendants who were being held for trial during the summer of 1953.[68] This shows that the practical effect of Philadelphia methods for determining the amount of bail is to deny bail to the great majority of those charged with more serious offenses and to a substantial proportion of those charged with lesser crimes. It explains the chronic overcrowding in the untried department of the County Prison,

---

66. These facts were obtained for state cases only, and no comparable studies were made of federal cases. As federal prisoners awaiting trial are held in the same prison as state untried prisoners, conclusions drawn about the effects of imprisonment upon preparation of a defense are equally applicable to them. See Annual Report 1952, Philadelphia County Prison Board of Inspectors 31 (1953) (hereinafter cited as Prison Rep.).

67. Arson, rape, mayhem, sodomy, buggery, robbery or burglary. Pa. Stat. Ann. tit. 19, § 51 (Purdon Supp. 1953).

68. The sample for defendants whose bail was set by magistrates' court consisted of all cases in the District Attorney's pre-indictment file between July 15 and August 11, 1953; out of a total of 501 defendants, 368 obtained bail and 133 did not. Statistics for defendants held for the more serious crimes, see note 67 *supra,* were more difficult to obtain, and were compiled in the following way. The dockets at Moyamensing Prison (the county prison) show that 251 defendants were committed pending trial for these offenses during May and June, 1953. The number of defendants for whom bail was set by Quarter Sessions Court and who raised bail during the same months is estimated at 62. This total was compiled by checking all cases in which the District Attorney recommended bail under the informal procedure described at note 50 *supra* against bail records in the offices of the Clerk of the Court of Common Pleas and the Bail Clerk of Quarter Sessions Court. This search indicated that 46 defendants raised bail, and to this was added 16, an estimate for the defendants whose bail was set under the procedure provided by Quarter Sessions Court Rule 51C, see note 40 *supra.* This estimate was based on the opinion of Stanley Bashman, Chief of the Bail Division, District Attorney's Office.

where in 1952 detainees spent a total of 131,683 days awaiting trial.[69]  That such a large volume of defendants are jailed pending trial emphasizes the importance of examining what disposition is made of their cases and the effects of imprisonment upon those dispositions.

### (b) *Disposition of Jail Cases*

Most Philadelphia cases are brought to court for disposition.  The practice of the District Attorney's office is to seek indictments in all cases in which the accused are held at preliminary hearing, and the grand jury, which acted on 17,168 cases in 1952, "is too overburdened to discriminate in any great number of cases." [70]  During 1952 only 735 bills were ignored by the grand jury, which means that only about 4% of all cases were disposed of by failure to indict.[71]

A study of the disposition of 1000 jail cases showed that the defendants fell into three major categories: [72]

(1) Forty-seven per cent of all jail defendants were convicted and sentenced to a term of imprisonment.  As they received credit on their sentences for time served while awaiting trial, they lost nothing in terms of confinement by not posting bail.

(2) A second group (318 defendants) were convicted but did not have to serve any time in prison after conviction.  Of these, 228 were either fined or given suspended sentences.  Failure to raise bail penalized these defendants, in comparison to comparable offenders who did raise bail, in that they served jail terms [73] only because of their poverty.  The remaining 90 of this group were sentenced to the period of time which they had already served while awaiting trial, and they were released im-

---

69. See PRISON REP., *op. cit. supra* note 66, at 31.
70. DIST. ATT'Y REP., *op. cit. supra* note 46, at 12.
71. *Ibid.*
72. This sample consists of 958 jail cases which were disposed of by Quarter Sessions Court between August 15 and December 31, 1953, to which was added 42 cases to make allowance for the fact that four and a quarter per cent of all cases held at preliminary hearings are disposed of because the grand jury ignores the bill. See DIST. ATT'Y REP., *op. cit. supra* note 46, at 12.  The sample includes all cases for all offenses during the period studied, and is broken down as follows:

| | |
|---|---:|
| Not indicted | 42 (est.) |
| Nolle Prosequi | 30 |
| Demurrer to evidence sustained | 21 |
| Acquitted | 117 |
| Suspended Sentence | 193 |
| Fine | 35 |
| Sentenced to time already served awaiting trial | 90 |
| Sentenced to further imprisonment | 472 |

Compare the dispositions of 2077 "finished cases" handled by the Voluntary Defender in Quarter Sessions Court for the 12 months ending June 1, 1953.  Of these, 29% were not convicted, consisting of 397 acquittals and 205 otherwise not convicted, and 21% were given suspended sentences or probation.  The remaining 50% were sentenced to imprisonment.  See NINETEENTH ANNUAL REPORT, PHILADELPHIA VOLUNTARY DEFENDER ASS'N 1952-1953 at 10 (hereinafter VOL. DEFENDER REP.).
73. Some of those fined may subsequently serve a further term in prison in lieu of fine and costs.  A total of 137 prisoners in this category were received by the County Prison in 1952.  See PRISON REP., *op. cit. supra* note 66, Table 6 at 40.

**A140**

mediately after conviction. It is impossible to determine whether these defendants would have been sentenced to a comparable short term, if they had been out on bail; but, since they were released immediately, the judgment might merely be an acknowledgment that the defendants had already served the time and that if they had been out on bail, they might have received suspended sentences. This explanation seems especially valid in light of the apparent discrimination between the treatment of jail and bail cases,[74] and therefore for the purposes of this study sentences to time already served are regarded as equivalent to suspended sentences.

(3) One out of five jail defendants was not convicted. Nearly two-thirds of these were acquitted and the remainder were dismissed on nolle prosequi, demurrer to the evidence, or failure to indict. These 210 defendants were required to serve a jail term although they were innocent.

A sample of 181 defendants charged with burglary and serious violent crimes [75] revealed no significant variation in these figures for the more serious offenses. Of these defendants, most of whom have only one chance in four of pre-trial release on bail, 24% were not convicted, 27% were not sentenced to further imprisonment, and 49% were imprisoned.

(c) *Duration of Pre-trial Detention*

The interviewed prisoners, whose cases were followed to their termination, served an average of 33 days between preliminary hearing and disposition. The distribution according to duration of detention is shown in figure 3.[76]

The longest detentions for those who ultimately were not convicted were 75 days for a defendant whose case was nol prossed, 60 days for a man acquitted on a charge of carrying a concealed deadly weapon, and 56 days for a person acquitted of robbery. The shortest detention was 13 days for a defendant acquitted on a liquor charge.

The maximum period of pre-trial detention is limited in Pennsylvania by the requirement that a defendant who is held in jail shall be discharged from imprisonment if he "shall not be indicted and tried the second term, session or court after his or her commitment . . ." [77] A limitation which

---

74. See text at note 84 *infra*.

75. Rape, robbery, arson and aggravated assault and battery. The sample consisted of jail dispositions for the months of October and November, 1953.

76. The sample on which this is based consists of only 83 cases. Compare the "crude average number of days" served in Moyamensing Prison by all prisoners awaiting trial in 1952, which was 37 days. This average includes defendants who spend a few days in prison and then are released on bail, so that the average detention for defendants who never make bail would be longer. See PRISON REP., *op. cit. supra* note 66, Table 4 at 38. This may indicate that our sample shows too short a period of detention. See, however, an estimate that by 1953 "the average stay of those untried has been reduced to three to five weeks." *Id.* at 90.

77. PA. STAT. ANN. tit. 19, § 781 (Purdon 1930).

### TIME SPENT IN JAIL AWAITING TRIAL



FIGURE 3.   DISTRIBUTION OF DEFENDANTS ACCORDING TO NUMBER OF
DAYS SPENT IN JAIL AWAITING TRIAL

in Philadelphia is of more practical importance is the policy inaugurated at the request of the Voluntary Defender whereby any detainee who is not indicted by the Grand Jury within 20 days will be brought into court so that a judge may consider the advisability of releasing him to await trial without formal entry of bail.[78]

#### (d) *Comparative Treatment*

The disposition of 946 cases was studied to compare the treatment of jail and bail cases.  This sample consisted of all dispositions during October and November, 1953, for cases in which the defendants were charged with rape, robbery, arson, burglary, assault and battery (simple and aggravated), auto theft, other property crimes, sex offenses (except rape and prostitution), and narcotics offenses.[79]

This comparison showed that defendants who came to court from jail received much less favorable treatment as to both the proportions of those convicted and those receiving prison sentences.  While the many factors involved in determining the disposition of criminal cases require that these statistics be regarded with caution, the contrast between the disposition of jail and bail cases was so striking that it raises a strong inference that the handicap of jail status is a major contributing cause for the difference.

78. See VOL. DEFENDER REP., *op. cit. supra* note 72, at 3.

79. These offenses comprise the great bulk of jail defendants.  Defendants charged with other crimes were eliminated because the number of jail defendants was too small to have any validity for comparison with bail cases.

Although there are marked variations among different types of crimes, table 1 illustrates that a defendant who is out on bail is much more likely not to be convicted than is a defendant who comes to court from jail.

Table 1—Percentages of Indicted Defendants Not Convicted

| Crime | Defendants on Bail | | | Defendants in Jail | | |
|---|---|---|---|---|---|---|
| | convicted | not convicted | % not convicted | convicted | not convicted | % not convicted |
| Violent crimes | 50 | 101 | 67% | 86 | 29 | 25% |
| Burglary | 19 | 3 | 14% | 52 | 14 | 21% |
| Assault and Battery | 62 | 79 | 56% | 27 | 7 | 21% |
| Auto theft | 24 | 8 | 25% | 33 | 12 | 27% |
| Property crimes | 47 | 46 | 49% | 75 | 6 | 7% |
| Sex crimes | 44 | 16 | 27% | 11 | 4 | 27% |
| Narcotics offenses | 29 | 1 | 3% | 56 | 5 | 8% |
| All above offenses | 275 | 254 | 48% | 340 | 77 | 18% |

One of the primary reasons for this difference is the much higher proportion of nol prosses in the bail cases. Only ten out of 417 jail case indictments were nol prossed, or 2.4%, whereas there were 160 nol prosses in bail cases, or 30.2% of all bail indictments. There are at least two explanations for this markedly lower incidence of nol prosses in jail cases which should be given considerable weight. First, the jail defendant is probably unable to obtain the private settlement in lieu of prosecution which Pennsylvania law provides for minor offenses [80] and is unable to persuade the prosecuting witness or private prosecutor [81] to abandon the case. Second, while jail cases came to trial in about a month after preliminary hearing,[82] the time required to bring a bail case to trial was nine months.[83] Some nol prosses, therefore, may simply mean that the failure to provide a speedy trial has resulted in the loss of valuable evidence. However, even when the nol prosse cases are eliminated, 25% of bail defendants who went to trial were not convicted, while jail defendants were not convicted in only 16.5% of the cases.

---

80. Pa. Stat. Ann. tit. 19, § 491 (Purdon Supp. 1953). See discussion in text at note 100 *infra*.

81. The common-law rule whereby a private person can initiate criminal prosecution exists in Pennsylvania. Sadler, Criminal Procedure in Pennsylvania § 73 (1937).

82. See note 76 *supra*.

83. "On the average [bail cases] have to wait nine months before they are tried. Some, we try to speed up . . . Numbers cases are down to a four month wait and narcotics to two." First Assistant District Attorney Michael von Moschzisker, quoted in the Philadelphia Inquirer, Feb. 1954, p. 7, col. 4.

Table 2—Percentages of Convicted Offenders Who Received Prison Sentences

| Crime | Defendants on bail | | | Defendants in jail | | |
|---|---|---|---|---|---|---|
| | Convicted | Sent to Prison | % | Convicted | Sent to Prison | % |
| Violent crimes | 50 | 12 | 24% | 86 | 59 | 69% |
| Burglary | 19 | 6 | 32% | 52 | 30 | 58% |
| Assault and Battery | 62 | 8 | 13% | 27 | 14 | 52% |
| Auto theft | 24 | 6 | 25% | 33 | 15 | 45% |
| Property crimes | 47 | 19 | 40% | 75 | 41 | 55% |
| Sex crimes | 44 | 2 | 5% | 11 | 5 | 45% |
| Narcotics offenses | 29 | 8 | 28% | 56 | 36 | 64% |
| All above offenses | 275 | 61 | 22% | 340 | 200 | 59% |

Table 2 shows a comparison of the proportion of convicted offenders, who were on bail and were sentenced to imprisonment, with jail defendants who received a sentence of imprisonment in addition to a sentence imposed for time already served.[84]  Over two and one-half times as many jail defendants got prison terms as is the case for defendants who were out on bail.

A number of factors might contribute to this difference.  If the jail defendant had a job when he was arrested, he will have lost it and probably cannot get it back, whereas the defendant who is on bail can usually make the argument that probation will enable him to continue working on a job he then holds.  The fact that most jail defendants are represented by the Philadelphia Voluntary Defender may also be significant, for this types the defendant as a man who is already a charity case and a burden upon society,[85] with the result that the court may be much more inclined to impose a prison sentence.  The large volume of cases handled by the small staff of the Voluntary Defender, which limits the effort which can be expended on an individual case, and the fact that the defendant has been isolated in jail and cannot help himself, may also mean that the jail defendant is much less likely to have character witnesses who will appear to urge mitigation of penalty.  Such circumstances help explain the inference raised by these statistics that, unconsciously or not, jail status prejudices the courts as to the treatment they prescribe.

The validity of using these statistics for the purpose of showing such prejudice against jail defendants depends upon the strength of other factors which could also account for differences in treatment.  It is believed that variances attributable to divergent judicial methods and philosophies were

---

84. See text following note 73 *supra.*

85. The Voluntary Defender will represent only those "who, by reason of their poverty, are unable to pay counsel fees."  Vol. Defender Rep., *op. cit. supra* note 72, at 1.

**A144**

largely eliminated because the cases were decided by many different judges. There are other variables, however, which cannot be resolved. For example, if the magistrates are sufficiently sagacious to impose high bail predominantly upon those who are in fact guilty and are lenient with those who are in fact not guilty, then to that extent the higher proportion among jail defendants of those adjudged guilty will not reflect any handicap resulting from jail status. The fact that some magistrates penalize what they regard as aggravated circumstances by setting higher bail may concentrate the aggravated cases in jail and thus partially explain the more severe punishment of the guilty offenders in the jail group. One distinction between the jail group and the bail group is the comparatively lower economic status of the former. This factor would also explain in part the different treatment of these two groups, if in fact indigent persons charged with crime are more likely to be found guilty than all individuals so charged, and if in fact the indigent guilty tend to commit offenses under more aggravating circumstances than do guilty persons in general.

Despite these unmeasurable variables, however, the contrast in comparative dispositions was so striking that it is reasonable to conclude that jail status had a good deal to do with it. Wigmore has noted that any criminal defendant is under the handicap that he looks guilty,[86] and this applies most forcefully to the defendant who arrives in court in custody from jail where he has had little opportunity to prepare himself so that he can come to trial neat and clean. The following analysis of the conditions under which a jail defendant must prepare for his day in court strongly supports the inference of prejudice raised by these statistics on comparative dispositions.

### (e) *The Effects of Detention*

Assuming for the moment that pre-trial imprisonment of such a large number of defendants is a necessity, it follows that such imprisonment should impose as few restrictions as is practicably possible which will interfere with a defendant's attempts to get bail and preparation of his defense. This study uncovered serious problems created by the failure to attempt such minimization of the sacrifice which results from imprisonment.

The period of police detention which occurs after arrest but before the preliminary hearing is regulated by the Magistrates' Court Act.[87] This statute, which is applicable only to Philadelphia, requires that "all persons arrested shall be given the opportunity to promptly communicate with, be interviewed or examined by, such persons as they desire." [88] It is difficult to determine how well this requirement is observed. Several of the interviewed prisoners stated that they were not allowed to telephone anyone, and one stated that police policy denied access to the phone for everyone

---

86. 9 Wigmore, Evidence § 2511 (3rd ed. 1940).

87. Pa. Stat. Ann. tit. 42, §§ 1101 *et seq.* (Purdon Supp. 1953).

88. *Id.* § 1113.

who was arrested and confined in the station house with him. It is probable that Negro or poorly-dressed defendants are frequent victims of such violations. That even some well-dressed and apparently reliable defendants lose their right to outside communication is indicated by a report from a Quaker defendant who, with some companions, was arrested on July 22, 1953, on a charge of breach of the peace. The charge grew out of an anti-war street meeting which was broken up by the police, and the case against the defendants was eventually dismissed. The account of their detention in the station house suggests how theoretical the accused defendant's protections may be in some cases: [89]

> "At the time of booking we asked to make our one legal phone call. The request was repeatedly put off and was never finally granted. Hallman tried again in the morning, no luck."

These defendants were able to obtain counsel only because a friend who had seen the arrest contacted an attorney for them; otherwise they would have had to go on trial in the morning for their summary offense without any chance to contact counsel. Even with an attorney they were unable to effect their release that night:

> "Although we had been arrested at 9:30 P. M., no copy of the charge could be secured till 12:55 A. M. By then no magistrate would get out of bed to sign it. So the prisoners had to stay in the lock-up overnight."

After the preliminary hearing defendants who have not posted bail are detained in the untried section of Moyamensing Prison (Philadelphia County Prison). There is no statute applicable to these detainees comparable to the requirement of free communication for those in police custody,[90] and conditions of imprisonment are substantially equivalent to those of convicted prisoners. The prison's Board of Inspectors reports: [91]

> "Although the [untried prisoners] are segregated and allowed a few special privileges, including additional visitors; the untried prisoner generally must be subjected to the same rules and regulations as the convicted prisoner, as a security measure, due to the limited facilities presently available."

At the time of this study these regulations stipulated that an untried prisoner may write two letters per week, that the prison agent will make calls for the prisoner at the rate of one per week and that members of the immediate family may visit the prisoner for 15 minutes once per

---

89. See HALLMAN & WALKER, THE RITTENHOUSE SQUARE MEETING 3 (mimeo 1953), on file in Biddle Law Library.

90. See note 88 *supra.*

91. PRISON REP., *op. cit. supra* note 66, at 33.

**A146**

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: ?

1056    *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 102

week.[92]  The prisoner may write a letter one or two days after his arrival, and thereafter, if he has no money for postage, the county will pay the postage for one letter a month.  These "privileges" may be lost if the prisoner is "keyed in," *i.e.,* confined to his cell as a disciplinary measure for disobedience of prison regulations.[93]

Such regulations aggravate the enforced isolation which is the inevitable concomitant of any imprisonment, and are as restrictive as those which exist in many institutions for convicted offenders.  The provisions for two letters a week and the opportunity to have someone else make one phone call in his behalf obviously imposed a prohibitive limitation upon a defendant who wished to prepare a defense, and 28 of the 104 prisoners interviewed blamed the communication restrictions for their failure to obtain bail.

If the prisoners' complaints are valid, telephone calls placed through the prison agent sometimes proved to be ineffective as a means of communication.  One defendant, trying to contact his mother by phone, was told by the agent that there was no answer, and the agent refused to call again because he thought that the mother certainly knew after four days that the defendant was in prison.  Another defendant stated that he had hoped to raise bail either from his brother, who could be reached at his home only in the evening, or from his employer, who was located in the suburbs.  The prison agent refused to make either call, the first because he worked only from 9 to 5, the second because he would not call out of the city.  At the time of the interview the defendant had written a letter to his brother and was waiting for an answer.  Other defendants complained about the restrictions in the hours during which they could have calls placed.  One defendant who came in on Saturday had to wait until the prison agent next came to work on Monday.

The prison agent regarded these complaints as unjustified, stated that rules were relaxed in special cases, and said that he refused to make a phone call only when he felt it would not do any good.[94]  But regardless of the truth of these conflicting allegations, it would seem self-evident that the statutory requirement as to Philadelphia police station confinement, that arrested persons "shall be given the opportunity to promptly communicate with . . . such persons as they desire," [95] should be extended to cover the entire period of pre-trial confinement for all defendants throughout the state.[96]  Provisions for unlimited correspondence and reasonably free access to telephones and visitors would create an administrative burden which seems small when compared with the handicap placed on defendants

---

92. Letter dated August 26, 1953 from William J. Ruch, Assistant Superintendent, Philadelphia County Prison, on file in Biddle Law Library.  There has been an improvement in telephone facilities since this study was made.  See text at note 97 *infra.*

93. Interview, June 1, 1954, with James J. O'Shea, Jr., prison agent.

94. *Ibid.*

95. See note 88 *supra.*

96. See suggested remedy at text following note 177 *infra.*

who are denied those rights. Such a requirement should provide explicitly that a defendant be permitted to make telephone calls himself, rather than being required to use an intermediary; many defendants complained that the inability to talk directly with persons outside deprived them of the opportunity to make persuasive pleas for help. Since the field study at Moyamensing Prison was made, there has been a small improvement in this direction. At the instigation of the Voluntary Defender, a telephone has been installed from which a defendant personally can make one call immediately upon arrival at the prison; but no subsequent calls can be made and if the number called is answered, that counts as the defendant's one call even if the person he desires to reach is not there.[97]

For those defendants who must support families, the problems which are created by pre-trial detention are aggravated. "The situations clamoring most loudly for attention," the Voluntary Defender Association reported in 1953, "involve citizens supporting families from modest earnings who are imprisoned for several weeks to await trial on relatively minor charges. Such imprisonment should be kept at a minimum in view of the disruption to the community occasioned by loss of employment and the necessity for families to subsist on charity and public assistance."[98] Of course, for those who are subsequently convicted and sentenced to imprisonment, this disruption would eventually follow anyway, but in more than half the cases this eventuality does not occur. To a somewhat lesser extent the same consideration applies to defendants without dependents who are employed at the time of their arrest. When defendants are detained, the loss of employment may deprive them of the ability to pay for lawyers; and in the cases in which release follows trial, they may have to resort to public assistance while seeking a new job. For some defendants detention is comparable to imprisonment in lieu of payment of a fine, for a number of those interviewed stated that they could pay for a bail bond if they could only resume their jobs.

Perhaps the most important result of confinement which may influence the less favorable dispositions given to jail defendants is the inability of these defendants when charged with minor crimes to do anything to get their cases dropped. It seems possible that charges initiated by private prosecutors may, when the defendant is out on bail, be settled or dropped informally and that many nolle prosequis may therefore result. However, it is impossible to draw definite conclusions until a careful study is made of the policy underlying the use of nolle prosequi by the District Attorney. This would involve a comparison of its use in cases originated by the police as against those originated by private prosecutors.[99] A Pennsylvania statute permits private settlements in minor cases and provides that the

---

97. Interview, note 93 *supra.*
98. Vol. Defender Rep., *op. cit. supra* note 72, at 4.
99. See note 81 *supra.*

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: ?

1058        *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 102

settlement may be a bar to further prosecution of the charge.[100]  The statute applies to those who, "on complaint of another," are awaiting trial for larceny or fraudulent conversion where the value of the property involved is less than $200, or for assault and battery or other misdemeanor "to the injury and damage of the party complaining." If the complainant appears and acknowledges that he has received satisfaction for the damage inflicted upon him, the court may "order a nolle prosequi to be entered on the indictment." In many cases the same result may occur informally by failure of the prosecution witnesses to appear for trial.

If such settlements are widespread the defendant held in jail is being severely prejudiced by his inability to negotiate such settlements and to exert whatever persuasion he can command to this end. Under current regulations he can make one phone call upon admission and none thereafter, and even if the private party is willing to come to the prison the defendant would not be allowed to see him.[101] When this is considered in conjunction with a jailed defendant's inability to search out evidence and persuade witnesses in his behalf to testify at the trial either to his innocence or in mitigation of penalty, it suggests that the handicap of being in jail may result in a number of convictions which would not occur were the defendant given his liberty during the pre-trial period.

### (f) *The Conditions of Detention*

The County Prison's Board of Inspectors has noted that "of those detained, the majority must be assumed to be innocent and should be treated accordingly. It is not fair to subject the untried prisoner . . . to the same routine as that of the prisoner convicted and serving sentence." [102] It would be possible to lessen the degree of punishment attendant upon pre-trial detention by providing relatively pleasant detention facilities in which restrictions upon the inmates were limited to those imperatively demanded by security requirements; one criminologist has suggested "secure individual rooms in buildings equipped much like a clean third-class hotel." [103] The defendants observed in this study, however, were treated almost exactly like convicted prisoners.[104] The police station detention facilities used prior to preliminary hearing are extremely unpleasant,[105] and at

---

100. Pa. Stat. Ann. tit. 19, § 491 (Purdon Supp. 1953).

101. Visitors are limited to members of the defendant's immediate family. See note 92 *supra*. For an explanation of why visitors other than members of the immediate family are refused visiting privileges, see the report of the Superintendent of the Philadelphia County Prison, Prison Rep., *op. cit. supra* note 66, at 15: "(a) Because many inmates are ashamed of the disgrace and don't want it thrown up to them once they get their freedom—'Remember when I saw you behind bars,' *etc.* It is a very practical thought and might save some unpleasant and unhealthy argument. (b) We have not the facilities to permit unlimited visitation."

102. *Id.* at 33.

103. Taft, Criminology 384 (1942).

104. See text at note 91 *supra*.

105. The following description was published by defendants who spent the night of July 22-23, 1953, in the 12th and Pine Sts. Police Station: "The cell in which

Moyamensing Prison the untried prisoner is subjected to an admission routine that the prison's superintendent calls "not much better than stock yard methods," [106] and is then confined in cells built for single occupancy in 1835 which, due to overcrowding, must now often contain two persons.[107] Despite the "almost insurmountable barriers" due to the age of the buildings and the prison's inadequate facilities and handicaps because of its construction, the institution is reported to be in "clean, well painted, well kept condition." [108]

The hardships of such imprisonment are a relatively minor problem compared with the handicaps upon untried defendants which are inevitable with any kind of confinement, but the fact that hundreds of Philadelphia defendants who upon trial are not convicted must serve a pre-trial term of imprisonment under such conditions emphasizes the importance of examining methods for securing attendance at trial without the necessity of detention.

### III. Minimizing the Risk of Non-Appearance

In addition to its effects upon defendants, securing trial attendance by incarceration is also undesirable because of the cost of such detention. Under present conditions detention facilities in Philadelphia are severely taxed, and the cost in 1952 of maintaining pre-trial detainees a total of 131,683 days was more than $300,000.[109] To extend the method of assuring trial attendance by imprisonment to all defendants would require multiplication of present prison facilities and prohibitive expense.[110]

Criminal administration assumes that most defendants will be free before trial, and, therefore, it is desirable to examine the problems created by pre-trial freedom and the methods employed to minimize the resulting risk of non-appearance. An evaluation of the efficacy of these methods is important not only to determine how well this policy of freedom

---

Hallman and Walker were lodged was about 6 × 8 feet, with a wooden bench running the length of the cell, and a toilet. After several requests for cleaning equipment, we were given a broom and swept out the cell. During our stay there, 21 bugs of various species were dispatched to their doom, although some escaped to feast upon their sleeping victims later in the night . . . Hallman by virtue of winning the toss of a coin slept on the board. The two others in this cell slept on the cement floor, the soft side of which did not seem to be in evidence. We had to buy our own breakfast in the morning, plus tip extracted for the service." Hallman & Walker, *op. cit. supra* note 89, at 3-4.

106. ". . . we are milling in and out of prison human beings, daily, in a manner not much better than stock yard methods for cattle . . . Our admission of inmates is revolting to the decency of an understanding person." Prison Rep., *op. cit. supra* note 66, at 12.

107. Annual Report 1950, Philadelphia County Prison Board of Inspectors 11 (1951).

108. *Visiting Inspectors' Report* in Prison Rep., *op. cit. supra* note 66, at 93.

109. *Id.* at 31.

110. Recognition of this fact resulted in 1952 in "a meeting at which the most notorious professional bondsmen voted to go on strike" to protest vigorous enforcement by the District Attorney of laws affecting bail. For an account of this threat and the way in which it was met see Dist. Att'y Rep., *op. cit. supra* note 46, at 15.

works, but also to see what deterrents are available which would make it safe to reduce the proportion of jail cases and thus lessen the substantial sacrifice of defendants' rights which has been found to exist in Philadelphia.

The use of a financial incentive through bail is the product of long tradition, but under modern conditions the extent to which it deters non-appearance will vary greatly depending upon the type of bail which is posted. If the defendant has put up his own property or cash or that of a friend or relative whom he does not wish to harm, the resulting restraint upon the accused may be substantial. The amount of deterrence declines, however, when the defendant purchases a bond from a bondsman or a surety company,[111] especially if there is no provision for cross-indemnification or if such provision proves to be ineffective. In no case, however, can it be said that the bail jumper "has in reality bought his freedom," [112] for to do so would overlook the deterrent effect of not wanting to be a fugitive. The bail defendant who weighs the advisability of jumping has much more to consider than the often fictitious increased financial loss to which he may be subjected. The likelihood that he will be caught and possibly receive a more severe sentence if convicted may have a much greater impact on a defendant's decision than forfeiture of the bond. Consideration should be given, therefore, both to bail and to non-financial deterrents, for the extent to which the latter can be strengthened presents a method for mitigating the harsh prejudice against the indigent which is an inevitable product of exclusive reliance on financial incentives to induce appearance.

### (a) *Bail Bonds*

Bonds written in Philadelphia during 1950 were studied to determine the apportionment of bail among private sources, professional bondsmen and surety companies, the forfeiture rates for each of these kinds of bail, and the extent to which forfeited bail is actually collected.[113]

Of the 10,749 bonds with a total value of $7,043,700 written in 1950, 45% of the number of bonds or 46% of the total value came from private sources. Surety companies issued only 16% by number or 20% by value, and professional bondsmen issued 39% by number or 34% by value. It is believed that this low proportion of surety company business has been due to lax collection on forfeitures, and that the natural effect of the more

---

111. For the cost of bonds, see text at note 56 *supra*.

112. ORFIELD, CRIMINAL PROCEDURE FROM ARREST TO APPEAL 127 (1947). Note that for certain minor traffic offenses a defendant may post a sum of money which, in the event he does not appear for trial, is forfeited as a fine. This is not really a bail situation, for later appearance is not required if the defendant elects to forfeit his deposit as a fine.

113. Each bond posted before a magistrate during 1950 was listed on dockets in the office of the clerk of Quarter Sessions Court. All bail posted before the bail clerk of Quarter Sessions Court is recorded in that office. The total number of bonds posted was compiled from these records and was broken down as to the source of bail. It was necessary to go back to 1950 because of the time lag of up to a year before trial in bail cases and the further time lapse before it is possible to evaluate collection practices and determine how many fugitives are subsequently apprehended.

**A151**

vigorous collection methods inaugurated in the fall of 1952 will tend to alter these ratios radically. In Detroit, where collection of forfeitures is 100%, surety companies write 95% of the bail,[114] and a spot check of Philadelphia bail in late 1952 indicated that movement in this direction is already well advanced.[115]

When the accused is scheduled to be tried, notice is issued to the surety ordering him to bring the defendant to court. If the latter fails to appear, the District Attorney sues out the bail and asks for the issuance of a bench warrant; [116] the surety is then given five days to produce the defendant before judgment will be brought against the surety. If the defendant still does not appear, the surety may obtain a bail piece empowering him to arrest the fugitive on sight.[117] Sometime thereafter, when sufficient jumps have accumulated, the District Attorney confesses judgment in court against the respective sureties.[118]

The number of forfeitures, therefore, represents all serious bail jumping, and does not take into account the tactics of non-appearance which are used to cause delay or rescheduling of the case before a different judge. No default will appear on the record if an appearance is made within five days, and no figures were obtained on the extent of such "judge-jumping." These delaying devices serve to complicate court calendars and considerably increase expense to the community, although these problems are minor in comparison to those created by defendants who escape entirely. Remedies for this situation would include the assignment of the same judge to the re-trial, thus removing the incentive for the practice, or, if this is not feasible, suspending the licenses of bondsmen whose clients are persistent offenders.

While tactics like judge-jumping are technically violations of the bond, determination of the effectiveness of the compulsion to appear was measured in terms of breaches which result in forfeiture. Out of the 10,749 bonds written in 1950 there were 264 forfeitures, and of the defendants involved, 162 were still at large in July, 1953.[119] This forfeiture rate of two and

114. Letter dated May 14, 1953 from E. Burke Montgomery, Clerk of The Recorder's Court, Detroit, Mich., on file in Biddle Law Library.

115. Of a total amount of $382,450 bail posted in the office of the bail clerk of Quarter Sessions Court for the months of November and December, 1952, the proportion posted by surety companies had risen to 60%, and that posted by professional bondsmen had declined to 10% and by private sources to 30%.

116. Information as to practices of the District Attorney's office was received from the Assistant District Attorney in charge of the Bail Division, Stanley Bashman.

117. PA. STAT. ANN. tit. 19, § 53 (Purdon 1930).

118. See PA. STAT. ANN. tit. 53, § 6995 (Purdon 1930) for section delegating to the Attorney General of the Commonwealth the duty of issuing process upon forfeitures in Philadelphia County. This power was later delegated by the Attorney General to the District Attorney.

119. This information was obtained from a docket kept by Assistant District Attorney Stanley Bashman, which contained the names of all forfeitures, and the status of the defendants was obtained from trial dockets in the same office. This information was broken down as to the source of bail and the crime of which the defendant was accused.

**A152**

one-half percent of all bonds written is comparable to Cleveland's rate [120] but much higher than that of Detroit, where in a five-year period there were 131 forfeitures on a total of 21,260 bonds, a rate of six-tenths of one percent.[121] Pittsburgh officials regard the problem of bail jumping as "negligible" [122] and other cities report that it has occurred "two or three times" in twelve years (Minneapolis) [123] and once in eleven years (Schenectady, N.Y.).[124] These estimates suggest a very low forfeiture rate.

Two things should be noted in connection with Philadelphia's forfeiture rate. First, the statistics alone over-emphasize the problem. Forfeitures for serious crimes were rare. There were two bail jumpers among those charged with forgery, five for sodomy, ten for narcotics offenders, and none for burglary, robbery, rape, arson and voluntary manslaughter.[125] Nearly half (119) of the forfeitures involved gambling, liquor or traffic offenses, and the forfeiture rate drops to 1.35% when these are subtracted. The other bail jumpers included 34 charged with larceny or other property crimes, 46 charged with assault and battery, and 48 held for miscellaneous offenses, such as prostitution, indecent exhibition, fortune-telling and indecent exposure. Second, the ratio of forfeitures varied sharply according to the type of bail written (see figure 4). Bail supplied from commercial sources had a forfeiture rate more than twice that of privately supplied bail.

One probable explanation for the relatively high Philadelphia forfeiture rate was that only 20% of the bonds written in 1950 which were later forfeited and never remitted were actually collected.[126] Although enforcement was strengthened in 1952, collection rates were still less than 50%.[127] This is to be contrasted with Detroit, which had one-fourth as many forfeitures under a bail system in which 100% collection is main-

---

120. Letter dated July 31, 1953, from Leonard F. Fuerst, Clerk of Courts, Cuyahoga County, Cleveland, Ohio, on file in Biddle Law Library (from 1947 to date of letter an average of 343 bonds posted annually and a total of 51 forfeitures for same period).

121. See note 114 *supra*.

122. Letter dated June 24, 1953, from James F. Malone, Jr., District Attorney, Allegheny County, Pittsburgh, Pa., on file in Biddle Law Library.

123. Letter dated May 17, 1954, from Michael J. Dillon, County Attorney, Hennepin County, Minneapolis, Minn., on file in Biddle Law Library.

124. Letter dated May 12, 1954, from Emmet J. Lynch, District Attorney, Schenectady County, N.Y., on file in Biddle Law Library.

125. One explanation for this is that far fewer defendants charged with these serious crimes are admitted to bail, but at least some of these defendants are released. See note 68 *supra*.

126. Out of 215 bonds which were not remitted, only 43, or 20% of the total number, were collected. The value of the collected bonds was $22,200, or 17% of the total of $127,500 which should have been collected.

127. "In 1952, one hundred ninety-seven judgments having a total value of $120,000.00 were entered in cases where defendants had jumped bail. $20,732.00 was collected on judgments. Arrangements were made with many bondsmen to pay off in weekly or monthly installments judgments totaling $35,700.00. This collection plan is being ever broadened and it is hoped that soon there will be a minimum of old unpaid judgments on the books." DIST. ATT'Y REP., *op. cit. supra* note 46, at 14-5.

**A153**

### FORFEITURES BY TYPE OF BAIL



FIGURE 4.  NUMBER OF FORFEITURES PER 1000 BONDS WRITTEN
ACCORDING TO SOURCE OF BAIL

tained.[128]  Methods which could be employed to ensure effective collection need only be mentioned here.[129]  The most important prerequisites are (1) that the system for checking the value of property offered as collateral be sufficient to avert "straw bail" or inadequate collateral;[130] (2) that as soon as bail is posted a lien be imposed upon the property put up as collateral;[131] (3) that the licensing and regulation of bondsmen require bondsmen to post an initial deposit before being permitted to write any bail;[132] and (4) that in the event of forfeiture, the bondsman immediately deposit with the court the amount of the forfeited bond.[133]

128. See note 114 *supra*.

129. See, *e.g.*, ORFIELD, *op. cit. supra* note 112, at 119-34.  See also COURT RULES, THE RECORDER'S COURT FOR THE CITY OF DETROIT (Rev. ed. 1951) (hereinafter cited as DETROIT RULES), which offers a "model statute" of proved effectiveness for maximizing collections.

130. See, *e.g.*, DETROIT RULES, *op. cit. supra* note 129, at Rule 9, § 4: ". . . before accepting any recognizance" the clerk of court must "verify the following information by means of the telautograph system: a) The Recorded Owner; b) All mortgages, liens, judgments, bonds and recognizances and encumbrances of every kind which appear uncancelled of record; c) Any pending action in which the premises pledged are specifically described; and d) The assessed valuation of the real property as shown by the County Treasurer's Records."

131. For examples see ILL. ANN. STAT. c. 38, § 616 (Smith-Hurd 1935) (copy of recognizances in felony cases sent to office of Recorder of Deeds in county where property located, and lien commenced when this is filed); DETROIT RULES, *op. cit. supra* note 129, at Rule 9, § 10 (when real estate offered as security, recognizance becomes lien on said real estate).

132. See, *e.g.*, ILL. ANN. STAT. c. 38, § 627*l*. (Smith-Hurd Cum. Supp. 1953).  See also, THE MUNICIPAL COURT OF CHICAGO, RULES IN RELATION TO BAIL IN CRIMINAL AND QUASI-CRIMINAL CASES, Rules 19, 20 (1952).

133. This is required in Detroit and was described as the court's "great weapon" against bondsmen.  See letter dated November 17, 1953, from E. Burke Montgomery, Clerk, the Recorder's Court of the City of Detroit, Mich., on file in Biddle Law Library.

**A154**

NUMBER OF FORFEITURES NOT COLLECTED



FIGURE 5. PERCENTAGE OF BONDS FORFEITED, AND NOT LATER REMITTED, WHICH WERE NOT COLLECTED

The relationship between the rate of collection on forfeitures and the efficacy of bail in compelling appearance which is suggested by the Philadelphia-Detroit comparison is generally assumed to be significant, and, therefore, most bail reform efforts have been directed at improvement of collections.[134] To the extent that the threat of a financial loss is the incentive which makes the defendant comply, this assumption is logical, for if the threatened loss in fact does not occur the deterrent should lose much of its force. When the Philadelphia figures on collection are broken down by source of bail, however, the results are difficult to reconcile with such a theory. Bail supplied from private sources was the least likely to be collected (see figure 5), yet this was the form of bail which had much the greatest deterrent effectiveness (see figure 4 *supra*). Furthermore, private bail is apparently unable to exist as a major supply source in the face of strict collection. With stricter collection policies, it declined by one-third in Philadelphia by the end of 1952, and in two other cities with 100% collection it was doing only 5% of the business.

These facts suggest the need for careful examination of the ways in which the bail bond system minimizes the risk of non-appearance. If an increased forfeiture collection rate results in a net decrease in the proportion of forfeitures, as it has done in Detroit, the improvement apparently takes place despite the virtual elimination of the only type of bail in which

134. See, *e.g.*, A STUDY OF THE BAIL BOND SYSTEM IN THE DISTRICT OF COLUMBIA 42 (Washington Crim. Justice Ass n 1937, mimeo); BEELEY, THE BAIL SYSTEM IN CHICAGO 167-9 (1927); and the reform which led to the present DETROIT RULES, *op. cit. supra* note 129.

the defendant has a strong financial inducement not to become a fugitive. Many factors probably contributed to the comparatively greater efficiency of private bail in producing defendants for trial in Philadelphia. First, the defendant for whom a private bond has been put up knows that if he jumps bail the loss will fall upon the relative or friend who has assumed the risk solely for the purpose of freeing the defendant. The relatively low forfeiture rate for private bail in Philadelphia suggests that, even with low collection, this moral compulsion operates as a powerful deterrent. Second, the private bondsman is probably a friend or relative of the defendant, and thus is in a favorable position to gauge his reliability and to refuse to do business with him if he is a bad risk. Third, the private bondsman can police his risk to some extent because he is likely to see the defendant frequently.

The commercial bondsman, whether operating on his own or as agent for a surety company, is at a comparative disadvantage in all these respects. The defendant is not financially obligated to him because, in the absence of collectible cross-indemnification, the payment of the premium ends the defendant's liability. The moral obligation is also lacking because the professional bondsman does not have the advantageous personal relationship which is the private bondsman's chief weapon. Finally, the commercial bondsman is in an inferior position in selecting and policing his risks. He may know little or nothing about the defendant when he is asked to put up bond, and in addition there are strong pressures upon him to accept even a known poor risk. His business usually comes either from runners, who work on a commission basis and therefore have an incentive to write as many bonds as possible, or from ward politicians, whom the bondsman is unlikely to turn down because they are a frequent source of business. That professional bondsmen do little to eliminate poor risks is indicated by the fact that only one of the 104 jail defendants who were interviewed stated that she had the money for a bail bond but was unable to get anyone to write it. Once he has put up the bond, the professional bondsman has little opportunity to police his risk, for the cost of keeping track of the defendant would be prohibitive and, barring exceptional circumstances, not warranted by the low forfeiture rate. The length of time which elapses before a bail defendant is brought to trial accentuates this problem. One bondsman stated that, upon receiving notice to bring to trial a defendant whom he had not seen since arrest some twelve months previously: "My heart was in my mouth when I knocked on the door of the address listed on the bond. It is impossible to keep track of a defendant for that length of time."

Strict collection increases the bondsman's risk, but there is little flexibility within the system described above by which the surety can protect himself against this increased risk. The private surety is already likely to reject bad risks, while the commercal bondsman is limited in his ability to do much to improve his selection of risks. It may be that, under a bail

**A156**

system with strict collection on forfeitures, the proportion of defendants unable to raise bail would rise substantially because of increased discrimination on the part of commercial bondsmen. Since no figures could be obtained elsewhere on the proportion of defendants unable to raise bail, it is impossible to know if one cost of the lower forfeiture rate of a city like Detroit is an increase in the number of jail defendants. However, in view of the pressure upon commercial bondsmen to do as much business as possible and the difficulty of attaining a better selection of risks, it seems unlikely that strict collection would have any marked effect in increasing the number of defendants who can afford bail but who cannot find a bondsman willing to accept them.

There remains only one other way in which strict collection can affect the bondsman's incentive to produce the defendant and thus reduce the forfeiture rate, *i.e.,* the increased pressure it places upon him to try to find fugitives. Liberal provisions for remission of forfeitures are designed to make it attractive for bondsmen to recover their losses by finding the defendant who has jumped bail and returning him for trial.[135] With collection rates as low as they were in Philadelphia for bonds written in 1950, the incentive for bondsmen to spend time and money looking for runaway defendants is not great, and this is doubtless one explanation for the relatively high number of bail jumps for minor crimes in that year. If every forfeiture were reduced to judgment and collection, however, the bondsman would be forced to become a private detective.

This effect of strict collection reveals that the real deterrent force against non-appearance in commercial bail is the threat of apprehension. The private surety is at a great disadvantage compared to the commercial bondsmen in the performance of this function. The friend or relative of an absconded defendant is not able to make an extensive search for the defendant, since it might mean giving up his job and because he normally does not have any contacts which would guide him to the fugitive. It is not surprising, therefore, that as strict collection puts a premium on apprehension, one of its effects is to drive private bail into an insignificant position. It is difficult to determine exactly why the professional bondsman is able to fare better as a detective than the private surety. However, the professional bondsman does have police and underworld contacts which are useful, and in more or less organized areas of crime, such as gambling, it is quite possible that participants will give information to the professional

---

135. The court may "moderate or remit" forfeitures, PA. STAT. ANN. tit. 17, § 502 (Purdon 1930), and even after the judgment has been collected that part of the funds collected which has been allocated to the county may be returned, PA. STAT. ANN. tit. 8, §§ 177, 180, 181 (Purdon 1930). Compare ILL. STAT. ANN., c. 38, § 625f (Smith-Hurd 1935) (forfeiture and judgment may be vacated or modified upon showing that within 15 months "the accused person has been apprehended or surrendered, or has died, or has been convicted and imprisoned by some other state or by the United States. . . ."). In Newark, N.J., "the bondsman has four years within which to surrender the absconded defendant. Upon doing so the forfeited money is returned to him 100%, less any expense caused by the county for his apprehension." Letter dated July 3, 1953, from Russell C. Gates, County Clerk, Essex County, Newark, N.J., on file in Biddle Law Library.

**A157**

bondsman as to the whereabouts of those who have jumped bail in order to protect their own opportunity to get bail.[136] Furthermore, giving the bondsman a financial incentive to recapture fugitives would seem to invite a situation in which the police, instead of making an arrest directly, "sell" their knowledge of the defendant's location to the bondsman.

As it seems probable that under a bail bond situation the police do not concentrate on apprehending bail fugitives but leave this task to bondsmen, the result of strict collection will be to lower the forfeiture rate because it induces increased activity by bondsmen directed toward apprehension. In one city where the "very few civil actions pending for the collection of bail" implies a low forfeiture rate, the clerk of the court stated that this was [137]

> ". . . due, perhaps, to the fact that personal bondsmen in our county are a very aggresive group and relentlessly pursue the defendant who skips bail on which they are surety and bring them back in very many instances. We have had examples where they have gone out of the country in order to effect the production of a person who has skipped bail. This hard attitude on the part of some of these sureties has put the fear of God into a lot of defendants who know what to expect in the event that they skip bail; so we do not have any particular problem in this regard."

Commercial bail is essentially a transaction in which the bondsmen agree to help the police track down fugitives at the expense of all defendants who pay the premiums for bonds. This may save the state some money, although the cost of administering a bail system probably offsets any economy in police costs. It can also be argued that the threat of having both the bondsman and the police searching for a fugitive would increase a defendant's fear that he will be caught if he jumps bail. It is doubtful, however, if such teamwork is an efficient method of apprehension. It may invite police lethargy and corruption, and it is difficult to believe that the bondsman has sources of information which do not either stem from the police or could be as readily obtained by them. The police alone have the communication facilities, a nation-wide cooperating system and the scientific methods which are keys to successful location of missing defendants. Even if it could be demonstrated that the retention of private law enforcement in this area is efficient, that efficiency must be balanced with the cost of a bail system in terms of pre-trial imprisonment and sacrifice of defendants' rights.

### (b) *Non-financial Sanctions Against Bail-Jumping*

The effectiveness of ultimate apprehension as a deterrent to bail-jumping will partially depend upon the sanction imposed upon the defend-

---

136. Information that this was done was supplied by a surety company executive who would not permit the use of his name.

137. Letter dated June 24, 1953, from Sidney J. Gottneid, Clerk of the District Court, Douglas County, Omaha, Neb., on file in Biddle Law Library.

ant for non-appearance. In most jurisdictions the existence of any non-financial sanction will depend upon the conviction of the defendant for the offense with which he was originally charged. In such a situation the imposition of a more severe sentence upon a convicted defendant who has jumped bail may often in fact occur, and it is probable that defendants are aware that such increased sentences may be a penalty for bail-jumping. Since there are no other effective non-financial sanctions, however, the threat of an increased sentence may not operate as a deterrent where a defendant, by becoming a fugitive, can materially lessen the chance of conviction because of the resulting delay in his trial.

To remedy this defect, a few jurisdictions punish bail-jumping directly. One federal court has done this by using its contempt power [138] to punish a defendant's wilful disobedience of an order to appear.[139] However, the availability of this method is severely limited because it can be applied only if the defendant had actual knowledge of the order to report, and ordinarily the accused would have disappeared before an attempt was made to serve notice upon him.

A more useful sanction was developed in Canada, where the statute penalizing escape from prison or from lawful custody was extended to punish a defendant on bail who, "without lawful excuse," fails to "present himself at the proper time and place." [140] Thus the bail defendant is treated as if he were in technical custody and bail-jumping is regarded as an unlawful "escape." Statutes patterned on this Canadian model have been adopted in Minnesota [141] and New York,[142] and the Department of Justice recently proposed one for the federal system.[143] The New York Act makes the defendant absolutely liable if he does not appear within 30 days after the forfeiture of his bail; the Canadian Act places the burden of proof upon the defendant to show a "lawful excuse" for his failure; and the Minnesota and proposed federal acts punish "wilful" violations.

The New York and Minnesota statutes have not been widely used. In the latter state, the act was very rarely invoked in two of the most populous counties because "bail jumping is not a serious problem." [144] A

---

138. 18 U.S.C. § 401 (1946).

139. United States v. Hall, 198 F.2d 726 (2d Cir. 1952), *cert. denied,* 345 U.S. 905 (1953). Compare Collins v. Georgia, 32 Ga. App. 450, 123 S.E. 723 (1924) (held error to declare defendant in contempt for refusing to appear in absence of specific statutory authority).

140. Rev. Stats. of Canada c. 36, § 189(c) (1927), amended by Stats. of Canada 11 Geo. VI, c. 55, § 2 (1947).

141. Minn. Stats. Ann. § 613.35 (1947).

142. N.Y. Penal Code § 1694-a. See People v. Davis, 5 N.Y.S.2d 411, 168 Misc. 511 (1938); People v. Pilkington, 103 N.Y.S.2d 66, 199 Misc. 667 (1951).

143. Dep't of Justice Press Release dated March 25, 1954.

144. "During the past 12 years, I don't believe bail jumping occurred more than two or three times. The Statute has never been invoked in the work of this office. Up to the present time, we have been fortunate enough to convict all bail jumpers and their sentences have been to [state] penal institutions. We have felt that this punishment has been sufficient." Letter dated May 17, 1954, from Michael J. Dillon, County Attorney, Hennepin County, Minneapolis, Minn., on file in Biddle Law Library. See also letter dated May 26, 1954, from Thomas J. Naylor, County Attor-

similar response was given by some New York prosecutors who were questioned.[145]  In New York County, however, eight or nine cases a month are referred to the Grand Jury,[146] and in Kings County (Brooklyn), the practice is "to indict in all cases where [the District Attorney] believes the forfeiture is wilful." [147]  Thirteen bail-jumping indictments during the last six years are reported in Brooklyn and the District Attorney believes that the statute is a valuable deterrent because "an experienced bondsman will impress upon his principal the necessity of appearing whenever required to do so and will also make known to his principal the consequences of his failure to do so." [148]

Such a statute serves a useful purpose in cases in which there is no other sufficient deterrent against a temptation to flee and avoid or delay trial.  It represents a step towards recognition of the fact that the threat of apprehension is the major deterrent against non-appearance, and may foreshadow the day when appearance for trial will be enforced by a criminal sanction instead of by a bail bond system.

### Conclusions

More than twenty years ago the Wickersham Commission pointed to the need for research on bail "in the direction of the individualization of bail determinations based on the history, character, standing, personality and record of the accused." [149]  The Supreme Court in *Stack v. Boyle* [150] held that such an individual determination was a constitutional requirement, and the concurring opinion of Justices Jackson and Frankfurter stated that fixing "a uniform blanket bail chiefly by consideration of the nature of the accusation [which] did not take into account the differences

ney, St. Louis County, Duluth, Minn., on file in Biddle Law Library (". . . we do not have a serious problem in bail jumping in our county"; statute invoked twice in 25 years).

145. William Kerwick, Assistant District Attorney, Queens County, New York, stated in an interview in June, 1953, that he could recall of its being invoked only once in the past 20 years.  See also letter from Emmet J. Lynch, *supra* note 124.  The statute has been invoked "on occasions" in Buffalo.  Letter dated May 13, 1954 from John F. Dwyer, District Attorney, Erie County, Buffalo, N.Y., on file in Biddle Law Library.

146. Letter dated June 4, 1954, from Harold R. Shapiro, Assistant District Attorney, County of New York, New York, N.Y., on file in Biddle Law Library.  "Most of the cases of bail-jumping presented to the Grand Juries of this County have resulted in indictments or informations, as the case required, and in most instances these, in turn, have resulted in guilty pleas or have been covered on disposition of the main case." *Ibid.*

147. Letter dated May 17, 1954, from Edward S. Silver, District Attorney, Kings County, Brooklyn, N.Y., on file in Biddle Law Library.  Disposition of these cases included four sentences of imprisonment, two suspended sentences, one sentence to time served while awaiting trial, and three indictments still pending while the defendants are serving their sentences on the principal charges.

148. *Ibid.*  See also letter from Harold R. Shapiro, *supra* note 146 (the statute "has had a salutary effect in deterring persons from violating the conditions upon which they have been released on bail").

149. National Commission on Law Observance & Enforcement, Report on Prosecution 12 (1931).

150. 342 U.S. 1 (1951).

in circumstances between different defendants" would be "a clear violation of Rule 46(c)." [151]

The gulf which separates this goal of individualization from the Philadelphia practices which have been noted in this study is so wide as to suggest that it cannot be bridged. The only kind of "individualization" which was significant was the frequent magisterial practice of assuming that the defendant was guilty and deciding whether or not the circumstances of the offense were such that punishment in the form of high bail was warranted. The nature of the offense was the rule of thumb against which the amount of bail was determined, and factors based on "the history, character, standing, personality and record of the accused" were not developed at all in most hearings. This is not surprising in view of the formidable theoretical and administrative difficulties which stand in the way of individualizing bail according to the risk presented by the particular defendant. The lack of any adequate knowledge upon which to base a determination as to a defendant's reliability appears to present insuperable difficulties in the absence of the kind of research advocated by the Wickersham Commission.[152]

Even the value of attempting such research is questionable, however, because of administrative difficulties which prevent the kind of hearing that would be required for individualization. The relief provided by bail must be speedy if it is to be effective in preventing the punishment of the innocent and the economic dislocation of employed defendants. Release should come as soon after arrest as is practicable, and one of the major defects in Philadelphia practice was that it took an average of five days for defendants charged with serious offenses to obtain bail and be released from jail. Development of the kind of information necessary for genuine individualization would require a practice somewhat comparable to the pre-sentence investigation made by probation departments following conviction.[153] Yet this takes a week or more of preparation, and the cost of applying such a procedure at the level of the preliminary hearing would be very great. Without such pre-bail investigation, there is no practicable way of obtaining the facts which are required. The preliminary hearing is not adequate to achieve this purpose, for the police information is insufficient and one-sided. A fair hearing for bail purposes would require full participation by an adequately represented defendant. However, in the observed hearings only 15% of the defendants were represented by counsel and the defendant takes a real risk if he participates at all. The primary purpose of the preliminary hearing is to determine whether or not there is a prima facie

151. *Id.* at 7, 9.

152. See text at note 26 *supra.*

153. FED. R. CRIM. P. 32(c)(2): "The report of the presentence investigation shall contain any prior criminal record of the defendant and such information about his characteristics, his financial condition and the circumstances affecting his behavior as may be helpful. . . ."

**A161**

case; the defendant is warned that anything he says may be used against him, and it is usually to his advantage to say nothing. Yet in the 35% of the cases in which the question of bail determination was given independent consideration, the discussion was intermeshed with the hearing on the prima facie case, for which purpose the defendant had been cautioned against speaking. Nor are the magistrates who make the decision qualified to exercise the broad discretionary power which individualization must repose in them. The fact that most magistrates in Philadelphia are not lawyers aggravates this problem. While this may not be a major consideration, at least a lawyer-magistrate would be more likely to recognize that the preliminary hearing determines merely whether or not a prima facie case exists, that presentation of the police case does not establish the defendant's guilt, and that the use of bail for punishment is improper.

It seems improbable, therefore, that there can be any substantial improvement in bail determination beyond the kind of practices which were observed in this study. The volume of cases requires the use of a rule of thumb; the fact that hearings are held before the lowest level of the judiciary and that appeals are usually impracticable makes a considerable amount of abuse inevitable; and the employment of a pre-bail investigation to develop information about the defendant would involve prohibitive expense and the denial of bail to all defendants for the time necessary to make the investigation.

In any event, improvement in the method of bail determination would not resolve the central problem of the bail system unless bail for each defendant was to be set for an amount not in excess of what that particular defendant could afford. As long as the yardstick for determining what constitutes excessive bail is the range within which bail is "usually set" for comparable offenses,[154] there will be defendants who are denied pre-trial release. The only resolution of the clash between bail and defendants' rights is to abandon the necessity of bail for defendants who are financially unable to obtain it, and if society can afford to take this risk with indigents, it can take it with all defendants.

The feasibility of such a step depends upon the extent to which it might increase the number of fugitives. Since most bail is commercially provided, the financial deterrent against bail jumping is usually fictitious. If there were an appropriate criminal sanction against non-appearance which was directly enforced by the police, it is extremely improbable that there would be any increase in the number of fugitives from among those who now post bail.

The unknown risk which the abandonment of bail would require society to assume is the possibility that the type of defendants who are now jailed are so much more unreliable as a group that their pre-trial freedom would substantially increase the incidence of non-appearance. It is impossible

---

154. See note 16 *supra*.

to determine how much weight should be given to this possibility;[155] the untested assumption that there is a high correlation between financial inability and the likelihood of non-appearance is the strongest argument for the retention of bail.

This risk can be minimized in several ways. First, the enactment of a law which penalizes failure to appear in court when ordered would invoke a direct deterrent against trying to flee. Second, speeding up the trial of bail cases would decrease both the opportunity for a defendant to commit new crimes while awaiting trial and would operate as an indirect preventive to reduce non-appearance. Defendants who have little tie to the city are much more likely to wander off if their case will not be reached for nine months than would be the case if trial followed preliminary hearing by not more than a few weeks.

With such correctives the degree of risk created by releasing the jailed defendants does not appear to be large. When this risk is weighed against the substantial impairment of defendants' rights which is the concomitant of the present system, an unwillingness to experiment in the direction of the abolition of bail perpetuates the overemphasis on security at the expense of individual rights which is an anomaly in our system of criminal justice.

### RECOMMENDATIONS

The recommendations which follow fall into four categories: (1) a statute which makes non-appearance a criminal offense and thus establishes a deterrent against non-appearance as an alternative to or substitute for bail; (2) recommendations designed to increase the number of defendants released without security on their own promise to appear, and to improve the procedure for obtaining pre-trial release; (3) lowering of the standard amount of bail which is now set for many offenses; and (4) methods by which defendants who are detained pending trial can be assured of the right

---

155. In this study, social histories were obtained from 104 prisoners who were interviewed, but it was not feasible to verify the information from other sources. In any event such information would have limited value unless it was compared with an analysis of the social histories of bail defendants, whom it was not feasible to interview.

The unverified social histories which were obtained in general agreed with those of BEELEY, *op. cit. supra* note 26, at 157-9, that: (1) "contrary to expectations, the unsentenced Jail prisoners are not transients, taken as a whole"; (2) they are usually single or separated; (3) they are "for the most part vocationally unskilled"; and (4) they are usually young, which in part accounts for their economic incapacity and single status.

Compare Beeley's attempt to classify 170 pre-trial detainees, as a result of which he decided that "at least 65" were "dependable" and could safely have been allowed their freedom. *Id.* at 159. This classification was made by two field workers and one psychiatrist on the basis of information obtained from interviews with the prisoners and a study of their social case histories. No comparative study was made to measure bail defendants by the same standards to see if there were significant differences between the two groups. An added difficulty with according much weight to Beeley's classification is that his conclusions are unverified because the central problem of bail determination, *i.e.,* how to determine reliability, was assumed. Beeley decided what factors indicate dependability and then measured the defendants against this untested assumption.

to communicate freely with persons outside the jail, thus reducing the handicap which is caused by pre-trial confinement. No separate recommendations are made here for improving the efficacy of collection of forfeited bail, suggested remedies having been previously discussed.[156]

### (1) *Making Non-appearance a Criminal Offense*

The ultimate abolition of the bail system is the only solution for the prejudice to jail defendants which results from their low economic status. A prerequisite for this development is a statute which sets up a direct sanction against non-appearance. The statute proposed in the margin [157]

---

156. See text at notes 129-33 *supra.*

157. While this study was limited to an examination of problems concerning defendants held pending trial, see note 1 *supra,* the following proposed statute is drafted to include persons bailed or otherwise released after conviction, pending an appeal or pending appearance as a witness.

The purview of the proposed statute follows:

Section 1. Whoever, having been charged with a criminal offense, or having been held for appearance as a witness, and having been admitted to bail, or served with a summons to appear for a preliminary hearing, or otherwise released pending appearance as a witness or for a preliminary hearing or for trial or pending the outcome of an appeal, does not, without lawful excuse, present himself at the proper time and place, is guilty of an offense, and, upon conviction in a summary proceeding, shall be sentenced to a fine not exceeding one hundred dollars ($100), or to imprisonment not exceeding thirty (30) days, or both.

Section 2. Whoever violates Section 1 of this Act and, in addition, does not surrender himself within thirty (30) days following the date of his failure to appear, if bail was given or release obtained in connection with a charge of felony or pending appeal or certiorari after conviction of any offense, is guilty of a felony, and, upon conviction, shall be sentenced to pay a fine not exceeding five thousand dollars ($5,000), or to imprisonment not exceeding five (5) years, or both.

Section 3. Whoever violates Section 1 of this Act and, in addition, does not surrender himself within thirty (30) days following the date of his failure to appear, if bail was given or release obtained in connection with a charge of committing a misdemeanor, or for appearance as a witness, is guilty of a misdemeanor, and, upon conviction, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to imprisonment not exceeding one (1) year, or both.

Section 4. In all proceedings under this Act, proof that the defendant did not present himself at the proper time and place is prima facie evidence of a violation of this Act.

Section 5. A person admitted to bail or otherwise released pending appearance before any court shall furnish his address and shall give written notice of any change of address to the District Attorney and the clerk of the court before which he is to appear. Whoever furnishes a false address, or fails to give written notice of any change of address to the District Attorney and the clerk of the court before which he is to appear within 48 hours after he has changed his address, is guilty of an offense, and, upon conviction in a summary proceeding, shall be sentenced to a fine not exceeding one hundred dollars ($100), or to imprisonment not exceeding thirty (30) days, or both.

Section 6. Before a person is admitted to bail or otherwise released pending appearance as a witness or for preliminary hearing or for trial, he shall be photographed and fingerprinted, and shall be given a written notice clearly explaining the requirements and penalties provided for by this Act. If such person is released pending a preliminary hearing, he shall be served with a summons which shall state clearly the time and place at which he is to appear. If such person is released pending appearance as a witness or defendant before any court, he shall be given at least five (5) days notice by registered mail of the time and place at which he is required to appear.

**A164**

provides a severe penalty for fugitives who do not appear within 30 days of the time required; proscribes "judge-jumping" by providing a lesser penalty for those who do not appear on the day required but do appear within 30 days; protects the defendant when he has a lawful excuse for non-appearance, but makes proof of non-appearance constitute prima facie evidence of a violation; and protects both the state and the defendant by requiring fingerprinting before release and by appropriate notice provisions.

### (2) *Reduction in the Use of Bail*

A marked reduction in the incidence of pre-trial detention could be achieved by legislation which would utilize a summons instead of arrest in proper cases [158] and which would require that a defendant charged with a minor offense be released without bail on his own promise to appear unless it was shown that the individual circumstances of the case give rise to a reasonable belief that the defendant will probably flee the jurisdiction. A statute authorizing the use of the summons should (1) require its use for defendants charged with minor offenses and (2) permit it to be employed in any case in which the defendant is bailable as of right.[159] The proposed statute penalizing non-appearance [160] includes those who fail to appear after being served with a summons and would obviate the necessity for police station confinement pending a preliminary hearing in many cases.[161]

Even if the power to release a defendant on his own recognizance without bail is recognized, as in Pennsylvania,[162] there should be specific legislation to govern and encourage its use. Bail was required in almost every state case studied and the Pennsylvania case authorizing release

---

158. *E.g.,* MASS. ANN. LAWS c. 276, §§ 24-5 (1933) : "Upon a complaint for a crime punishable by fine only, or by imprisonment for not more than one year, with or without a fine, a summons may be issued instead of a warrant for arrest, if, in the judgment of the court or justice receiving the complaint, there is a reason to believe that the defendant will appear upon a summons." Provision is made for service "not less than twenty-four hours before the return hour."

159. The following form is recommended :

> In all cases in which the offense which the defendant is alleged to have committed is an offense which can be tried summarily, or a misdemeanor, or larceny or fraudulent conversion where the value of the property involved is less than $200, prosecution shall be begun by summons instead of by warrant of arrest. In no such case shall any warrant of arrest be issued except upon affidavit showing reasonable cause to believe that the defendant will probably flee the jurisdiction. In any other case which is bailable as of right, prosecution may be initiated by summons instead of warrant of arrest, whenever there is no reasonable cause to believe that the defendant will probably flee the jurisdiction.

Compare the similar but less extensive provisions of Senate Bill No. 459, Session of 1953, Pennsylvania Legislature.

160. See note 157 *supra.*

161. If it was necessary to photograph or fingerprint the defendant, he could be taken into custody for this purpose and then served with a summons and released. The same procedure could be followed in the case of a defendant arrested on sight.

162. McNair's Petition, 324 Pa. 48, 187 Atl. 498 (1936).

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: ?

1954]          *COMPELLING APPEARANCE IN COURT*          1075

without bail added that this "is a practice not to be recommended or encouraged." [163]  Specific legislative direction will be required to reverse this trend.  It is particularly important to require pre-trial release in cases in which Pennsylvania authorizes private settlement in lieu of prosecution,[164] unless there are circumstances creating an exceptional risk of non-appearance.  Pre-trial detention deprives defendants of this remedy, and existence of the provision for private settlement indicates a judgment about the minor nature of the offenses which makes pre-trial imprisonment particularly unjustifiable.  The statute proposed in the margin [165] encourages the use of release without bail in all cases in which there is no unusual risk of non-appearance, and enables greater utilization of the provision for private settlement.

Another recommendation which will reduce the incidence of pre-trial detention is a requirement that a defendant who is in custody be given a prompt preliminary hearing at which bail will be set in all cases.  The division of responsibility in Pennsylvania, under which magistrates cannot set bail for serious offenses, resulted in Philadelphia in a substantial infringement of the constitutional right to bail.[166]  Under this procedure, some defendants were unaware of their right to bail, bail was never set for many defendants, and those who did obtain release were detained five days or longer after their preliminary hearing before release was effected.  The recommended statute [167] abolishes this division and requires that bail shall be set in all cases when the defendant is first brought up for preliminary hearing, preventing prolongation of the period of police detention by a continuance of a preliminary hearing in a case for which the magistrate cannot now set bail.

---

163. *Id.* at 55, 187 Atl. at 501.

164. See note 100 *supra.*

165. The proposed statutory provision follows:

A person charged with a misdemeanor, or with larceny or fraudulent conversion where the value of the property involved is less than $200, and who at his preliminary hearing is held for court, shall be released without bail on his own promise to appear unless it is shown that there is reasonable cause to believe that the defendant will probably flee the jurisdiction.  A person charged with any other offense which is bailable as of right may be released without bail on his own promise to appear whenever there is no reasonable cause to believe that the defendant will probably flee the jurisdiction.  As used in this Act, "reasonable cause to believe that the defendant will probably flee the jurisdiction" shall be construed to effectuate the purpose of this Act to facilitate the release of defendants pending trial.

166. See text at note 49 *et seq. supra.*

167. Proposed statute to enable bail to be set in all cases at the preliminary hearing:

Whenever a person is in custody pending his preliminary hearing, the preliminary hearing shall be held not later than noon on the day following the person's arrest.  If the preliminary hearing has not been held by that time, the defendant shall be released without bail and served with a summons.  In all cases where the defendant is bailable as of right, bail shall be set or the defendant released without bail on his promise to appear when the defendant is first brought up for preliminary hearing.

**A166**

### (3) *Limitation on the Amount of Bail*

One of the most important problems examined by this study is the restriction on pre-trial release due to the high level of the standard amount of bail which is customary for many offenses. The objective of bail is to secure the release of as many defendants as possible, and this is sought to be achieved by the constitutional outlawry of excessive bail. We have seen, however, that the standard which is applied to determine the excessiveness of bail is whether or not the amount is within the range customarily set for like offenses,[168] and that this range is an irrational product of custom.[169]

This study suggests the feasibility and desirability of a much more specific yardstick against which to measure whether bail is excessive, *i.e.,* that absent special circumstances showing a high risk, bail is excessive if it is set in an amount higher than that which in practice most defendants can raise. In this study it was found that in magistrates' court, if bail was set at a figure below $500, 85% of defendants obtained release; if bail was set at a higher figure, the number of defendants obtaining release decreased until, for bail of over $1000, only 32% obtained release.[170] For the offenses for which bail was set by Quarter Sessions Court, in an amount averaging over $1000, only 25% of the defendants obtained pre-trial release. A bail of not over $1500 is within the standard range customarily set for many offenses, yet such a bail is high enough to imprison most defendants. The customary range itself is therefore excessive for the purposes of securing the release of most defendants.

The fact that makes it extremely difficult to achieve a rational method of controlling the amount of bail within the bail system is that variations in amount have almost no relationship to the weight of the deterrent force against bail jumping. As most bail is provided by unsecured commercial bonds, "an excessive bail merely means the enrichment of the bonding company," [171] with the higher amount resulting in no added deterrent against non-appearance. The only instance in which high bail would be justified is in the case of a defendant who had financial resources which he would risk losing were the bail to be forfeited. This would be true only if the defendant put up his own property as bail or as security for a commercial bond, which is a rare situation confined to defendants who are comparatively responsible financially. The conclusion is inescapable, therefore, that the real purpose of high bail is to incarcerate defendants, a result which the constitutional limitation against excessive bail is designed to prevent but for which purpose it is presently ineffective.

The recommended provision reflects a functional definition of excessive bail by providing that no bail shall be set in an amount higher than

---

168. See text at note 16 *supra.*
169. See text preceding note 26 *supra.*
170. See figure 1 in text preceding note 4 *supra* and figure 2 in text preceding note 6 *supra.*
171. Yankwich, *Release on Bond by Trial and Appellate Courts,* 7 F.R.D. 271, 275 (1947).

**A167**

$500 except under special circumstances where the higher amount would not prevent the release of the defendant and would result in an added deterrent against bail jumping.[172]  The figure of $500 is chosen because of the sharp rise in the number of defendants who cannot raise bail in an amount above that figure.  Such a provision is no help for the impecunious defendant who cannot post even this much bail and to that extent discriminates arbitrarily against the indigent.  As has been indicated, there is no solution for that problem short of the abolition of bail, and this recommendation is at best a compromise with that goal.

Because this limitation will severely restrict the use of high bail for the deliberate purpose of incarcerating defendants pending trial, mention will be made of two ways in which objectives which typically prompt the use of excessive bail can be remedied.

If it is feared that the defendants will commit further crimes if released on bail, the remedy is not preventive detention but a prompt trial.[173]  Administrative procedures could be evolved to achieve this end, and in Philadelphia some progress has been made in this direction with narcotics and numbers offenders.[174]  One problem connected with speeding up trials in cases in which there is an apparently high risk of further criminality is the Pennsylvania requirement that all defendants be indicted by the grand jury.  The Philadelphia District Attorney has recommended a constitutional amendment to eliminate the grand jury entirely,[175] but even without this change it is possible to speed up the indictment process and bring the defendant to trial in a very short time.  A speedy trial is a much more

---

172. The recommended statute provides:
   Whenever bail is required, the amount set shall not exceed $500 unless it is shown, in addition to the fact that the circumstances of the case are such as to create a high risk that the defendant will not appear, that
   (a) there is reason to believe that the defendant is able to afford the higher amount of bail; and
   (b) there is reason to believe that the result of imposing higher bail will be to make it more probable that the defendant will appear for his trial than would be the case if the amount of bail was not in excess of $500.
   In any case in which bail is set in excess of $500 in accordance with this section, the record shall state with particularity the findings of fact upon which the court or magistrate relied.

173. "From time to time, armed robbers or narcotics peddlers who have exercised this Constitutional right [to bail], commit a second crime while awaiting trial for the first crime.  Great excitement then ensues and some people argue that the defendants should never have been at liberty on bail.  This in turn leads to criticism of the Courts, which is unjust since they are sworn to uphold the Constitution and, therefore, they must fix bail and may not fix unreasonable bail.  The best way to eliminate a bad bail situation is the prompt trial of bail cases.  That can be accomplished in Philadelphia if there is a further increase in the number of court rooms devoted to criminal trials.  Such an increase would raise numerous questions of man power but, by proper planning, all such problems can be solved."  Dist. Att'y Rep., *op. cit. supra* note 46, at 14.

174. "Numbers cases are down to a four month wait and narcotics to two.  We try to speed up the numbers cases because they involve men and women who have set out deliberately to break the law.  The narcotics cases need quick handling because of the danger of having such people at large."  First Assistant District Attorney Michael von Moschzisker, quoted in The Philadelphia Inquirer, Feb. 15, 1954, p. 1, col. 1.

175. Dist. Att'y Rep., *op. cit. supra* note 46, at 40.

**A168**

satisfactory solution than the use of imprisonment to prevent crimes which have not yet been committed. Such imprisonment is repugnant to our theory of criminal justice and is particularly objectionable when, as was often the case in Philadelphia, high bail was the method used to obtain preventive detention. In such situations, the decision that the defendant is a potential offender is merely a guess by the magistrate, court or District Attorney, without any hearing on the factors relevant to such a risk.

If the basis for fearing that a defendant will harm other people if released pending trial is a belief that the defendant is mentally ill, or a mental defective, drug addict, inebriate or epileptic, the proper remedy is to obtain commitment under the provisions of statutes governing the mentally ill.[176]

### (4) *Rights of Defendants Detained Pending Trial*

As long as defendants are to be imprisoned pending trial, there should be a statutory declaration of the rights to which they are entitled while so confined. As such detention is solely for the purpose of assuring the defendant's appearance at his trial and not for punishment, the element of punishment which inevitably accompanies any deprivation of liberty should be minimized so far as is possible. Ideally this would involve separate detention facilities where the only restrictions would be those imperatively required by considerations of custody.[177] However, such a remedy would involve so great an expense that it is impracticable, and even ideal detention facilities would still punish the untried defendant and severely prejudice him in his efforts to prepare a defense. The recommendation which is made is therefore limited to guarantees of free communication between the untried defendant and the outside world. These provisions would involve relatively minor expense to the state and are so obviously required to prevent unnecessary aggravation of the prejudicial effects of pre-trial detention that this added expense is fully justified.

Legislation to this end should include the following guarantees:

(a) Any defendant who is detained pending preliminary hearing or after being committed for trial shall be permitted to use the telephone with reasonable frequency, to see any visitor or visitors who come to see him, and to write and receive an unlimited number of letters.

(b) The statute should provide specifically that the defendant shall be permitted to use the telephone a reasonable number of times immediately upon being booked at a police station or upon being admitted to a jail or prison; that he should be supplied with stationery and postage and permitted to write at least three letters immediately upon admission; and that, if he is without funds, he shall thereafter be provided with a reasonable number of free telephone calls and postage for a reasonable number of letters per week.

---

176. PA. STAT. ANN. tit. 50, §§ 1072, 1201, 2063(3) (Purdon 1954).
177. See note 103 *supra*.

**A169**

Case: 12-5951    Document: 006111610811    Filed: 03/05/2013    Page: ?

1954]            *COMPELLING APPEARANCE IN COURT*            1079

(c) Specific provision should be made so that a defendant can contact a professional bondsman if he so desires. For this purpose, each police station, jail or county prison should be required to keep and show to each defendant an alphabetical list of the names, addresses and telephone numbers of all licensed bondsmen in the county.[178]

Employment of an effective sanction to force compliance with such a statute raises a very difficult problem. Criminal and civil sanctions against anyone who wilfully deprives a defendant of his rights under the statute probably should be provided, although such remedies are notoriously ineffective when, as in this situation, they must be applied against law enforcement officers.[179]  The civil cause of action would be more effective if it provided for a waiver of sovereign immunity so that the city or county involved would be jointly liable with the offending officer, and if the statute provided for the recovery of damages of not less than $500.  Probably such a statute cannot be effectively enforced unless vigilant supervision is maintained by voluntary defender associations, bar associations and other groups concerned with individual rights.  It is nonetheless important, however, as a standard in seeking improvement of the conditions under which untried defendants are confined.

## SUMMARY

Some of the foregoing recommendations represent basic reforms. The use of the summons would eliminate many police detentions, while the requirement of release without bail in most cases in which the defendant is charged with a minor offense would materially reduce the pre-trial jail population.  Greater limitation on the maximum amount of bail which can be set and improved procedures to speed up setting bail would make pre-trial release more feasible for defendants charged with more serious offenses, most of whom are now detained pending trial.

Such proposals, however, minimize rather than solves the problem of pre-trial detention.  Permitting a magistrate to require bail even for defendants charged with minor offenses, where he finds a probability that the defendant will flee, opens the door to probable abuse, while the use of bail even in small amounts will force pre-trial imprisonment of those with very limited financial ability.  The premise upon which the bail system was founded, that we should not imprison a person who was merely an accused, can be realized only if a direct penal sanction is substituted for the bail system as the deterrent relied upon to compel appearance in court.  Reforms within the bail system are at best temporary expedients pending a time when abolition of the wrongs inherent in pre-trial imprisonment is more highly valued than the usually fictitious deterrent force provided by modern commercial bail.

---

178. This practice is reported in A STUDY OF THE BAIL BOND SYSTEM IN THE DISTRICT OF COLUMBIA 14 (Washington Crim. Justice Ass'n 1937 mimeo).

179. See, *e.g.,* the dissenting opinion of Mr. Justice Murphy in Wolf v. Colorado, 338 U.S. 25, 41 (1949), discussing the limitations of criminal and civil sanctions against unlawful search and seizure.

13 of 14 DOCUMENTS

Copyright (c) 1983 Northwestern School of Law
Journal of Criminal Law & Criminology

Winter, 1983

74 J. Crim. L. & Criminology 1556

**LENGTH:** 11189 words

ARTICLE: Criminology: Questioning the Practice of Pretrial Detention: Some Empirical Evidence from Philadelphia

**NAME:** John S. Goldkamp *

**BIO:**


   * Associate Professor, Dep't of Criminal Justice, Temple University.  Ph.D. School of Criminal Justice, State University of New York at Albany, 1977; M.A. School of Criminal Justice, State University of New York at Albany, 1975; B.A. Wesleyan University, 1969.

**LEXISNEXIS SUMMARY:**
 ... The role of pretrial detention in the American criminal justice system has long been questioned.  ...  Generally, critics of bail practices and of the use of pretrial detention questioned the fairness and effectiveness of bail practices that were so discretionary and that placed the detained at such a disadvantage.  ...  The job of the bail judge, who serves as gatekeeper of pretrial detention, involves prediction in its most fundamental sense. ... Two concerns lie at the core of prediction-related issues in bail and pretrial detention, although they may likewise apply to other crucial justice decisions. ...  As applied to the specially released defendants, as well as to the pretrial population overall, this device provided a singular analytic framework resulting in evidence relating to the function of pretrial detention and its selectivity, as well as to the general utility of predictive classification in bail and detention. ... Second, if pretrial detention can best be understood as the system's prediction of "worst-risk" defendants, i.e., those most likely to flee the jurisdiction or to commit new crimes if granted pretrial release, then detention may be performing better as a predictor than critics have suspected -- again, at least in the city of Philadelphia. ...

**TEXT:**
 **[*1556]**  I.  INTRODUCTION

   The role of pretrial detention in the American criminal justice system has long been questioned.  [1] Within the last sixty years, pretrial detention in particular has been the source of social, legal, and research debate.  [2] The bail reform movement of the 1960's was in large part a response to concerns about the institution of pretrial detention.  [3] State and local investigations of jails, focusing on conditions, resources, and rights of the pretrial confined,  [4] became increasingly common during the 1960's and 1970's as federal efforts to conduct censuses of jails and surveys of their inmates  [5] provided new data which were descriptive of  **[*1557]**  the overall dimensions of jail problems.

   At the heart of the bail reform movement during the 1960's were issues related to pretrial detention, many of which have received thorough review elsewhere.  [6] Generally, critics of bail practices and of the use of pretrial detention questioned the fairness and effectiveness of bail practices that were so discretionary and that placed the detained at such a disadvantage.  Commentators noted that defendants who awaited adjudication in confinement suffered not only from the privations associated with incarceration in jail, but also experienced ruptures in family and social ties, loss of employment, and restricted access to counsel which impaired their ability to prepare an adequate defense.  [7] A number

of studies focused on an additional apparent handicap: defendants who were detained seemed to have their cases dismissed less often or charges dropped less often and to be convicted and sentenced to incarceration more often than their released counterparts. [n8]

Although it is incorrect to suggest that the initial influence of bail reform has totally diminshed, the current focus on pretrial detention reflects emphases somewhat different than those of the 1960's and early 1970's. Two recent developments, overcrowding in many of the nation's jails and proposals and enactments for extended uses of pretrial detention, [n9] are premised in part on serious concerns about the function and performance of the pretrial detention institution.

[*1558] Both those seeking solutions to mounting overcrowding in urban jails and proponents of pretrial or "preventive" detention measures [n10] have questioned the use of pretrial detention, though perhaps for very different reasons. Analysts of jail crowding view bail-produced detention as a major and disproportionate contributor to the overcrowding crisis. They believe that ineffective bail practices lead to unnecessary detention of defendants who are poor, not very seriously charged, and have reasonably strong community ties. [n11] In contrast to this concern with detention practices' systematic overinclusion, proponents of preventive detention assume that current practices do not successfully restrain dangerous defendants, but rather permit their release, thereby threatening public safety. [n12] Of course, these criticisms of the current practice of pretrial detention in the United States are not mutually exclusive: pretrial jails simultaneously may overinclude low-risk defendants and underinclude those likely to abscond or pose a public danger. It is noteworthy that discussions in both arenas -- overcrowding and preventive detention -- share as common ground the criticism that pretrial detention is not sufficiently selective.

## II. BAIL AND DETENTION AS PREDICTION

Since pretrial detention affectuates a radical abridgment of the liberty of confined defendants and not of those released before trial, questions about the use of detention and whether pretrial detention performs its function adequately are of utmost importance. [n13] The job of the bail judge, who serves as gatekeeper of pretrial detention, involves prediction [*1559] in its most fundamental sense. The judge must assess the likelihood that defendants will abscond, commit crimes, or harass or intimidate victims and witnesses if released before trial, [n14] and then devise the necessary restraints from a range of options. [n15] From this perspective, we may view detained defendants as those deemed by the judges as ineligible for less restrictive pretrial options -- such as ROR (release on recognizance) or conditional release -- and thus as embodying the judges' (or the system's) prediction of "worst-risks." [n16] Because the goals of bail involve anticipation of possible future conduct, and the resulting use of detention is predictive in nature, questions about prediction have played a major role in the debate surrounding bail and detention practices. Answers to these questions will necessarily be derived through use of a framework designed to evaluate their predictive effectiveness.

Two concerns lie at the core of prediction-related issues in bail and pretrial detention, although they may likewise apply to other crucial justice decisions. [n17] Those concerns are (1) that courts make unwarranted assumptions of guilt; and (2) that courts are unable accurately to predict defendants' behavior.

## A. UNWARRANTED ASSUMPTIONS OF GUILT

By definition, bail and pretrial detention decisions involve defendants who have been charged with but not convicted of any crime. A major criticism of the *sub rosa* use of detention through traditional cash bail practices (*sub rosa* because detention is produced through the indirect [*1560] device of assigning unaffordable cash bail) and of preventive detention proposals is that bail judges premise the assessment of the probability of future crime or flight largely on the offense(s) with which a defendant is currently charged but of which he or she has not yet been convicted.

Judges may perceive a "pattern" of dangerous behavior, reasoning, for example, that if a defendant could have been involved in a particularly serious offense, then he or she might be quite likely to become so involved again. Judges, like

many preventive detention supporters, may also discern such a pattern by combining knowledge of a current alleged offense with a record of past conviction(s) or arrest(s) for similar crimes. [n18] Though perhaps logical from the point of view of the decisionmaker making the forecast of future behavior, critics argue that this approach, which is based upon *a priori* assumptions about the defendant's guilt, flies in the face of the perceived due process right to a presumption of innocence. [n19]

## B. INABILITY TO PREDICT ACCURATELY

Critics who argue from a legal perspective that prediction based upon assumptions of guilt related to a current charge is unconstitutional may shift to a social science argument to protest that, in any event, prediction of rare human behavior (such as pretrial flight or crime, which have generally low baseline or incidence rates) is statistically difficult and, as performed by judges making the bail decisions, is quite likely to be terrible. [n20] That detention could be the result for some defendants, then, would be unconscionable. The critics can point to recent research literature in criminal justice generally, [n21] and in bail specifically [n22] which [*1561] supports the contention that current predictive skills are poor.

Both legal and social science critiques of the predictive abilities of bail judges focus on the margin of error that results from poor prediction. To successfully ensure the detention of defendants who would actually abscond or commit crimes if released, many defendants who would never pose such a risk will necesssarily be held. At the same time, in attempting to foster the release of as many low-risk defendants as possible, judges also mistakenly permit the release of defendants who turn out to be dangerous or who later abscond. [n23]

Recent studies of prediction in pretrial decisionmaking have added fuel to the debate about the predictive efficacy of bail and detention. In general, correlates of failure for defendants on pretrial release have been found, [n24] but they have not demonstrated strength in multivariate analyses. Moreover, their overall power to predict failure-to-appear (FTA) and rearrest among released defendants accurately has been weak. Moreover, factors found to be related to pretrial failure, however weakly, have not been found to be those necessarily relied upon by judges in making bail decisions; rather, factors actually employed in bail decisions may ignore or contradict those found to be noteworthy in predictive studies. [n25]

The less-than-overwhelming findings concerning the power of bail predictions aside, it is important to note that virtually all of the studies may have suffered a significant limitation in the selection of their samples: they studied only defendants achieving pretrial release, thus excluding those who were detained. Although researchers have grown accustomed to studying released defendants for the same practical reasons that parole predictions are based only on those released and not on those originally eligible (i.e., a certain proportion of the high-risk cases remain confined and unavailable for study), this limitation is potentially important because a sizeable proportion of the total population of defendants may have been ignored. [n26] Depending upon the proportion of defedants typically detained, which varies from jurisdiction to jurisdiction, [n27] [*1562] and the selectivity of detention practices, it is conceivable that these studies have produced predictive equations for failure among defendants from whom the most likely candidates for failure have already been screened out by detention.

Along with the assumptions implied in overcrowding reduction strategies and provisions for increased use of detention, the predictive studies fuel further questions about the nature of pretrial detention. If even statistical prediction is likely to be inherently marginal and it is known that statistical methods are generally superior to "clinical" methods, then subjective assessments of judges at bail may be poor and the resulting use of detention may be highly unselective. If pretrial confinement practices were found to differentiate only poorly among criminal defendants awaiting adjudication, then grave questions concerning the legitimacy of the institution of pretrial detention would have to be faced.

The study presented here makes use of several sources of detentionrelated data gathered in Philadelphia to investigate the effectiveness of pretrial detention. A fundamental question focuses on the extent to which pretrial

detention differentiates among criminal defendants (i.e., its selectivity) and the degree to which this selectivity is appropriate and effective. The analysis involves both empirical characterizations of detainees to assess whether they conform to their presumed status as the system's (or, more correctly, the bail judges') predictions of "worst-risk" defendants and testing of these predictions through release and followup of detained defendants. [n28] We designed the following two empirical components to address separate aspects of detention and prediction questions.

*1. Pretrial Detention in Philadelphia and a "Natural" Experiment*

In the first component, we addressed questions concerning the relative "selectivity" of pretrial detention empirically through two sets of data -- one, a sample describing the population of defendants detained **[*1563]** in Philadelphia on a single day, and the second, a sample comprised of a group of defendants selected by court order for emergency release from detention as a result of overcrowding litigation. Using these data, we examined questions about the characteristics of those typically detained in a major urban jurisdiction and drew inferences about the selectivity of detention practices. Further inferences about the predictive effectiveness of detention in Philadelphia were examined by means of the "natural" experiment brought about by the expedited release of defendants who would otherwise have remained in detention.

*2. The Utility of Predictive Classification*

The second component of the study tested the accuracy of a predictive classification recently developed through study of released Philadelphia defendants. As applied to the specially released defendants, as well as to the pretrial population overall, this device provided a singular analytic framework resulting in evidence relating to the function of pretrial detention and its selectivity, as well as to the general utility of predictive classification in bail and detention.

III. *JACKSON V. HENDRICK* AND THE "NATURAL" EXPERIMENT

The three institutions which serve as the functional equivalent of Philadelphia's urban jail system, Holmesburg, the House of Correction, and the Detention Center (hereinafter "the Philadelphia prisons"), have been the source of serious crowding-related difficulties for at least the last fifteen years. Two of the facilities were constructed near the turn of the century; the third, the Detention Center, was constructed in 1965 to help alleviate overcrowded conditions in the City's other institutions.

During the late 1960's, the Philadelphia prisons gained national notoriety as a result of an investigation of sexual violence occurring within the institutions and in sheriffs' vans. [n29] Riots in the 1970's and the murder of prison administrators were followed by two class actions brought on behalf of inmates protesting conditions within the prisons. In *Bryant v. Hendrick,* [n30] the Pennsylvania Supreme Court found the existence of "cruel and unusual" conditions, and, in *Jackson v. Hendrick,* [n31] the Court of Common Pleas set forth procedures designed to remedy conditions within the substandard facilities. The *Jackson* suit, litigated for more **[*1564]** than a decade at the time of this writing, has produced consent decrees mandating procedures for improvements in physical conditions, programs, and resources available to the individuals held in the Philadelphia prisons. A theme running throughout these actions has been crowding; one decree stipulated a population limit of 2,200 inmates, although at the time of this study the population was approaching 3,000 and still growing. [n32]

Although the Philadelphia institutions hold inmates in diverse statuses as do other urban jails, one of the *Jackson* court-ordered population reduction measures was aimed at bail-held detainees because a substantial portion of the total population of the prisons are detained awaiting trial. [n33] Premised on a belief that a major share of the pretrial population consisted of defendants who were not seriously charged, had good community ties, were reasonably good risks, and were held principally because they were unable to afford low amounts of bail, the *Jackson* court ordered prompt review for release of all defendants held on $ 1,500 bail (only $ 150 bail in actual ten percent terms) [n34] or less, with particular priority assigned to those confined for the longest periods awaiting trial. The rationale for this emergency approach was simple and tantamount to a "longest-in and lowest-bail" approach to expedited release. This

resulted in what, from the perspective of social science research, might be viewed as a "natural" experiment. The court remedy sought to reasonably delineate and to grant belated release to the safest, lowest-risk defendants in the jail, those who but for a few dollars would have been able to secure pretrial release in any event. n35

The resulting release of defendants who were -- and would have remained **[\*1565]** -- detained provided an important opportunity to gather evidence relating to the nature of pretrial detention. Although a full "natural" experiment might have involved study and follow-up of release of the total population of pretrial detained, n36 we determined that follow-up of defendants implicitly designated by court order as the most releasable (i.e., the lowest-risk) would shed light on the highly questioned "dividing-line" between release and detention. If the court-selected, most releasable of Philadelphia detainees differed little from other released defendants, then serious questions could be raised about the apparent arbitrariness of the assignment of detention among defendants. If, for example, the "specially" released defendants resembled the "normally" released defendants, then either they never should have been confined pending adjudication in the first place, or the "normally" released defendants ought to have been confined as well. On the other hand, if they differed greatly from those "normally" released, and in follow-up it was shown that they performed considerably more poorly, one colud conclude that the dividing line between release and detention before trial, creating two classes of accused, was based on a tangible and relevant distinction and that the institution of detention appeared, in Philadelphia at least, to be appropriately selective.

## A. METHOD: DETENTION, RELEASE, AND FOLLOW-UP

As noted above, the data collected were (1) descriptive of the pretrial population in the Philadelphia prisons in general, and (2) related to the defendants ordered released by the *Jackson* court. Furthermore, we also used descriptive findings from an earlier study done in Philadelphia n37 for purposes of comparison.

To reflect the pretrial population generally, we drew a random sample (n = 463) of defendants detained in the prisons prior to trial on a "typical" day (November 13, 1980). n38 To study the specially released **[\*1566]** defendants, we collected data on all defendants (n = 462) named in the first five lists produced by the *Jackson* court for expedited release during the late summer and fall of 1979. n39 We then followed defendants released under the *Jackson* procedures for a period of ninety days to record their performance while on pretrial release.

In order to address questions relating to the nature of pretrial detention in more general terms, the sample reflecting the detained overall is examined first. The descriptive findings are outlined here because of the important background they provide.

## B. DEFENDANTS DETAINED IN THE PHILADELPHIA PRISONS

On November 13, 1980, approximately 54% of all persons confined in the prisons (n = 2,695) were confined for bail-related reasons. (See Figure 1). We took a 17% random sample (n = 463) of these 1,452 detainees to produce estimates of the pretrial population overall. n40 Briefly, the Philadelphia detainees exhibited the following characteristics.

*1. Demographics.* Defendants detained in the Philadelphia prisons were predominantly young (58% were twenty-five years old or younger), single (73% had never married), black (80% were black, 17% white, 3% other ethnicities), male (94%), and unemployed (79%). About one-third were on public assistance at the time of their arrests.

*2. Criminal charge.* Figure 2 arrays the detained defendants according to the seriousness of the offenses with which they were charged. Using Pennsylvania's former six-grade felony-misdemeanor classification, n41 we found that most were charged with serious offenses: 85% were charged with felonies; 61% were charged with first degree felonies. In addition, more than half (56%) were charged with crimes against the person. Approximately 22% charged with crimes involving injury to the victim (9% minor injury, 6% serious, 7% resulting in death).

[*1567]  *3.  Prior record.* Only 23% had not been arrested within the past three years.  Nineteen percent had been arrested once, and 58% had been arrested two or more times.  Approximately 28% had been arrested four or more times during that period.  Sixty-two percent had prior arrests for crimes against the person, 51% for property crimes, 32% for drug offenses, and 47% for weapons offenses.

Only 31% had no prior convictions; 21% had one prior conviction; 48% had two or more.  Thirty-nine percent had prior convictions for crimes against the person, 16% had prior drug convictions, and 25% had prior weapons convictions.  Overall, 56% of those detained on a single day had prior felony convictions.

*4.  Other indicators of prior involvement with the criminal justice system.* Twenty percent had warrants or detainers outstanding, and 40% had other charges pending at the time of their arrest on the current alleged offense.  More than half of all detainees had prior willful FTAs (failures-to-appear in court): 16% had one prior willful FTA; 36% had two or more.

[*1568]  *5.  Length of confinement.* Figure 3 depicts the length of time already spent in detention by defendants sampled on November 13, 1980.  Approximately 3% had been in jail for one day or less, another 9% had been confined from 2 to 7 days, 8% were in their second week (between 8 and 14 days), 17% were in their third or fourth week of confinement.  Approximately 62% of all detainees had been confined for more than one month; 31% had been confined for more than three months.

*6.  Bail holding defendants in detention.* Figure 4 shows the amount of bail on which Philadelphia detainees were held: 6% of defendants were held on amounts between $ 300 and $ 500; 11% were held on amounts between $ 800 and $ 1,000; 5% were held on $ 1,500; 13% were held on amounts between $ 2,500 and $ 3,000; 7% were held on amounts between [*1569] $ 3,500 and $ 4,500; 13% were held on $ 5,000; 5% were held on between $ 5,300 and $ 9,500 bail; 10% were held on $ 10,000; 21% were held on amounts higher than $ 10,000.  The court completely denied bail to 7% of the defendants.  [n42]

[*1571]  Of course, the composition of the jail population in Philadelphia fluctuates from day to day and month to month.  Nevertheless, it seems reasonable to view these findings as generally indicative of the pretrial population on a given day.

In themselves, these descriptive findings are insufficient to draw definitive conclusions; nevertheless, the general picture of the pretrial detained that emerges does not on its face confirm assumptions that detention is unselective or that many non-seriously charged, first-time, low-risk defendants are held.  Interestingly, a sizeable portion of the population was confined on relatively low bail; an estimated 22% were held on $ 1,500 bail -- only $ 150 in 10% terms -- or less (this portion of the population became the target of the *Jackson* release measures).  On the whole, and without the benefit of comparison with released defendants, the characteristics of the population of pretrial detainees suggest a notable degree of selectivity in the institution of pretrial detention.

C.  DETAINED DEFENDANTS DESIGNATED FOR RELEASE UNDER *JACKSON*

In the summer of 1979, the *Jackson* court ordered that detainees held on $ 1,500 or less be reviewed immediately for expedited release.  As a result, periodic lists of detained defendants were produced.  This study included all defendants named on the first five lists, although the listing process continued beyond that number.  It was reasoned that study of a "slice" of the overall pretrial population of the prisons implicitly viewed as the most releasable of detained defendants by the *Jackson* court would allow inferences to be drawn about the selectivity of pretrial detention, the "dividing line" between release and detention, and the predictive effectiveness of detention in one jurisdiction.  Following is a summary of the attributes of the *Jackson* defendants designated for expedited release from pretrial detention.

1.  *Demographics.* The *Jackson* defendants exhibited the demographic attributes shared by the pretrial population

as a whole reported above.

2. *Current charge.* Remarkably, 62% were being held on felony charges, and 29% were held for first degree felony charges.  More specifically, 2% were held for serious crimes against the person, [n43] 9% were held for robbery, 21% were held for burglary, and 21% were held for aggravated asssult.  Overall, 32% of those designated for expedited release under *Jackson* were charged with crimes against the person.

 **[\*1572]**  3. *Prior record.* Among the *Jackson*-designated most releasable defendants, only 26% had no record of prior arrest within the last three years; 24% had one, and 50% had more than one arrest.  Fifty percent had prior arrests against the person; 32% had recent prior arrests for weapons offenses.

More than half (57%) had prior convictions; 39% had two or more prior convictions.  Twenty-six percent had convictions for crimes against the person, 11% had drug convictions, and 43% had convictions for felonies.

4. *Pending charges.* If one test of the likelihood that a defendant might commit a crime while on pretrial release is whether the current arrest occurred while on release pending disposition of previous charges, then the fact that about one-third of *Jackson* designees had pending charges is striking: 11% had more than one case pending.

5. *Prior willful FTAs.* Equally striking is the finding that 45% of *Jackson* defendants had prior willful FTAs; 25% had recorded two or more prior willful FTAs.  Most astonishing, 20% of the defendants designated for release under *Jackson* were in jail after having failed, either through FTA or rearrest, on pretrial release.

Inferences about the selectivity of pretrial detention can best be made by contrasting detained defendants with Philadelphia defendants generally and then comparing the profiles of each of these with the *Jackson* special releases. Table 1 compares several of the salient characteristics of Philadelphia detainees and *Jackson* defendants with characteristics of the overall Philadelphia defendant population obtained in a study conducted in 1975. [n44] Some limitations in the data should be acknowledged, such as possible sampling errors in the sample of Philadelphia detainees (estimated at no more than +/- two to three percentage points) and the fact that the figures from the 1975 study are also subject to very slight error [n45] around the estimates given.  In addition, the three sets of data were not drawn at the same time and thus may be subject to qualitative fluctuations associated with the passage of time.  These qualifications aside, a contrast of the three studies generate very valuable findings.

Using the 1975 sample of all Philadelphia defendants entering the system [n46] prior to selection for detention or release as a baseline, we **[\*1574]** learned the following about the characteristics of detainees in general, and the *Jackson* defendants, in particular (see Table 1).

TABLE 1

COMPARISON OF ATTRIBUTES OF *JACKSON* DEFENDANTS,

ALL DETAINED DEFENDANTS AND ALL PHILADELPHIA

DEFENDANTS ENTERING

THE JUDICIAL PROCESS a

| Study | Felony charges | | Prior felony convictions | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| *Jackson defendants* | | | | |
| 1979-1980 (n=463) | (286) | 62.0 | (199) | 43.0 |
| Ratio (Jackson/all) | | 2.8 | | 1.7 |
| *Philadelphia detainees* | | | | |

| | | | | |
|---|---|---|---|---|
| Nov. 13, 1980 (n=462) | (394) | 85.0 | (259) | 56.0 |
| Ratio (Detainees/all) | | 3.9 | | 2.2 |
| *All Philadelphia defendants* | | | | |
| 1975-1977 (n=8,311) | (1,828) | 22.0 | (2,078) | 25.0 |

TABLE 1

COMPARISON OF ATTRIBUTES OF *JACKSON* DEFENDANTS,

ALL DETAINED DEFENDANTS AND ALL PHILADELPHIA

DEFENDANTS ENTERING

THE JUDICIAL PROCESS a

| | Prior FTAs | | Pending charges | |
|---|---|---|---|---|
| Study | Number | Percent | Number | Percent |
| *Jackson defendants* | | | | |
| 1979-1980 (n=463) | (208) | 45.0 | (148) | 32.0 |
| Ratio (Jackson/all) | | 3.2 | | 4.0 |
| *Philadelphia detainees* | | | | |
| Nov. 13, 1980 (n=462) | (241) | 52.0 | (185) | 40.0 |
| Ratio (Detainees/all) | | 3.7 | | 5.0 |
| *All Philadelphia defendants* | | | | |
| 1975-1977 (n=8,311) | (1,164) | 14.0 | (635) | 8.0 |

   a Percentages of *Jackson* defendants and defendants detained in the Philadelphia prisons on a single day are contrasted with those describing all Philadelphia defendants from an earlier study. That study examined all defendants in an estimated cohort of 8,311 entering the system at first appearance in the fall of 1975 through conclusion of all cases by 1977. *See* J. GOLDKAMP, *supra* note 6; J. Goldkamp, *supra* note 35.

   1. *Current charge.* Roughly 22% of all Philadelphia defendants entering the system were charged with felonies. Nearly four times that proportion of detainees and nearly three times the *Jackson* defendants were so charged.

   2. *Prior felony convictions.* Approximately 25% of the total number of defendants who entered the system in Philadelphia had records of prior felony convictions. More than two times as many detainees and almost twice that proportion of *Jackson* defendants showed such prior records.

   3. *Prior FTAs.* Roughly 14% of the total number of defendants had prior willful FTAs. Almost four times that proportion of Philadelphia detainees in Philadelphia prisons had prior willful FTAs, and more than three times that proportion of *Jackson* defendants had previously absconded.

   4. *Pending charges.* Approximately 8% of Philadelphia defendants entering the process in late 1975 on a current charge had been on pretrial release for a former, pending charge; thus, they had "failed" on release as a result of the current offense. Five times that proportion of all detainees and four times that proportion of *Jackson* defendants similarly had pending charges at the time of their current offenses.

   The comparison in Table 1 removes all doubt about whether pretrial detention is used selectively; indeed, there is evidence that a substantial screening of defendants occurs. Moreover, these findings create inferences about the dividing line between release and detention. If the *Jackson* order applied to the most releasable of detainees in the

Philadelphia prisons during the period studied, the implications are clear: the *Jackson* defendants also possessed the attributes of central concern (criminal charge, prior record, prior FTA and pending charges) at several times greater than the averages for Philadelphia defendants generally, although at a rate slightly less than detainees overall. Even if the *Jackson* group represented the least-releasable segment of the pretrial population, one could infer that pretrial detention functions selectively in choosing between defendants who are released and those who are detained, given the greatest differences between the *Jackson* detainees and defendants overall.

## D.  RELEASE AND FOLLOW-UP OF THE *JACKSON* DEFENDANTS

The first five lists compiled under the *Jackson* $ 1,500 bail rule designated 462 defendants for expedited release from pretrial confinement, but by the time the lists were fully processed only 313 or 68% of those **[*1575]** named were actually released. Detainees not released had either progressed through the judicial process to disposition or were held for other reasons, such as detainers or probation violations that were not evident when the lists were produced. Defendants released subsequent to their inclusion on the *Jackson* lists were followed for a period of ninety days. Of the *Jackson* defendants achieving release, 42% recorded willful FTAs from court at least once. Twenty-eight percent were arrested for crimes occurring during their period of pretrial release. Of these, approximately 24% were for serious crimes against the person (murder, rape, robbery, aggravated assault), 23% were for serious property crimes, 5% for weapons crimes.

By using the previous study of all Philadelphia defendants as a baseline, we were able to confirm the perception that these rates of failure are high. [47] Approximately 76% of the cohort of an estimated 8,311 defendants were released within one day of their bail decisions. Approximately 12% of all released Philadelphia defendants in that representative cohort recorded willful FTAs and 17% were rearrested for crimes during a follow-up period of 120 days. [48] Thus, defendants released through the *Jackson* court-ordered selection of the "most releasable" of detainees absconded at 3.5 times and were rearrested at roughly 2.3 times the Philadelphia average.

The implications of these results for the use of detention in a general sense are straightforward: not only is detention in Philadelphia selective, but the dividing line between released defendants and the "most releasable" detained defendants appears to have predictive merit. The assumption that a sizeable proportion of detained defendants, as exemplified in this study by the *Jackson* defendants, poses no more serious risk of flight or crime than that posed by released defendants generally is not supported. If we view detainees generally, and the *Jackson* detainees in particular, as the system's prediction of poor risks, the *Jackson* findings reveal predictive merit.

**[*1576]  IV.  VIEWING DETENTION FROM THE PERSPECTIVE OF A PREDICTION INSTRUMENT**

The finding that pretrial detention may effectively select for confinement defendants who are significantly higher risks than those released underscores the problem raised in studies of prediction in pretrial release. As noted above, these studies have attempted to predict failure-to-appear and rearrest among various samples of released defendants. Their results, though potentially very valuable to the improvement of bail decisionmaking, generally have been weak. The exclusion of detained defendants was viewed as a serious limitation [49] to the extent that those defendants might differ from released defendants. That is, if detained defendants were generally more dangerous or more likely to fail to appear, the weakness of these predictive analyses could be traced in part to the fact that they were derived from the study of failure among populations of defendants generally unlikely to fail.

As a final component to the current study, we attempted to assess the validity of release-based predictive approaches by applying a predictive classification instrument recently developed in a study of released defendants [50] to the *Jackson* defendants who, but for the court-ordered special release procedures, would have remained in detention. We reasoned that application of the prediction instrument to the *Jackson* defendants would test the validity of a bail prediction instrument, which was based on a limited sample of defendants, only those achieving release, and would thereby shed light on the likely utility of such instruments for bail decisionmaking. Moreover, we determined that application of the prediction instrument here would allow further inferences to be drawn concerning the attributes of the

*Jackson* "most releasable" detainees.  Would the use of such a predictive classification confirm or rebut inferences about the dividing line between released and detained defendants?  Would the prediction instrument accurately predict the relative rates of failure among *Jackson* releases?

As part of the work of the Bail Decisionmaking Project in Philadelphia, [n51] we conducted a number of empirical analyses of failure-to-appear and rearrest among Philadelphia defendants.  [n52] A final prediction **[*1577]** instrument, which sought to predict pretrial failure generally, [n53] was validated on an independent sample representative of Philadelphia defendants who were processed into the judicial system and who subsequently **[*1579]** secured release. [n54] The final instrument included the following factors (see Table 2): type of charged offense, recent arrests pending charges, prior willful FTAs, age, telephone, and combination of charge and arrests, age, and FTAs.  [n55]

TABLE 2

PARAMETERS AND CORRESPONDING POINTS a FOR FINAL MODI-
FIED

LOGIT MODEL FITTED TO FAILURE ON RELEASE FOR

CONSTRUCTION SAMPLE DATA b

| Variable | Parameter | Points |
| --- | --- | --- |
| Intercept | -0.54 | - 4 |
| Over 44 | | |
| Yes | -0.76 | - 5 |
| Phone | | |
| Yes | -0.36 | - 2 |
| Prior FTAs | | |
| 1 | 0.25 | 2 |
| 2 or more | 0.50 | 3 |
| Pending charges | | |
| 1 or more | 0.64 | 4 |
| Arrests within the last three years | | |
| 1 | 0.17 | 1 |
| 2 | 0.34 | 2 |
| 3 or more | 0.51 | 3 |
| Serious personal/sex offense | | |
| Yes | -2.03 | -14 |
| Miscellaneous offense | | |
| Yes | -0.89 | - 6 |
| Property offense | | |
| Yes | -0.48 | - 3 |
| Over 44 is yes and prior FTAs is | | |
| 1 | 0.69 | 5 |
| 2 or more | 1.38 | 9 |
| Serious personal/sex offense is | | |
| yes and arrests is | | |

74 J. Crim. L. & Criminology 1556, *1579

| | | |
|---|---|---|
| 1 | 0.23 | 2 |
| 2 | 0.46 | 3 |
| 3 or more | 0.69 | 5 |

a Points were derived by dividing by .15.

b Source: J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25.

TABLE 3

OBSERVED PERCENT FAILURE FOR DEFENDANTS IN THE

CONSTRUCTION AND VALIDATION SAMPLES, BY FIVE RISK

GROUPS DERIVED FROM MODIFIED FINAL

LOGIT MODEL FITTED TO FAILURE ON RELEASE a

| | | *Construction sample* | | | *Validation sample* | | |
|---|---|---|---|---|---|---|---|
| | | | | Observed | | | Observed |
| | | Released | | | Released | | |
| | Failure | defendants | | percent | defendants | | percent |
| Risk group | score | Number | Percent | failure | Number | Percent | failure |
| Total, all released | | | | | | | |
| defendants | | 4,020 | 100 | 24 | 6,785 | 100 | 26 |
| I | -13 or less | 471 | 12 | 9 | 1,062 | 16 | 12 |
| II | -12 to -10 | 1,242 | 31 | 15 | 2,401 | 35 | 18 |
| III | - 9 | 698 | 17 | 20 | 1,069 | 16 | 23 |
| IV | - 8 to - 4 | 1,106 | 28 | 32 | 1,733 | 26 | 38 |
| V | - 3 or more | 503 | 12 | 46 | 520 | 8 | 54 |

| *Construction sample* | *Validation sample* |
|---|---|
| MCR = .34 | MCR = .34 |
| P.R.E. = .00 | P.R.E. = .02 |
| $X^2$ = 292.68 with 4 df; P<.001 | $X^2$ = 558.46 with 4 df; p<.001 |

a Source: J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25.

*1. Classification of the Jackson Defendants According to Risk*

The predictive scheme described above produces five classes of defendants **[*1580]** based on the relative likelihood of pretrial failure. As depicted in Table 3, in the validation sample on which the final version of the instrument was based, defendants classified in Group 1 failed on release (through FTA or rearrest) 12% of the time; those in Group 2 failed 18% of the time; Group 3 defendants failed 23% of the time; 38% in Group 4 failed; and in Group 5 defendants failed 54% of the time. These rates of failure reflect the probability that other defendants classified as falling within a given group would fail to appear in court and/or be rearrested for a new crime during pretrial release.

Figure 5 arrays defendants designated for special release by the *Jackson* $ 1,500 bail rule according to their classification of risk. Had this tool been available before the *Jackson* court release procedures began, the court would

not have been reassured: 47% of the *Jackson*-named defendants would have been in the highest risk category (Group 5); another 32% percent would have been ranked as second highest risk (in Group 4). [n56] Thus, together, 79% would have shown the highest probabilities of failure during a period of pretrial release. On the other hand, 8% would have been classified as lowest risk, 4% falling into Group 1 and 4% into Group 2. Figure 6 shows roughly the same classification results for *Jackson* defendants actually set free. [n57] Using this classification approach, the court would have predicted a rate of failure among the soon-to-be-released *Jackson* defendants of approximately 42%.

These findings further undermine the view that the dividing line between release and detention is arbitrary: the *Jackson* court's designation of the most releasable defendants actually included a discouragingly high proportion of high-risk detainees. In fact, contrasted with the expected distribution among Philadelphia defendants (see Table 3), the *Jackson* defendants were disproportionately high risk.

The strength of this predictive classification approach is supported by findings from the follow-up study of *Jackson* defendants. Figure 7 first contrasts the rates of failure, either through FTA or rearrest, for *Jackson* defendants with the rates for the representative sample of Philadelphia defendants. The darkened horizontal bar shows that 53% of the *Jackson* defendants either absconded or were rearrested within ninety **[*1581]** days compared to 26% of a representative sample of Philadelphia defendants overall. [n58] In addition, however, this Figure documents support for the predictive classification: the instrument ranked defendants well according to their relative probabilities of failure. With the exception that *Jackson* defendants in Groups 2 and 3 failed at similar rates, Group **[*1583]** 1 defendants failed less than those in higher groups and defendants classified into Groups 4 and 5 failed at the highest rates. Thus, the prediction instrument developed through analysis of released defendants ranked detained defendants according to the relative probability of failure on pretrial release reasonably well.

Remarkably, Figure 7 further shows that the prediction scheme underpredicts rates of failure. Based on the validation sample, [n59] defendants classified within Group 1 could be expected to fail on release about 12% of the time; *Jackson* defendants failed 20% of the time. The classification also underpredicted failure for Group 3 defendants by 10%. Although the prediction scheme based on the performance of released defendants would have projected a 38% failure rate among Group 4 Jackson defendants, 57% failed. Although a 54% failure rate was projected for Group 5 *Jackson* defendants, 69% actually failed during pretrial release.

Thus, use of the prediction instrument would have predicted that the *Jackson* court's releasees could be expected to fail in approximately 42% of the cases -- a striking contrast to an expected rate of failure among all Philadelphia defendants of about 25%. In fact, however, their performance was notably worse: 53% failed on pretrial release, 11% more than predicted.

*2. Classification of All Detainees According to Risk*

An important implication of the application of the classification instrument to *Jackson* defendants is that predictive studies in bail have been weak in part because they have had to develop predictors using samples that under-represented likely absconders and pretrial "recidivists." If the application of the previously developed predictive classification instrument to the *Jackson* detainees validates to a certain extent the strength and utility of that instrument, then it commends its use to the further evaluation of pretrial detention as well.

Figure 8 extends the analysis to the sample of the total population of defendants detained in the Philadelphia prisons on a single day. When all detainees are classified using this risk assessment instrument, the view that pretrial detention may be quite appropriately selective in predictive terms is further underscored: more than half (56%) of all detainees on a single day possessed attributes falling into Group 5, the highest risk category. Another one-quarter (24%) fell into Group 4. **[*1584]** Thus, on any given day, approximately 80% of all detainees could be classified as high or very high risk.

These findings should not be allowed to overshadow the following: 8% of those confined in pretrial detention were

lowest-risk; in other words, 8% were very unlikely ever to abscond or be rearrested for crime during pretrial release. An additional 5% were in Group 2, nearly as low-risk as detainees classified in Group 1.

These last findings have important implications, for, if risk alone is **[*1585]** considered, an estimated 13% of the pretrial population or 7% of the entire population of the prisons could be considered immediate prospects for unconditional release. On November 13, 1980, that would have amounted to between 175 and 200 detainees, approximately 40% of the margin of overcrowding.

## IV. EVALUATING THE PRACTICE OF PRETRIAL DETENTION: FUTURE DIRECTIONS

Underlying debates about the impact of pretrial detention in jail overcrowding and proposals for increased use of "preventive" detention are assumptions about the current uses of detention and its effectiveness in selectively confining the worst risks among defendants. Implicit in both controversies are criticisms that pretrial detention in the United States today is not doing its job.

In attempting to "solve" the overcrowding problem, commentators often assume that chaotic bail practices produce detention populations which needlessly include a substantial number of defendants. This view echoes the cries of early bail reformers that jails were filled with poor defendants who were not charged with serious offenses, had little or no prior criminal history, and had reasonable ties to the community as well. [60]

Just as overcrowding crises in many American jurisdictions have brought jails once again to the forefront of public scrutiny, proposals for extending the use of pretrial detention -- as a counterpoint to movements to reduce jail populations -- are being received with increasing favor by the public and justice officials alike. Generally, the various proposals focus on defendants with serious criminal charges and prior records of convictions for serious or violent crimes. [61] Regardless of whether these kinds of criteria have been statistically related to risk of flight or crime before trial, [62] proponents assume that they are appropriate standards to govern the use of pretrial detention and, judging from the impetus behind these proposals, they assume that pretrial detention does not operate effectively in current practice, or at least not along the lines envisaged in the legislation. In fact, they argue that, all too often, dangerous defendants are released to commit further crimes or to harass victims and witnesses -- again, regardless of what empirical studies on **[*1586]** the matter have shown. [63]

The conclusions drawn from Philadelphia data call in to question the emerging "conventional wisdoms" relating to the causes of overcrowding and the inability of pretrial detention to restrain defendants. Although these data do not indicate that no nonseriously charged or low-risk defendants are inappropriately held or that no dangerous defendants somehow gain their freedom to prey upon the public before trial, they do strongly suggest the following points.

First, pretrial detention -- at least in the Philadelphia case study -- appears to operate selectively and does not incarcerate defendants randomly. The descriptive findings from the study of the overall detention population and from the "natural experiment" demonstrate that detained defendants differ notably from the "average" Philadelphia defendant entering the criminal process: they are charged with more serious crimes, they have lengthy records of prior arrests and conviction, and they exhibit lengthy histories of flight from court and arrest for crimes committed during previous periods of pretrial release.

Second, if pretrial detention can best be understood as the system's prediction of "worst-risk" defendants, i.e., those most likely to flee the jurisdiction or to commit new crimes if granted pretrial release, then detention may be performing better as a predictor than critics have suspected -- again, at least in the city of Philadelphia. Follow-up of the *Jackson*-released defendants, who were viewed as the "most releasable" of detainees, and the application of the predictive classification instrument to them and to the detention population overall suggests that detainees will perform worse as a group than "normally" released Philadelphia defendants.

At the same time, it is important to emphasize firmly the limitations of these conclusions. That pretrial detention

operates to some measurable extent as it is expected to do is reassuring mainly to the extent that the purely arbitrary "chaos" model of criminal processing can be rejected. To conclude that pretrial detention is at a minimum selective and not chaotic -- at least in Philadelphia -- begs the question of how selectively detention should be allocated among defendants. Should the standard for evaluating pretrial detention be that a substantial majority or virtually all of those held must be classified as "very high risk?"

Any standard for evaluation of the selectivity of the pretrial detention **[*1587]** population not only must focus on questions of its composition (e.g., to establish an accepted minimum level of high risk detainees) but, more fundamentally, must establish the criteria to be invoked in classifying individuals as "low" or "high" risk. Arguably, the criteria should relate demonstrably to the outcomes of concern in the bail decision, such as risk of flight or pretrial crime, and, furthermore, be based on an actuarial classification scheme, such as the one developed in the Philadelphia study. An alternative approach, based on factors merely assumed or believed to be logically related to the minimization of FTAs and rearrests by defendants awaiting trial, has been taken in various preventive detention legislative schemes -- e.g., the new laws in California, Nebraska or Michigan. [n64]

It is one thing to argue, as this Article does, that a large share of the detention population appears to be "very high risk" and therefore appears not randomly confined as observers of bail practices might have believed. It is quite another -- and a major jump in logic -- to conclude that detention should be meted out on the basis of falling into the most undesirable categories of a classification scheme measuring "very high risk" or based on other factors, such as criminal charges or prior record, established in current laws. Setting aside the controversial nature of such assumptions, [n65] however, even if one accepts that being defined as "very high risk" or very "dangerous" somehow overcomes the presumption that defendants should be granted pretrial release, [n66] the fact that a sizeable minority of the Philadelphia detention population did not fall into such categories should be cause for alarm. If the former group (high risk defendants) represents an appropriate use of detention, then **[*1588]** the latter group (the lower risk minority) surely points to inappropriate pretrial detention.

A major positive finding of this study lies in the potential value of a statistically or actuarially derived evaluation of the pretrial population based on risk. Although imperfect, the prediction instrument applied to the *Jackson* defendants who were specially released received secondary validation. The finding that the instrument ranked detainees well according to risk, but underpredicted their actual rates of failure, suggests that earlier predictive studies have suffered importantly from the exclusion of high risk defendants. Hopefully, future predictive efforts will focus productively on methods that can take into account the characteristics of detained defendants, thereby enhancing the strength of the predictions.

It is unfortunately true that, when applied as a yardstick to the pretrial population as a whole as well as to the *Jackson* designees, the predictive classification demonstrated that detainees are disproportionately high risk. Yet, in a more positive vein, the classification scheme also identified groups of lower risk defendants who arguably represent inappropriate uses of detention: thirteen percent of detainees on a given day were assessed as very low risk. Although such a predictive approach must be used with caution -- for as it was to a surprising extent accurate, it was also notably inaccurate in individual cases -- there is now some promise that population reduction proponents, for example, guided by assessment of risk could devise release alternatives. While certain defendants should unquestionably be released on their own recognizance, others might be released more appropriately under various forms of supervision, such as in third party custody or to particular programs based on the knowledge such a tool provides. [n67] In fact, had this approach been taken in *Jackson,* the follow-up results might have been dramatically different.

Finally, as the issue of selectivity in pretrial detention sharpens in response to concerns both about jail overcrowding and about community protection, it is critical to keep in mind the potentially adverse side-effects of any "selectivity enhancing" measures, namely that defendants will be confined erroneously because of their membership in a group possessing particular attributes. The cost of these errors must be faced squarely before implementing policy measures that seem to respond effectively to hitherto intransigent pretrial issues.

74 J. Crim. L. & Criminology 1556, *1588

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Criminal Law & ProcedureCriminal OffensesWeaponsGeneral OverviewCriminal Law & ProcedureBailRisk of FlightCriminal Law & ProcedurePostconviction ProceedingsImprisonment

**FOOTNOTES:**

n1  Perhaps the earliest criticism of the practice was offered by de Beaumont and de Tocqueville during the nineteenth century.  *See* G. DE BEAUMONT & A. DE TOCQUEVILLE, ON THE PENITENTIARY SYSTEM IN THE UNITED STATES AND ITS APPLICATION IN FRANCE 53 (reprint ed. 1964).

n2  A. BEELEY, THE BAIL SYSTEM IN CHICAGO (1966); PENNSYLVANIA COMMITTEE ON PENAL AFFAIRS, A HOUSE OF DETENTION FOR PHILADELPHIA (1938); *see* R. POUND & F. FRANKFURTER, CRIMINAL JUSTICE IN CLEVELAND (reprint ed. 1968); Foote, *Compelling Appearance in Court: Administration of Bail in Philadelphia,* 102 U. PA. L. REV. 1031 (1954); W. Morse & R. Beattie, *Survey of the Administration of Criminal Justice in Oregon,* 11 OR. L. REV. 100 (Supp. 1932).

n3  D. FREED & P. WALD, BAIL IN THE UNITED STATES: A REPORT TO THE NATIONAL CONFERENCE ON BAIL AND CRIMINAL JUSTICE 9-21 (1964).

n4  The following sources represent a few of the many examples of these kinds of efforts.  A. ASHMAN, LOCKUP: NORTH CAROLINA LOOKS AT ITS LOCAL JAILS (1969); CALIFORNIA BOARD OF CORRECTIONS, CALIFORNIA CORRECTIONAL SYSTEM STUDY: THE SYSTEM 26 (1971); H. MATTICK & R. SWEET, ILLINOIS JAILS (1969); NEW YORK STATE COMM'N OF INVESTIGATION, COUNTY JAILS AND PENITENTIARIES IN NEW YORK STATE 67 (1966); G. STRACENSKY, TEXAS JAILS -- PROBLEMS AND REFORMATION 43 (3 CRIMINAL JUSTICE MONOGRAPH NO. 4, 1970).

n5  *See, e.g.,* LAW ENFORCEMENT ASSISTANCE ADMINISTRATION (LEAA), DEP'T OF JUSTICE, CENSUS OF JAILS AND SURVEY OF JAIL INMATES, 1978 (1979) [hereinafter cited as LEAA, CENSUS]; LEAA, DEP'T OF JUSTICE, SURVEY OF INMATES OF LOCAL JAILS, 1972: ADVANCE REPORT (1972) [hereinafter LEAA, ADVANCE REPORT].

n6  *See generally* D. FREED & D. WALD, *supra* note 3; R. GOLDFARB, RANSOM: A CRITIQUE OF THE AMERICAN BAIL SYSTEM 127 (1965); J. GOLDKAMP, TWO CLASSES OF ACCUSED: A STUDY OF BAIL AND DETENTION IN AMERICAN JUSTICE 5-25 (1979); W. THOMAS, BAIL REFORM IN AMERICA 227 (1976); Foote, *The Coming Constitutional Crisis in Bail: I,* 113 U. PA. L. REV. 959 (1965) [hereinafter cited as Foote, *Crisis in Bail: I];* Foote, *The Coming Constitutional Crisis in Bail: II,* 113 U. PA. L. REV. 1125 (1965) [hereinafter cited as Foote, *Crisis in Bail: II].*

n7  *See* Foote, *Crisis in Bail: I, supra* note 6, at 960.  *See generally* ATTORNEY GENERAL'S COMM. ON POVERTY & ADMINISTRATION OF FEDERAL CRIMINAL JUSTICE, POVERTY AND THE ADMINISTRATION OF FEDERAL CRIMINAL

JUSTICE (1963) [hereinafter cited as COMM. ON POVERTY]; D. FREED & P. WALD, *supra* note 3; R. GOLDFARB, *supra* note 6; Alexander, Glass, King, Palermo, Roberts & Schury, *A Study of the Adminstration of Bail in New York City,* 106 U.P.A.L. REV. 685 (1958); Ares, Rankin & Sturz, *The Manhattan Bail Project: An Interim Report on the Use of Pretrial Parole,* 38 N.Y.U. L. REV. 67 (1963) [hereinafter cited as Ares]; Foote, *supra* note 2.

n8  *See* J. GOLDKAMP, *supra* note 6, at 185; Foote, *supra* note 2, at 1049-58; Landes, *Legality and Reality: Some Evidence on Criminal Proceedings,* 3 J. LEGAL STUD. 287, 329 (1974); Morse & Beattie, *supra* note 2, at 19; Rankin, *The Effect of Pretrial Detention,* 39 N.Y.U. L. REV. 641 (1964); SINGLE, *The Unconstitutional Administration of Bail: Bellamy v. the Judges of New York City,* 8 CRIM. L. BULL. 459, 462 (1972).

n9  See, e.g., NATIONAL ASSOCIATION OF CRIMINAL JUSTICE PLANNERS, NATIONAL SURVEY OF COUNTY JAILS (1982), for a recent survey of population levels in county jails.  For examples of recent provisions for extended use of pretrial detention, see MICH. CONST. art. I, §§ 15-16; NEB. CONST. art. I, § 9; D.C. CODE ANN. §§ 23-1321 to -1332 (1981 & Supp. 1983); WISC. STAT. §§ 969.001-969.013 (West Supp. 1983-84).

n10  The difference between pretrial and "preventive" detention is often confused in contemporary usage.  Pretrial detention generally denotes the custody of defendants before trial as a result of having unaffordably high or no bail assigned at the first appearance before a judge.  "Preventive" detention usually signifies a purposeful detention of a defendant deemed likely to pose a danger to the public if released pending adjudication, either *sub rosa* through the device of setting high cash bail or directly when permitted by statute, as for example in the District of Columbia.  *See* D.C. CODE ANN §§ 23-1321 to -1332.  Although defendants could also be preventively detained as a result of their perceived risk of flight, this use of the term preventive detention is rarely encountered.  *But see* K. Feinberg, Promoting Accountability in Making Bail Decisions (February 1982) (paper presented at Harvard University, Conference on Public Danger, Dangerous Offenders and the Criminal Justice System).

n11  In fact, this strongly resembles the perspective of early advocates of bail reform.  *See, e.g.,* D. FREED & P. WALD, *supra* note 3, at 39-48; R. GOLDFARB, *supra* note 6, at 32; Ares, *supra* note 7, at 88-92; Foote, *supra* note 2, at 1057.

n12  *See, e.g.,* AMERICAN BAR ASSOCIATION, CRIMINAL JUSTICE SECTION, TASK FORCE ON CRIME 11-14 (1981) [hereinafter cited as ABA]; ATTORNEY GENERAL'S TASK FORCE ON VIOLENT CRIME, TASK FORCE ON VIOLENT CRIME; FINAL REPORT 50-53 (1981) [hereinafter cited as ATTORNEY GENERAL'S TASK FORCE]; Mitchell, *Bail Reform and the Constitutionality of Preventive Detention,* 55 VA. L. REV. 1223 (1969).

n13  For a discussion of the equal protection issues raised by the use of pretrial detention, see J. GOLDKAMP, *supra* note 6, at 11; Meyer, *Pretrial Detention,* 60 GEO. L.J. 1381 (1972).

n14  It is important to note the longstanding debate over defining the legitimate purposes of bail.  Many have argued that concerns about danger are not constitutionally relevant to the bail determination and that bail may be used only to assure the appearance of defendants at trial.  For a summary of this argument and its treatment in case law and legislation, see J. GOLDKAMP *supra* note 6, at 18.

n15  Consideration of a range of options at bail may be alien to most judges who actually make bail decisions.  Generally, if bail is not denied outright, either personal recognizance release (ROR) or cash bail are the only two options employed.  Yet, in theory the options available to bail decisionmakers are much richer.  The landmark legislation from the bail reform movement of the 1960's, the Federal Bail Reform Act of 1966, 18 U.S.C. §§ 3146-3152 (1976), outlines a "least restrictive" strategy for federal judges deciding bail, including release to a third party, release under supervision, restrictions on travel, residence, and associations, deposit bail, and, at the restrictive extreme, part-time custody.  Except under recent preventive detention amendments, legislation, and proposals, bail in most states cannot be denied directly except in capital cases "where the proof is evident and the presumption great." See J. GOLDKAMP, *supra* note 6, at 55, for a comprehensive analysis of laws in the states governing the right to bail.

n16  This, of course, ignores the extent to which bail and pretrial detention are put to nonlefitimate uses such as punishment.  *See* Landes, *supra* note 8, at 328; R. FLEMMING, PUNISHMENT BEFORE TRIAL: AN ORGANIZATIONAL PERSPECTIVE OF FELONY BAIL PROCESS (1982).

n17  For an excellent treatment of prediction issues in criminal justice system-wide, see M. GOTTFREDSON & D. GOTTFREDSON, DECISIONMAKING IN CRIMINAL JUSTICE: TOWARD THE RATIONAL EXERCISE OF DISCRETION 7-17 (1980).

n18  *See* United States v. Edwards, 43 A.2d 1321 (D.C. App. 1981), *cert. denied,* 455 U.S. 1024 (1982); D.C. CODE ANN. §§ 23-1321 to -1332; ABA, *supra* note 12, at 11-13; ATTORNEY GENERAL'S TASK FORCE, *supra* note 12, at 50-53.

n19  *See* Ares, *supra* note 7, at 69, 88; Ervin, *Foreword to Preventive Detention: An Empirical Analysis,* 6 HARV. C.R.-C.L. L. REV. 290, 298 (1971); Foote, *supra* note 2, at 1036, 1038, 1043; Foote, *Crisis in Bail: I, supra* note 6 at 963; Foote, *Crisis in Bail: II, supra* note 6, at 1130, 1135-36, 1164-65.  *But see* Bell v. Wolfish, 441 U.S. 520 (1979) (presumption of innocence has no application to a determination of the rights of a pretrial detainee during confinement before trial).

n20  *See generally,* J. MONAHAN, PREDICTING VIOLENT BEHAVIOR: AN ASSESSMENT OF CLINICAL TECHNIQUES (1981) (comprehensive review of issues relating to prediction of dangerousness).

n21  *See* M. GOTTFREDSON & D. GOTTFREDSON, *supra* note 17.

n22  *See, e.g.,* S. CLARKE, J. FREEMAN & G. KOCH, THE EFFECTIVENESS OF BAIL SYSTEMS: AN ANALYSIS OF FAILURE-TO-APPEAR IN COURT AND REARREST WHILE ON BAIL 2-4 (1976) [hereinafter cited as S. CLARKE]; J. LOCKE, R. PENN, R. RICK, BUNTEN & G. HARE, NATIONAL BUREAU OF STANDARDS, TECHNICAL NOTE 535, COMPILATION AND USE OF CRIMINAL COURT DATA IN RELATION TO PRE-TRIAL RELEASE OF DEFENDANTS: PILOT STUDY (1970) [hereinafter cited as J. LOCKE, PILOT STUDY]; J. ROTH & P. WICE, PRETRIAL RELEASE AND MISCONDUCT IN THE DISTRICT OF COLUMBIA (1978); Gottfredson, *An Empirical Analysis of Pretrial Release Decisions,* 2 J. CRIM. JUST. 287, 289 (1974); M. Feeley & J. McNaughton, The Pretrial Process in the Sixth Circuit: A Qualitative and Legal Analysis (1974) (mimeograph).

74 J. Crim. L. & Criminology 1556, *1588

n23  *See* Angel, Green, Kaufman & Van Loon, *Preventive Detention: An Empirical Analysis,* 6 HARV. C.R.-C.L. L. REV. 301, 303-32 (1971) [hereinafter cited as Angel].

n24  *See, e.g.,* S. CLARKE, *supra* note 22, at 20-32; J. LOCKE, PILOT STUDY, *supra* note 22, at 293-301; Angel, *supra* note 23, at 309-22; J. ROTH & P. WICE, *supra* note 22; Gottfredson, *supra* note 22, at 293-301; M. Feeley & J. McNaughton, *supra* note 22.

n25  *See* J. GOLDKAMP, M. GOTTFREDSON & S. MITCHELL - HERZFELD, NATIONAL INSTITUTE OF CORRECTIONS, BAIL DECISIONMAKING: A STUDY OF POLICY GUIDELINES (1981) [hereinafter cited as J. GOLDKAMP, BAIL DECISIONMAKING].

n26  *See* Gottfredson, *supra* note 22, at 300-01.  For a general discussion of methodological issues related to prediction in other areas of criminal justice decisionmaking, including parole, see M. GOTTFREDSON & D. GOTTFREDSON, *supra* note 17, at 99-143.

n27  *See* LAZAR INSTITUTE, PRETRIAL RELEASE: AN EVALUATION OF DEFENDANT OUTCOMES AND PROGRAM IMPACT 6 (1981); W. THOMAS, *supra* note 6, at 37-42.

n28  Although Philadelphia may differ from other American jurisdictions in important respects such as the existence of well-developed pretrial services resources, Philadelphia nevertheless was an excellent case study because of its similarities with other major urban jurisdictions which are struggling with diminishing resources, large case loads, and jail overcrowding.  This study was funded in part by the National Institute of Corrections as part of the work of the Bail Decisionmaking Project through the Criminal Justice Research Center in Albany, New York, and in part by Temple University.  Temple University provided support for the data collection relating to the *Jackson* defendants.

n29  *See* Davis, *Report on Sexual Assaults in the Philadelphia Prison System and Sheriffs' Vans,* TRANSACTION 8 (1968).

n30  444 Pa. 83, 280 A.2d 110 (1971).

n31  No. 71-2437 (Philadelphia Court of Common Pleas, Feb. 1971); *see also Jackson,* No. 71-2437 (Mar. 1981) (stipulation and agreement); *Jackson,* No. 71-2437 (Feb. 1977) (same).  For a description of problems leading up to the class action, see Rudovsky, *Prison Reform in Philadelphia,* 38 SHINGLE 85 (1975).

n32  By December 1981, the population had reached 3,700, or 1,500 inmates over capacity.

n33  Each of the Philadelphia prisons housed some pretrial detainees.  According to an annual report from 1980, pretrial detention accounted for 88% of the population of the Detention Center, 78% of the inmates at Holmesburg and about 50% of those in the House of Detention. *See* PHILADELPHIA DEPT OF PUBLIC WELFARE, ANNUAL REPORT OF THE PHILADELPHIA PRISONS (1980).

n34  *Jackson,* No. 71-2437 at 3.  Under Philadelphia's "deposit" bail program, the bondsman has been displaced and the defendant is able to secure release by posting 10% of the actual full bail amount with the court.  Upon successful completion of the required proceedings, the deposit is returned to the defendant, minus a small service charge.  *See* J. GOLDKAMP, *supra* note 6, at 111-35.  *See generally* W. THOMAS, *supra* note 6, at 188.

n35  It is important to point out that the soundness of the *Jackson* court's method in selecting the most appropriate detainees for expedited release rests heavily on the assumption that the relative risk of defendants is accurately indicated by the amount of bail the court assigns to them.  There is a growing body of research literature that would seriously call into question such an assumption.  *See* J. GOLDKAMP, *supra* note 6; J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25; J. GOLDKAMP & M. GOTTFREDSON, JUDICIAL DECISION GUIDELINES FOR BAIL: THE PHILADELPHIA EXPERIMENT (1983); J. ROTH & P. WICE, *supra* note 22; J. Goldkamp, Bail Decisionmaking and the Role of Pretrial Detention in American Justice (Ph.D. dissertation 1977).

n36  An excellent example of a "natural" experiment is described in H. STEADMAN & J. COCOZZA, CAREERS OF THE CRIMINALLY INSANE 46-54 (1974).  In the Steadman and Cocozza study, the researchers took advantage of the Supreme Court's decision in Baxstrom v. Herold, 383 U.S. 107 (1966), which mandated the release of persons held in a New York institution for the criminally insane to civil mental facilities.  This court-ordered release allowed the researchers to test assumptions about persons confined as criminally insane in comparison with those civilly determined to be insane, particularly assumptions about their dangerousness.  In this respect, though on a more modest scale, the current study capitalizes on a similar circumstance to examine assumptions about those held in pretrial detention in Philadelphia.

n37  J. GOLDKAMP, *supra* note 6; J. Goldkamp, *supra* note 35; *see also* J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25.

n38  The total population of pretrial detained on that day was 1,452 defendants.  This sampling approach, focusing on a single day, follows the approach adopted by LEAA in surveying inmates of jails across the United States.  The cross-sectional approach permits characterization of the overall population as it might typically be faced "on a given day." *See* LEAA, ADVANCE REPORT, *supra* note 5, at 11-12.  *See generally* LEAA, CENSUS, *supra* note 5.

n39  The court ruled in *Jackson*

    that by July 1, 1977, the defendants shall develop and implement an adminstrative mechanism to maintain the population in the 3 institutions at no greater than the rated level.  If the population exceeds this level, persons who are held in default of $ 1,500 bail or less, starting with those who have been detained for the longest period of time, shall be released on their own recognizance by the Court. . . . No. 71-2437 at 3 (Philadelphia Court of Common Pleas, Feb. 21, 1977).  More than five lists were ultimately produced; in fact, the *Jackson* listing procedure continued until a subsequent consent decree changed the order to include defendants held on $ 3,000 or less.  The *Jackson* reviews continue at the time of this writing.

74 J. Crim. L. & Criminology 1556, *1588

n40  Because of standard error, estimates may vary from true population values of +/- 2% to 3%.

n41  PA. CONS. STAT. ANN. § 106 (Purdon 1983).

n42  These amounts reflect the full amount theoretically owed to the court should a defendant abscond and then be apprehended.  In practice, because of Philadelphia's ten percent plan, defendants could gain release by paying only 10% of those amounts.  *See supra* note 34.

n43  This category of offenses includes murder, rape, manslaughter, aggravated assault, involuntary deviate sexual intercourse, and kidnapping.  *See* PA. CONS. STAT. ANN. §§ 2301, 2501-2504, 2702, 2901, 3101 (Purdon 1983).

n44  *See* J. GOLDKAMP, *supra* note 6, at 126.

n45  For a description of the methodology employed in the 1975-1977 study of Philadelphia defendants, see *id.* at 111-35.

n47  *See* J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25, at Appendix H; J. GOLDKAMP, *supra* note 6.

n48  *See* J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25, at Appendix H. Note that the follow-up period -- 120 days -- for the baseline sample is longer than that which was employed for the *Jackson* follow-up.  Some observers of bail contend that failure rate is a function of the length of time at risk (on pretrial release).  *See, e.g.,* S. CLARKE, *supra* note 22, at 18.  Thus, it would be hypothesized that, other factors being comparable, a sample employing a longer follow-up period would show a somewhat higher rate of failure.  Therefore, the findings from this comparison become more striking when the longer follow-up period for the baseline sample is acknowledged.

n49  *See* J. GOLDKAMP, *supra* note 6, at 77-108; Gottfredson, *supra* note 22, at 300.

n50  *See generally* J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25.

n51  The Bail Decisionmaking Project was funded initially by a grant from the National

     The Predictive scheme described above produces five classes of Institute of Corrections (NIC) to the Criminal Justice Research Center to study the feasibility of a guidelines approach to bail in Philadelphia.  In a subsequent experimental implementation stage, NIC was joined by the National Institute of Justice.  *See* J. GOLDKAMP & M. GOTTFREDSON, *supra* note 35.  J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25.

n52  *See* J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25, at 81-84, Appendices G & H.

n53  Failure among released defendants refers to either FTA or rearrest.

n54  For a discussion of the validation procedures, see J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25, at Appendix H.

n55  As noted above, *see supra* text accompanying note 54, this predictive classification was validated on an independent sample of Philadelphia defendants.  *See also* J. Goldkamp, *supra* note 35, at 355-65.

n56  The missing numbers indicated in the figures for *Jackson* defendants resulted from the lack of relevant information in certain cases -- the partial result of a retrospective data collection procedure.

n57  As noted above, some of the defendants designated for expedited release under the *Jackson* procedures were not released, either as a result of other factors that were at first not apparent or because their cases reached disposition through dismissal, adjudication, or sentencing shortly after the lists were produced.  *See supra* text accompanying notes 47-49.

n58  It should be recalled again that the baseline sample employed a 120-day follow-up.  *See supra* note 46.

n59  The prediction equation was first developed on a sample that did not reflect Philadelphia defendants overall, but was designed to permit examination of judicial disparity in bail decisions.  It was, however, validated on an independent representative sample from the earlier Goldkamp study.  *See* J. GOLDKAMP, BAIL DECISIONMAKING, *supra* note 25, at Appendix H.

n60  *See, e.g.,* Ares, *Bail and the Indigent Accused,* 8 CRIME & DELINQ. 12, 15, (1962); Ares, *supra* note 7, at 89; COMM. ON POVERTY, *supra* note 7, at 58, 69, 75, 77; Note, *Pre-Trial Detention in the New York City Jails,* 7 COLUM. J.L. & SOC. PROBS. 350 (1971).

n61  *Compare* MICH. CONST. art I., §§ 15-16 *and* NEB. CONST. art. I, § 9 *with* D.C. CODE ANN. §§ 23-1321 to -1332 (1981 & Supp. 1983).

n62  For a comprehensive treatment of this question, see Angel, *supra* note 23, at 323-32.

n63  In fact, relatively low rates of failure on pretrial release are reported in jurisdictions around the country.  Especially rare are rearrests of released defendants for serious crimes against the person.  *See* M. Gottfredson, *supra* note 22, at 297-301; LAZAR INSTITUTE, *supra* note 27, at 20; W. THOMAS, *supra* note 6, at 234-44; Angel, *supra* note 23, at 323-24.  *See generally* J. LOCKE, PILOT STUDY, *supra* note 22.

n64  *Compare* CAL. CONST. art. I, § 12 *with* MICH. CONST. art. I, §§ 15-16 *and* NEB. CONST. art. I, § 9.

n65  If the preventive detention of persons who are only charged and not convicted, and who therefore must be presumed innocent, has been viewed as controversial (because the theory relies not only on predictions of future behavior but also on assumptions of past behavior which have not been demonstrated), then clearly rationales legitimizing pretrial detention based on risk classification would be doubly controversial.  The reason is simple: classification of defendants into a "high risk" category based on their possession of certain attributes is likely to produce a noticeable margin of the error in individual cases.  Although most members of high risk group may eventually fail to appear in court, for example, many individuals in that category, of course, would appear.  Classification handles individual defendants as members of groups or categories; they are tried under the criminal laws, however, as distinct individuals.  *See generally* Angel, *supra* note 23, at 342-47.

n66  In Stack v. Boyle, the Supreme Court alluded in dicta to "the traditional right [of the accused] to freedom before conviction." 342 U.S. 1, 4-5 (1951). This right later emerged as a presumption favoring the release of defendants under nonfinancial conditions and under least restrictive alternatives in subsequent state and federal legislation.  *See* Bail Reform Act of 1966, 18 U.S.C. § 3146 (1976). For a discussion of state bail laws, see generally J. GOLDKAMP, *supra* note 6, at 55-75.

n67  This recommendation, of course, is hardly original; it borrows directly from the approach of release under least restrictive conditions outlined in the Federal Bail Reform Act of 1966.  *See* 18 U.S.C. § 3146.